*RUFUS-ISAACS, ACLAND & GRANTHAM*
*232 North Canon Drive*
*Beverly Hills, California 90210*
*By: Jacqueline Perry (State Bar No.: 218637)*
 *Neil J. Fraser (State Bar No.: 125651)*
*Telephone: (310) 274-3803*
*Fax: (310) 860-2430*
*E-Mail: jperry@rufuslaw.com/nfraser@rufuslaw.com*

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## NORTH DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATTO IYELA GBARABE, on Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CHEVRON CORPORATION,<br><br>Defendant. | Case No.:  14-CV00173-SI<br>[Assigned to Hon. Susan Illston. Courtroom 1)<br><br>**MOTION OF PLAINTIFF NATTO IYELA GBARABE TO CERTIFY THIS CASE AS A CLASS ACTION PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE, RULE 23; MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT THEREOF; DECLARATIONS OF JACQUELINE PERRY, Q.C. & NEIL J. FRASER IN SUPPORT THEREOF; EXPERT REPORTS IN SUPPORT THEREOF; DECLARATIONS OF PLAINTIFF NATTO IYELA GBARABE IN SUPPORT THEREOF; EXHIBITS AND DECLARATIONS IN SUPPORT THEREOF; PROPOSED ORDER**<br><br>Date: November 4, 2016<br>Time: 9.00 a.m.<br>Courtroom: One |

-1-

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

1

2     **COMES NOW** plaintiff NATTO IYELA GBARABE, on behalf of himself and all other

3   similarly situated, and through his attorneys of record, and moves this court, pursuant to *Federal*

4   *Rules of Civil Procedure*, *Rule 23*, for an order certifying this cause as a class action.

5     This motion is brought on the grounds set forth in the introduction and Statement of Facts

6   below, upon the memorandum of points and authorities and declarations of lead plaintiff Natto

7   Iyela Gbarabe, and counsel Jacqueline Perry, Q.C. and Neil J. Fraser attached hereto, upon all

8   Expert Reports, Witness Statements, Declarations and other Documents attached hereto, all

9   exhibits filed concurrently herewith, all records, pleadings and papers on file herein, and upon all

10  further oral and/or documentary evidence as may be presented at time of hearing.

11

12  DATED: April 8, 2016 at Los Angeles, California.

13

14

15                    RUFUS-ISAACS, ACLAND & GRATHAM

16

17                    /s/
                      _____
18                    NEIL J. FRASER/JACQUELINE PERRY
                      Attorneys for Plaintiff
19

20

21

22

23

24

25

26

27

28

**-2-**
_____
**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 3

STATEMENT OF FACTS ........................................................................................ 5

MEMORANDUM OF POINTS AND AUTHORITIES ........................................... 10

   (A)   STANDARD OF CERTIFICATION FOR A CLASS ACTION ................................. 10

   (B)   RULE 23 (A)(1) – NUMEROSITY ........................................................................ 12

   (C)   RULE 23 (A) (2) – COMMONALITY .................................................................... 13

   (D)   RULE 23 (A) (3) – TYPICALITY .......................................................................... 14

   (E)   RULE 23 (A) (4) – ADEQUACY OF REPRESENTATION ................................... 16

   (F)   RULE 23 (B) (3) – REQUIREMENTS: 1) PREDOMINANCE ............................ 19

   (G)   RULE 23 (B) (3) – REQUIREMENTS: 2) SUPERIORITY ................................. 33

   (H)   RULE 23 IMPLIED REQUIREMENTS: 1) ASCERTAINABLE CLASS .............. 38

   (I)   RULE 23 IMPLIED REQUIREMENTS: 2) STANDING ..................................... 40

CONCLUSION ....................................................................................................... 41

DECLARATION OF JACQUELINE PERRY, Q.C. .................................................. 42

DECLARATION OF NEIL J. FRASER, ESQ. .......................................................... 52

# TABLE OF AUTHORITIES CITED

## STATUTES

*Foreign Judgments (Reciprocal Enforcement) Act (1990)* .................................................................... 36, 37, 40

## CASES

*Amchem Products, Inc. v. Windsor, 521 U.S. 591 (1997)* ................................................................. 16, 32, 34, 35

*Amgen Inc., et al v. Connecticut Retirement Plans & Trust Funds, 133 Sup.Ct. 1184, 1194-5 (2013)* ............... 11

*Bell Atlantic Corp. v. AT&T Corp., 339 F.3d 294, 306 (5th Circ. 2003)* ....................................................... 29

*Berger v. Compaq Computer Corporation, 257 F.3d 475 (5th Circ. 2001)* ................................................... 17

*Blackie v. Barrack, 524 F.2d 891, 901 (9th Circ. 1975)* .................................................................................. 11

*Brinker Restaurant Copr. V. Superior Court, (2012) 53 Cal.4th 1004* ........................................................... 30

*Chamberlan v. Ford Motor Co., 402 F.3d 952, 96, n.4 (9th Circ. 2005)* ....................................................... 30

*Comcast Corp. v. Behrend, 133 S.CT. 1426 (2013)* ................................................................................. 29, 30

*Cummings v. Connell, 316 F.3d 886, 895 (9th Circ. 2003)* ............................................................................ 10

*Dewey v. Volkswagen Aktiengesellschaft, 681 F.3d 170, 186 (3rd Circ. 2012)* ........................................... 18

*Diaz v. Romer, 961 F.2d 1508 (10th Circ. 1992)* ......................................................................................... 19

*East Tex. Motor Freight Sys. Inc. v. Rodriquez, 431 U.S. 395, 403 (1977)* ............................................ 40, 41

*Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177 (1974)* ....................................................................... 19, 37

*General Telephone Company of the Southwest v. Falcon, 457 U.S. 147, 157 (1982)* .............................. 15

*Gintis v. Bouchard Transportation Company, 09-1717 (1st Circ. 2010)* ..................................................... 35

*Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Circ. 1998)* ....................................... 12, 13, 14, 15

*Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Circ. 1992)* ....................................................... 14, 15

*In Re Alstom SA Sec.Litig., 253 F.R.D. 266, 282 (S.D.N.Y. 2008)* .............................................................. 37

*In Re Nigeria Charter Flights Contract Litigation, 233 F.R.D. 297, 301 (E.D.N.Y. 2006)* ....................... 37

*In Re Rodriguez, 695 F.3d 360, 370 (5th Circ. 2012)* ................................................................................... 40

*Leyva v. Medline Industries, Inc., 716 F.3d 510 (9th Circ. 2009)* ..................................... 29, 30, 33, 37

*Madison v. Chamlette Refining, 637 F.3d 551 (5th Circ. 2011)* ................................................................... 20

*Mullins v. Direct Digital LLC, 795 F.3d 654 (7th Circ. 2015)* ........................................................ 39

*Paton v. New Mexico Highlands University, 275 F.3d 1274, 1277 (10th Circ. 2002)* ...................... 11

*Probe v. State Teachers' Retirement System, 780 F.2d 776, 780 (9th Circ. 1986)* ........................... 40

*Robidoux v. Celani, 987 F.2d 931, 936 (2nd Circ. 1993)* ................................................................ 13

*Rodriguez v. West Publishing Corp., 563 F.3d 948, 959 (9th Circ. 2009)* ...................................... 18

*Sandwich Chef of Texas v. Reliance, 111 F.Supp. 2d 867 (2000)* ................................................... 20

*Sosna v. Iowa, 419 U.S. 393, 403 (1975)* ....................................................................................... 16

*Steering Committee v. Exxon Mobil Corp., 461 F.3d 598 (5th Circ. 2006)* ..................................... 31

*Surowitz v. Hilton Hotels Corp., 383 U.S. 363 (1997)* .................................................................... 17

*Unger v. Amedisys Inc., 401 F.3d 316 (5th Circ. 2005)* .................................................................. 20

*Valentino v. Carter-Wallace, Inc., 97 F.3d 1227 (1996)* ................................................................. 34

*Walmart Stores, Inc. v. Dukes, 131 Sup.Ct. 2541 (2010)* ................................................... 11, 13, 14

*Watson v. Shell Oil Company, 979 F.2d 1014 (5th Circ. 1992)* ....................................................... 30

*Yokoyama v. Midland National Life, 594 F.3d 1087, 1094 (9th Circ. 2010)* .............................. 29, 33

## RULES

*Federal Rules of Civil Procedure, Rule 23* ............................ 2, 3, 10, 11, 13, 14, 17, 31, 33, 34, 35, 37, 39, 41

**1.**

**INTRODUCTION**

Class certification pursuant to <u>*Federal Rules of Civil Procedure, Rule 23*</u> is dependent on the moving party's ability to satisfy various strands contained therein under *Rule 23(a)* and, in this particular action *Rule 23(b)(3).* Although the parties have stipulated that defendant Chevron will not contest certain issues for purposes of class certification, it is respectfully submitted that the Court is obligated to conduct an inquiry into each strand of *Rule 23* that must be satisfied, both in order to satisfy the prevailing law as to the rigorous analysis required, and in order to create the necessary record should the court order be subject to review.

Section 9 of the Joint Case Management Statement (ECF#63), filed on January 23, 2015, sets forth that defendant's liability, generally, is not contested for purposes of class certification, in so far as the Court's inquiry may touch on the merits of this case. However, all other aspects of *Rule 23(a)* and *(b)* are subject to determination by this Court.

Therefore, plaintiff will address the following issues under the rule through submission of evidence in the form of declarations and expert opinions, evidence that meets the foundational requirements for consideration, and supporting legal authority that this case meets all mandated strands for class certification.

The issues addressed herein are:

1.  **That plaintiff has adequately defined an ascertainable class of claimants;**

2.  **Numerosity;**

3.  **Questions of law and fact common to the class, other than those concerning liability, stipulated to be not in dispute for the instant proceedings;**

4.  **Typicality;**

-3-

5. **Adequacy of representation by the named lead plaintiff and by counsel of record;**

6. **That common issues of law and fact predominate over individual issues;**

7. **That a class action is the superior vehicle for resolving all claims and procedurally appropriate by reason of the uniformity of issues on liability, causation and damages, with the latter capable of adjudication by this Court through bifurcation, the use of subclasses pursuant to *Rule 23(c)(5),* or by use of the model for proving damages submitted with this motion for class certification; and**

8. **That separate adjudications would create a risk of inconsistent decisions that may affect and be dispositive of other class members' claims.**

The proposed class definition in the operative pleading is as follows:

**All residents of the coastal, estuarine and adjacent river or creek-situated areas of the Ekeremor, Southern Ijaw, Brass and Nembe Local Government Areas, State of Bayelsa, Federal Republic of Nigeria who, as of January 16, 2012 and thereafter, used the land, rivers, waterways, ponds, inlets, estuaries and adjacent oceanic waters for the purpose of fishing and/or farming to provide food and livelihood and who sustained articulable damage and/or diminution to said activities as a result of the explosion of defendant's exploratory gas rig as detailed herein.**

(*Fourth Amended Complaint (ECF #99), p.8; 8-14*)

-4-

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

**2.**

**STATEMENT OF FACTS**

This case arises from an horrific explosion that occurred on the 16th January 2012 involving the K.S. Endeavour (Panama) drilling rig. Fode Drilling Limited was operating the rig for and on behalf of the Chevron Corporation and was drilling gas in the North Apoi Field west of Funiwa Field, identified as Oil Block 86, some 5 nautical miles from the shoreline of the Southern Nigerian coast in the region generally known as the Niger Delta. The explosion caused a fire that raged for some 46 days before the same could be extinguished.

The Niger Delta is located in southern Nigeria. Defendants Chevron Corp., through their agent CNL, were at all material times the operator of a joint project with the Nigerian government for petroleum extraction, gas exploration and development and export from the Niger Delta.

