Robert A. Mittelstaedt (State Bar No. 60359)
ramittelstaedt@JonesDay.com
Caroline N. Mitchell (State Bar No. 143124)
cnmitchell@JonesDay.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone:    415.626.3939
Facsimile:    415.875.5700

Attorneys for Defendant
CHEVRON CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **Natto Iyela Gbarabe,**<br><br>            **Plaintiff,**<br><br>       **v.**<br><br>**Chevron Corporation,**<br><br>            **Defendant.** | **Case No. 14-cv-00173-SI**<br><br>**DEFENDANT CHEVRON CORPORATION'S MOTION FOR AN ORDER COMPELLING PLAINTIFF TO COMPLY WITH DISCOVERY REQUESTS**<br><br>Date:        August 26, 2016<br>Time:        10:00 a.m.<br>Place:       Hon. Susan Illston |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION ................................................................................................. 1

RELIEF SOUGHT ..................................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................. 1

I.      BACKGROUND. ............................................................................................ 3

    A.      The Original Complaint and First Amended Complaint......................... 3

    B.      The First Meeting Between Counsel and Plaintiff Ogola. ..................... 5

    C.      Second Amended Complaint.................................................................. 7

    D.      Admission of False, Unsupportable Allegations.................................... 8

    E.      Relationship Between Counsel and Ogola............................................. 9

    F.      Plaintiff's Counsel Abandons Ogola and Four Other Plaintiffs............ 10

    G.      The Operative Fourth Amended Complaint and Continuing Fraud...... 12

II.     CHEVRON'S DISCOVERY EFFORTS AND PLAINTIFF'S SELECTIVE
    DISCLOSURES............................................................................................... 12

III.    ARGUMENT. ................................................................................................. 16

    A.      The Requested Documents and Information Are Relevant to Plaintiff's
    Class Certification Motion. .................................................................... 16

    B.      Plaintiff's Privilege Objections to Defendant's Interrogatories Are Waived
    and Meritless. ......................................................................................... 16

    C.      The Communications Listed on Plaintiff's Privilege Log Fall Within the
    Scope of the Waiver. .............................................................................. 20

    D.      Plaintiff Also Should Be Required to Produce Other Withheld E-mails on
    These Subjects. ....................................................................................... 21

    E.      Attorney-Client Privilege and Work Product Protection Do Not Apply to
    Communications Made in Furtherance of Fraudulent Claims. ............... 23

IV.     CONCLUSION. .............................................................................................. 24

# TABLE OF AUTHORITIES

**Page**

CASES

*Aclara Biosciences, Inc. v. Caliper Tech. Corp.*,
   2001 WL 777083 (N.D. Cal. June 16, 2000) ........................................................................17

*Ballan v. Upjohn Co.*,
   159 F.R.D. 473 (W.D. Mich. 1994) ......................................................................................16

*Cleveland Hair Clinic, Inc. v. Puig*,
   968 F. Supp. 1227 (N.D. Ill. 1996) ......................................................................................23

*Coleman v. Sterling*,
   2011 WL 1099793 (S.D. Cal. Mar. 24, 2011) .....................................................................22

*E. Fin. Corp. v. JSC Alchevsk Iron & Steel Works*,
   258 F.R.D. 76 (S.D.N.Y. 2008) ..........................................................................................23

*Frontier-Kemper Constructors, Inc. v. Elk Run Coal Co., Inc.*,
   246 F.R.D. 522 (S.D. W. Va. 2007).....................................................................................18

*Hydranautics v. Filmtec Corp.*,
   2003 WL 23358187 (S.D. Cal. July 23, 2003) ....................................................................17

*In re Connetics Corp. Sec. Litig.*,
   542 F. Supp. 2d 996 (N.D. Cal. 2008) ..................................................................................4

*In re Grand Jury Proceedings*,
   87 F.3d 377 (9th Cir. 1996).................................................................................................23

*McGoldrick v. TruePosition, Inc.*,
   2008 WL 4613860 (E.D. Pa. Oct. 14, 2008)........................................................................22

*Reliable Money Order, Inc. v. McKnight Sales Co., Inc.*,
   704 F.3d 489 (7th Cir. 2013)................................................................................................16

*Roberts v. Heim*,
   123 F.R.D. 614 (N.D. Cal. 1988) ........................................................................................23

*Sevey v. Soliz*,
   2011 WL 2633826 (N.D. Cal. July 5, 2011)........................................................................19

*Specialty Minerals, Inc. v. Pleuss-Stauffer AG*,
   2004 WL 42280 (S.D.N.Y. Jan. 7, 2004).............................................................................23

*United States v. Dimucci*,
   110 F.R.D. 263 (N.D. Ill. 1986)...........................................................................................18

1
2

**TABLE OF AUTHORITIES**
**(continued)**

Page

3
4

*United States v. Hightower,*
    2004 WL 897886 (N.D. Ill. Apr. 23, 2004) ...............................................................24

5

*United States v. Martin,*
    278 F.3d 988 (9th Cir. 2002)...................................................................................23

6
7

*United States v. Mass. Inst. of Tech.,*
    129 F.3d 681 (1st Cir. 1997) ...................................................................................18

8
9

*Upjohn Co. v. United States,*
    449 U.S. 383 (1981) ...............................................................................................19

10

*Weil v. Inv./Indicators, Research and Mgmt., Inc.,*
    647 F.2d 18 (9th Cir. 1981).....................................................................................17

11
12

*White v. Experian Info. Sols.,*
    993 F. Supp. 2d 1154 (C.D. Cal. 2014)..................................................................16

13

**RULES**

14

Fed. R. Civ. P. 11(b) ................................................................................................8

15

Fed. R. Civ. P. 23 ..................................................................................................16

16

Fed. R. Civ. P. 23(a)(4) .........................................................................................16

17

Fed. R. Civ. P. 23(g)(1) .........................................................................................16

18
19

Fed. R. Civ. P. 23(g)(1)(A)(i) ...............................................................................16

Fed. R Civ. P. 33(a)...............................................................................................18

20
21

Fed. R. Civ. P. 33(b)(3)..........................................................................................18

Fed. R. Evid. 502(a)(3) ..........................................................................................17

22

**OTHER AUTHORITIES**

23
24

http://www.ngex.com/nigeria/places/states/bayelsa.htm ....................................3, 6

25
26
27
28

DEFENDANT'S MOT. TO COMPEL
COMPLIANCE WITH DISC. REQS.
CASE NO. 14-CV-00173-SI

1

**NOTICE OF MOTION[1]**

2      PLEASE TAKE NOTICE that at 10:00 a.m. on August 26, 2016, before the Honorable

3  Susan Illston, in Courtroom 1, 450 Golden Gate Avenue, San Francisco, California, defendant

4  Chevron Corporation will move this Court for an order compelling plaintiff Natto Iyela Gbarabe

5  to provide the following discovery:

6

**RELIEF SOUGHT**

7      An order compelling plaintiff to produce all documents responsive to requests 77, 78,

8  78(2), 81, 82 and 84 of defendant's third set of requests for production (Ex. 1) and unredacted

9  copies of the exhibits to the declaration of Neil Fraser (ECF No. 81); and to provide full

10  responses to interrogatories 14-17 and 19 of defendant's second set of interrogatories (Ex. 2)

11  including information known to his counsel.[2]

12

**MEMORANDUM OF POINTS AND AUTHORITIES**

13      This case presents a troubling pattern of breaches of fundamental duties owed by putative

14  class representatives and their counsel to the Court and the putative class—and an improper

15  refusal to provide full discovery into these critical matters.  Counsel's breaches include making

16  false allegations without due diligence and without even meeting their clients, and abandoning

17  plaintiffs and purported class members on a false pretext.

18      Six plaintiffs sued in 2014 claiming that an accident at a natural gas well six miles

19  offshore caused damage throughout Bayelsa State, Nigeria, an area the size of New Jersey and

20  reaching 75 miles inland.  Plaintiffs alleged that they had expert reports to prove statewide

21  damage.  And, after two dismissals, they added allegations specifying injuries to themselves.