Specifically, in January 2012 the platform rig, the KS Endeavour operated by KS Drilling for and on behalf of defendant was drilling for natural gas in the ocean off the Nigerian coast in the Funiwa field. Prior to the ultimate explosion, reports of equipment failures and smoke as well as gas build-up had been communicated to the operators. No measures were taken to close down the rig. Instead more staff was delegated to attend at the rig. For at least one week, the borehole was emitting large quantities of smoke but Defendant failed/and/or refused to permit the rig to be shutdown or evacuated. It is believed that a series of pump failures caused the build-up of gas. Gas pressures were actually showing twice the levels that were considered safe for normal operations namely

-5-

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

6000 pounds per square inch rather than 3000 pounds per square inch. Despite being informed of the gas pressure build –up and receiving actual advice from engineers on site to apply gas pressure controls and to evacuate the rig, Defendant refused or failed to heed the advice but instead ordered that drilling continue. To the best of plaintiff's knowledge and belief, Defendant had prior experience with pump failures in attempting to conduct gas exploration and had abandoned a previous exploration well some weeks earlier.

For the purposes of this certification motion, the defendant declared their intent not to contest the facts set out herein as regards the circumstances of and leading to the explosion, thus defendant is not taking issue with liability for the explosion as pled for purposes of class certification (see Section 9 of the Joint Case Management Conference Statement *(ECF 63)* filed January 23, 2015, ratified unchanged in the second Joint Case Management Statement (*ECF 114)*, filed December 4, 2015.

The defendant, by itself or through its agent, CNL, willfully refused or failed to desist from drilling, and by this case is charged with gross negligence in its conduct when it refused or failed to stop activity on the rig and indeed evacuate the same. It is averred that any and all decisions as to the whether there should be cessation of pumping and evacuation of the rig were taken by defendant, alternatively sanctioned by defendant from its headquarters in San Ramon, California. It is further averred that the decision to continue pumping and for personnel to remain on the rig was taken by the defendant or sanctioned by the defendant herein. The defendant employed a representative who was, at all material times, the Rig Superintendent with overall control on the rig. Prior to the explosion he was attending daily report meetings with the personnel on board and in particular the Offshore Installation Manager ("OIM"). Some 3 days prior to the explosion

-6-

but after the gas pressure and pumping problems had been reported, the said representative of the defendant failed to appear at any meeting and simply disappeared. Despite instructions from the defendant to continue operations on the rig as normal, the OIM took the initiative to launch the lifeboats in readiness to evacuate the rig. In the event the OIM and a driller were killed whilst saving the lives of the rest of the rig personnel.

As a consequence of the wholesale failure to take cognizance of and act upon the operational faults reported and the signs and symptoms of a gas build-up, on the morning of January 16 2012, a massive explosion occurred sending vast quantities of hydro-carbon gases into the ocean, setting off a fire that burned fiercely for some 46 days, creating pollution of both air and water which has seeped into soil, fresh water creeks, fisheries and drinking wells as well as creating trauma and fear causing the death of two rig employees.

If the defendant had ordered the rig to be shut down in response to and following the clear and unequivocal reports of the gas build up and pump failures, the explosion, resultant fire and escape of gas and other pollutants into the waters, soil and atmosphere surrounding and adjacent to the Funiwa Field would have been avoided and all damage consequent thereon. The defendant's failure to so shut down the rig was thus causative of the damage and injuries comprising the claims herein.

Expert reports are appended to this motion which have concluded that there have been significant environmental impacts and all areas have been subjected to various degrees of damage.  Dead or diseased fish and livestock, contaminated water and soil and general health breakdown within the communities due to contaminated air have all been

-7-

observed as a consequence of this explosion and fire.  The operation to extract gas from the borehole on behalf of the Defendant also involved the extraction of pollutants and waste matter to enable a clear path for the gas to be extracted. The explosion caused a massive escape of both hydrocarbon gas and pollutants from the drilling operations to be discharged into the ocean in an area only some 5 nautical miles from the shoreline. The ingress of both hydrocarbon gas and pollutants impacted upon the fish stocks within the ocean and were carried inland by tides into creeks and soil. Wells supplying fresh water were affected. Rivers inland and fed by the sea were poisoned. Additionally, the fire itself, which burned for some 46 days, killed immense fish stock. Photographs and videos were taken contemporaneously by one Alagoa Morris of the Niger Delta Resource center which show extensive areas floating debris, dead fish and the like.

Each community comprises individuals whose livelihood was reliant upon fishing and they have had their industry devastated; persons eating fish that did survive or have drunk polluted water have sustained illness and sickness caused by gas and discharged pollutants affecting both fish and water, all proximately and directly caused by the failures on the part of the defendant as alleged.

The discharged material from the explosion into the ocean has washed ashore and affected the soil which in turn has impacted upon farming and food products relied upon by communities from whom the putative class is drawn, with the consequence they have been unable to rely upon farming for sustenance or income due to the hydrocarbon and other pollutants that have impacted upon their land.

The air quality, affected by both the explosion and the fire and the toxins released as a consequence, caused common, classwide health hazards, giving rise to breathing

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

difficulties.

The lead plaintiff and the putative class members, as a whole, suffered economic loss from farming and fishing. The communities collectively hold the right of possession to the land and rights to fish rivers and in estuarine and oceanic waters abutting their communities, based upon rights embodied in custom and, to an extent, statute, notably the operative Land Act, which vests ownership in the State and Federal Government but preserves possessory rights to the indigenous population. This, and other statutes, also embody private rights to compensation, at least in principle.

Economic damages sustained include, but are not limited to, past, present and future damage, destruction, or diminution in value of assets, real and personal property, loss of income and revenue, loss of resources, loss of use, costs of clean-up, restoration, remediation, costs of public services, other damages, losses and costs as a result of the fire and hydro-carbon contamination.

The plaintiff class as a whole has sustained and suffered damage to their non-economic interests in that the actions and omissions of the defendant created an environmental catastrophe which directly impacted upon the waters and land upon which the community was dependent and for which the defendant is liable for taking all necessary steps to rectify the environmental impact of the consequences of the explosion.

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

**3.**

## MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT
## OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

### A.   *STANDARD FOR CERTIFICATION OF A CLASS ACTION:*

The decision as to whether to certify a class lies within the discretion of the District Court within the guidelines of *Federal Rules of Civil Procedure, Rule 23 (Cummings v. Connell* 316 F.3d 886, 895 (9th Circ. 2003)). Certification may be granted if the court finds the plaintiff has met all the prerequisites of *Rule 23(a)*, and at least one of the requirements of *Rule 23(b)* of the Federal Rules.

*Rule 23(a)* sets forth the four requirements which all must be met for certification; (1) **Numerosity** (the class must be so numerous as to make joinder of all members impractible; (2) **Commonality** (questions of law or fact exist that are common to the class; (3) **Typicality** (the claims or defenses of the representative parties are typical of the claims or defenses of the class; and, (4) **Adequate Representation** (the representative parties will fairly and adequately protect the interests of the class.

If the provisions of *Rule 23(a)* are met, the moving party must then establish that one or more of the grounds under *Rule 23(b)* are met. In the case at bar, plaintiff will present argument and evidence herein which satisfies, it is submitted, the provisions of *Rule 23(b)(3)* – that common questions of law or fact predominate herein and the vehicle of a class action is superior to other available methods of adjudication.

*Rule 23* grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merit questions may be considered only to the extent that they are relevant to

-10-
_____
**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

determining whether *Rule 23* prerequisites for certification are satisfied (*Amgen Inc., et al v. Connecticut Retirement Plans & Trust Funds, 133 Sup.Ct. 1184, 1194-5 (2013)*). An evaluation of the probable outcome on the merits is thus not properly part of the certification decision (*Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177 (1974)*). Thus, although a court's class certification analysis must be "rigorous", and may entail some overlap with the merits of the plaintiff's underlying claim (*Walmart Stores, Inc. v. Dukes, 131 Sup.Ct. 2541 (2010)*), the evidence submitted to demonstrate that a particular contention is, for example, common, does not mean, at certification stage, it must be proved the contention is necessarily correct (*Amgen Inc. v. Conn. Ret. Plans & Trust Funds (supra), at 1195*).

The Court is obliged to accept as true the substantive allegations made in the complaint even it the plaintiff is not able later to prove the allegations (*Blackie v. Barrack, 524 F.2d 891, 901 (9th Circ. 1975)*) and the district court's decision is subject to review only on a limited abuse of discretion standard (*Paton v. New Mexico Highlands University, 275 F.3d 1274, 1277 (10th Circ. 2002)*).

In this present case before the Court, certain aspects of *Rule 23(a)* have been stipulated not to be in issue for certification purposes, namely defendant does "not dispute there are questions of law and fact common to the proposed class", specifically "defendant's role in the events leading up the the Incident and Chevron Corporation's relationship with CNL and other entities". (Joint Case Management Statement (*ECF 63*), p. 9; 12-15 – adopted in second Case Management Statement (*ECF 114/115*), p. 19; 16-18.)

Plaintiff now examines the legal basis for class certification as it applied to the law and relevant facts and issues of this case.

-11-

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

**B.  *RULE 23(A)(1) – NUMEROSITY*:**

This is a case-specific inquiry and there is no minimum number required by law. Numerosity is satisfied if the class is so large that joinder of all members is impracticable (*Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Circ. 1998)*. General knowledge and common sense can be used to reasonably deduce the numerosity strand is met even in the absence of exact numbers.

Certainly this case - with some 12,500 claimants from community lists filed with the court, and many more potentially eligible putative class members upon certification - does not lack for numbers.

However, the real focus of the numerosity inquiry is impracticality of individual joinder. In the case at bar, the geographic location of the residences of class members alone demonstrate impracticality. All live in the Niger Delta area of Nigeria, specifically in Bayelsa State, in communities inaccessible except by waterborne transport, which requires navigation through creeks and waterways which, for decades now, have presented numerous dangers from sea pirates, rebel groups, kidnappers and even corrupt arms of the Nigerian military. It is an area riven by poverty, with little access to the courts because of a lack of funds, as is illustrated within the socio-economic report of Dr. Alagoa filed concurrently herewith. Such factors strongly support impracticality of joinder in this case.

Additionally, there is no requirement that every potential class member be identified when litigation begins. As long as the general outlines for membership in the class are determinable at the outset of litigation, a class will be deemed to exist.

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

With jurisdiction established herein through diversity and the amount in controversy not an issue at this stage of proceedings, it is also clear that judicial economy is promoted by the avoidance of multiple actions (*Robidoux v. Celani, 987 F.2d 931, 936 (2nd Circ.1993)*).

The numerosity strand is manifestly satisfied.

## C.  RULE 23(A)(2) – COMMONALITY:

*Rule 23* contains two commonality provisions, the *Rule 23(a)(2)* strand requiring a showing that there be "questions of law or fact common to the class", while *Rule 23(b)(3)* turns on whether such common questions predominate over individual ones. The latter strand will be discussed later in this brief.

The preconditions required to satisfy the *Rule 23(a)(2)* strand are less rigorous than those of its companion in commonality. Commonality under the *(a)* subsection of *Rule 23* is construed permissively and the prerequisites deemed "minimal" (*Hanlon v. Chrysler Corp. (supra at 1019)*).

There is no requirement that all questions of fact and law be common. Shared legal issues with divergent factual predicates suffice, as does a common core of salient facts coupled with disparate legal remedies within the class (*Hanlon (supra)*).