22      When discovery began in early 2015, however, plaintiffs were forced to admit that the

23  statewide damage claims were unsustainable and that the alleged expert reports did not exist.  The

24  allegations about plaintiffs' own injuries were also baseless.

25      In the fall of 2015, counsel dropped five of the six plaintiffs and 80% of the putative class.

26

----

[1] Plaintiff agreed that it is appropriate for defendant to proceed by noticed motion rather than through a joint letter brief, and Chevron hereby seeks leave from the Court to do so.

27

[2] References to "Ex." are to the exhibits attached to the accompanying Declaration of Caroline N. Mitchell.

28

They told the Court that this "realignment" was based on "objective scientific evidence" and that the only "genuine claims" were being pursued.  In fact, with history repeating itself, no such scientific evidence has been produced.  Dropping the statewide claim appears to have been based on "common sense," as plaintiff's Nigerian "litigation coordinator" put it.  The statewide damage claim was never supportable; it was "very bogus" from the start.  And no scientific evidence supported the "realigned" claim that 26 coastal communities, stretching up to 80 kilometers from the accident site, were impacted.

In late 2015, Chevron asked plaintiff and his counsel to explain their conduct.  Pledging transparency, counsel stated that they were "ill served" by the Nigerian/U.K. promoters of this lawsuit but that it "is not customary nor acceptable" under the English system for them to question the referring lawyers.  Exs. 3-5.  So, as they acknowledged, they brought this lawsuit without even communicating with their clients.  The former lead plaintiff apparently did not even know that a case had been brought in the United States.

To support their "blame-the-promoters" narrative, plaintiff and his counsel provided selected attorney-client communications and work product information.  But the selectively-disclosed materials not only heightened concerns about the origins of this case and the "realignment" but also revealed further issues.  They showed, for example, that when the original lead plaintiff, Foster Ogola, complained about lack of communication by counsel and threatened to switch law firms, he was told that he would have to pay an £825,000 exit fee to do so.

When those disclosures did not end the inquiry, plaintiff and his counsel belatedly asserted privilege and refused to fully answer defendant's interrogatories or produce all their documents responsive to production requests.  The interrogatories seek a verified explanation for the improprieties that have come to light, including the basis on which plaintiff's counsel alleged that the accident caused statewide impact and damaged the five former plaintiffs; how and when plaintiff and his counsel discovered that those allegations were false; and the circumstances surrounding the abandonment of the five former plaintiffs and their communities.  Defendant's document requests seek contemporaneous communications about these issues.  Plaintiff seeks to justify withholding these documents by saying he has already "fully summarised" them to

DEFENDANT'S MOT. TO COMPEL
COMPLIANCE WITH DISC. REQS.
CASE NO. 14-CV-00173-SI

defendant and that the documents merely "confirm[] what you have been apprised of." Ex. 32 at 2. But the information revealed to date casts serious questions, and there is every reason to expect that the material they are withholding will be even more damaging.

Contrary to plaintiff's argument, any attorney-client privilege or work-product protection has been waived by plaintiff's selective production of documents and information, or is vitiated under the crime/fraud exception. The record shows, at a minimum, that plaintiffs sought to perpetrate a fraud on the Court and consulted with counsel to facilitate it.

In moving to certify a class, plaintiff tries to put the conduct in the best light. Ignoring their role in initiating this lawsuit with its unsustainable allegations, counsel attest in declarations that they have "worked extremely hard to ensure the claims in this matter are presented only by genuine claimants with articulable damage claims" and that this case is "properly and ethically presented." ECF No. 123 at 47. The evidence to date refutes those assertions, but it may be only the tip of the iceberg. The discovery requests at issue are designed to test plaintiff's explanation for his and his lawyer's conduct of this case to date, which reflects strongly on their adequacy as class representative and class counsel. The discovery is also relevant to whether sanctions, including dismissal, should be imposed for fraud on the Court and other improprieties.

## I.   BACKGROUND.

This case involves a gas well blowout six miles off the Nigerian coast in 2012. Five versions of the complaint have been filed. As discovery has shown, key allegations in each version of the complaint were false and plaintiff's explanations for his and his attorneys' conduct have only raised greater concerns.

### A.   The Original Complaint and First Amended Complaint.

In the original complaint, filed January 2014, six plaintiffs alleged that the offshore accident caused property damage and personal injuries throughout all eight Local Government Areas of Bayelsa State, Nigeria—an area approximately the size of New Jersey but stretching more than 75 miles inland from the coast.[3] ECF No. 1, ¶¶ 24, 20 (p. 13).[4] To support that

---

[3] *See* http://www.ngex.com/nigeria/places/states/bayelsa.htm (Bayelsa state has an area of 21,100 square kilometers (8,147 square miles)). A map of Bayelsa state is attached as Ex. 6.

[4] The paragraph numbering in the complaint re-starts on page nine. So there are two

1   improbable claim, they alleged that "[e]xpert reports have concluded that there have been

2   significant environmental impacts and **all areas** have been subjected to various degrees of

3   damage." *Id.* ¶ 25 (emphasis added).

4       The six plaintiffs averred that they held powers of attorney from 65,000 individuals whose

5   claims they sought to prosecute. *Id.* ¶ 9.  Two of the six purportedly granted power of attorney to

6   a Nigerian lawyer, Peter Egbegi, purportedly on behalf of all six.  Cmplt. ¶ 9 (ECF No. 1); Ex. 7

7   at 1-4.  In turn, Egbegi gave power of attorney to Nicholas Ekhorutomwen, a solicitor practicing

8   in Nigeria and England, who then gave power of attorney to Rufus-Isaacs, Acland & Grantham

9   LLP—Jacqueline Perry's and Neil Fraser's former firm.  *Id* at 5-12.  Based on these powers of

10  attorney, counsel viewed the six named plaintiffs and the 65,000 individuals as clients.  ECF No.

11  20 at 17-18.

12      Counsel later admitted that they had no contacts with the six plaintiffs or the Nigerian

13  lawyer Egbegi before suing. Ex. 3 at 4-7; Ex. 8 at 1; Ex. 9; Ex. A at 2.[5]  Ekhorutomwen, the

14  Nigerian lawyer who practiced with a U.K. firm, purportedly assured them that Egbegi had done

15  "full due diligence" in Nigeria. Ex. 3 at 4, 5.  According to counsel, "[i]t is not customary nor

16  acceptable practice for a barrister to do due diligence on a fellow professional within the English

17  system[.]" *Id.* at 4.[6]  Counsel also asserted that the case was referred to them shortly before the

---

18  (continued…)

19  paragraphs with numbers 1 to 29.

20    [5]  Most of the privileged documents and information were voluntarily produced by
    plaintiff with no restriction.  Later, plaintiff produced several documents under a stipulation that
21  their production did not waive privilege, without prejudice to defendant's contention that plaintiff
    had already waived privilege by producing other privileged documents.  *See* Stipulation (ECF No.
22  122).  Exhibits designated by letter (*e.g.*, Ex. A) were produced under the stipulation.  All other
    documents were produced without restriction and are designated by number (*e.g.*, Ex. 1).

23    [6]  Whatever may be the practice in England, the duty in U.S. federal court to conduct an
24  adequate pre-filing investigation is "non-delegable." *In re Connetics Corp. Sec. Litig.*, 542 F.
    Supp. 2d 996, 1006 (N.D. Cal. 2008) (citing *Pavelic & LeFlore v. Marvel Entm't Grp.*, 493 U.S.
25  120, 125 (1989) ("The signing attorney cannot leave it to some trusted subordinate, or to one of
    his partners, to satisfy himself that the filed paper is factually and legally responsible; by signing
26  he represents not merely the fact that it is so, but also the fact that he personally has applied his
    own judgment.")).