The much-cited case of *Wal-Mart v. Dukes, (supra)* affirmed this *Rule 23(a)(2)* standard, holding that class member must raise at least one contention that is central to the validity of each class member's claim only – and that need not relate specifically to, for example, the damage component of the claims. The legal requirement that class members have all suffered the same

**-13-**
_____
**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

1  injury cab be satisfied by an instance of the defendant's injurious conduct, even if the damages

2  are diverse

3       There are numerous examples of factual commonality present herein; all claims arise

4  from one source – the KS Endeavor rig explosion and its direct consequences – and defendant

5  Chevron are not disputing the existence of common issues of law, as per the aforementioned

6  Joint Case Management Statement (*ECF 63*).

7

8       Therefore, the commonality strand of *Rule 23(a)(2)* is amply satisfied in this matter.

9

10      **D.  RULE 23(A)(3) – TYPICALITY:**

11

12      The third prerequisite is satisfied if "the claims or defenses of the representative

13  parties are typical of the claims or defenses of the class". Once again the rule in this

14  regard embodies a permissive standard which hold representative claims to be "typical" if

15  they are reasonably co-extensive with those of absent class members. They need not be

16  substantially identical (*Hanlan, (supra at 1120)*). Examples of typicality include whether

17  other members have the same or similar injury, whether the action is based on conduct

18  which is not unique to the named plaintiff(s), and whether other class members have been

19  injured by the same course of conduct (*Hanon v. Dataproducts Corp., 976 F.2d 497, 508

20  (9th Circ. 1992)*). All three of the above examples are present herein.

21      Plaintiff Gbarabe's claims are essentially identical to those of the class. He lost

22  his livelihood as a fisherman – the occupation of all prospective class members by

23  reference to Professor Alagoa's socio-economic study, in the sense each of the involved

24  commutes are comprised of individuals who depend on fish catch for income and

**-14-**

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

sustenance. The loss of a way of making a living as a fisherman impacts more than just those who take to the ocean and rivers to fish, but also encompasses their families, who depend on the catch both economically and for basic subsistence. The social framework of the communities, as per Professor Alagoa, reflects the fact that they must fend for themselves, which gives rise to the social obligation to provide for those unable to contribute because of such things as age or infirmity. Consequently, the drastic drop in fish to catch impacts entire communities and every person therein.

Furthermore, all putative class members trace their damage to a single event, the Chevron rig explosion, and base their claims on identical legal theories. Since Chevron are not contesting liability for purposes of class certification, typicality of defenses is not in issue, although it is clear that there is nothing unique pled as to lead plaintiff that would separate any possible theory of defense Chevron may assert against him from those asserted against the class members as a whole.

The U.S. Supreme Court, in the leading case discussing typicality, held that the class representative had to "possess the same interest and suffer the same injury as the class members" (_General Telephone Company of the Southwest v. Falcon, 457 U.S. 147, 157 (1982)_). However, factual differences will not defeat typicality if the class representative's claims have the same essential characteristics as the class members and the claims arise from a similar course of conduct, not unique to the named plaintiff, and share the same legal theory (_Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Circ. 1992)_). It is a permissive standard and the class representative's clams are "typical" if reasonably co-extensive with absent class members. They need not be substantially identical (_Hanlon v. Chrysler Corp., (supra at 1020)_).

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

In the case at bar, the "typicality" is clearly satisfied.

### E.  RULE 23(a)(4) – ADEQUACY OF REPRESENTATION:

There are two sub-strands to this requirement – adequacy of representation must be found as to both the plaintiff class representative and as to counsel.

Regarding the class representative, the fundamental question is whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. (*Amchem Prods., Inc. v. Windsor*, *521 U.S. 591(1997)*). Essentially a factual question, the adequacy standard is met if the named plaintiff has interests common with, and not antagonistic to, those of absent class members (*Sosna v. Iowa, 419 U.S. 393, 403 (1975)*).

Natto Gbarabe, the sole lead plaintiff in this case, has already proven himself to be responsive to the demands of his position. He appeared for his deposition in San Francisco on December 9, 2015, and was responsive to defense counsel's questions. He submitted to a medical examination at the defendant's request the day before his deposition. He attended court on December 11, 2015, although his presence was not mandatory, and, by reference to the declarations of the individuals looking after the interests of the communities in which all prospective class member reside, he has the support and approval of the community leaders, who signal their satisfaction with his dissemination of information, often hosting meetings for all community representatives at the offices of case coordinator Alagoa Morris in Yenagoa, the main town in Bayelsa

-16-

State. Photographs of such update meetings are included in Professor Alagoa's report and highlight Mr. Gbarabe's responsible attitude to his position.

The lead plaintiff herein certainly satisfies the adequacy strand in the eyes of the putative class members and, it is submitted, his ongoing commitment to an active role in the case by interacting with counsel and keeping the community representatives informed of status displays an affirmative desire to protect the interests of all prospective class members

The above summation illustrates Mr. Gbarabe's adequacy for the role of lead plaintiff and satisfies the *Rule 23(a)(4)* requirements of willingness to take an active role, along with the ability to stay up with the progress of the litigation to ensure the interests of absentee class members are protected (*Berger v. Compaq Computer Corporation, 257 F.3d 475 (5th Circ. 2001)*).

The standard does not require the class representation to possess unique ability or a complete understanding of the legal issues. Rather the focus is on more practical matters and adequacy is supported by a showing that the representative demonstrated a common interest with the putative class members, has a personal stake in the suit, is in regular contact with counsel, responded to discovery, appeared for deposition and a defense medical examination, supports certification and carries the support of prospective class members in seeking such an order and shows the ability to make positive, considered decisions that are in the best interests of the putative class as a whole.

The basic purpose of the Federal Rules is to administer justice through fair trials (*Surowitz v. Holton Hotels Corp., 383 U.S. 363 (1997)*). Nothing in the record suggests that Mr. Gbarabe is anything but an adequate representative.

**-17-**

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

Adequacy receives further support in the record in this case, which a shared desire for justice among prospective class members, as well as a lack of any conflict amongst them as to their respective interests. That several different communities are involved does not raise any inference of conflicting interests. Each lie within a tightly defined geographic area within which contamination is shown to be present to a reasonable scientific certainty.

Although the creation of subclasses is sometimes necessary under *Rule 23(a)(4)* to avoid a "fundamental conflict", there is no need to do so to accommodate every instance of "differently weighted interests" (*Dewey v. Volkswagen Aktiengesellschaft, 681 F.3d 170, 186 (3rd Circ. 2012)*).  It is submitted the defined "zone of contamination", carefully drawn up by plaintiff and the product of extensive research, inquiry and investigation, both scientific and societal, creates an objectively ascertainable area from within which absentee class members could rationally be held to be capable of presenting reasonable articulable claims.

Even if any conflict amongst the class members or, indeed, class members and counsel was found to exist, it must be a "material" conflict (*Rodriguez v. West Publishing Corp., 563 F.3d 948, 959 (9th Circ. 2009)*). And the declarations attached hereto of the lead plaintiff and community representatives show an absence of antagonism, a respect for absentee prospective class members and a spirit of cooperation among the class members and their representatives.

Conflicts can usually be averted by counsel keeping in touch with the class members and their inquiries and/or concerns on a regular basis, which is clearly happening herein, and, if conflicts arise, by informing the Court and seeking appropriate

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

resolution, such as certifying a subclass to represent those with varying interests (*Diaz v. Romer*, *961 F. 2d 1508 (10th Circ. 1992)*).

Generally, the adequacy of plaintiff's counsel will be presumed in the absence of evidence to the contrary, which, it is submitted, is the case here.

However, it may be stated, as a general standard, that adequate representation requires the party's attorney be qualified, experienced and generally able to conduct the proposed litigation (*Eisen v. Carlisle & Jacquelin*, *391 F.2d 555, 562 (2nd Circ. 1968)*).

Factors include the zeal shown by moving party's counsel in litigating the matter and by the experience of the involved attorneys. The declarations of Jacqueline Perry, Q.C. and Neil J. Fraser, Esq. illustrate the dedication and zealous advocacy both have brought to this matter, and also show their consummate experience as trial lawyers in California courts and elsewhere over the decades. It is hoped the pleadings to date in the case at bar will also be found supportive of counsel's competency, commitment, knowledge of relevant law, experience and respect for legal ethics of the highest order, from the moment counsel was retained shortly before the statute of limitations and through to this moment, including the manner in which amendments have been prepared and filed with transparency, consideration to defense counsel and in accord with sound legal and ethical principles.

F.   **THE RULE 23 (b)(3) REQUIREMENTS: 1) PREDOMINANCE:**

The critical analysis in determining whether or not to certify a case such as this as a class action lies under this subsection of the rules. Moving party must demonstrate both

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

(1) that questions common to the class members predominate over questions affecting only individual members; and, (2) that class resolution is superior to alternative methods for adjudication of the controversy (*Madison v. Chamlette Refining, 637 F.3d 551 (5th Circ. 2011)*). Predominance may be ensured, even in a mass tort accident case, when a district court performs a sufficiently rigorous analysis of the means by which common and individual issues will be divided and tried where necessary (*Madison (supra at p. 556*).

However, this strand does not require a movant to prove their case at class certification. The court, however, is obligated to conduct a "rigorous analysis" of "how a trial on the merits would be conducted if a class was certified (*Sandwich Chef of Texas v. Reliance, 111 F.Supp.2d 867 (2000)*). This can touch on the merits of the case as the court must look "beyond the pleadings and understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues" (*Unger v. Amedisys Inc., 401 F.3d 316 (5th Circ. 2005)*).

What the Court needs to determine is whether Chevron, having been the cause of the rig blow-out would be called upon to meet individual claims which potentially could have inconsistent or even incompatible determinations. The class adjudication provides a ready and fair means of achieving unitary adjudication as long as the issues in common predominate over such individual ones.

The incident giving rise to this lawsuit was a single catastrophic event – the blowout explosion of Chevron's KS Endeavor exploratory rig, resulting in its utter destruction and the tragic loss of two lives on the platform.

This was no minor blast. The extreme force of the explosion is described in the

-20-

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

1  statement of Mr. Harry Harper attached hereto, an engineer who was on the rig.

2         Investigative work by plaintiff's environmental experts, Verde, revealed the

3  existence of a huge crater at the explosion site of such proportions it swallowed the

4  twisted rig wreckage whole. The existence of this crater (verified to be on the seabed

5  directly at the coordinates where the KS Endeavor was situated in the days before the

6  explosion) lends a lie to Chevron's explanation of an equipment failure leading to a

7  borehole blowout.

8         In fact, such was the force of the explosion, it blew right through the sea bed, thus

9  creating the crater effect.

10        In support of plaintiff's motion, a team environmental scientists under the

11 direction of Verde Environmental Group Inc. carried out a comprehensive Environmental

12 Assessment of the oceanic area at and around the former site of the fated rig. Their remit

13 was to:

14 •  *Complete a subsea mapping survey to establish the visual impact around the area
       of the KS Endeavor well head and identify the extent of the blowout crater.*

15 •   *Complete a Marine Benthic Assessment to identify any residual impact of the rig
        explosion and subsequent fire on the marine environment.*

                        (Verde Non-Technical Study, page 3)

16        Execution of this assignment was undertaken by Physalia Limited, whose team of

17 environmental scientists were asked:

       *"(T)o assess and describe the benthic faunal (meiofauna and macrofauna)
       communities/assemblages and their spatial distributions in the vicinity of the KS
       Endeavor blowout site (Funiwa Deep-1A exploration well);*

       *(T)o assess and describe the physico-chemical conditions of the benthic sediments
       in the vicinity of the KS Endeavor blowout site to include both natural and*

                                    **-21-**

*anthropogenic (oil- and gas-related) parameters and to determine the spatial distribution of these parameters;*

*(T)o assess/correlate the structures of the benthic fauna communities (i.e. the species present and their relative abundances at each sampling site) with the physico-chemical conditions of the seabed using multivariate analytical techniques, and;*

*(T)o identify and describe detectable residual effects of the KS Endeavor blowout on the benthic habitats and invertebrate communities four years after the initial incident.* "

(*"Residual Marine Benthic Impact Assessment"* (hereinafter *"BIR"*),  compiled by Physalia Limited and attached hereto, page 8)

Physalia's investigation was supplemented by a marine geophysical survey and sediment sampling exercise and the expedition was mounted over an eight-day period in January 2016.

The team's findings were startling.

A massive crater was found in the seabed directly under the last site of the KS Endeavor exploratory rig. This was determined to be a blast crater caused by the force of the blowout. The crater's dimensions were mapped.