27      Counsel privately acknowledged that they breached their ethical duties by pursuing this
28  litigation without having any contact with their putative clients:  "'Not only is it necessary, but it
    is actually required as a matter of ethics to speak to, to get direct instructions from the client.'  It

DEFENDANT'S MOT. TO COMPEL
COMPLIANCE WITH DISC. REQS.
CASE NO. 14-CV-00173-SI

statute of limitations expired in January 2014, suggesting that they did not have time to investigate. *See* Mitchell Decl. ¶ 14 & Ex. 5 at 4. Their motion for class certification repeats this excuse. ECF No. 123 at 19:18. But plaintiff's privilege log shows that the case was referred to counsel in February 2013, nearly a year earlier. Ex. 10 ¶ 1. And Ms. Perry has admitted that she was retained sometime before July 2013. Ex. 11 at 2.[7]

Chevron moved to dismiss the original complaint because, *inter alia*, plaintiffs did not adequately allege injury to themselves and did not have standing to represent others. ECF No. 13 at 13-17. Opposing the motion, plaintiffs asserted that they had expert reports that "identified severe effects upon the communities" for which they were suing. ECF No. 25 at 3. The Court dismissed the complaint, with leave to amend, for failure to allege injuries to the six plaintiffs or a valid basis to sue for others without joining them in the action or seeking to certify a class action. ECF No. 30.

In June 2014, plaintiffs' counsel converted the case into a purported class action for their 65,000 alleged "clients." ECF No. 34 ¶ 12. They realleged that expert reports showed damages in "all areas" (*id.* ¶ 30) and emphasized it again in opposing defendant's motion to dismiss. ECF No. 40 at 3:12-13. On August 21, 2014, the Court dismissed the amended complaint with leave to amend, again concluding it did not adequately allege injury to the six plaintiffs. ECF No. 44.

**B.      The First Meeting Between Counsel and Plaintiff Ogola.**

With the motion to dismiss the first amended complaint pending and the issue of whether plaintiffs could allege injury outstanding, plaintiffs' counsel met on July 24, 2014, with lead

---

(continued…)

is a matter of ethics. You need to have the client. . . . The problem to some extent lies with the sort of approach which is, 'We're the lawyers in California, Nicholas is the lawyer in London, he gets his instructions from Mr Edbegi (*sic*) and that is good enough.' But it is not good enough." Ex. A at 3.

[7] Counsel also asserted that Mr. Fraser was not brought on as counsel until just two weeks before the statute of limitations expired in January 2014. Ex. 5 at 4; *see also* Fraser Decl. ¶ 9 (ECF No. 123 at 57) ("I have been involved in the prosecution of this present case since late 2014 when I was asked by Jacqueline Perry, Q.C. to co-counsel the case with her."). Presumably, late 2014 means late 2013. But plaintiff produced a "Preliminary Opinion" from Ms. Perry dated July 8, 2013, which states that Mr. Fraser already had been "brought on board" and had been of "immeasurable assistance." Ex. G at ¶ 27.

plaintiff Ogola in London, apparently for the first time.  As Ogola later recounted in an e-mail to

plaintiff's counsel, "I told you during our London meetings that, any existing environmental

reports in Nigeria[] on this Chevron rig explosion will[] not be useful to this lawsuit" because

they are "academic / theoretical efforts or limited in scope of impact."[8]  Ex. B at 3.  The near-

verbatim notes of the meeting, voluntarily produced by plaintiff, reinforce that point:

> **[Foster Ogola]:** . . . [T]hat community wants us to sign an
> agreement with them that unless we give them a certain percentage
> of the balance after the lawyers' fees have gone, they would not like
> to give us the study they made.  Now, my take on the study is that if
> it limits our scope of the case, we don't need to present it.
>
> [**Jacqueline Perry**]:  No.
>
> **[Foster Ogola]**:  And I'm very reluctant in going forward and
> spending money to be getting . . .
>
> [**Jacqueline Perry**]:  Something that may not be helpful."
>
> …
>
> **[Foster Ogola]**:  OK.  And so anything we can lay our hands on but
> not anything that will shoot us in the leg.
>
> [**Jacqueline Perry**]:  Or both legs."

Ex. A at 15, 18.

But counsel and Ogola were at odds on other issues, including counsel's failure to keep

Ogola informed of case developments and include him in key decisions.  According to Ogola, the

case was filed in California without his knowledge or approval.  *Id.* at 2.  Ogola learned that the

Court dismissed the original complaint only by asking someone to check the court files.  Ex. A at

2.  Ogola "expressed his desire to instruct other attorneys in California as he felt that he was being

left out of the 'loop'," as counsel later recounted in an e-mail.  Ex. 8 at 4; Ex. B at 5.  But Ogola

---

[8] The e-mail does not identify the reports to which Ogola referred.  But in correspondence
with defendant, plaintiff's counsel stated that they relied on a draft Post-Impact Report from the
Bayelsa State Ministry of the Environment for the allegations in the original complaint.  Ex. 3 at
5.  But that report is limited to studying sites with a mean distance of 10 km from the accident.
Ex. 12 at 2.  The accident occurred 5 nautical miles (9.26 km) offshore.  *Id.* at 1.  Thus, the study
reaches only a small area immediately adjacent to the accident site less than one kilometer inland.
By contrast, the nine Local Government Areas in Bayelsa State that were the subject of the
original complaint and the first and second amended complaints cover an area of 21,100 km sq.
*See* http://www.ngex.com/nigeria/places/states/bayelsa.htm.

DEFENDANT'S MOT. TO COMPEL
COMPLIANCE WITH DISC. REQS.
CASE NO. 14-CV-00173-SI

1    was told that to change lawyers he would have to pay £825,000 for incurred time and expenses.

2    Ex. A at 5.  As Perry summarized it:  Ogola "was told by Nicholas [Ekhorutomwen] that he

3    would have to account for costs and time expended if he pulled the case from our firm.  I knew

4    this from Nicholas[.]"  Ex. 8 at 4.

5              **C.      Second Amended Complaint.**

6              The second amended complaint, filed in September 2014, realleged that expert reports

7    showed impact in "all areas" (ECF No. 45 ¶ 33), as did the third (ECF No. 82 ¶ 32) and the

8    operative fourth amended complaints (ECF No. 99 ¶ 30).  This allegation persisted despite

9    Ogola's acknowledgement to counsel that the expert reports were not "useful" because they were

10   "limited in scope of impact."  Ex. B at 3.

11             To meet one ground for the previous dismissal, the second amended complaint added

12   allegations of property damage and adverse health consequences for the six plaintiffs.  ECF No.

13   45 ¶¶ 12(i)-(vi).  It alleged, for example, that Ogola lived and worked in Yenagoa as a fish and

14   land farmer, that he lost use of 7.5 acres of farmland and five large fish ponds due to pollution

15   from the rig accident, and that he suffered gastro-intestinal ailments, diarrhea, vomiting and a

16   heart attack.  *Id.* ¶ 12(i).  Yenagoa is more than 60 kilometers inland from the coastline.  Ex. 6.

17   The second amended complaint alleged similar injuries for other plaintiffs who lived in inland

18   locations throughout Bayelsa State.  ECF. No. 45 ¶¶ 12(ii)-(vi).  To give heft to the second

19   amended complaint, plaintiffs attached a Schedule A, listing the names of 65,000 putative

20   claimants across the state and the economic damages each allegedly incurred.  ECF No. 45.[9]

21             Chevron moved to dismiss the second amended complaint on several grounds including

22   the implausibility of statewide impact.  ECF No. 49 at 4-6.  In opposition, plaintiffs argued that

23   their allegations were sufficient and reiterated that they were supported by "expert reports [that]

24   have identified the severe impact upon the communities[.]"  ECF No. 51 at 4.

25             Granting in part and denying in part Chevron's motion to dismiss, the Court permitted the

26   action to proceed, noting the difficulty of deciding the extent of any impact at the pleading stage.

27   _____

28             [9] This document was referred to in earlier versions of the complaint but not attached.
     Plaintiffs adopted this list as their damages computation in initial disclosures.  Ex. 13 at 11.