The results are contained in the attached *"Appraisal Report on Marine Survey Data for Funiwa Crater"* (hereinafter *"MSD"*) authored by JF Walshe of Irish Hydrodata Ltd.

The survey establishes:

*1.      A crater is present at the location of the Funiwa 1A wellhead;*

*2.      The crater has a maximum depth of 48.1 m at mid-tide which equates to approximately 37.5m below the surrounding seabed level;*

*3.      The crater is almost circular in shape with a surface diameter of*

**-22-**

approximately 535m. It covers an area of about 200,000m$^2$;

4.   The volume of the crater below the original seabed level is estimated to be approximately 4,500,000m$^3$;

5.   Linear backscatter features observed in the water column on the sonar data may very well be indicative of ongoing gas seepages.

(*MSD, page 3*)

A color graphic of the crater (a small reproduction of which is immediately below) is found in the *MSD* at page 11 (*Figure 4.1*).



These objective findings corroborate the numerous antidotal reports from local residents in Bayelsa (see declarations of the lead plaintiff and community representatives attached hereto) that "bubbling" can still be sited at times at the former rig site. [1]

A full exposition of the Verde teams' findings, testing protocols and scientific opinions are documented with great precision in the attached 166-page report.

///

_____

[1]  A news report dated August 15, 2013 records an incident around that time whereby Chevron personnel were seen pouring over 250 bags of cement into the sea at the rig site, allegedly to seal a gas leak (Sahara Reporters). Chevron deny leakage after March 2012.

-23-

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

There are clear findings of long-term environmental impact:

"*The evidence presented in this report demonstrates unequivocally that the displacement and re-distribution of materials that emanated from the KS Endeavor crater during and following the blow-out incident resulted in long term, persistent impacts on the surrounding marine habitats.*"
*(BIR, p. 31)*

In the vicinity of the crater formed by the force of the rig explosion, a deviation from the sediment type of the surrounding waters was found. This noted modification of the sediment "granulometry" (sediment type and the relative proportions of sand and silts), is a product of the rig explosion and is categorized thus:

"*(T)he redistribution of material resulting from the KS Endeavor incident should be considered an ecological impact.* "

*(BIR, p. 32)*

In fact, the Verde team's findings further corroborate the local population's persistent complaints – and the marine survey data - that gas leakage at the rig site has never ceased since the January 2012 blowout:

"*There was evidence from both the field sampling observations and the nematode community data to show that the benthic habitats in the vicinity of the KS Endeavor blowout were subjected to persistent and on-going perturbations.*"

*(BIR, p. 32)*

Observational evidence documented as part of Physalia's fieldwork programme offered corroboration:

"*The fact that surface sands were evident during the January/February 2016 field survey indicates that sands had been deposited within this area in the relatively recent past. Given that the only rational source of sands in this area would have been the KS Endeavor blowout crater, these observations indicate that sporadic displacement of sands from the crater is still occurring. This would occur only had there been significant quantities of gas emitted through the sandy substrata beneath the former well head site.*" *(BIR, p. 32)*

-24-

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

It is moving party's position that the Court must draw the inexorable inference that it is reasonably probable the declaration testimony of plaintiff and other lay witnesses is accurate and that persistent gas leakage from the explosion crater formed as a direct result of the ferocity of the blast is strong inferential evidence of the class-wide complaints of low fish yield throughout the area and communities impacted in the four years since the rig's fiery end. It is undisputed that the rig location a mere 5 nautical miles from the Southern Ijaw coastline, with Koluama the nearest community but all other communities within eyesight distance of the rig.

Fishing was the common occupation of all the named communities in this lawsuit, both for subsistence and as the area's main economic driver, as of January 16, 2012. The importance of this occupation is documented by Professor Ebiegberi J. Alagoa, Bayelsa's most eminent historian, in his Socio-Economic Report attached hereto, commissioned to examine the effects of the rig explosion on the area of impact and the communities located therein.

His field report findings are detailed, firsthand and deeply sourced, on page 10 of the report, it is opined that:

> "*The impact of the K.S Endeavour Rig Explosion at the Chevron Apoi North Facility off the Bayelsa Coastal Communities was widespread. It can be seen in the* **Bio-Physical Environment** *(in the form of noise pollution, earth vibrations causing cracks in the wells and buildings, and the acceleration of sea encroachment and blocking of waterways); in the* **Traditional Economy** *(in terms of the disappearance of some fish species and other marine resources; the appearance of new/strange sea-weeds that impede normal fishery activities; the drastic decline in fish output and the emigration of many fisherfolk to other lands and 'greener pastures'. Others are the forced importation of "ice" or frozen fish from abroad into the coastal communities; the increasing pauperization of the people; decline in the demand for new woven fishing gears and associated accessories, as well as the decline in the demand for new labor and apprentices). Its impact is also obvious in the* **Socio-Cultural life and activities of the People***

-25-

*(especially in the desecration of the traditional religious beliefs and cultural values as well as institutions; and its impact on health and sanitation). It also produced some **Socio-Political Impact.** The incidence of the K.S Endeavor Rig Explosion has exposed more than ever before, the weaknesses of the Nigerian socio-political institutions, especially the judicial system and the functioning of the Ministries of Environment at the State and Federal levels. It has also led to, among other things, the disruption of family structure and bonds; and the collapse in morals, social values and security in the communities."*

Professor Alagoa notes the coastal communities of Bayelsa State traditionally have always enjoyed "*the longest coastline among the maritime states of Nigeria measuring approximately 200km*" (*Alagoa report, p. 119*). Prior to the subject explosion, "*records indicate that the Bayelsa coast was one of the richest fishing grounds in the world*" (ibid), its geophysical characteristics allowing a "*diverse assemblage of fishery resources making it the home of active artisanal and industrial fishing activities*" (ibid).

Fishing has been the dominant occupation of all communities in the impacted area and for the vast majority of the people in this coastal region from which the putative class is drawn. Professor Alagoa determined some 80% of the populace described their primary occupation as fishermen, most for many years. The industry provided sustenance as well as significant and lucrative trading opportunities.

The devastation of the fishing lifestyle and industry is borne out by the scientific studies into the effect of the rig explosion performed by Professor J.F.N. Abowei, a fisheries and aquatic pollution expert, who carried out several objective scientific studies of the affected area in April/May 2012.

Prof. Abowei's findings, attached hereto, established a profound effect on human and aquatic life through study of:

-26-

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

*"Plankton species composition;*
*Benthic macro fauna species composition;*
*Condition factor, mortality, exploitation ratio and catch per unit effort of*
*Lagocephacelus laevigatus (Tarpon); and*
*Fish species composition, histology, shrimp fishery and fishing gear types."*

The Professor's published reports on the above are attached hereto.

It was found that "(f)ishing is the major occupation of the inhabitants. It is carried out both at commercial and subsistent levels. The fish species landed, their relative abundance and distribution were very low. Most of the fish species were rare and few, few were common but none was abundant and dominant. This is not normal in a marine environment, especially in the Atlantic Ocean. In fact, further investigation need to be done to ascertain if the pollution is not continuing." (*Abowei Summary Report, p.11-12*)

Professor Abowei's 2012 findings dovetail with Verde's 2016 discoveries. The professor's studies revealed a reduction of phytoplankton species which was an indication of reduction of primary productivity. He opined that such a reduction "*can affect the food chain and destroy breeding grounds and subsequent fish mortality; migration and growth, recruitment and ecosystem overfishing resulting in a decline most especially when the pollution continues*" (*Summary Report, Section 3.1, p.9*). The inexorable inference to be drawn from the combined lay and antidotal evidence and the objective scientific findings is that the almost total destruction of the fishing culture and industry in the contaminated area is traceable to one event, standing alone – the KS Endeavor explosion.

The economic impact on the fishing industry is capable, it is submitted, of calculation on a classwide basis. The putative class suffered in common the loss of multiple sea creatures. For a 46-day period after the blowout, the consequent fire made fishing unsafe. Most individuals in the affected area attempted to take up their trade again when the fire went out in March 2012, only to

-27-

find, across the communities identified herein, a dramatic and crippling decline in stock. Some species such as oysters, all but disappeared completely.

Professor Alagoa's report speaks of the "*pauperization*" of the area, with a dramatic decline in income recorded area-wide. (Socio-Economic Report, Section 4.2.3.7, *et seq*. The dominant fishing industry's woes have had a knock-on effect throughout their entire economy, precipitating a decline in all the other cottage industries and occupations throughout the area. The socio-economic effects recorded are disturbing and profound and the rapid decline of business and opportunity is assembled in statistical data form from which the forensic accounting firm of HSNO build a framework for a workable damage model, presented here for the Court's consideration.

Health issues also manifested in similar ways throughout the class area. For the inhabitants of the Bayelsan coastal region wherein the named communities lie, the percussive effect of the explosion woke them from their sleep and began their waking nightmare. Centered five nautical miles from shore, the explosion was forceful enough to damage buildings on land, as is illustrated by the attached video stills of Koluama 11 shot by Alagoa Morris some two weeks after the blast. The noise and the vibrations were such that some inhabitants believed that they were experiencing an earthquake or under-sea volcanic eruption.

The ensuing effects from the gas fire, which raged on and under the sea for 46 days, caused widespread common ailments reported by residents of all nearby coastal communities.

Manifest in every represented community were complaints of breathing difficulty, stomach and intestinal problems (the latter being the result of unwittingly eating contaminated fish or drinking polluted water from affected wells). Skin rashes and

-28-

blistering was reported throughout the communities herein.

Cause and effect is evident from the evidentiary submissions in support of this motion on both a scientific and socio-economic level.

Although defendant Chevron are not contesting liability *per* se at this stage, the issue of causation remains a primary area of dispute. Thus the pled damage alleged to stem from the defendant's actions that created their legal liability must be addressed and, for that purpose, we submit a damages study to provide the Court with some measure of plaintiff's approach to "the translation of the legal theory of the harmful event into an analysis of the economic impact of that event" *Comcast Corp. v. Behrend, 133 S.Ct 1426.*

As the Supreme Court held in *Comcast*, it is moving party's burden to work up and present a model regarding how to handle the damages issue so that this Court can address, at least in a prospective manner, whether plaintiff can tender to the Court a workable trial plan which includes a viable methodology for adjudicating each aspect of the litigation, especially the issue of damages. Furthermore, the model(s) submitted must be specific and delineated as to each theory of recovery as "a model purporting to serve as evidence of damages must measure only those damages attributable to that theory".

The 9th Circuit's treatment of commonality and predominance questions after *Comcast* has made it clear that "in this circuit, damage calculations alone cannot defeat certification" (*Yokoyama v. Midland National Life, 594 F.3d 1087, 1094 (9th Circ. 2010)*). As was held in *Bell Atlantic Corp. v. AT&T Corp., 339 F.3d 294, 306 (5th Circ. 2003)*), "even wide disparity among class members as to the amount of damages" does not preclude class certification.

It is an abuse of discretion to deny certification simply because a damages inquiry will be highly individualized. As was noted in so ruling in the case of *Leyva v. Medline Industries, Inc.,*

-29-

*716 F.3d 510 (9th Circ. 2009)*), in almost every class action, factual determination of damages to individual class members must be made. Citing with approval to the California Supreme Court case of <u>*Brinker Restaurant Corp. v. Superior Court, (2012) 53 Cal.4th 1004*</u>, the *Leyva* court noted "we know of no case" where the factual determination of individual damages "has prevented a court from aiding the class to obtain its just restitution. Indeed, to decertify a class on the issue of damages or restitution may well be effectively to sound the death-knell of the class action device (<u>*Leyva, (supra, at p. 513-4)*</u>).

When, as here, predominance is based upon common issues of liability, and not on common issues of damages as a primary focus, the <u>*Comcast*</u> case is inapposite, rendering whether or nor a classwide measurement of damages is required at certification arguably irrelevant to a decision herein.