DEFENDANT'S MOT. TO COMPEL
COMPLIANCE WITH DISC. REQS.
CASE NO. 14-CV-00173-SI

ECF No. 56 at 5. In effect, the Court was relying on plaintiff's counsel's representation under Fed. R. Civ. P. 11(b) that they had a good faith basis for their allegations.

The case then entered the discovery phase, with discovery limited by stipulation to issues relating to class certification. ECF No. 69. And the case began to unravel quickly.

### D.    Admission of False, Unsupportable Allegations.

In February 2015, Chevron served interrogatories and requests for document production seeking the basis (if any) for plaintiffs' allegation of statewide injury or injury to plaintiffs and 65,000 individuals. ECF No. 78 ¶¶ 1-3. Unable to produce anything supporting those allegations, counsel acknowledged that most of the purported class and five of six plaintiffs did not have "articulable claims of damage." ECF No. 80 at 5. Their Nigerian "litigation coordinator"—a Nigerian environmental advocate—told counsel that the list of purportedly impacted communities was "very bogus" because some communities were "really, really upstream." Ex. 14 at 25:20-26:4. Indeed he "laugh[ed]" at Ogola's claims when he first saw them. *Id.* at 53:17-54:3. "Common sense told me it's not possible." *Id.* at 28:10-11.

Internally, plaintiffs' counsel admitted that the allegation that expert reports showed damages in all areas was false. In an e-mail sent to Nigerian co-counsel (and later voluntarily produced to Chevron), they stated that "none [of the reports] that we have reviewed opine that any damage reached the LGAs [Local Government Areas] of Yenagoa, Sagbama, Kolokuma/Opokuma, Ogbia or the interior communities of Ekeremor." Fraser Decl. (ECF No. 81) at 27.

Plaintiff Gbarabe expanded on these admissions at his deposition in December 2015. He testified that the claims of the other plaintiffs were "falsehoods" and "everything about [Ogola] was false." Ex. 15 at 84:2-85:4. The other plaintiffs were not "genuinely affected." *Id.* at 63:12-16, 65:11-66:5, 86:1-6. When Gbarabe told his Nigerian counsel, Ebgegi, that the other plaintiffs' claims were baseless, Gbarabe was told to mind his own business. *Id.* at 63:12-16, 84:9-19, 86:1-6. The allegations of damage incurred by Gbarabe and his community were "doctored" and he had not been shown the second amended complaint until long after it was filed. *Id.* at 294:11-295:17.

The allegations specifying damages to the other plaintiffs were also false.  Counsel later asserted that the allegations were based on the affidavits that Ogola gave them at the London meeting.  Ex. 3 at 7.  But the affidavits do not support the allegations.  For example, Itonyo's affidavit said nothing about any physical injury to himself, asserting only that "[o]thers have suffered diarrhea, cholera, because they drink from the polluted water and cook their food with same."  Ex. F ¶ 7.   This contention was converted to allege: "As with fellow members of the community, [Itonyo] suffered debilitating health ailments, such as diarrhea and nausea, from the effects of drinking and utilizing contaminated water."  ECF No. 45 ¶ 12(v); *E.g.*, *compare* Ex. D ¶ 10 *with* ECF No. 45 ¶ 12(iii); *compare* Ex. 9, *with* ECF No. 45 ¶ 12(vi); *compare* Ex. E ¶ 8, *with* ECF No. 45 ¶ 12(iv).[10]

Gbarabe also discredited Schedule A as "doctored" by Egbegi and Ogola to assert inflated and baseless claims.  Ex. 15 at 112:12-113:16, 115:25-116:2.  And plaintiff's litigation coordinator testified that many of the putative claimants listed in the Schedule A do not exist.  Ex. 14 at 79:3-8, 80:8-22; ECF No. 127-1 ¶ 1.  When he enlisted agents to verify the list of claimants, in certain communities he found that "almost hundred percent of the list there was fake" and purported claimants did not even exist.  *Id*. at 78:24-79:8.  Counsel later admitted that they knew by June 2015 that Schedule A was false.  Ex. 5 at 3.  But they took no action to inform the Court or defendant, or to correct the record.  On the contrary, the operative fourth amended complaint continues to incorporate the doctored Schedule A.

**E.    Relationship Between Counsel and Ogola.**

The final breakdown in the relationship between Ogola and counsel occurred after the start of discovery.  On March 10, 2015, Ogola complained to counsel that even after their July 2014 conference, counsel still is "not updating me timely, on the needed information and developments[.]"  Ex. B at 1.  "I wonder why this habit[] should continue with you, at this critical stage, when I am the lead complainant."  *Id.*  He claimed that counsel had even failed to provide

---

[10] Gbarabe testified that his affidavit was largely false and that the document purporting to give power of attorney to Egbegi to act on Gbarabe's behalf was also false.  Ex. 16 at 135:8-168:11, 198:15-202:6.  Gbarabe claimed to have signed the affidavit because it had been drafted by his counsel, Egbegi, whom he trusted.  *Id*.

him a "legal engagement agreement" as promised at the 2014 London meeting. *Id.* at 2. Assuring counsel of his "irrevocable continued commitment," Ogola stated that "myself and funding partners are near 90% towards receiving funds to continue with this law suit," and that he "would also supply you with every other interrogatory information that you need from us." *Id.* at 4-5. But Ogola cautioned that plaintiffs and their counsel needed "to quickly [] do three things": (1) "buy time" to enable him to provide the information sought in the discovery requests; (2) "**bring in additional lawyers to join and support you in prosecuting this law suit**"; and (3) "urgently introduce funding[.]" *Id.* at 4-5 (emphasis added).

### F.    Plaintiff's Counsel Abandons Ogola and Four Other Plaintiffs.

In the next round of pleadings, Ogola and four other plaintiffs, along with 80% of the putative class were dropped. Leading up to that, plaintiffs' counsel told defendant on February 27 that they intended to narrow their case to claims that their experts had determined were "reasonably certain and scientifically supportable." Ex. 17 at 2. On March 19, counsel stated that they planned to drop "at least one half of our present lead Plaintiffs[.]" Ex. 18; *see also* Ex. 19 at 1. On March 27, 2015, they advised Egbegi of "serious questions" whether most of the communities had "viable claims" and expressed their belief that Ogola and four other plaintiffs should "step down and withdraw their claims." ECF No. 81, p. 27.

It does not appear that counsel informed Ogola or the other plaintiffs that their claims were not viable. Instead, they told Ogola that his responses to Chevron's discovery requests were overdue and that he would have to withdraw or face personal liability if he did not provide complete responses by March 31. ECF 81, p. 37. Chevron earlier had agreed to extend the due date to April 3 (Ex. 20), but counsel evidently did not notify Ogola.

On May 12, 2015, Chevron moved to dismiss five of the six plaintiffs as a sanction for their failure to respond to the discovery requests. *See* ECF No. 77. On May 26, on behalf of all six plaintiffs, counsel told the Court that they did not oppose the motion. *See* ECF No. 80. Contrary to Ogola's recent assurance of his "irrevocable continued commitment," counsel represented to the Court that the five plaintiffs became "completely unresponsive" after counsel presented them with "objective scientific evidence" showing that they did not have a "provable

claim." *Id.* at 2:18-25.  It appears that counsel did not advise their clients of counsel's intention to file this brief or take the positions set forth in it.  Plaintiff's privilege log lists no communications between counsel and their clients during this period.  Exs. 8, 10, 21.

Counsel's representation that they had developed "objective scientific evidence" appears false.  Plaintiff has never produced any such evidence.  And plaintiff admitted recently that his science expert, Verde, had nothing to do with the "realignment."  Ex. 22 at 1.  Instead, the decision to drop the statewide impact claim was a matter of "common sense."  Ex. 14 at 103:22-105:4.  The point is not that Ogola or the other four plaintiffs ever had valid claims; they did not, as has been admitted by plaintiff, his counsel and multiple witnesses.  The point is that, when counsel dropped those plaintiffs, they did so on the pretext of "objective scientific evidence," apparently to avoid admitting that the claims never should have been made in the first place.[11]

Plaintiffs supported their brief with a declaration from counsel attaching 13 privileged e-mails among counsel of record, Egbegi and Ogola.  ECF No. 81.  Those e-mails contain no discussion of scientific evidence about the provability of the five plaintiffs' claims, although they reveal confidential discussions regarding the absence of expert reports finding statewide impact, the role that class counsel expects the class representatives to play, and other issues.  *See, e.g.*, *id.* at 27-28, 32-35, 37, 39-40.