In the case at bar, Chevron's liability for negligence and punitive damages arise out of the same event, and that one event only. Chevron is the only defendant and has not cross-complained against any other party they claim share fault. The punitive damages inquiry focuses primarily on the egregiousness of the defendant's conduct Therefore the degree of culpability underlying a single act, and hence the propriety of imposing punitive damages as a result of that act should not markedly vary, if at all, from class member to class member. If appropriate when such determinations must be made, several alternatives are available within a trial plan. In this respect, the claims of a cross-section of the plaintiff class can be considered in assessing the propriety of punitive damages (<u>*Watson v. Shell Oil Company, 979 F.2d 1014 (5th Circ. 1992)*</u>).

There is no hard and fast requirement that plaintiff must submit a viable trial plan for proceeding as a class action (<u>*Chamberlan v. Ford Motor Co., 402 F.3d 952, 96, n.4 (9th Circ. 2005)*</u>). Nevertheless, it behooves plaintiff to provide a damages model framework to assist the

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

court in determining the predominance question herein and reference is made to the report of HSNO attached hereto.

The court holding in the case of  *Steering Committee v. Exxon Mobil Corp., 461 F.3d 598 (5th Circ. 2006)* is instructive, even though it upheld a denial of class certification.

The plaintiffs failed in *Steering* to present a workable plan for case management if the matter was certified. Because primary issues (presented through expert testimony) that turned on location, exposure, dose, susceptibility to illness, nature of symptoms, type and cost of medical treatment, property damage, loss of business etc. were found to be part of what had to still be adjudicated, certification was denied in the absence of an acceptable mathematical or formulaic method of calculation of individual damages within a class setting. The absence of a presentation of a workable model by plaintiffs led to a finding that "the damages issue may predominate over any common issues shared by the class".

But, therein, plaintiffs never suggested the use of bifurcation and/or subclasses, options that expressly discussed herein, Furthermore, the *Steering* court may it clear that their decision did not alter the fact that it is indeed "possible to satisfy the predominance …. requirements of *Rule 23(b)(3)* in a mass tort or mass accident class action" despite the particular need in such cases for individualized damages calculations.

The case at bar contains elements which actually make adjudication by class action entirely appropriate in both liability and damages phases. First of all, there are familiar methods open to the court to nullify any question of a damages issue predominating. One, it is suggested is to consider bifurcation of the case at bar into separate stages, requiring liability to be litigated first as a class action and, if found adverse to defendant, to then determine whether or not

-31-

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

damages can also be addressed in a class setting, or, at that point, reconsidering the issue of predominance.

Another viable option, for now or later, is to consider dividing the class into sub-classes should the Court be concerned that damage issues may vary from commonality from, say, community to community.

The phased trial of common issues in this case would undoubtedly prevent the repitious re-litigation of these common issues by each individual claimant in thousands of separate lawsuits. A class action would therefore "achieve economies of time, effort, and expense, and promote …. uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bring about other undesirable results" (*Amchem Products, Inc. v. Windsor, 521 U.S. 591, 615 (1997)*).

It is an indisputable fact that localized mass disasters and environmental torts normally produce injuries which share the unities of time, place, circumstances, and general causation. These unities, standing alone, create a substantial factual basis common to all individual claims, which can be categorized as:

    a.   The events prior to the occurrence of the tort;

    b.   The occurrence and nature of the wrong;

    c.   The identity of the party or parties responsible for the tort;

    d.   The standard of care owed to the members of the class by the defendant(s);

    e.   The legal liability, if any, of the defendant(s) responsible for the damages to the class members; and

    f.   The amount of punitive damages, if any, which are just and proper.

In the case at bar, these common factors are even more pronounced than in many mass tort cases – there is a single occurrence, liability for which is not disputed by Chevron for

-32-

purposes of certification, thus clearly identifying one defendant, who owed an identical standard of care to all putative class members and whose liability for damages is not diluted by any issues of comparative fault.

In the conspicuous absence of any individual issues pertaining to contributory negligence or other such considerations, the putative class herein presents an unusual degree of homogeneity with regard to the fundamental issues of liability.

Furthermore, as previously stated, issues relating to individual damage claims and damages calculations do not alone defeat class certification (*Leyva v. Medline Industries Inc. (supra); Yokoyama v. Midland (supra)*).

Under the undisputed and indisputable facts of this matter, it is clear that the predominance requirement of *Rule 23(b)(3)* is fully met.

Therefore, we now turn towards the second strand which is required to be addressed and its prerequisites met; Superiority.

## G.  RULE 23(b)(3) REQUIREMENTS: 2) SUPERIORITY:

In determining the superiority of the class action device in litigation such as this case, a comparison with other alternatives is necessary to adjudge whether a class action would achieve economies of time, effort and expense, sufficiently safeguards the rights of the litigants, and offer a manageability rationale better than clogging a court calendar with thousands of individual lawsuits arising from the same occurrence.

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

It therefore must be demonstrated that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy (*Federal Rules of Civil Procedure, Rule 23(b)(3)*).

First of all, where, as here, classwide litigation of common issues will reduce litigation costs and promote greater efficiency, a class action is a methodology superior to other forms of litigation, especially if no realistic alternative exists (*Valentino v. Carter-Wallace, Inc.* 97 F.3d 1227 (1996)).

In the case at bar, it is common sense that the generally impoverished people of the coastal communities of Bayelsa State, Nigeria would not be able to file individual actions for damages in this Court, not only because of the distances involved (and indeed the inherent difficulties of travelling any distance from their home communities, given the only mode available is by boat and necessarily involves travel through creeks and/or open water where danger in the form of kidnappers, criminal gangs, sea pirates and remnants of rebel units lurk.

The economic circumstances of the prospective class members are discussed at length in Professor Alagoa's "*Socio-Economic Report on the Effects of the KS Endeavor Rig Explosion on the Coastal Communities of Bayelsa*" attached hereto. This report thoroughly supports the concept of the class action as not only the superior method, but, in reality, the only viable method of adjudication open to the Bayelsan people damaged by the KS Endeavor rig explosion.

Furthermore, the class action mechanism exists to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights (*Amchem Products, Inc. v. Windsor, 521 U.S. 591, 617 (1997)*). The expense of individually litigating the claims embodied herein plainly speaks to the superiority of the class action.

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

The *Amchem (supra)* holding also makes clear that mass tort cases arising from a common cause or disaster may satisfy the predominance requirement. Such cases may also satisfy the superiority prerequisite when common evidence will suffice to prove injury, causation and compensatory damages for at least a very substantial proportion of the claims that can be brought by putative class members (*Gintis v. Bouchard Transportation Company, 09-1717 (1st Circ. 2010)*).

There is no doubt that the claims in this case at bar, if individually litigated, would require repetitious resolution of issues common to each one of them and that even applies to the affirmative defenses raised by defendant, at least in a high proportion of the cases if tried individually. This the class action is superior to individual actions by putative class members (*Gintis, (supra)*).

The court will also consider "the extent and nature of any litigation concerning the controversy already begun by or against class members" under *Rule 23(b)(3)* as part of the superiority equation and, in this matter, it is believed defendant may refer to some 49 or so cases they have identified as having been filed in Nigerian courts in connection with the KS Endeavor blowout.

However, counsel for the putative class herein have already done their own "rigorous analysis" of prospective class members and, in a recent re-check, specifically inquired into whether any class members were a party to any Nigerian litigation over the 2012 explosion. Prospective claimants were specifically informed they could only seek one remedy in one case in one court and must choose just one avenue if a plaintiff in any other case than this one.

Counsel also has a Nigerian-based lawyer checking the plaintiffs listed in all known Nigerian litigation to ensure there is no overlap of clientele. At this time, none have been

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

identified but, should any names in the future appear in other, as well as this, litigation, immediate steps will be taken to remedy the situation, even if the most appropriate solution is dropping such an individual from the class.

This constant vigilance has been conducted with full transparency so that Chevron are made aware of any realignment of this case to conform to legal requirements and has already seen the dismissal of five original lead plaintiffs who failed to provide proof of claim or discovery responses in a timely manner. In line with counsel's ethical duties, cooperation with Chevron was provided upon request in the form of a declaration regarding the unanswered plaintiffs, which allowed for an expeditious determination that said plaintiffs should be dismissed from the litigation by court order.

However, even if there is Nigerian litigation on the same set of facts, it does not impact on the superiority of the class action mechanism herein. As is set forth in the expert opinion of Oba Nsugbe, Q.C. presented in declaration form herewith, Nigerian courts have statutory authority to recognize, and even enforce, judgments of U.S. courts under an Act entitled the _Foreign Judgments (Reciprocal Enforcement) Act of 1990_, under whose provisions there is "recognition of the principle of _res judicata_ in regard to adjudicated cases in the U.S.A." (Declaration of Oba Nsugbe, Q.C. attached hereto and incorporated herein by reference, p.3; 15).

Consequently, "a Nigerian court may recognize such a foreign judgment as the basis to resist and dismiss local proceedings brought in Nigeria that have already been subject to completed proceedings in a court of the United States between the same parties and relating to the same subject matter" (Decl. p. 3; 17-19).

A copy of the Act is attached to the learned barrister's declaration, along with his _curriculum vitae_ showing his impressive legal qualifications and admittance to the Bar in both

-36-

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

the U.K. and Nigeria. Section 3 of the *Foreign Judgments (Reciprocal Enforcement) Act of 1990*

states:

> 3. (1) The Minister of Justice if he is satisfied that, in the event of the benefits conferred by this Part of this Act being extended to judgments given in the superior courts of any foreign country, substantial reciprocity of treatment will be assured as respects the enforcement in that foreign country of judgments given in the superior courts in Nigeria, may by order direct—
>
> *(a) that this Part of this Act shall extend to that foreign country; and*
> *(b) that such courts of that foreign country as are specific in the order shall be deemed superior courts of that*
>
> country for the purposes of this Part of this Act.

It is clear that U.S. judgments fall under the purview of the Act.

In regard to class certification, moving party has only to show whether "the Foreign Courts would probably recognize as preclusive any judgment rendered by (a U.S.) Court (*In Re Alstom SA Sec.Litig.*, 253 F.R.D. 266, 282 (S.D.N.Y. 2008)*).

The issue is not whether the Nigerian courts *will* apply res judicata to any U.S. Court's judgment at this stage, only that it *can*. That it can is set forth in the Act of 1990.

A court generally should not examine the merits of the case in determining whether to certify a class pursuant to *Rule 23*. (*Eisen v. Carlisle Jacquelin*, 417 U.S. 156, 177 (1974)*).  Furthermore, "[T]he spectre of having to apply different substantive law does not warrant refusing to certify a class" (*In Re Nigeria Charter Flights Contract Litigation* 233 F.R.D. 297, 301 (E.D.N.Y. 2006)*).

In regard to manageability, damages and individual variations are not a reason to deny certification (*Leyva v. Medline (supra)*). Nevertheless, plaintiff submits a

-37-

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

framework for a damage model herein capable of common proof. In summary, the plan

will operate as follows:

"*Loss of earnings damages will be computed for persons living in communities that demonstrate a reduction in post-explosion harvest. The time period the class members were impacted will be identified consistent with the closure or impairment of the geographical areas relied upon by the class members between January 16, 2012 and until the harvest has recovered. Based upon class members' answers to questionnaires and interviews, loss of revenue will be computed by multiplying the lost catch quantities that would have been sold by the price the catch would have sold for if not for the explosion. Non-continuing expenses, if any, will be computed based upon class members' answers to questionnaires and interviews. Non-continuing expenses, if any, will be deducted from the loss of revenue to arrive at the loss of earnings.*"

*(H.S.N.O. Damage Model)*

And, in fact, the parties are already discussing elements of a trial plan in the most recent stipulation filed with the court, under whose terms such matters as deposition of a certain number of putative class members as a cross-section representative sampling (Stipulation filed March 22, 2016 (*ECF #122), p. 1; 15-18).*

As discussed infra, the availability of such procedural devices as bifurcation and subclasses clearly indicate that this case is manageable under *Rule 23* and the most appropriate vehicle for the exercise of fair and equitable justice to all parties.