On June 1, 2015, with the sanctions motion still pending, counsel filed the third amended complaint.  ECF No. 82.  The third amended complaint dropped the five plaintiffs other than Gbarabe, purported to replace them with 11 other plaintiffs, and reduced the putative class from 65,000 to 15,000 persons by reducing the number of communities from Schedule A that they claimed were in the class (for the communities in the proposed class, they continued to rely on Schedule A).  On July 28, the Court granted defendant's sanctions motion, dismissing the five plaintiffs with prejudice (ECF No. 93), and struck the third amended complaint as unauthorized (ECF No. 94 at 4).

---

[11] Defendant argued that the allegation of statewide impact should be dismissed as implausible (*supra* at 7), but plaintiff—instead of agreeing as a matter of common sense—derided that argument as "geographical surfing of a young associate logging on to the internet and printing out a map of Bayelsa state," which "make[s] a mockery of our entire legal tradition[.]" ECF No. 51 at 7.

DEFENDANT'S MOT. TO COMPEL
COMPLIANCE WITH DISC. REQS.
CASE NO. 14-CV-00173-SI

G.     **The Operative Fourth Amended Complaint and Continuing Fraud.**

In September 2015, by stipulation, Gbarabe filed the fourth amended complaint, dropping all other named plaintiffs and reducing the alleged class to 12,500.  ECF No. 99.  But improprieties continued.  This pleading continued to allege that "all currently known members of the prospective class have been signed to a register which explains the nature of the action, the claims and defenses and the binding nature of any decision, judgment or compromise."  *Id*. ¶ 9.  No such "register" has been produced.  The fourth amended complaint also alleged that a "list of those currently identified with claims have been filed with the Court and served upon defendant," a reference to Schedule A—the document that Gbarabe discredited as "doctored" and exaggerated.

In an apparent effort to cure the fraud, plaintiff undertook earlier this year to collect new claim forms from all putative class members that provide details of their claims and confirm their desire for plaintiff to represent them.  Ex. 16 at 209:1-12; Exs. 23-25.  But, as the recent round of depositions in Lagos confirmed, those forms are riddled with fraud.  For example, claim forms were submitted in the names of deceased persons.  Exs. 26 at 1 (Ephraim Digba), 27 at 2 (Chief Lot Ebifiegnene); *compare* Ex. 23 (damage questionnaire of Susu Freeman), *with* Ex. 28 at 80:19-81:1 (stating that Susu Freeman is deceased).  Plaintiff produced multiple inconsistent forms with matching names, but different income figures and signatures.  Exs. 24, 25, 29 at 150:8-15.  And claim forms were submitted on behalf of individuals without their knowledge or consent using inaccurate information and fraudulent signatures or thumbprints.  Exs. 35 at 18:22-19:15, 52:15-22, 77:20-81:2; 36 at 99:3-10; 37 at 43:21-25; 38 at 19:20-20:25, 22:20-23:13.[12]

II.     **CHEVRON'S DISCOVERY EFFORTS AND PLAINTIFF'S SELECTIVE DISCLOSURES.**

After the revelations at Gbarabe's deposition (*supra* at 8-9), defendant propounded formal interrogatories and requests for production on these topics.  Plaintiff's responses were inadequate.  Exs. 2, 30.

**Interrogatory No. 14** sought the information relied on for the allegations of plaintiffs'

---

[12] Defendant recently served discovery requests to obtain fuller evidence regarding the improprieties in the claim form process.

injuries. Ex. 2 at 3-6.  In response, plaintiff stated that he was not in contact with counsel until after the second amended complaint (*id*. at 6:22-23) and mostly limited his response to information known to him.  He excluded information known to his counsel except for a few self-serving assertions.  As a result, he provided no information about the sources relied on for the allegations of plaintiffs' injuries, defeating the point of the interrogatory.  He did not even include information his counsel had provided to Chevron orally and in e-mails.  *Infra* at 18.

**Interrogatory No. 15** sought a description of communications by counsel, plaintiffs or their representatives concerning the allegations regarding the plaintiffs' injuries.  Plaintiff again limited his response to information personally known to him, except for some speculation about counsel.  He stated that his counsel "believed they were dealing with reputable people," and "as soon as [they] became aware that people may not have had provable claims, they initiated an independent investigation[.]"  Ex. 2 at 5:27-6:1, 6:7-8.  Counsel contacted Gbarabe directly for the first time in 2015—more than a year after filing the case—because "they had become dissatisfied with and concerned about whether whatever information that was being provided by the Nigerian referring attorneys was wholly accurate[.]"  *Id*. at 8:10-16.  "[M]y present attorneys deduced that . . . I was likely to have the most accurate local information . . . [and] we were together able to deduce that a great many of the communities then in the lawsuit were, by the fact they were not at or near the coast, unlikely to have suffered damage that was capable of proof[.]"[13]  *Id*. at 8:19-9:2.  But, he refused to provide facts known to counsel as called for by the interrogatory.  *Id*. at 8:8-9, 9:4-6.

**Interrogatory No. 16** called for a description of how plaintiff (defined to include counsel and any other representatives) discovered that the pleadings contained false or fraudulent allegations.  Plaintiff avoided a substantive answer by denying that he ever said any of the pleadings "contain false or fraudulent allegations."  Ex. 2 at 9:23-10:19.  This despite his

---

[13] Plaintiff also mischaracterized Interrogatory No. 15 as excluding communications involving counsel of record, erroneously stating that the definition of "Counsel" in defendant's interrogatories "does not include my present attorneys[.]"  Ex. 2 at 9:5-6.  In fact, defendant's interrogatories define "COUNSEL" as "any lawyer who has represented a plaintiff in this litigation in connection with the same claims asserted in this litigation, regardless of the jurisdiction in which they practice, and includes litigation counsel . . . or any other legal counsel."  Ex. 39 at 2, ¶ 4.

DEFENDANT'S MOT. TO COMPEL
COMPLIANCE WITH DISC. REQS.
CASE NO. 14-CV-00173-SI

deposition testimony that Ogola was all "falsehoods," that the plaintiffs other than himself were not "genuinely affected," and that Schedule A and the claims of his own injuries were "doctored." *See supra* at 9.  Elsewhere in his interrogatory responses, Gbarabe admitted, with some understatement, that the damages alleged in the second amended complaint "might not be wholly accurate" and there had been "some meddling with the figures" in Schedule A.  Ex. 2 at 7:2-3, 7:19.  But he provided no information about how the inaccuracies and "meddling" had been perpetrated or discovered.

**Interrogatory No. 17** sought a description of the circumstances under which the five former plaintiffs and 52,500 class members were dropped from the action.  Plaintiff again refused to provide facts known to his counsel, offering only partial, self-serving comments about counsel's thought-processes.  In particular, he described his first telephone conversation with counsel, in 2014:  "[S]he asked all the people assembled there as plaintiffs about their personal knowledge of the explosion, the manner in which each of the represented communities were damaged and how.  Based upon what I heard and the impression that formed in my mind, I felt Ms. Perry was not satisfied with what she was hearing until she got to me and I explained about [my community]."  Ex. 2 at 11:21-27.  "I know my attorneys were extremely diligent in collecting as much information as possible and that it was their intent right from that first direct contact to ensure the case only contained claims from individuals within an area for which there appeared to be credible objective evidence[.]"  *Id.* at 12:11-16.  Plaintiff stated that the decision to drop the plaintiffs and class members was "based upon many different sources" that his counsel would know about, but did not describe those sources because they are known to counsel, not him.  *Id.* at 11:3-7, 12:18-21.[14]

**Interrogatory No. 19** asked whether plaintiff's counsel ever reviewed or had access to the documents that were the basis for Schedule A to the second amended complaint.  Ex. 2 at 14:9-12.  Plaintiff answered only that he lacked personal knowledge.  *Id.* at 14:15.