## H.  RULE 23 IMPLIED REQUIREMENTS: 1) ASCERTAINABLE CLASS:

It is an implicit requirement for class certification that the named class representative has standing and that the class itself is ascertainable.

The latter strand looks to whether the proposed class is defined in such terms as to allow the court to determine, by objective criteria, its parameters. A proposed class may not be drawn in vague or overbroad terms –a court must consider "the likely difficulties

**-38-**

in managing a class action," but, in doing so, it must balance countervailing interests to decide whether a class action "is superior to other available methods for fairly and efficiently adjudicating the controversy." (*Federal Rules of Civil Procedure, Rule 23(b)(3)*).

. How this question is resolved in an area in flux between the Circuits at this time but the rationale applied by the 7th Circuit in the case of *Mullins v. Direct Digital LLC, 795 F.3d 654 (7th Circ. 2015)*) would appear wholly appropriate to the case at bar.

The *Mullins* court looked for clear definition of the class. To avoid vagueness, class definitions generally need to identify a particular group, harmed during a particular time frame, in a particular location, in a particular way. To avoid a problem of subjective definition, an objective class may pass the ascertainability test by defining the class in terms of conduct (an objective fact) rather than a state of mind. And a class should also be one which allows for all claims to be litigated to conclusion in one action. (*Mullins, (supra at pps. 659-660)*).

In the case at bar, the definition of the putative class adheres to these objective criteria. It identifies a particular group of individuals harmed in a particular way during a specific period in a particular area.

State of mind is not a factor – the class definition does not allow for an individual who "believes" in his own mind that he may have suffered distress over the rig explosion. To qualify as a class member, an individual must have be located within a defined geographical "zone of contamination" whose boundaries are drawn narrowly to only include an area that sustained damage shown, to a reasonable scientific probability, to be apparent.

Finally, the declaration of Oba Nsugbe, Q.C., a prominent U.K. barrister and Nigerian SAN eminently qualified, by reference to his submitted and attested to

-39-

---

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

*curriculum vitae*, to provide an expert opinion on Nigerian law and legal procedure, opines, in support of this class certification motion, that the principles of *res judicata* can be applied in Nigerian courts through Nigeria's statute entitled the <u>*Foreign Judgments (Reciprocal Enforcement) Act (1990)*</u>, whose provisions enable recognition of a U.S. court's judgment to preclude the same parties litigating the same subject matter in Nigeria. Thus the defendant herein is shielded from the possibility of another round of litigation in that country.

The possibility that some claimants may fail to prevail on their individual claims will not defeat class membership in relation to the ascertainability requirement (<u>*In Re Rodriguez*</u>, *695 F.3d 360, 370 (5th Circ. 2012)*). And a class may be certified without the court identifying every potential member at that stage. Class members may inevitably be added or dropped during the course of the action without disturbing class action status in the class is ascertainable, as here, by its definition (<u>*Probe v. State Teachers' Retirement System*</u>, *780 F.2d 776, 780 (9th Circ. 1986)*).

Therefore, the implied strand of ascertainability is clearly satisfied by the class definition herein.


I.   <u>**RULE 23 IMPLIED REQUIREMENTS: 2) STANDING:**</u>

To have standing to sue as a class representative, it is essential that the named plaintiff be a member of the class and "possess the same interest and suffer the same injury shared by all members of the class" represented and he or she must be a member of the class at the time the class is certified (<u>*East Tex. Motor Freight Sys. Inc. v.*</u>

-40-

*Rodriquez, 431 U.S. 395, 403 (1977)).* By reference to the supporting evidence hereto, notably the declaration of lead plaintiff Gbarabe and those of the community leaders acting as liaison between their communities and the lead plaintiff, Natto Gbarabe clearly exhibits he possesses the necessary standing.

**4.**

**CONCLUSION**

**WHEREFORE**, based upon the submissions above regarding the prerequisites of *Rule 23* to certifying a matter as a class action, and the supporting opinions, documents and other exhibits attached hereto, as well as all papers, pleadings and other material on file herein, it is respectfully submitted that this case is suitable for class action adjudication and that it be certified as such for further proceedings.

DATED: April 8, 2016 at Los Angeles, California.

RUFUS-ISAACS, ACLAND & GRANTHAM

_____/s/_____
NEIL FRASER/JACQUELINE PERRY
Attorneys for Plaintiff

**-41-**

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

1  | *RUFUS-ISAACS, ACLAND & GRANTHAM*
2  | **By: Jacqueline Perry, Q.C. (State Bar No.: 218637)**
   |    *Neil J. Fraser. Esq. (State Bar No.: 125651)*
3  | *232 North Canon Drive*
   | *Beverly Hills, California 90210*
4  | *Phone:     (213) 324-4206*
   | *Fax:        (310) 860-2430*
5  | E-Mail: neil53@mac.com/ jperry@rufuslaw.com

7  | Attorneys for Plaintiff

10 | **UNITED STATES DISTRICT COURT**

11 | **NORTH DISTRICT OF CALIFORNIA**

13 | NATTO IYELA GBARABE, etc.,          | CASE NO. **14-cv-00173-SI**
14 |                      Plaintiff,        | **(Assigned to Hon. Susan Illston, Courtroom 1)**
15 | vs.                                   | **DECLARATION OF JACQUELINE PERRY Q.C.**
16 | CHEVRON CORPORATION,
17 |                      Defendant.

1

## DECLARATION OF JACQUELINE A. PERRY Q.C.

2

3       I, JACQUELINE PERRY, declare and state as follows:

4   My business address is 232 North Canon Drive, Beverly Hills, California 90210 and I am one of the

5   attorneys of record for plaintiffs herein. I have firsthand knowledge of the facts set forth herein and,

6   if called as a witness, I could and would competently testify to the following:

7       I am a qualified attorney in California and I have been so qualified since 2001. I have

8   been practicing law in California since shortly after I qualified.  I am also Queen's Counsel and

9   a Barrister qualified to practice law in England and Wales.

10      I was called to the Bar in 1975 in England and attained the rank of Queen's Counsel,

11  appointed by letters patent in 2006 to be one of "Her Majesty's Counsel learned in the law." I

12  maintain my English practice at 2 Temple Gardens, Temple, London  EC4.

13      I have mainly specialized in complex civil cases and in recent years I have been

14  involved in a good deal of group litigation including, pertinently, acting on behalf of 7500

15  individuals joined in a group action against Shell Petroleum Company of Nigeria arising out of

16  a serious oil spill which occurred in 2008 in the Bodo area of Rivers State, Nigeria. In the event

17  the matter was resolved by a negotiated settlement Agreement which was executed in August

18  2014.

19      I am presently Leading Counsel in a group action against Glaxo Smith Kline which is

20  proceedings in the English courts and I have just completed a lengthy trial in the Commercial

21  Court in London in which I was leading Counsel for almost 6000 Ivorians seeking to recover

22  entitlement in respect of the pollution dump carried out by the company Trafigura in the Cote

23  D'Ivoire. The claim was brought in respect of the professional liability of my clients' former

24  solicitors.

25

26

27

28

My CV is attached from which it will be seen that I maintain a flourishing practice both in the English Courts as well as the Californian courts and I have considerable litigation experience in both jurisdictions. I am a Fellow of the International Academy of Trial Lawyers having been nominated by existing fellows and accepted through the exacting Committee of this organization.

Mr. Fraser and I have worked enthusiastically and diligently on the present matter throughout from the time when we first received instructions through a London solicitor. We have sought to ensure that the case is properly and ethically presented so that any areas of concern involving possibly untenable claims have been stripped from the case and we have further ensured that we work only with those of impeccable reputation and standing. I actually teach ethics for my Inn of Court (Gray's Inn) and I was invited for a 3 tenure to sit on the English Bar Council's Professional Conduct Committee. Thus it has been of utmost importance to both Mr. Fraser and myself to ensure that the highest standards of integrity are brought to this matter and the defendant has been kept informed throughout of steps taken by us to conform with that standard of presentation.

We have brought diligence and commitment to the case and we have been able to carry out all that is required of us to prosecute the matter effectively. Where we have required assistance in preparation, we have ensured that such assistance is available. We have adequate office facilities in California to enable us to do whatever is required for the matter and we both have long-standing experience in conducting complex litigation. Furthermore, we have the ability to call upon my own chambers' facilities as or when required so that, for example, there are planned depositions to take place in London at the end of this month and my conference rooms in 2 Temple Gardens have been made available for this task.

1       I hereby upon oath and affirmation of belief and personal knowledge swear that the

2 foregoing is true and correct to the best of my knowledge.

3

4       I further acknowledge and expressly agree that a scanned and emailed signed copy of

5 this statement shall be deemed an original signed statement for all purposes.

6

7       Executed this 8th day of April 2016 at Temple, City of London, United Kingdom.

8

9                             /s/

                           JACQUELINE A. PERRY Q.C.

10                                  Declarant

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



# JACQUELINE A. PERRY QC

**SILK: 2006 CALL: 1975**

Jacqueline's areas of work span contract and tort. She handles commercial matters both in the UK and the US as well as personal injury, clinical negligence, insurance and product liability.

In recent times Jacqueline has been involved in high profile group actions against multi-national corporations including amongst her clients.

Jacqueline has acted for both claimants and defendants in very high-profile, public interest cases. She has acted for local authorities and insurers as well as received significant instructions from trades' unions and Government departments, the Police and the Fire Brigade. She has acted for claimants in cases arising out of major disasters, including the original and recent Thalidomide claims and she is instructed in major multi-party matters.

She is highly thought of by her professional clients, who instruct her in the sure knowledge of her thoroughness, fearlessness and sound and sensitive approach to all aspects of her work.

As a qualified and practising Californian lawyer, Jacqueline has consolidated her field of expertise in this jurisdiction and she has successfully litigated in front of civil juries in the California Superior Court in multi-million dollar claims. She is "Of Counsel" at Rufus-Isaacs, Acland & Grantham, Beverly Hills.

In all areas of her work, Jacqueline has frequently successfully pioneered arguments and points of law or practice.

## Commercial/International

Jacqueline is involved in both England and in Californian multi-million pound claims against major international oil companies arising out of oil spillages and explosions which have had catastrophic human and environmental impact.

Jacqueline successfully negotiated a multi-million pound settlement for some 7500 citizens of the Bodo region in the Delta area of the Republic of Nigeria arising from serious oil spills perpetrated by Shell Nigeria.

She has recently been leading in a professional negligence case which was litigated in the Commercial court against Leigh Day solicitors arising from the Trafigura pollution in the Ivory Coast. She was instructed in behalf of nearly 6000 Ivorians who were deprived of their compensation following the settlement with Trafigura.

In 2015 she argued a complex matter for clients in St. Lucia in the Privy Council on the interpretation of the St. Lucia civil code as it applied to a dispute on a hypothec between her clients and the First Caribbean International Bank.

Jacqueline is co-counsel with Neil Fraser Esq., her partner in ongoing litigation against Chevron Corporation which is being conducted in the federal Court in San Francisco. The claim arises from a catastrophic explosion on the rig KS Endeavor which occurred in January 2012 just off the coast of Bayelsa State, Nigeria. The client cohort comprises some 12500 persons all residing in the coastal plains whose livelihoods and lifestyles have been severely impacted by the blow-up and 46 day gas conflagration which ensued.

Jacqueline was also instructed in an appeal from the Court of Appeal to the Supreme Court in a claim against the Bank of Scotland  She has a number of ongoing instructions arising out of fraudulent and/or negligent advice connected with large investment schemes as well as an instruction from a liquidator arising from negligent tax advice to the underlying corporate entity.

Jacqueline is now associated with the Beverly Hills firm of Rufus-Isaacs, Acland & Grantham. The firm comprises litigators (dual qualified barristers) and transactional attorneys (dual qualified solicitors).