In the meet and confer process, plaintiff promised to provide supplemental interrogatory

---

[14] Interrogatory No. 18 asked plaintiff how he obtained authorization to represent others. He referred to an agreement by "lead claimants" that he will be "lead plaintiff."  This interrogatory is not part of this motion.

responses attesting under oath to the information that counsel relied on for the original and second amended complaints, and the circumstances surrounding his abandonment of the five former plaintiffs. Ex. 11 at 1 (stating that plaintiff had provided "direct and full answers" informally in e-mails and conversations and would provide "this same information in a formal discovery response . . . as soon as possible"). But he later changed his mind and now claims that his responses are "full and comprehensive" but only if "viewed in conjunction with all other materials provided either by formal discovery response or by reference to the inordinate amount of information provided informally[.]" Ex. 8 at 1.

Chevron's requests for production sought, *inter alia*, communications among plaintiffs and counsel of record (RFP No. 77), Egbegi (RFP. No. 78) and Ogola (RFP No. 78(2)); documents relied on by plaintiff and counsel to file suit (RFP No. 81); documents on the decision whether to file or continue the lawsuit (RFP No. 82); and documents on dropping the five former plaintiffs and 80% of the putative class (RFP No. 84). Ex. 1 at 6-7. Plaintiff initially objected based on attorney-client privilege and work product protection. But he agreed to produce some documents after defendant agreed to stipulate that additional documents produced in response to those requests for production would not constitute a further waiver of privilege. *See* Stip. and Order (ECF No. 122); *see also supra* at n.4. The documents that plaintiff produced include Ogola's March 10, 2015 e-mail, the transcript of his counsel's July 2014 meeting with Ogola, and the affidavits from the six plaintiffs that Ogola provided to counsel at that meeting. Exs. A-F.

But plaintiff refused based on attorney-client privilege and work product protection to produce 73 other e-mails and one letter among counsel, Ogola, Egbegi and Ekhorutomwen between February 2013 and January 2016. Plaintiff provided a log with cryptic descriptions of those e-mails. Exs. 8, 10, 21. They appear to concern the same topics on which plaintiff waived privilege—*i.e.*, instructions and information on which the original and amended complaints were based, the "doctored" Schedule A (described as "lists of clients" or just "lists"), and the apparent falling-out between plaintiff's counsel and the five former plaintiffs.

1

2

### III.    ARGUMENT.

#### A.    The Requested Documents and Information Are Relevant to Plaintiff's Class Certification Motion.

3

Adequacy of plaintiff and his counsel is a fundamental prerequisite to class certification

4

under Rules 23(a)(4) and 23(g)(1).  Rule 23(g)(1)(A)(i) mandates that the Court "must consider"

5

"the work counsel has done in identifying and investigating potential claims in the action."

6

"[F]ailure to make a reasonable pre-filing investigation of proposed class representatives is

7

sufficient to find counsel inadequate." *Ballan v. Upjohn Co.*, 159 F.R.D. 473, 489 (W.D. Mich.

8

1994).  Indeed, "[a]nything 'pertinent to counsel's ability to fairly and adequately represent the

9

interests of the class' bears on the class certification decision," including "an attorney's

10

misconduct or ethical breach." *Reliable Money Order, Inc. v. McKnight Sales Co., Inc.*, 704 F.3d

11

489, 498 (7th Cir. 2013) (quoting Fed. R. Civ. P. 23(g)(1)(B)).  "[I]t is clear that a lawyer's

12

unethical conduct, both before and during the litigation in question, is relevant to determining

13

whether counsel is adequate under Rule 23." *White v. Experian Info. Sols.*, 993 F. Supp. 2d 1154,

14

1170-71 (C.D. Cal. 2014).

15

Plaintiff cannot genuinely dispute the relevance of his and his counsel's adequacy as class

16

representatives and the importance of determining whether fraud on the court has been

17

committed.  On the contrary, plaintiff acknowledged the relevance of these issues by submitting

18

declarations of counsel in support of his class certification motion attesting to their purported

19

diligence in eliminating fraudulent claims and ensuring that the case is ethically presented.  ECF

20

No. 123 at 47, 57 of 66.

21

#### B.    Plaintiff's Privilege Objections to Defendant's Interrogatories Are Waived and Meritless.

22

23

Plaintiff waived privilege and work product protection with respect to subject matters of

the interrogatories by selectively disclosing privileged information on those matters and putting

24

his counsel's diligence in finding and eliminating fraud at issue in his class certification motion.

25

Intentional disclosure of documents and information protected by attorney-client privilege or

26

work product protection waives privilege for other information concerning the same subject

27

matter where the disclosed and undisclosed documents "ought in fairness to be considered

28

DEFENDANT'S MOT. TO COMPEL
COMPLIANCE WITH DISC. REQS.
CASE NO. 14-CV-00173-SI

together." Fed. R. Evid. 502(a)(3); *Aclara Biosciences, Inc. v. Caliper Tech. Corp.*, 2001 WL 777083, at *4 (N.D. Cal. June 16, 2000).  "[A party] . . . cannot be allowed, after disclosing as much as he pleases, to withhold the remainder."  *Weil v. Inv./Indicators, Research and Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981) (citation and quotation marks omitted).  Plaintiff "cannot hand-pick documents to its benefit for limited production during discovery, and hold back similarly dated documents relating to the same issues." *Hydranautics v. Filmtec Corp.*, 2003 WL 23358187, at *3 (S.D. Cal. July 23, 2003).

In a conscious effort to blame their Nigerian counterparts for the falsehoods in previous versions of the complaint, plaintiff and his counsel disclosed their account of the basis for the allegations in the original and amended complaints and later jettisoning the five former plaintiffs and 80% of the class.  Ex. 5 at 4; Ex. 3 at 5-7; Ex. 4 at 2; Ex. 8 at 1, ECF No. 115 at 16.  They filed privileged e-mails to support their explanation for abandoning the five former plaintiffs.  ECF Nos. 80 at 2; ECF No. 81 at 8-41.  Without objection or instruction not to answer, plaintiff testified in his deposition to conversations in which he purportedly notified his former Nigerian co-counsel (Egbegi) that the five former plaintiffs claims were "falsehoods" and Schedule A was "doctored."  Ex. 15 at 111:19-113:9, 115:24-116:21.  Plaintiff also provided interrogatory responses and deposition testimony on the content of conversations among himself, counsel of record and the former plaintiffs during which it purportedly became clear that the former plaintiffs did not have valid claims.  Exs. 15 at 63:17-65:9, 70:6-71:13; 2 at 11:16-12:8.  And plaintiff submitted interrogatory responses and declarations of his current counsel in support of class certification attesting to his counsel's purported diligence in weeding out fraudulent claims.  ECF No. 123 at 47, 57; Ex. 2 at 5:27-6:2, 8:10-16.

These disclosures waived privilege with respect to (1) the basis for the original and amended complaints, which included the fraudulent claims of the five former plaintiffs, bogus allegations of statewide impact and the "doctored" Schedule A; and (2) the circumstances surrounding the abandonment of the five former plaintiffs and 80% of the putative class.[15]

---

[15] The recent depositions in Nigeria revealed ongoing irregularities (*see supra* at 12), which are the subject of pending requests for production by Chevron.

DEFENDANT'S MOT. TO COMPEL
COMPLIANCE WITH DISC. REQS.
CASE NO. 14-CV-00173-SI

Plaintiff cannot disclose privileged communications and work-product information to cast blame on his Nigerian former co-counsel and co-plaintiffs, and then assert privilege as a shield to prevent disclosure of facts that may tell a different story. He cannot submit declarations and interrogatory responses attesting to his counsel's diligence and good faith, and then withhold evidence that may lead to a different conclusion. He cannot purport to "fully summarise[]" the documents and then claim they are privileged and confidential. Ex. 32 at 2.