A part of the work is associated with the entertainment industry and commercial and insurance work and, to that end, Jacqueline has advised in matters involving world famous celebrities (Stevie Wonder) and successfully resolved issues and drafted the necessary agreements arising from an IP dispute between employees of a Tennessee Company, its Californian licensee and a subsidiary company in Bristol, England. She has advised in claims ranging between clients in New York, conducting business in Dubai with a company and director in California.

In 2012, Jacqueline was asked to advise on both procedure and substantive issues in respect of a claim by a Californian, injured when disembarking a plane in London, who sued in Federal court in California.

In 2008, Jacqueline succeeded in obtaining a unanimous jury award of more than £3 million on behalf of a sub-contractor against one of the world's largest construction corporations (*Manufacturing Automation Solutions Inc v Kiewit Pacific Co*). The case required careful explanation and clarity in interpretation and exposition to a civil jury of contract terms, specifications and change orders in the context of a complex project involving the installations of control systems into an LA County water pumping station.

Jacqueline has had numerous cases to advise upon, from instructing solicitors in the Isle of Man and has several substantial matters extant.


## Product Liability

From the mid-90's and still continuing today, Jacqueline has been advising the victims of the drug Thalidomide in respect of the funding that needed to be substantially increased for them. On several successful occasions over the many years, Jacqueline has "taken on" Guinness PLC, then Diageo PLC, as well as HM Government and she has been instrumental in obtaining many millions of pounds for these claimants as well as an apology (drafted by her) from the last Labour Government on behalf of the authorities who allowed this disaster to occur. For this matter Jacqueline acted *pro bono* throughout.

The claim in respect of the thalidomide victims continues and now encompasses the prospect of recovery on behalf of European victims against the original manufacturers of the drug in Germany.

She is instructed as leading Counsel in a  multi-party action against Glaxo Smith Kline in respect of the drug Seroxat which litigation has been revised under Jacqueline's helm with two juniors from 2 temple Gardens and is now proceeding apace in the High Court.

She is presently leading in a number of cases seeking compensation for damage caused by mesh implants. The first of these has now settled and substantial damages have been recovered for the client.

2

In California, Jacqueline was invited to be lead trial counsel in litigation involving carbon monoxide poisoning arising out of faulty heating equipment. The case was heard in Spring 2012 in Napa Valley, California and comprised a claim for personal injuries sustained as a consequence of a faulty product.

In 2011, Jacqueline achieved a multi-million dollar settlement in Seattle, Washington State which was a wrongful death claim as a consequence of a defectively designed axle locking nut on a trailer. (Re- *Ellis deceased v Democon and Others*).

In dealing with these above claims, Jacqueline has worked closely with the leading experts in their fields, from scientists to forensic accountants.

### Insurance & Reinsurance

From the beginning of her career Jacqueline has been instructed in insurance claims ranging from motor traffic cases to municipal and local government cases, mainly on behalf of the defendant insurers.

The work she has done in recent years has tended to be of very high value and often where competing insurers may be involved. For example she has been instructed and advised in the M1 disaster when a trailer carrying military tanks overturned involving some 23 vehicles, some 6 deaths and multiple personal injury claims. The real issues revolved around which vehicle and therefore which insurer was responsible for the claims arising from the incident.

Jacqueline has frequently advised insurers as to the application and interpretation of a policy and whether, for example, the correct policy to be applied is road traffic or employer's liability. Jacqueline is currently instructed in a difficult and sensitive insurance claim arising out of a dispute on an employment policy.

In 2012 she provided multiple advices in advance of an arbitration hearing in a $60 million dispute with re-insurers on a CAR policy arising out of a $250 million hydraulic power plant project in the Philippines which was devastated by a typhoon in 2009.

### Personal Injury

From the beginning of her career Jacqueline has been instructed in insurance claims ranging from motor traffic cases to municipal and local government cases, mainly on behalf of the defendant insurers.

The work she has done in recent years has tended to be of very high value and often where competing insurers may be involved. For example she has been instructed and advised in the M1 disaster when a trailer carrying military tanks overturned involving some 23 vehicles, some 6 deaths and multiple personal injury claims. The real issues revolved around which vehicle and therefore which insurer was responsible for the claims arising from the incident.

### Clinical Negligence

Jacqueline's experience of personal injury work and her many years of reading, advising upon and working with or having to cross-examine medical experts made the transition to actually working in the field of clinical negligence an obvious cross-over. Jacqueline has made a particular speciality of causation issues, as seen in cases such as *Chester v Afshar* in the House of Lords. Jacqueline now has vast experience of this area of work both in bringing claims on behalf of claimants or bringing third party claims against health providers on behalf of her primary insurance clients.

## Costs

Jacqueline has considerable experience in advising and appearing for solicitors in respect of bills rendered or following litigation when bills are contested. She has handled such cases before the Master, in the High Court and in the Court of Appeal.

## Publications, Seminars & Teaching

- Continuous involvement in advocacy training at Gray's Inn.

- Invited lecturer on corporate litigation by Pepperdine University Law school, London programme - July 2013.

- Co-authored paper on proposals for the future of the Inns of Court and re-organisation of the legal professions in England & Wales – published by 'Graya' - June 2013.

- Selected by the South Eastern Circuit to participate as a faculty member in the civil advocacy course run at Florida University - May 2013

- Panel speaker for Gray's event "Call to the International Bar" – April 2011.

- Bar Conference: invited panel participant for Association of Women Barristers – 2010.

- Speaker on Corporate Manslaughter at Lady Margaret Hall, Oxford - May 2010.

- Co-authored with Peter Carter QC paper on ethics as part of presentation package for Gray's Inn students and trainee barristers – 2009.

- Co-presented discussion for Californian lawyers forum on comparative disclosure rules with Associate Justice William Rylaarsdam, Judge of the Appeal Court of Orange County – 2006.

- Women's Lawyer Conference, invited speaker – 1999.

- Developed and pioneered teaching course for restraining orders pursuant to Drug Trafficking Act 1986 and Criminal Justice Act and provided training to Metropolitan Police both at New Scotland Yard and Hendon Detective Training School 1986-1993.

- Under *nom-de-plume* (Nicola Charles): provided legal advice for popular Women's magazines and appeared regularly on Granada's "This Morning" programme as well as GMTV 1989- 1998. For some 7 years featured as one of Jimmy Young's team broadcasting legal advice on Radio 2.

- Co-wrote with writer and journalist, Janice James, two books (i) The Rights of Woman(Arrow 1990) and (ii) Know Your Law(Pavilion 1995) – this was republished in Japan with Japanese notations for teaching English in 2001.

- Paper written 1988 at request of head of Policy Studies Unit of IOD on English and European Jurisprudence.

4

**Significant Cases**

Many of Jacqueline's cases have been reported over the years, in the law reports, in the Personal Injury Quantum Reports and written up in Kemp & Kemp as well as other publications. Some of the significant reported cases are listed below.

*Chewings v Williams* [2010]
Serious leg injuries. Risk of deterioration. Possibility of amputation. Whether provisional damages suitable and if so, for what period.

*Armsden v Kent Police* [2009] EWCA Civ 631
Duty of care of emergency vehicles when answering urgent response calls.

*Sahakian v McDonnell* [2007] EWHC 3242 (QB)
Causation; contributory negligence; speed contributing to severity of injury and whether this should be a factor in the negligence of driver.

*Daniels v Metropolitan Police Commissioner* [2006] EWCA 1622
Costs dispute arising out of very late service of evidence.

*Chester v Afshar* [2005] 1AC 134
Autonomy of patient when doctor seeking consent for surgery.

*Bacon v White* 1997
Fatal diving accident and issue of contributory negligence of novice diver.

*Lewis v Osborne* 1995
Value of a mother's services following her death in RTA when vehicle driven by claimant's father.

*Birch v Hales Containers* 1992 (CA)
Early decision on admissibility of surveillance evidence – when appropriate.


**EDUCATION**

Lady Margaret Hall, Oxford University

Pepperdine University (Bar Finals), California


**QUALIFICATIONS**

MA (Oxon) Jurisprudence

California qualified attorney Qualified mediator


**AWARDS**

Bar Pro-Bono award for her work in the Thalidomide claims, 2007


**MEMBERSHIPS & AFFILIATIONS**

"Of Counsel" at Rufus-Isaacs, Acland & Grantham, Beverly Hills.

Personal Injury and Common Law Bar Association

Professional Negligence Bar Association

Vice-Chair of Advocacy Committee for four years (2004–2009)

PCC Committee of the Bar Council (1999–2002)

Association of Women Barristers (Chair 1998–1999)

London Court of International Arbitration

ADR (UK) Mediation Service

Los Angeles County Bar Association

Beverly Hills Bar Association

## APPOINTMENTS

Queen's Counsel (2006)

Fellow of the International Academy of Trial Lawyers (2009)

Admitted to California Bar (2001)

Bencher of Gray's Inn  (2005)

Master of Students, Gray's Inn (2009–2011)

Grade "A" Advocacy Trainer for Gray's Inn

Royal Society of Medicine, a UK Consulting Editor for "Medicine, Science and the Law"

## INTERESTS AND PERSONAL

Cinema, theatre, reading, swimming, travel and motor boat sailing.

Jacqueline has also squeezed in the time to be a wife, mother and chief cook and bottle washer!!!

## 2 TEMPLE GARDENS

| Contact | Address | www.2tg.co.uk |
|---|---|---|
| Tel:  +44 (0)20 7822 1200 | 2 Temple Gardens | |
| Fax:+44 (0)20 7822 1300 | London | **+44 (0)20 7822 1200** |
| LDE Chancery Lane 134 | EC4Y 9AY | |
| email: clerks@2tg.co.uk | | |

1   *RUFUS-ISAACS, ACLAND & GRANTHAM*
    *232 North Canon Drive*
2   *Beverly Hills, California 90210*
    *By: Jacqueline Perry (State Bar No.: 218637)*
3   *    Neil J. Fraser (State Bar No.: 125651)*
    *Telephone: (310) 274-3803*
4   *Fax: (310) 860-2430*
    *E-Mail: jperry@rufuslaw.com/nfraser@rufuslaw.com*
5
6   Attorney for Plaintiffs
7
8
                    **UNITED STATES DISTRICT COURT**
9
                    **NORTH DISTRICT OF CALIFORNIA**
10
11
12   NATTO IYELA GBARABE, etc.,           )   **Case No.:  14-CV00173-SI**
                                          )   [Assigned to Hon. Susan Illston
13                      Plaintiff,        )    Courtroom 1)
                                          )
14   v.                                   )
                                          )
15                                        )   **DECLARATION OF NEIL J. FRASER**
     CHEVRON CORPORATION,                 )   **IN SUPPORT OF PLAINTIFF'S**
16                                        )   **MOTION FOR CLASS**
                        Defendant.        )   **CERTIFICATION**
17                                        )
18   _____  )
19                                            **Date:  November 4, 2016**
                                              **Time: 9.00 a.m.**
20                                            **Courtroom: One**
21
22
23
24
25
26
27
28

                                **-1-**

## DECLARATION OF NEIL J. FRASER

I, NEIL J. FRASER, do hereby declare that I am over the age of eighteen years and not a party to the action herein. My business address is 232 North Canon Drive, Beverly Hills, California 90210 and I am one of the attorneys of record for plaintiffs herein. I have firsthand knowledge of the facts set forth herein and, if called as a witness, I could and would competently testify to the following:

1. That I am an attorney qualified to practice before all State Courts in the State of California and admitted to practice before the California Federal Courts in the Northern, Eastern and Central Districts of California. I was admitted to the Bar in 1986 and have practiced as an attorney continually ever since, primarily as a sole practitioner.

2. That, attached hereto as Exhibit A and incorporated herein by reference is a true and correct copy of my resume, which describes my career in law.

3. That I have tried numerous civil and criminal matters to successful conclusion in a wide and varied number of legal fields. These include plaintiff representation in civil matters involving personal injury, civil rights and constitutional violations litigation, police misconduct, product liability and fraud, while, as a criminal defense attorney, he has represented clients in regard to virtually every category of felony and misdemeanor, from driving under the influence to murder.