Counsel concedes that plaintiff's interrogatory responses are incomplete but argues that they are adequate because counsel's informal responses are "full and comprehensive." Ex. 8 at 1. But informal e-mails or oral conversations are no substitute for written, verified interrogatory responses. *See* Fed. R. Civ. P. 33(b)(3) ("Each interrogatory must, to the extent it is not objected to, be answered separately and fully in writing under oath."); *Frontier-Kemper Constructors, Inc. v. Elk Run Coal Co., Inc.*, 246 F.R.D. 522, 529 (S.D. W. Va. 2007) (interrogatory responses not answered under oath and signed by the person making the answers are "utterly deficient"); *United States v. Dimucci*, 110 F.R.D. 263, 265 (N.D. Ill. 1986) ("an oral response is not sufficient under Rule 33(a)"). And, if all the requested information had been provided informally, it would be a further reason why plaintiff cannot hide behind privilege to avoid answering the same questions under oath. *See, e.g.*, *United States v. Mass. Inst. of Tech.*, 129 F.3d 681, 687 (1st Cir. 1997) ("disclosure to an adversary, real or potential, forfeits work product protection").

The reality, though, is that plaintiff has not provided all responsive information even in e-mails or conversation. As illustrated by his privilege log, plaintiff has not disclosed all of the communications between counsel and others on these topics. He has disclosed material portions of important communications, but not all of them. He claims that all instructions on suing were "oral," but the log refers to a written instruction. No information has been provided, oral or written, as to how the six plaintiffs were chosen other than counsel's "preliminary opinion letter" which said that "selecting Plaintiffs can be resolved by reference to further and clear instruction from the communities in Nigeria and by reference to what may be permitted by the Court." Ex. G at 4. Nor, has plaintiff disclosed the "objective scientific evidence" that supposedly was the basis for narrowing the case, if any existed. ECF No. 80; Ex. 17 (vowing to pursue claims only for

persons "located in what is established by our experts as a reasonably certain and scientifically supportable zone of impact"). Plaintiff's counsel also represented to the court that they relied for the original complaint on an "initial report on the extent of the damage" prepared by the Nigerian referring attorneys. ECF No. 114 at 11:19-20. But plaintiff has never produced that report. Defendant's interrogatories, as shown above (pp. 13-15), require plaintiff to provide the full story regarding these matters under oath.

Plaintiff also improperly limited his interrogatory responses to information within his personal knowledge and objected on the grounds that attorney-client privilege shields any information that a client provides an attorney or the attorney gathers in the course of representation. Ex. 2 at 2:16-21. These limitations and contentions are incorrect. It is black letter law that "privilege only protects disclosure of communications," not "the underlying facts by those who communicated with the attorney," (*Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981)), and that a party answering an interrogatory "is required to give the information available to him, if any, through his attorney, investigators employed by him or on his behalf, or other agents or representatives, whether personally known to the answering party or not." *See Sevey v. Soliz*, 2011 WL 2633826, at *4 (N.D. Cal. July 5, 2011).

Plaintiff should be required to provide complete, verified responses to defendant's interrogatories stating (a) the basis on which his counsel alleged in the original complaint and first and second amended complaints that the accident had caused statewide impact and damaged the five former plaintiffs, including any communications relating to those allegations and any expert or other reports counsel reviewed or relied on regarding the extent of damage; (b) how and when plaintiff and his counsel discovered that the damages allegations were false and that Schedule A was doctored and included non-existent putative claimants; (c) whether plaintiff's counsel ever reviewed or had access to the documents on which Schedule A is based; and (d) the circumstances surrounding the abandonment of the five former plaintiffs and their communities, including the former lead plaintiff's desire to bring on other lawyers. This last point includes setting forth whether the "realignment" was based on "objective scientific evidence" as represented to the Court or simply "common sense" as appears to be the case.

1

2

### C.    The Communications Listed on Plaintiff's Privilege Log Fall Within the Scope of the Waiver.

3

4

Plaintiff's descriptions of the 74 withheld documents are terse and provide little

information.  Ex. 21.  Plaintiff refused to provide more substantive descriptions.  Ex. 8 at 2.  But

5

the dates of the communications, combined with the scant information in the privilege log,

6

suggest that they pertain to the same topics on which plaintiff has waived privilege.

7

The first 10 logged e-mails are during the period leading up to the filing of the original

8

complaint on January 13, 2014.  This is when Ekhorutomwen referred the case to plaintiff's

9

counsel and purportedly provided "clear instructions" that were the basis for the false damages

10

allegations.  Ex. 4 at 4.  Ekhorutomwen told counsel that Egbegi had led a team of fixers to gather

11

"comprehensive information" and perform "full due diligence."  Ex. 3 at 5.  Counsel represented

12

that, although these assurances turned out to be false, counsel had no reason at the time to doubt

13

them.  *Id.*, Ex. 31.  Counsel also represented that he had provided "full and frank disclosure of all

14

written materials that passed between [counsel and Ekhorutomwen] prior to the Complaint filed

15

in this matter[.]"  Ex. 8 at 2.  But plaintiff has not produced the "instructions" or assurances that

16

Ekhorutomwen provided and the log lists several communications between counsel and

17

Ekhorutomwen during this period.  They are described as the "first 'formal' instruction" to sue,

18

"discussion re case," "Opinion sent," "case logistics," and "planning California litigation."  Ex.

19

21 at 1.  These e-mails will show the information and instructions that Ekhorutomwen actually

20

gave counsel and whether, as counsel claims, there truly was no hint that plaintiffs' claims were

21

not genuine.

22

The next 25 e-mails date from the original complaint to the filing of the second amended

23

complaint on September 3, 2014.  Ex. 21.  During that period, counsel met with Ogola to discuss

24

the range of topics included in the produced meeting notes, and false allegations of personal

injury and property damage for plaintiffs were added in the second amended complaint.  This is

25

the period when counsel had the conference call with Gbarabe and two of the former plaintiffs

26

during which it became clear that the former plaintiffs did not have valid claims, as Gbarabe

27

testified in his deposition and interrogatory responses.  From their cryptic descriptions and dates,

28

the e-mails in this time period appear to deal with three related topics: the "client base" or "lists of clients" which apparently is the "doctored" list of 65,000 purported claimants and their damages (Nos. 26, 32, 34); "development with contact of Ogola" and communications with him and Ekhorutomwen just before filing the false damages allegations (Nos. 30, 31, 36-43); and the roles of the Nigerian lawyers whom plaintiff and counsel blame for all irregularities (Nos. 33, 35, 38).[16]  This is also when Ogola sought to fire counsel but was told that he would have to pay an £875,000 exit fee.  The transcript of counsel's meeting with Ogola states that Ogola "wrote and said, 'I don't want to go on'"; Ekhorutomwen wrote back and said "'If you do that, this is what you will owe." Ex. A at 5.  Plaintiff's counsel purported to summarize those communications, but refuses to produce the messages themselves.  Ex. 10.

The final 39 log entries relate to communications sent in the period leading up to counsel's dismissal of the five former plaintiffs and 80% of the class in the third amended complaint and in the months thereafter.  As discussed (p. 11), plaintiff volunteered several e-mails from this period to support his counsel's explanation for abandoning the five former plaintiffs.  Many of the withheld communications likely concern the same subject, such a June 21, 2015 letter from Egbegi described as a "litigation discussion," and e-mails "re client base and documents," "re: direct contact with clients," "re original lead Plaintiffs" and "respective roles of attorneys in case."  (Nos. 46, 49, 58, 63, 65)

Plaintiff should be ordered to produce these 74 communications and any other documents concerning the fraudulent damages allegations in the original and amended complaint, the bogus Schedule A and the abandonment of the five former plaintiffs and their communities.