4. That I have also developed a specialty practice in certain areas, including the voiding of criminal convictions on constitutional grounds, the defense of persons accused of shaken baby syndrome and representation of prospective police officers in administrative hearings on licensing issues.

5. That, for many years, I specialized on trial work for victims of police misconduct, obtaining numerous favorable verdicts against several different police and sheriff departments. A selection of these verdicts are listed in my resume attached hereto, along with a selection of other favorable civil verdicts in different fields.

6. That my trial work has involved several lengthy cases involving complex issues of civil rights, governmental immunities and improper polices and procedures. I am familiar with the

-2-

stresses and time demands of such trial work and have successfully tried most of these cases to

conclusion as a sole practitioner.

7. That I negotiated a settlement for the plaintiff in a case named _Silva v. County of Los Angeles_ on the eve of trial on 2010 which is the largest settlement of a jail medical negligence case to date and was partially predicated upon the fact that I had overcome all challenges to the civil rights/policies and procedures cause of action, thus potentially exposing the County of Los Angeles to liability for a constitutional violation based upon "deliberate indifference" for the first time in regard to medical treatment, or a failure to provide treatment to an inmate.

8. That I have also performed appellate work, one case of which was published in 1995 named _Hesse v. Best Western 32 Cal.App.4th 404_. I also wrote the brief on another matter named _Rose v, City of Los Angeles (1984) 159 Cal.App.3d 883_, which overturned a summary judgment grant as to the applicability of the "fireman's rule". The case was subsequently tried to verdict by Johnnie Cochran, Jr., Esq., who secured a verdict of 2.1 million.

9. That I have been involved in the prosecution of this present case since late 2014 when I was asked by Jacqueline Perry, Q.C. to co-counsel the case with her. I have since worked diligently on this matter on a close to fulltime basis and have logged many thousands of hours in research, investigation and the preparation and presentation of legal papers. Ms. Perry and I are aware of our ethical responsibilities in the presentation of meritorious cases and have worked extremely hard to ensure the claims in this matter are presented only by genuine claimants with articulable damage claims despite the fact our clients reside in another country and in a remote and unsettled part of that nation, Nigeria.

10. That it is my belief that the issues presented in this case, especially if certified as a class action, are issues of law with which I am familiar and that I am fully qualified to act, along with Ms. Perry, as counsel for the putative class, whose prospective members and representatives have declared that they are happy with the progress of the case and wish Ms. Perry and I to represent them to conclusions.

DECLARATION OF NEIL J. FRASER IN SUPPORT OF OPPOSITION TO MOTION TO STRIKE TAC

11. That co-counsel and I have handled the logistics of representation of foreign nationals to date and complied with defense discovery and deposition requests regarding the lead plaintiff. I am scheduled to travel to London and Lagos for depositions in this case in late April-early May, and for meetings with prospective class members thereafter in Bayelsa State. I am pledged to a continuing commitment to zealous advocacy on behalf of the peoples of the Niger Delta, while maintaining the high ethical standards and respect for opposing counsel that I believe are cornerstones of out judicial system.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on this, the 8th day of April, 2016 at Los Angeles, California.


_____
/s/
NEIL J. FRASER

**DECLARATION OF NEIL J. FRASER IN SUPPORT OF OPPOSITION TO MOTION TO STRIKE TAC**

# Neil J. Fraser, Attorney at Law

## General Resume

213-324-4206

# 1. <u>INTRODUCTION</u>:

Neil J. Fraser has practiced as a trial lawyer in Los Angeles for close to thirty years, primarily as a solo practitioner, and currently working both through his own law office and in an "Of Counsel" capacity with the Beverly Hills firm of Rufus-Isaacs, Acland & Grantham.

During his career, Neil has tried numerous civil and criminal matters to successful conclusion in a wide and varied number of legal fields. These include plaintiff representation in civil matters involving personal injury, civil rights and constitutional violations litigation, police misconduct, product liability and fraud, while, as a criminal defense attorney, he has represented clients in regard to virtually every category of felony and misdemeanor, from driving under the influence to murder.

## 2. <u>PRACTICE AREAS</u>:

<u>Criminal Defense</u>

Neil's love of trial work has seen him focus a lot of his practice in the area of criminal defense.  He has handled all manner of criminal and quasi-criminal matters, from misdemeanors such as driving under the influence, petty theft, resisting arrest and simple assault, through the most serious felonies, including murder, attempted murder, shaken baby syndrome matters, drug cases, violent and white-collar crime. Involvement in several serious felonies alleging death or injury to infants exhibiting "shaken baby syndrome" symptoms has led to Neil being recognized as one of the leading practitioners in this confusing and unsettled area. He has successfully defended all such cases to date.

Voiding Convictions

Neil has also developed a highly successful line of practice voiding convictions subject to attack on constitutional grounds. These include matters whereby pleas have been held *void ab initio* on the basis of an identified constitutional right deprivation proven to the reviewing court's satisfaction. As an adjunct to such work, Neil has successfully represented such individuals as prospective police officers in securing professional licensing after denial based upon a criminal conviction. He has overturned administrative rulings both with State Boards and with Federal bureaus such as the Department of Justice.

To date, Neil carries a 100% success rate in voiding convictions for persons he represents in such matters.

Civil Litigation

Neil has always maintained a parallel civil litigation practice and continues to represent plaintiffs in personal injury and general tort matters, as well as handling appellate cases, both civil and criminal, before all California courts and United States Federal District Courts, California Northern, Eastern and Southern Districts.

Over the years, Neil's success rate in civil litigation has seen a steady increase in requests from individuals and businesses that he handles their defense on various litigation matters, ranging from fraud, misappropriation of trade secrets, unfair competition, contractual disputes in film and music, and business disputes for actors and artists.

Currently Neil is co-counsel on a federal case in the Northern District Federal Court involving environmental damage suffered by residents of Bayelsa State, Nigeria arising out of a blowout rig explosion off the coast of that country.

## 3. <u>EDUCATION</u>:

George Watson's College, Edinburgh, Scotland; 1958-1971;

University of Dundee, Scotland; 1971-72;

University of St. Andrews, Scotland; 1972-73;

University of Glasgow, Scotland; 1979-81;

Degree: Bachelor of Laws (L.L.B.).

Additional Honors: Winner of the Politics Prize (1981); Certificate of Merit (Civil Law); Certificate of Distinction (Politics).

California Bar Examination was taken after successful completion of one and a half years of the State Bar Law Office Study Program (1986).

## 4. <u>PROFESSIONAL CAREER SUMMARY</u>:

<u>Selected Civil Verdicts</u>

Naranjo, et al v. City of Los Angeles: $1.4 million (police misconduct, L.A.P.D.);

Bell v. County of Los Angeles: $475,000.00 (police misconduct, L.A.S.D.);

Byrd, et al v. City of Los Angeles: $475,000.00 (police misconduct, L.A.P.D.);

Mercado v. City of Los Angeles: $160,000.00 (police misconduct, L.A.P.D.);

Simpson v. County of Los Angeles: $100,000.00 (jail beating, L.A.S.D.);

Jansen, et al v. M.S.I.: $2.3 million (fraud);

Medina v. Rockwell, et al (in association with Bernard L. Nizinski, Esq.): $1.8 million (construction accident)

Reyes v. Stanton: $1.1 million (art theft);

Sanchez v. K-Mart: $140,000.00 (false imprisonment - Neil's first jury trial).

///

///

///

Civil Settlements

      Neil has concluded hundreds of cases by way of settlement prior to trial. Of these cases, the following matters were of particular professional satisfaction to him:

      In 2010 he negotiated a $900,000.00 settlement with the County of Los Angeles in the case of Silva v. County, the largest ever settlement for a County Jail medical negligence case. The settlement occurred after the trial court denied repeated attempts by the defendant to excise plaintiff's civil rights cause of action from the lawsuit, ruling there was sufficient evidence generated by plaintiff to allow a jury to determine whether or not the County exhibited "deliberate indifference" towards plaintiff, as per the Supreme Court ruling in Estelle v. Gamble, 429 U.S. 97 (1976);

      In a personal injury matter, Neil was able to secure a six-figure settlement for an high school senior and upcoming track and field athlete named Ramon Gomez who suffered soft tissue injury in a rear-end accident which, although not disabling, caused a small fall-off in Mr. Gomez's track times sufficient to eliminate him from pursuing his dream of participation in future Olympic Games;

      In a bad faith matter in which an insurance company took diametrically opposed positions in the determination of liability for the uninsured motorist claim and the subsequent 3rd party liability claim of the passenger of his client, Neil secured a six-figure settlement from State Farm;

      In a case involving a minor child, Neil was able to negotiate a seven-figure structured settlement for the child after a car in a McDonald's parking lot struck him. The theory of liability centered on the faulty design of drive-thru area;

The re-negotiation of a fair royalty structure for legendary cult filmmaker Kenneth Anger prior to the DVD release of his seminal works such as "Scorpio Rising", "Lucifer Rising" and "Inauguration of the Pleasure Dome" as "The Films of Kenneth Anger, Vols. 1/2".

Criminal Defense

Neil has achieved consistently excellent results for his clients in criminal matters. He has become sought-after for his expertise in several areas, including, as previously stated, "shaken baby syndrome" cases and the voiding of convictions that violate an individual's constitutional rights. Neil carries a high percentage of trial wins and structured resolutions that serve both the interests of justice and the best interests of his client.

To date, none of his clients accused of murder have been convicted of that charge.

Neil has also worked on extradition matters involving the American litigation concerning persons who fled the jurisdiction to the United Kingdom and to Taiwan.

Appellate Work

Neil has argued before the appellate courts on a variety of civil and criminal causes.

As a law clerk, he wrote the successful appellant briefs in the case of Rose v. City of Los Angeles which overturned the trial court's summary judgment adjudication as to the applicability of the "fireman's rule" to the case. Thereafter the matter was tried in Los Angeles Superior Court by Johnnie Cochran, Jr., Esq., who secured a $2.1 million verdict in plaintiff's favor. (Rose v. City of Los Angeles (1984) 159 Cal.App.3d 883).

Neil also briefed and successfully argued the case of <u>Hesse v. Best Western International</u> (1995) 32 Cal.App.4th 404 which held that California courts could exercise general jurisdiction over the defendant under the "minimum contacts" rule in regard to a plaintiff who was seriously injured while vacationing at a Best Western hotel in Mexico.

<u>Pro Bono</u>

Neil has performed legal services on many occasions for persons unable to afford representation, primarily in the field of civil rights, landlord/tenant and harassment.

He hosts a free legal advice session each Tuesday at a neighborhood coffee house and contributes legal opinions to a variety of non-profit organizations without charge.

## 5. <u>BAR MEMBERSHIPS</u>:

The State Bar of California

American Bar Association

The British American Bar Association of S. California

## PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California, over the age of eighteen years and not a party to this action. My business address is 232 N. Canon Drive, California 90210.

On April 8, 2016, I served the following documents:

**NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION OF PLAINTIFF NATTI GBARABE; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF JACQUELINE PERRY & NEIL J. FRASER IN SUPPORT THEREOF**

On the interested parties by serving:

**JONES DAY**
**555 California Street, 26th Floor**
**San Francisco, California 94104**
**Attn: ROBERT A. MITTELSTAEDT, ESQ. (ramittelstaedt@JonesDay.com)**
    **CAROLINE N. MITCHELL, ESQ (cnmitchell@JonesDay.com)**

(\_\_) By Mail: I caused such envelope to be deposited in the U.S. Mail at Beverly Hills, California, postage fully paid, in the usual and customary course of business.

(\_X\_) By E-Mail: I caused such document to be transmitted by e-mail to the persons specified above, with said transmission reported as completed.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of April 2016 at Beverly Hills, California.

_____/S/_____
NEIL J. FRASER