### D. Plaintiff Also Should Be Required to Produce Other Withheld E-mails on These Subjects.

As noted, plaintiff attached 13 e-mails between his counsel, Egbegi and Ogola to a declaration filed to support the contention that the five former plaintiffs were abandoned because

---

[16] Item 39 is described as a 12/2/14 e-mail from Perry to Ekhorutomwen "requesting full report and provenance of a report supplied."  The report is not identified and there is no statement that it was produced.  Except to the extent it repeats privileged communications or was created by Ekhorutomwen to prepare for trial, it would not be privileged in any event.

they became unresponsive and other messages that were part of those exchanges.  But without explanation or justification, plaintiff redacted some parts of the 13 produced e-mails, including the name of a recipient and parts of certain sentences and paragraphs.[17]   Plaintiff also withheld other messages referred to in those e-mails and in the March 10 e-mail from Ogola, including a message sent to Ogola that included a set of questions,[18] an e-mail from Ogola that counsel quotes and responds to,[19] Ogola's "frantic efforts" to reach counsel and obtain information about the status of the case,[20] and counsel's response to those efforts "with explanations."[21]  Disclosing part of a privileged communication while redacting or withholding the remainder is the epitome of selective waiver.  *See McGoldrick v. TruePosition, Inc.*, 2008 WL 4613860, *2 (E.D. Pa. Oct. 14, 2008) ("plaintiff cannot pick and choose which pieces to intentionally divulge while claiming privilege for the entire document"); *Coleman v. Sterling*, 2011 WL 1099793, at *4 (S.D. Cal. Mar. 24, 2011).

Plaintiff also should be required to produce e-mails between counsel and Alagoa Morris, plaintiff's litigation coordinator, regarding narrowing the class and abandoning the five plaintiffs and their communities.  As noted (*supra* at 17-18), plaintiff waived privilege with respect to the "realignment" process.  Morris advised counsel on that process, and his communications with counsel were mainly by e-mail.  Ex. 14 at 103:22-105:24, 287:6-14; *see also* Ex. 34.

---

[17] *See, e.g., id.* at 34 of 41 ("█████████████████████████████████████████████
████████████████████████████  We fully expect the court to order a painstaking investigation of every step
████████████████████████████ regarding the process of ████████████ claimants, including
the procedures you used to ensure the genuine nature of each claim, the exact method you used to calculate individual damages and a comprehensive examination of the manner in which you ensure each individual was provided with full and open disclosure of the proceedings he had elected to be part of.").

[18] ECF No. 81 at 33 ("the questions I sent you, along with those propounded by Chevron, set out what must be provided to prove loss").

[19] ECF No. 81 at 39 ("You say in your e-mail that even shipment of materials regarding sign-up of claimants will be delayed even now, along with 'procurement of other information and development of other evidence'.").

[20] Ex. B at 1.

[21] *Id.*

1

**E.   Attorney-Client Privilege and Work Product Protection Do Not Apply to Communications Made in Furtherance of Fraudulent Claims.**

2

3       Plaintiff's selective waiver is sufficient grounds to require him to produce the withheld

4   documents and provide full interrogatory answers.  Application of the crime-fraud exception is an

5   independent ground for reaching the same result.  A party seeking to invoke the crime/fraud

6   exception must show "that the communications with the lawyer were in furtherance of an

7   intended or present illegality and that there is some relationship between the communications and

8   the illegality." *United States v. Martin*, 278 F.3d 988, 1001 (9th Cir. 2002) (citation and

9   quotation marks omitted).  The evidence presented must establish "reasonable cause to believe

10   that the attorney's services were utilized in furtherance of the ongoing unlawful scheme." *Id.*

11   (quotation marks omitted).  "The crime-fraud exception does not require that the attorney have

12   participated, even unwittingly, in the client's criminal activity." *In re Grand Jury Proceedings*,

13   87 F.3d 377, 382 (9th Cir. 1996).  It applies to attorney-client privilege and work product

14   protection alike. *Roberts v. Heim*, 123 F.R.D. 614, 635 (N.D. Cal. 1988).

15       Making baseless claims and false representations to the court constitutes a fraud that

16   vitiates the attorney-client privilege and work product protection. *Specialty Minerals, Inc. v.*

17   *Pleuss-Stauffer AG*, 2004 WL 42280, at *5 (S.D.N.Y. Jan. 7, 2004) (pursuing sham litigation is a

18   fraud); *Cleveland Hair Clinic, Inc. v. Puig*, 968 F. Supp. 1227, 1241 (N.D. Ill. 1996) (bad faith

19   litigation justifies application of the crime-fraud exception); *E. Fin. Corp. v. JSC Alchevsk Iron &*

20   *Steel Works*, 258 F.R.D. 76, 85 (S.D.N.Y. 2008) ("When an attorney misrepresents . . . material

21   facts to the court, or acts on a client's perjury or distortion of evidence, his conduct . . .

22   constitute[s] a fraud on the court.") (internal citations omitted).

23       The evidence outlined above is more than sufficient to establish reasonable cause to

24   believe, at the very least, that Ogola and Egbegi used the services of Ekhorutomwen and counsel

25   of record to pursue knowingly false claims and make knowing misrepresentations to the court.

26   The claims of statewide impact were false and "very bogus." *Supra* at 8.  Gbarabe knew from the

27   start that the five former plaintiffs were not affected by the accident. *Supra* at 8-9.  The repeated

28

- 23 -

allegation of expert reports showing damage in "all areas" was also false.  No such expert reports ever have been produced, and plaintiff's counsel admitted in an internal e-mail that no expert reports ever found damage to the inland areas of Bayelsa State.  *Supra* at 8.  Indeed, in July 2014, Ogola told plaintiff's counsel that existing expert reports would not support their case because they were limited in scope.  *Supra* at 6.  Nevertheless, the second amended complaint, filed less than two months later, continued to allege that expert reports had found statewide impact.  There is no obvious explanation for how plaintiffs could have alleged in good faith to have expert reports that never existed.  And although, by all accounts, Schedule A was "doctored," every iteration of the complaint referred to or incorporated it.

In sum, the evidence establishes, at the least, that the Nigerian former co-counsel and co-plaintiffs used counsel of record to advance allegations and claims that they knew to be false. This vitiates any privilege or work product protection that may have applied to communications with Ekhorutomwen, Egbegi and Ogola.  *See United States v. Hightower*, 2004 WL 897886, at *3 (N.D. Ill. Apr. 23, 2004) (where the defendant retained an attorney for the purpose of committing a fraud "there never was a legitimate attorney-client relationship established," and the privilege protected nothing that was communicated).

## IV.  CONCLUSION.

For these reasons, plaintiff should be ordered to produce unredacted versions of the e-mails filed as exhibits to the Declaration of Neil Fraser (ECF No. 81), the 74 communications listed on his privilege log, any other communications with the former plaintiffs, referring attorneys and their representatives, and any communications concerning the abandonment of the five former plaintiffs and narrowing of the putative class.  In the alternative, plaintiff should be ordered to submit the documents for *in camera* review, and to produce any documents that were in furtherance of the fraudulent claims or that relate to the false damages allegations or the dismissal of the five former plaintiffs.

Plaintiff also should be ordered to provide complete, verified responses to defendant's interrogatories stating (a) the basis on which his counsel alleged in the original complaint and first and second amended complaints that the accident had caused statewide impact and damaged the

five former plaintiffs, including any communications relating to those allegations; (b) how and when plaintiff and his counsel discovered that the damages allegations were false and that Schedule A was doctored and included non-existent putative claimants; (c) whether plaintiff's counsel ever reviewed or had access to the documents on which Schedule A is based; and (d) the circumstances surrounding the abandonment of the five former plaintiffs and their communities, including the former lead plaintiffs desire to bring on other lawyers and the imposition of an £825,000 exit fee.

Dated: July 22, 2016                                   Respectfully submitted,

                                                       Jones Day


                                                       By:  /S/ Robert A. Mittelstaedt
                                                            Robert A. Mittelstaedt

                                                       Counsel for Defendant
                                                       CHEVRON CORPORATION