Robert A. Mittelstaedt (State Bar No. 60359)
ramittelstaedt@JonesDay.com
Caroline N. Mitchell (State Bar No. 143124)
cnmitchell@JonesDay.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA  94104
Telephone:     415.626.3939
Facsimile:     415.875.5700

Christopher H. Domingo (pro hac vice)
chdomingo@JonesDay.com
JONES DAY
717 Texas, Suite 3300
Houston, TX 77002
Telephone:     832.239.3939
Facsimile:     832.239.3600

Attorneys for Defendant
CHEVRON CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NATTO IYELA GBARABE,<br><br>Plaintiff,<br><br>v.<br><br>CHEVRON CORPORATION,<br><br>Defendant. | **Case No.  14-cv-00173-SI**<br><br>**CHEVRON'S EXHIBITS TO JOINT CASE MANAGEMENT STATEMENT**<br><br>Date:          November 10, 2016<br>Time:          4:00 p.m.<br>Judge:         Hon. Susan Illston<br>Courtroom:  1 |

Attached are Chevron's Exhibits E – J to the parties' Joint Case Management Statement.

Dated: November 7, 2016

**JONES DAY**

By:___ /s/  Robert A. Mittelstaedt___
        Robert A. Mittelstaedt

*Counsel for Defendant Chevron Corp.*

# EXHIBIT E





DONATE

About Us : Our Work : News : Resour… : Get Involved : Contact Us

HOME : PRESS/LINKS : **NIGERIA LOSES $30M WORTH OF FISH ANNUALY**

# Nigeria loses $30m worth of fish annualy

POSTED BY ORBITAL ADMIN   :  2ND APR, 2013   :   IMPACTS OF ILLEGAL FISHING

A fisheries expert has called for the establishment of a National Fish Feed Development Centre to safeguard the nation's fishstock and further boost production in Nigeria.

Delivering the third inaugural lecture from the Department of Wildlife and Fisheries of the University of Ibadan since its establishment in 1981, Professor Eyiwumi Falaye lamented

### RECENT POSTS

**India, Sri Lanka to set up coast guard hotline to deal with fishermen crossing territorial waters**
India and Sri Lanka have decided to set up a coast guard hotline...

that the West African coast lost an average of USD 10 000 worth of its sea treasure to poachers daily, while the nation recorded an annual estimated loss of about USD 30 million, saying ships flying 'Flags of Convinence' had become a menace.

The Professor of Fisheries noted that although the nation's "waters were endowed with some of the world's concentration of highly cherished finfish, crustaceans and mollusks, its coastal fishing communities are amongst the most impoverished and therefore, vulnerable to IUU( Illegal, Unreported Unregulated) fishing by foreign fishing vessels."

According to Falaye, fleets of trawlers belonging mostly to Chinese and Koreans daily flock Nigerian coastal waters, pillaging the seas due to the lack of policing of these areas, carting away landings of shrimps, tuna, lobsters, Sharks and snappers among other sea valuables.

Professor Falaye, who cited the example of Ghana where a Monitoring, Control, Surveillance and Enforcement Unit was strenghtened to ensure that foreign vessels were monitored and deterred from illegal fishing in the country's territorial waters, recommended a partnership between relevant agencies such as the Food Agricultural Organisation(FAO) and the International Commission for the conservation of Trans Antlantic Tunas(ICCAT) "to effectively combat IUU fishing in the West Africa Sub-region."

The inaugural lecturer recommended the adoption of an agriculture and fisheries development policy by all tiers of government to accelerate local production of fish and conserve the huge foreign exchange currently being expended on imported fish.

Present at the event were the Vice Chancellor, Professor Isaac Adewole, who was represented by the Deputy Vice Chancellor(Admin) Professor Arinola Sanya, the Deputy Vice Chancellor (Academic) Professor Idowu Olayinka, the Deputy Registrar, Mr. V. A. A. Adegoroye,Acting burser and other top management officers of the university.

http://tribune.com.ng/news2013/index.php/en/news/item/8370-nigeria-loses-30m-worth-of-fish-annualy-don?goback=%2Egde_4153219_member_227560870/

2 April 2013

Read More...

### Chinese investing to tap huge fish stocks off West African coast

QINGDAO, China — Investors, mainly Chinese, are putting $150 million in a joint...
Read More...

### Dynamite blasts endanger Fisheries Sector in southeast Tanzania

ARUSHA, Tanzania (Xinhua) — Sitting on a veranda of his grass-thatched house, Hemed...
Read More...

### New fishing information system in Maldives signals a step ahead

The new online Fisheries Information System (FIS) recently introduced to Maldivian one-by-one tuna...
Read More...

SIF NEWS CATEGORIES

Select Issue

Select Initiatives

Select Country

## THE ISSUES

One in four fish in Africa is caught illegally, this threatens the sustainability of fish stocks, damages the ecosystem and deprives governments of income and people of livelihoods.

FIND OUT MORE...

## OUR APPPROACH

Creating change by informing policy and practice, our hands on experience and investigative work means we are often the first to spot new trends and find ways to challenge these.

READ MORE...

## OUR INITIATIVES

Illegal fishing is a complex issue that requires multifaceted responses. Stop Illegal Fishing are working with a range of organisations to bring about change.

FIND OUT MORE...

### Stop Illegal Fishing

About Us
Vision and mission
How we are run
News
Contact Us

### Our Work

Approach
Impacts
Resources
Annual Reports

### Issues

Port State
Measures
Flags of
Convenience
Shark Finning
Vessel Identity
Market Access
Securing
Convictions

### Initiatives

FISH-i Africa
West Africa Task
Force
FishCRIME
African Voice
VISIBLE
Industry Charter

Sitemap |
Disclaimer |
Privacy Statement
© 2016 Stop Illegal Fishing. All rights reserved
Designed and Built by Orbital

# EXHIBIT F



HOME   NEWS   SPORTS   POLITICS   BUSINESS   ENTERTAINMENT   OPINION

COLUMNISTS   JOBS

Home  ›  News  ›  South News  ›  Fishing trawler crushes three to death in Bayelsa

News   South News

# Fishing trawler crushes three to death in Bayelsa

October 15, 2016



Tweet

Simon Utebor

Three persons have allegedly been killed by fishing trawlers in coastal communities of Bayelsa State.

It was learnt that the incident occurred on Friday in Brass and Southern Ijaw local government areas of the state.

The residents of the concerned communities of Odioma, Twon-Brass, Sangana, Koluama, Foropah, Ekeni and Ezetu communities also accused the trawlers of engaging in dangerous operations and violation of existing laws.

The communities in a report released in Yenagoa by the

Environmental Right Action/Friends of the Earth Nigeria, accused owners of the trawlers of killing, stealing of fishing nets and sponsoring attacks.

A community leader from Foropa community, Chief Uyadongha Ziprebo, said just a few days ago, someone died as a result of trawlers coming close to the shoreline in the environment.

Ziprebo said, "Two persons from Ilaje in Ondo State, who have resided here for years, going about their fishing activities, went out to fish that night.

"Due to the way a trawler was fast approaching their fishing boat, they jumped into the water and one of them was found dead later by a search team from the community.

"For now, the deceased is identified as Funsho. I don't know his other name. Trawler operators have become really lawless and making things uncomfortable for us; since we are all first and foremost, fisher folks."

Also, an indigene of Ekeni community, John Degbe, added, "For sure, the activities of trawler operators in our environment in recent times have become a major source of worry to our people.

"You know we are fishing people and once our main occupation is threatened, our lives are also threatened. As I speak to you now, there is a very recent case at Foropah, our neighbouring community, where somebody, an Ilaje man, died due to trawler incursion to the coastline.

"They damaged our fishing nets, hooks and floaters on the sea in the shallow waters. We are not really happy about this and unless the authorities intervene, it might lead to a very disastrous level.

"Government should prevail on the trawler owners/operators to go back to where they used to operate lawfully and leave us to also live our lives."

The State Coordinator, ERA/FoEN, Alagoa Morris, lamented the incursion of trawler operators into the shorelines and coastlines of the state.

Morris said, "Trawler operators' incursion to the shoreline is becoming abnormal and threat to the livelihood and lives of residents of coastline communities in Bayelsa State.

"The situation calls for urgent intervention of relevant agencies of the federal and state governments. The law of the sea has stipulated five nautical miles away from the coastline or shoreline for trawlers to operate.

"Besides, captains of trawlers have been assigned the responsibility of not going close to any fishing gears on the waters. They are expected to give a space of over a mile to any such fishing gears in the sea.

"The law also stipulates that captains/operators should promptly report any damage caused to the property of other users of the sea. This gross violation of the law needs to be addressed as it should.

"A brief research indicates that there is an existing law referred to as the Fisheries Act of 1992 or Decree No 108 of 1992 wherein trawling is put at a limit of five nautical miles off the coast or continental shelf."

*Copyright PUNCH.*

*All rights reserved. This material, and other digital content on this website, may not be reproduced, published, broadcast, rewritten or redistributed in whole or in part without prior express written permission from PUNCH.*

Contact: editor@punchng.com

# EXHIBIT G

RE: Project Bayelsa

mailbox:///C:/Users/burwash/AppData/Roaming/Thunderbi...

**Subject:** RE: Project Bayelsa
**From:** Kevin Cleary <kevin.cleary@verde.ie>
**Date:** 08/10/2015 15:30
**To:** Simon Forster <simon.forster@physalia.uk>, "marcus.trett@physalia.uk"
<marcus.trett@physalia.uk>
**CC:** Paul Van Den Bergh <paul.vandenbergh@verde.ie>

Hi Simon,

Thanks for that.

Can you let me know your boat requirements so that I can liaise with the local contact to see if something suitable is available.

I think for the sampling equipment you require this will have to bring your own. Can you include a price for that?

I have a few queries:
- The rate of £500 for field work is that a per person per day rate?
- Which of you will be present during the works to supervise and also to be able to tell a judge that you were present?
- Can you provide an indication of how long it will take for the collection of 50, 75 and 100 samples?
- What kind of spacing are you proposing between the samples?
- How big an area will be covered if you take 50 samples, 75 samples or 100 samples?
- Realistically how many samples can be tested in the time we have been given – Report issued by 1st February.
- I recommend that all samples are transported back to the UK for analysis – I have contacted Jones Environmental for a quote as they are testing a lot of samples from Nigeria.

Can you come back to me on my query in relation to the seabed survey of the area and also if you know somebody that is an expert on assessing fish stock records?

Finally did Prof Joseph Montoya ever come back to you?

Regards,

Kevin

**From:** Simon Forster [mailto:simon.forster@physalia.uk]
**Sent:** 07 October 2015 20:00
**To:** Kevin Cleary; marcus.trett@physalia.uk
**Cc:** Paul Van Den Bergh
**Subject:** Re: Project Bayelsa

Hi Kevin

Please find attached an outline proposal for the benthic survey in the vicinity of the KSE site. Briefly, the survey is much as discussed previously, comprising a 50 station grid analysing the meiofauna, macrofauna and sediment physico-chemistry. This will be analysed using a range of our statistical packages that will identify any changes in the animal communities that are spatially associated with the KSE site and correlate the variance within the biology (the ecology) with both the natural factors (mainly the sediment type and TOC) and the contaminants associated with the KSE incident. This approach will provide a robust assessment of the extent of any residual impacts following the KSE blow-out.

Please note that it essential that we define to chemical attributes that may be associated with the incident in order to relate these to modifications in the animal communities. Any information that you may have on potential chemical markers/signatures for the blowout/fire/on-going gas leak(s) would be very useful and will enable us to cover all chemical bases and identify any potential effects in the bioindicator communities.

PHYSALIA_00093

RE: Project Bayelsa                                    mailbox:///C:/Users/burwash/AppData/Roaming/Thunderbi...

As you will see, I am still awaiting confirmation of the chemical analytical costs from the labs and information on stability times etc. I will forward these asap.

We have suggested collecting replicates of the faunal samples. Whilst we don't normally analyse replicate samples for grid-based surveys, and replication is not necessary for the MVAs, it will be worth having replicates 'in the bank' in case sample variability is raised as an issue by Chevron's legal team. I would suggest that we analyse single samples initially; this will keep the costs down, speed up the taxonomic analyses and enable us to produce findings based on the single samples within the required time scale. We could then analyse the replicates, or randomly selected replicates as and when required.

Have a look through this document. If you have any queries, please feel free to call either myself or Marcus.

Best regards

Simon

On 06/10/2015 12:51, Kevin Cleary wrote:

> Hi Marcus/Simon,
>
> The conference call with the legal team and funders went well yesterday.  They want to tie down details of what we will be doing, associated costs and an outline timeframe. Can you prepare an outline quote by Thursday morning? I think it is important for everybody that there is a clear list of the deliverables.
>
> Yesterday we were informed that the first task will be to prepare a protocol for the work that will then be agreed with Chevron's representatives. We were also informed that they will be present during the sampling and may take duplicate samples.
>
> We are told that Security and logistical support will be provided and we are arranging Insurance cover for the team. Can you outline your requirements for a suitable boat and the support crew. Please also include for taking sediment and water samples.
>
> Once we get budget approval I will meet with you guys in the UK to plan out the works in detail. We are planning to arrange a survey to generate a digital terrain model of the area? Do you think that this would be of benefit to presenting your findings?
>
> Finally, something that came up in discussions yesterday is the completion of assessments on the fishing catches pre and post the incident. We are told that there are records for a number of the Local Fishing Co-Ops that are available. Do you know any expert in this area who could review the existing data-set, obtaining the records from Agencies in Nigeria interview representatives of the Co-Ops and ultimately prepare an expert report?
>
> Look forward to hearing from you.
>
> Kind regards,
>
> Kevin

---

**From:** marcus.trett@physalia.uk [mailto:marcus.trett@physalia.uk]
**Sent:** 06 October 2015 10:41
**To:** Kevin Cleary
**Subject:** Re: Project Bayelsa
**Importance:** High

Kevin –

Simon is in the field sampling in East Anglia at the moment. I have brought him up-to-speed and he is "over-the-moon" that the project has gone live!  He will try to give you call

PHYSALIA_00094

RE: Project Bayelsa                                          mailbox:///C:/Users/burwash/AppData/Roaming/Thunderbi...

today/tomorrow to discuss details. His mobile number is 07890 683 691 if needed <u>but</u> he will be on-board a vessel collecting samples with Toby Ryder-Abrehart our Senior Botanist which can make communications. Could you copy me in on all communications so that I can make the necessary arrangements at this end – in particular getting heavy grab samplers onto site either from the UK or the ones we use from Durban (South Africa).

Hope that all is well,

Marcus


Dr. Marcus Trett
Scientific Director

Physalia Limited - Applied Sciences
Consultant + Forensic Ecologists



**Dr M W Trett**
Scientific Director

Physalia Limited - Applied Sciences
  Consultant & Forensic Ecologists

t  +44(0)1582 764 304
e  marcus.trett@physalia.uk


--

Dr Simon Forster
Senior Consultant

Physalia Limited - Applied Sciences

*Sussex Office:*
t  +44(0)1435 883105
e  simon.forster@physalia.uk



# EXHIBIT H

RE: Nigeria Survey                                              mailbox:///C:/Users/burwash/AppData/Roaming/Thunderbi..

**Subject:** RE: Nigeria Survey
**From:** Kevin Cleary <kevin.cleary@verde.ie>
**Date:** 27/10/2015 09:49
**To:** Simon Forster <simon.forster@physalia.uk>, "Marcus Trett (Physalia)"
<marcus.trett@physalia.uk>

Hi Simon,

Hope you had a good break.

The legal team have still not pressed the button on the project but we have a conference call today to
discuss specific needs on the ground and logistics.

There is no point in meeting face to face until we get the official go ahead.

Paul has been in contact with the owners of the SV Gyre. Can you detail your specific needs during the
survey? How many people will you be bringing and do you require the services of the SV Gyre crew to assist
in your sampling works.

Regards,

Kevin

**From:** Simon Forster [mailto:simon.forster@physalia.uk]
**Sent:** 14 October 2015 22:24
**To:** Kevin Cleary; Marcus Trett (Physalia)
**Subject:** Nigeria Survey

Hi Kevin,

Further to our telephone conversation earlier today, I have pencilled in Tuesday 27th October for a
meeting, either teleconference or face to face. If we have got the go-ahead in the mean time, a face to
face would be useful I think.

If you hear anything from the Legal Team please let Marcus know. He will be around most of next
week except for Friday when he has meetings in Felixstowe. Please copy me in on any emails.

The survey vessel SV Gyre is apparently based in Ghana, so a quick survey in Nigeria on the way
back from Cameroon would fit in perfectly!

Speak to you in a week or so.

All the best

Simon

--

# EXHIBIT I

1   **PERRY FRASER, LLP**
    945 Mayo Street
2   Los Angeles, California 90042
    Phone:      (213) 324-4206
3   nfraser@perryfraser.com; jperry@perryfraser.com

4
    Attorneys for Plaintiff
5

6

7

8                       **UNITED STATES DISTRICT COURT**

9                      **NORTHERN DISTRICT OF CALIFORNIA**

10

11  NATTO IYELA GBARABE, for himself and      CASE NO. 14-cv-00173-SI
12  for Others Similarly Situated,            (Assigned to Hon. Susan Illston, Ctroom 1)

13              Plaintiff,                     **DECLARATION OF NEIL PURSLOW IN
                                               SUPPORT OF PLAINTIFF'S
14  vs.                                        OPPOSITION TO MOTION TO COMPEL
                                               DISCOVERY OF FUNDING
15  CHEVRON CORPORATION,                       AGREEMENT.**

16              Defendant.                     **DATE: JULY 29, 2016
17                                             TIME: 10.00 A.M.
                                               PLACE: COURTROOM ONE**
18
                                               **(UNREDACTED VERSION OF DOCUMENT
19                                                  SOUGHT TO BE SEALED)**
20

21                      **DECLARATION OF NEIL PURSLOW**

22          I, NEIL PURSLOW, declare and state as follows:

23          I am a director and a co-founder of Therium Capital Management Limited and currently

24  serve as the company's Chief Investment Officer. Therium Capital Management Limited is the

25  investment adviser to Therium Litigation Funding IC, the Therium entity providing funding in

26  relation to the case at bar.  Therium Capital Management Limited's role is to advise the board

27  of the investing entities, including Therium Litigation Funding IC, as to their investments,

28                                              1
    _____
              **DECLARATION OF NEIL PURSLOW IN SUPPORT OF PLAINTIFF'S OPPOSITION
              TO COMPEL PRODUCTION OF LITIGATION FUNDING DOCUMENTS**

including Therium Litigation Funding IC's investment in this case. My business address is 77 Kingsway, London WC2B 6SR, United Kingdom.

I have personal knowledge of the following facts and, if called as a witness, I could and would competently testify thereto.

1. Therium Capital Management Limited, and the entities it advises, specialize in providing litigation funding to third parties, a business known in the UK as third party funding.   Therium Capital Management is a founder member of the Association of Litigation Funders of England and Wales and I am director of that organization.  I am also a fully qualified solicitor and thus an officer of the Court of England and Wales.

2. Therium's funding for the case is governed by the terms of a Litigation Funding Agreement operative as of 23 November 2015, formally memorialized in final form as of 29 March 2016, and as amended by a letter of variation dated 18th May 2016, which approved an increase in the initial budget.  Pursuant to those agreements, Therium initially committed funding (defined as "the Committed Funds") of USD 1,500,000.00   On the request from the Lawyers, that figure for the Committed Funds was increased by agreement to USD 1,700,000.00. All mentioned documents are available to be filed under seal with this declaration for *in camera* review.

3. The Committed Funds figure represents the amount of funding committed by Therium to the case from time to time.   As this figure drives the Success Fee (as defined in the Litigation Funding Agreement) due to Therium, it is not in the interests of the Lawyers to seek more funding than they contemplate is reasonably required from time to time.  However, as Therium is already invested in the case, and given that an increase in funding will increase the Success Fee due to Therium, Therium is highly incentivized to provide additional funding if that is required for the case, as was agreed by way of example in the 18th May variation letter. There is no cap or stated limit in the agreement that cannot be exceeded. Therium's

**DECLARATION OF NEIL PURSLOW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO COMPEL PRODUCTION OF LITIGATION FUNDING DOCUMENTS**

resources, by way of a simple internet search, can be seen to be substantial.

4. My understanding is that the funding Therium has provided to date should be sufficient to take the case through to at least the class certification stage, although that is subject to review upon application by counsel if additional funds are deemed by them to be required.

5. I understand that an issue has arisen in the case as to whether there is adequate funding to take the case through to trial.  At this point, for the reasons stated above, Therium has not been asked to increase the Committed Funds figure beyond that currently agreed such as may be required for the trial phase of this case.   No formal decision has therefore yet been taken on additional funding.  However, on receiving such a request, I can say that I would fully expect Therium to approve the additional funding reasonably required to take the case through to trial.  I am not aware of any reason why, if class certification were granted, Therium would not be both willing and able to do so and, to the contrary, it would be in Therium's interests to continue to properly support the case through to resolution.

6. I can also affirm of my own personal knowledge, and by reference to the funding agreement herein, that:

   (a) That Therium does not influence or participate in the litigation of the case and, in particular, does not control settlement;

   (b) That Therium is not entitled to any return or repayment on their investment if there is no recovery in the case;

   (c) That the funding agreement is specifically tailored to avoid all real and/or potential conflicts of interest, allowing for full control of the litigation by counsel of record in all aspects;

   (d) That Therium's recovery is derived from that portion of any recovery which comprises the attorney fees and funding does not diminish or affect in any manner the potential dollar amount of any settlement or judgment in favor of

3

**DECLARATION OF NEIL PURSLOW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO COMPEL PRODUCTION OF LITIGATION FUNDING DOCUMENTS**

1    the plaintiff and/or putative class;

2    (e) That withdrawal of funding cannot be unilateral and may only occur upon

3    material breach of the terms of the agreement, as is the case with all standard

4    contracts.

5    I declare under penalty of perjury under the laws of the State of California that the

6    foregoing is true and correct.

7

8    Executed this 8th day of July 2016 at London, United Kingdom.

9    /s/

10   _____

11   NEIL PURSLOW
     Declarant

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DECLARATION OF NEIL PURSLOW IN SUPPORT OF PLAINTIFF'S OPPOSITION
TO COMPEL PRODUCTION OF LITIGATION FUNDING DOCUMENTS**

# EXHIBIT J

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

- - - - - - - - - - - - - - - - - -
IN THE MATTER OF     )
                     )
NATTO IYELA GBARABE  )
        Plaintiff,   )
                     )         CIVIL ACTION NO:
v.                   )         14-cv-00173-SI
                     )
CHEVRON CORPORATION  )
        Defendant.   )
- - - - - - - - - - - - - - - - - -


DEPOSITION OF DR. BEATRIZ CALVO

VOLUME I

Tuesday, May 3, 2016

AT:  2:53 p.m.


Taken at:

2 Temple Gardens
London
EC4Y 9AY
United Kingdom


Court Reporter:
Leanne Shipp
Accredited Real-time Reporter


(SF-081224B)

DR. BEATRIZ CALVO - 5/3/2016

Page 62

1  figure E1A?
2      A.  Yes.
3          Q.  Were you involved in creating this figure?
4      A.  No.
5          Q.  If you can turn to page 74 of the Physalia
6  report, figure E?
7      MR. FRASER:  E3, Chris?
8      MR. DOMINGO:  Figure E3, yes, thank you.
9      A.  Page 74, right?
10         Q.  Page 74.  This was one of the figures that
11  you created; correct?
12     A.  Yes.
13         Q.  You created the data and Dr. Trett added the
14  annotations at the end?
15     A.  I created the output.  The data was supplied
16  by Jones Environmental.  And, yes, Dr. Trett annotated it,
17  put the -- the plot, yes.
18         Q.  Can you tell us what this figure shows?
19     A.  This figure shows the concentration of
20  aluminium in samples analyzed.  The larger the circles,
21  the higher the concentration.  And the colors refer to the
22  clusters that were found when analyzing the nematodes.
23         Q.  This figure, E3, is for aluminum and then
24  figures E4 through E20 provide the same type of information
25  for other types of metals; correct?

Page 63

1      A.  Correct.
2          Q.  And then figures E21 through E27 provide the
3  same information for dioxins and furans?
4      A.  I don't see the labels very well, but -- oh
5  yes, I see.  E21 to E27 are (inaudible).
6      THE COURT REPORTER:  Are what?
7      A.  Dioxins and furans.
8  BY MR. DOMINGO
9          Q.  Finally E28 and figure E29 provide similar
10  information for aliphatic and aromatic compounds and total
11  organic carbon?
12     A.  Yes.
13         Q.  Okay, now, for all of these figures, the
14  circles correspond to the sampling locations; correct?
15     A.  Correct.
16         Q.  And all of these sampling locations are for
17  the nearfield; correct?
18     A.  Yes.
19         Q.  And you didn't do any of this type of
20  analysis for any of the farfield samples; correct?
21     A.  Correct.
22         Q.  The larger the dot on these figures, the
23  higher the concentration of the analyte?
24     A.  Correct.
25         Q.  You're not offering any opinions as to

Page 64

1  whether the concentrations of any of these analytes are
2  above acceptable levels, are you?
3      A.  No.
4          Q.  You're not offering opinions as to whether
5  the concentrations of any of these analytes pose a risk to
6  fish?
7      A.  No.
8          Q.  And you're not offering any opinions as to
9  whether the concentrations of these analytes pose a risk to
10  human health?
11     A.  No.
12         Q.  You received the chemistry analysis from
13  Jones Environmental Laboratory for not only the nearfield
14  sites but the farfield sites as well; correct?
15     A.  I don't know.  Sorry, yes, the data here,
16  yes.
17         Q.  The data in appendix I to your report, to the
18  Physalia report --
19     A.  Yeah.
20         Q.  -- contains information for the farfield
21  sites as well?
22     A.  I believe so, yes.
23         Q.  Why did you not conduct the same analysis for
24  the farfield sites?
25     A.  Time limiting.  We didn't have time to do

Page 65

1  that.
2          Q.  If you had more time, would you have
3  conducted the same analysis for the farfield sites?
4      A.  It was --
5      MR. FRASER:  Objection, calls for speculation.  Go
6  ahead and answer.
7      A.  It wasn't for me to decide that.
8  BY MR. DOMINGO
9          Q.  You were instructed not to conduct this
10  analysis for the farfield sites?
11     A.  I was instructed to conduct the analysis for
12  the samples that I did.  I was ...
13         Q.  You were instructed to conduct the analysis
14  only for the samples that you received?
15     A.  Yes.
16         Q.  You received no instructions to conduct the
17  same analysis for the farfield samples?
18     A.  I didn't receive instructions for the
19  farfield instructions, no.
20         Q.  What is a univariate analysis?
21     A.  It's an analysis that tries to summarize the
22  information into one variable.  In this case, for instance,
23  it's -- we summarized the information about the species into
24  a number -- the species richness, the number of the species
25  in one sample or the density.  From the data metrics we

17 (Pages 62 to 65)

1               **CERTIFICATE OF COURT REPORTER**

2

3    I, Leanne Shipp, an Accredited Real-time Reporter, hereby

4    certify that the testimony of the witness Beatriz Calvo in

5    the foregoing transcript, numbered pages 1 through 81, taken

6    on this 3rd day of May, 2016 was recorded by me in machine

7    shorthand and was thereafter transcribed by me; and that the

8    foregoing transcript is a true and accurate verbatim record

9    of the said testimony.

10

11

12   I further certify that I am not a relative, employee,

13   counsel or financially involved with any of the parties to

14   the within cause, nor am I an employee or relative of any

15   counsel for the parties, nor am I in any way interested in

16   the outcome of the within cause.

17

18

19   Signed:  ...........

20   Name:    Leanne Shipp

21   Date:    ...........12/5/16

22

23

24

25

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

- - - - - - - - - - - - - - - - - - -
          IN THE MATTER OF

NATTO IYELA GBARABE
                    Plaintiff,
          CIVIL ACTION NO:14-cv-00173-SI
          v.

CHEVRON CORPORATION
                    Defendant.
- - - - - - - - - - - - - - - - - - -

DEPOSITION OF MR KEVIN CLEARY

VOLUME I

FRIDAY, 29th APRIL, 2016

AT:  13:00

Taken at:

2 TEMPLE GARDENS
LONDON
EC4Y 9AY

United Kingdom


Court Reporter:

CHRIS LANG
Accredited Real-time Reporter
(SF-083231)

KEVIN CLEARY - 4/29/2016

Page 10

1  Q. Okay. Which reports?
2  A. Can I refer to this document?
3  Q. Sure. If you can tell me what you are referring to.
4  A. In the first report I prepared, the phase one study, the
5     DES study I was provided a list of documentation.
6  Q. Okay, fair enough. You are referring to the reports
7     that you reviewed for the DES?
8  A. Exactly.
9  Q. Apart from the DES study have you seen any reports that
10    were prepared for this litigation that reached the
11    conclusion that there is any link between the
12    KS Endeavor and an impact on human health?
13 A. I haven't reviewed any reports.
14 Q. You haven't seen any such reports?
15 A. No I haven't.
16 THE COURT REPORTER: Can you wait until the question is
17    finished before you answer, please.
18 A. Yes.
19 Q. Okay, why don't we go over some ground rules for
20    depositions. I am going to ask you a series of
21    questions today and it is important that you answer
22    those audibly, so the court reporter hears what your
23    answer is. I don't want you to shake your head. You
24    can wait until I am done and say yes, does that make
25    sense to you?

Page 11

1  A. It does.
2  Q. Okay, you agree to do that?
3  A. I do.
4  Q. If I ask you a question that you don't understand, then
5     it is important that you let me know that you don't
6     understand the question. So if you can say "I don't
7     understand the question, could you please rephrase".
8     Will you do that?
9  A. I will.
10 Q. Okay.
11    Are you on any kind of medication or is there any
12    reason why you can't testify fully today?
13 A. No.
14 Q. Okay. And I am going to ask you questions. I want you
15    to answer with information that you know and not to
16    speculate or guess unless I ask you to, do you
17    understand that?
18 A. I do.
19 Q. Okay. And if I ask you for any kind of information
20    where you feel like you have to approximate, then I want
21    you to tell me that, do you understand that?
22 A. I do.
23 Q. You are allowed to take breaks during this deposition,
24    and it isn't supposed to be a marathon. So if you feel
25    like you need a break, then that is fine. I just ask

Page 12

1     you that you not take a break between a question and
2     an answer, do you understand that?
3  A. I do.
4  Q. And from time to time it is possible that counsel will
5     object to a question, and unless counsel instructs you
6     not to answer you are to go ahead and answer, do you
7     understand that?
8  A. I do.
9  Q. Okay. Do you have any questions about the deposition
10    before we start?
11 A. No.
12 Q. Okay.
13    Did you supervise anyone in doing any study of the
14    impact of the KS Endeavor on fish at any time?
15 A. No.
16 Q. Okay. And did you supervise anyone in doing a study of
17    the impact of the KS Endeavor on human beings at any
18    time?
19 A. No.
20 Q. And did you ever do any kind of investigation of the
21    impact of the KS Endeavor on any land or soils?
22 A. No.
23 Q. You said that you reviewed the Physalia report, is that
24    right?
25 A. That's correct.

Page 13

1  Q. Okay.
2     Did you make any changes to the Physalia report?
3  A. No.
4  Q. Okay.
5     Did you talk with anyone about the content of the
6     Physalia report?
7  A. Yes I would have spoken to the team.
8  Q. Okay. And who do you mean when you reference the team?
9  A. My main point of contact in Physalia is Simon Forster.
10 Q. Okay and who else would you have spoken with?
11 A. Simon is the only one at Physalia I would have spoken
12    to?
13 Q. What was the nature of your conversations with Simon
14    about the report?
15 A. I can't actually recollect. They weren't significant
16    conversations.
17 Q. Okay. When did you first have a conversation with him
18    about the report?
19 A. I assume when I got the first draft of his report, which
20    was in early April.
21 Q. Okay. When was the last time you had a conversation
22    with him about the report?
23 A. Um, when it was submitted, when it was finalized, on
24    I think it was 6 April.
25 Q. Okay. So you spoke with him about it in early April,

4 (Pages 10 to 13)

1                    CERTIFICATE OF COURT REPORTER

2

3    I, CHRIS LANG, an Accredited Real-time Reporter, hereby

4    certify that the testimony of the witness KEVIN CLEARY in

5    the foregoing transcript, numbered pages 1 through 100,

6    taken on this 29TH day of APRIL, 2016 was recorded by me in

7    machine shorthand and was thereafter transcribed by me; and

8    that the foregoing transcript is a true and accurate

9    verbatim record of the said testimony.

10

11

12   I further certify that I am not a relative, employee,

13   counsel or financially involved with any of the parties to

14   the within cause, nor am I an employee or relative of any

15   counsel for the parties, nor am I in any way interested in

16   the outcome of the within cause.

17

18

19   Signed:  ........ _Coccin(W_ ...........

20   Name:    CHRIS LANG

21   Date:    ............ _3/5/16_ ...........

22

23

24

25

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

– – – – – – – – – – – – – – – – – – –
IN THE MATTER OF     )
                     )
NATTO IYELA GBARABE  )
        Plaintiff,   )
                     )            CIVIL ACTION NO:
v.                   )            14-cv-00173-SI
                     )
CHEVRON CORPORATION  )
        Defendant.   )
– – – – – – – – – – – – – – – – – – –


DEPOSITION OF SIMON FORSTER

VOLUME I

Tuesday, May 3, 2016

AT:  9:44 a.m.


Taken at:

2 Temple Gardens
London
EC4Y 9AY
United Kingdom


Court Reporter:
Leanne Shipp
Accredited Real-time Reporter


(SF-081224A)

SIMON FORSTER - 5/3/2016

Page 34

1  include in the report?
2      A.  No, I don't think so.
3      Q.  And in the version record chart on page 3 of
4  38, it says that you implemented the first draft.  Do you
5  see that?
6      A.  That's right, yes.
7      Q.  What does that mean?
8      A.  What does it mean?
9      Q.  Does that mean that's the date you finished
10  the first draft --
11      A.  Yes, that's right, yes.
12      Q.  -- or what does it mean?
13      A.  That was when it was completed, the first
14  draft.
15      MR. FRASER:  May I just say, Caroline, in regard
16  to the dates, we have to be aware that the dates are listed
17  in British order of day, month, year.
18      MS. MITCHELL:  Okay, fair enough.
19      Q.  And then Dr. Trett approved it the following
20  day.  That would be April 5; is that right?
21      A.  That's correct.  That was the draft, yes.
22      Q.  What was involved in the approval process?
23      A.  He just basically reviewed and made sure he
24  was absolutely happy with it.
25      Q.  Okay.  Is it important to review it carefully

Page 35

1  and make sure everything is accurate in the report?
2      A.  Yes.
3      Q.  And why is that important?
4      A.  Because basically we've got to stand by the
5  comments that are in there.
6      Q.  Okay.
7      A.  And as -- Marcus is the scientific director,
8  he's the owner of the company, and so he's ultimately --
9  he's got to be happy with it before it goes out.
10      Q.  And do you -- do you try to make sure that
11  everything in a report that you sign is accurate?
12      A.  Yes.
13      Q.  And did you do that with respect to
14  Exhibit 45?
15      A.  We tried the best we could.  It was a very
16  tight schedule, but, you know, the information that is in
17  there, I'm happy is accurate, yes.
18      Q.  Did you have less time to produce Exhibit 45
19  than you normally do for reports of this type?
20      A.  We had less time to undertake the analysis,
21  yes.
22      Q.  Did you feel like there was more work you
23  needed to do on the report to finalize it?
24      MR. FRASER:  I'll object to that as vague, but go
25  ahead.  You can answer.

Page 36

1      A.  As the report stands, there was -- with the
2  work we undertook, there was no more work we could have done
3  to actually produce the report.  I'm happy with the report
4  as it stands.  But there was -- there was analysis that we
5  had to put aside because we just didn't have time.
6  BY MS. MITCHELL:
7      Q.  Which analysis was that?
8      A.  We -- the -- the survey was carried out so we
9  had a central area with a high density of sampling sites,
10  which had 48 sites in the immediate vicinity of the former
11  rig site, and then we had farfield sites, which extended up
12  to about 12 kilometers away.  Given the deadlines we had,
13  unfortunately we couldn't analyze the farfield sites, so
14  this report refers only to the nearfield.
15      Q.  So the nearfield site which you described as
16  being in the immediate vicinity of the former rig site?
17      A.  Yes.
18      Q.  And as a consequence of that, you're not
19  offering any opinions relating to any area other than the
20  near site?
21      A.  That's right, yes.
22      Q.  So all of your opinions relate to the area in
23  the immediate vicinity of the former rig?
24      A.  That's right, yes.
25      Q.  Is there a reason that you didn't have

Page 37

1  Dr. Calvo sign this report?
2      A.  No.
3      Q.  Is there a reason that you didn't list
4  Dr. Hutchinson or the other Dr. Trett on this report?
5      A.  Well, the reason why we didn't list them is
6  because they weren't directly involved in the production of
7  the report.  They produced data.
8      Q.  Okay.  Was there anyone else who produced
9  data relating to this report who you haven't described
10  today?
11      A.  No.  The other data was received from Jones
12  Environmental.
13      Q.  And any other --
14      A.  That's the chemistry.
15      Q.  -- data?
16      A.  I don't believe so.
17      Q.  How many hours did you spend preparing the
18  report?
19      A.  Oh, I -- I couldn't hazard a guess.
20  I couldn't guess.
21      Q.  Would you say more than 100 hours?
22      A.  Yes, I would say so, yes.
23      Q.  More than 1,000 hours?
24      A.  What would that relate to in days?
25  Probably -- 100 hours?  What is that, 12 days?  So -- more

10 (Pages 34 to 37)

SIMON FORSTER  –  5/3/2016

Page 38

1  than 1,000 hours, did you say?
2       Q.  Yes.
3       A.  So that would be 120 days?  Am I getting my
4  calculations correct?
5       Q.  Yes, if you do 8-hour days.
6       A.  Yes.  No, it wouldn't be more than 1,000, no.
7       Q.  Okay, so somewhere between there?
8       A.  Yes.
9       Q.  And closer to 100 or closer to 1,000?
10      A.  I --
11      Q.  Do you know roughly how many weeks you worked
12  on the report?
13      A.  I could -- I could work it out by looking at
14  when we had all the data together, but the -- when we get
15  certain information we can start producing the report and in
16  the absence of the full complement of data.  So it's very
17  difficult for me to guestimate how -- how long it took us
18  actually to produce the report.
19      Q.  Okay.
20      A.  We estimated -- I could return to the
21  quotations of what we estimated it would be and that's what
22  we -- that was the fixed price?
23      Q.  Okay.
24      A.  So whether it was that or -- chances are it
25  was more than that, but that's the way of it.  I couldn't

Page 39

1  tell you exactly how many hours.
2       Q.  Okay, fair enough, and -- but you think the
3  documents that you'll produce will include your estimate?
4       A.  Yes, yes, I've got them here for you.
5       Q.  Okay.  On page 11 of the report, if we could
6  turn to that, and this time I'm referring to the page
7  numbers of the report itself.
8       MR. FRASER:  Just for accuracy, is that the page
9  that says "Project Design and Data Acquisition"?
10      MS. MITCHELL:  Yeah.
11      Q.  Where it says the "Note", why did you include
12  that note?
13      A.  It was important that there was
14  a justification of why we only undertook the nearfield
15  sampling sites.
16      Q.  Okay.  And that note is intended to indicate
17  that your opinions are limited to the nearfield sampling
18  sites --
19      A.  That's right.
20      Q.  -- is that correct?
21      A.  That's correct, yeah.
22      Q.  Where are the samples that you were not able
23  to analyze?
24      A.  They're stored at -- in our facilities in
25  Harpenden.

Page 40

1       Q.  I'm sorry?
2       A.  They're stored in our facilities in
3  Harpenden, that's in Hertfordshire.  That's about 50 miles
4  north of here.
5       Q.  What did you do to prepare them for storage?
6       A.  What we did -- well, they're labeled and
7  they're stored in -- in boxes ready for analysis if and when
8  required.
9       Q.  Okay.  Are they in any kind of refrigeration?
10      A.  No.
11      Q.  Were they preserved at the time?
12      A.  Yes, they were preserved in formalin.
13      Q.  So you don't think there's --
14      A.  Formalin.
15      Q.  There's no need to preserve them in any
16  additional way?
17      A.  No.
18      Q.  And how long will those samples be good?
19      A.  They should be good for months, if not years.
20      Q.  Okay.  And are you storing them at any
21  particular temperature?
22      A.  No, just cool room temperature.  They're not
23  refrigerated.
24      Q.  Okay.  And they played no role in the
25  opinions that you offer for class certification; is that

Page 41

1  correct?
2       A.  No, they don't.
3       Sorry, do you mind if you pass some water, please?
4       MS. PERRY:  Still or sparkling?
5       A.  Still, please.
6  BY MS. MITCHELL:
7       Q.  Were you ever asked to determine a scientific
8  way to demonstrate that the KS Endeavor incident caused
9  damage to the plaintiffs in the lawsuit?
10      A.  No.
11      Q.  So was your assignment limited to determining
12  whether there was any environmental impact from the
13  KS Endeavor on the benthic community?
14      A.  That's correct, yes.
15      Q.  And no broader than that; is that correct?
16      A.  No broader than that.
17      Q.  And is -- did you ever receive any
18  information about the availability of funding or the absence
19  of funding for this litigation?
20      A.  No, I was just informed that the project was
21  awaiting funding.
22      Q.  When were you informed of that?
23      A.  Well, when we first -- I first discussed it
24  with -- with Kevin, Kevin Cleary, he said, "We're awaiting
25  funding", so ...

SIMON FORSTER  -  5/3/2016

Page 114

1    Q.  Okay.  And does the placement of the dots on
2  this figure E3 correspond to where the sample sites were?
3    A.  That's correct, yes.
4    Q.  So you'd expect the colors to remain
5  consistent; is that correct?
6    A.  With the -- yes, with the metals -- yes, if
7  it relates to the nematode clusters, that's what the -- the
8  similarity clusters.
9    Q.  So the colors would be consistent from chart
10  to chart?
11    A.  Yes, as long as it -- as long as it relates
12  to the nematodes community clusters, similarity clusters.
13    Q.  Right, but that's what all of these metal --
14    A.  All the metals do, yes.
15    Q.  Yes.
16    A.  I believe so.
17    Q.  So the colors are the same on all the metals
18  although --
19    A.  Where there's no metal or no record, there's
20  no color, obviously.
21    Q.  Right, okay.  Understood.  And is this
22  a standard color selection or is this a color selection that
23  you made?
24    A.  That's just to identify the different
25  nematode community types.

Page 115

1    Q.  Okay?
2    A.  It just relates back to the nematodes because
3  that's --
4    Q.  Okay, but that's not standardized -- there's
5  not a standard color --
6    A.  No, no.  No.
7    Q.  -- that's a particular --
8    A.  No, no, there's no -- red doesn't signify
9  anything and green doesn't signify anything.  It's just to
10  identify the different clusters.
11    Q.  And does anything on any of these charts
12  reflect whether the particular metal appeared within
13  an acceptable limit?
14    A.  No, we didn't -- didn't relate back to
15  toxicity testing on this -- this study.
16    Q.  Okay.  Does any of -- does any of your
17  analysis relate back to toxicity for this study?
18    A.  No, we were looking at actual impacts, actual
19  changes.  So, toxicity testing is theoretical, so you get --
20  they're derived from laboratory tests and when you're
21  looking for actual impacts, actual environmental impacts, if
22  you use toxicity testing you're using a hypothetical value
23  for a habitat conditions and environments where you don't
24  know whether that's the same as a laboratory-based test.  So
25  therefore we just used absolutes when we were looking at

Page 116

1  the -- the actual impacts, actual associations.
2    Q.  And do the absolutes tell you what the impact
3  on fish or humans will be?
4    A.  No, it's just relating to the communities
5  we -- we studied.
6    Q.  Okay.  So the toxicity -- so -- and do you
7  know whether the -- the presence of the metals that you
8  detected is consistent with background present?
9    A.  No, because we haven't analyzed the farfield
10  samples as yet.
11    Q.  Okay.  So you -- and you don't have any other
12  background data to assess whether the metals appear at
13  a background level?
14    A.  No, we haven't looked at those.
15    Q.  Okay, and you haven't done -- so you're not
16  offering any opinion that any of the -- that the presence of
17  any of these metals is at above a background level?
18    A.  Not directly, no.
19    Q.  Okay, are you offering the opinion indirectly
20  that any of them appear at above --
21    A.  No.
22    Q.  A background level?
23    A.  We can't make that assessment until we've
24  looked at all of the samples.
25    Q.  Okay.  And you haven't done that assessment

Page 117

1  yet and you're not offering that opinion now?
2    A.  We haven't done that assessment, we haven't
3  done those -- that work with -- we haven't analyzed the
4  samples from the farfield, so we're not making that
5  assessment in this report, no.
6    Q.  Okay.  And you're not offering an opinion on
7  this in this report?
8    A.  Not -- no.
9    MR. FRASER:  I'm sorry --
10    A.  Sorry.
11    MR. FRASER:  I'm sorry, I didn't hear your
12  question.
13  BY MS. MITCHELL:
14    Q.  Okay.  If we go back to the QAPP at page 8,
15  you say you're doing a univariate analysis?
16    A.  Mm-hm.
17    Q.  Can you explain what that is?
18    A.  That is looking at individual parameters and
19  assessing their distribution within the survey area.  The
20  univariate data are the data plotted on the distribution
21  plots.  It's single, uni, parameters.
22    Q.  Okay, so you do both that and then you do the
23  multivariate to look --
24    A.  That's correct.
25    Q.  -- at the -- the interrelationship?

30 (Pages 114 to 117)

DTI Court Reporting Solutions - San Francisco
(800) 869-9132                    www.deposition.com

SIMON FORSTER – 5/3/2016

Page 142

1  there were any changes?
2       A. I don't think so, but I wouldn't be able to
3  say for certain.
4       Q. And then how did you get to the KS Endeavor
5  site? How did you determine when you were at the
6  KS Endeavor site?
7       A. Through GPS.
8       Q. Okay. And why did you decide to do that via
9  GPS? Is that the most reliable method to do it?
10      A. Yes. Yes, it is.
11      Q. Okay. And you didn't have someone from the
12 village telling you where it was?
13      A. No, no.
14      Q. Was there anything at the surface of the
15 water that would have caused you to recognize it as the
16 KS Endeavor site?
17      A. Well, there were structures there, yes.
18      Q. There were structures in the water at the
19 site of the KS Endeavor well?
20      A. Yes, rig structures.
21      Q. Okay, you saw rig structures nearby?
22      A. Yes, yes.
23      Q. Did you see anything at the actual --
24      A. If you look at the picture, figure Plate 1,
25 you can see them in the background.

Page 143

1       Q. Okay. And were those at the actual site of
2  the KS Endeavor rig or were those in the distance?
3       A. No, they were in the vicinity.
4       Q. Okay.
5       A. They weren't actually -- none of those is the
6  KS Endeavor rig --
7       Q. Okay.
8       A. -- which I gather is not there any more.
9       Q. Okay. So was there anything that marked the
10 rig site specifically?
11      A. No.
12      Q. Were any samples ever taken from creeks or
13 rivers in the communities?
14      A. No.
15      Q. Why not?
16      A. Because we were specifically looking at the
17 vicinity of the wellhead.
18      Q. Okay, so. You weren't asked to determine any
19 environmental impact on the creeks or rivers?
20      A. No.
21      MS. MITCHELL: Okay, I think that we can take our
22 break now.
23      VIDEOGRAPHER: Going off the record, the time is
24 1:03.
25           (Lunch recess.)

Page 144

1       VIDEOGRAPHER: Back on the record, the time is
2  2:02.
3  BY MS. MITCHELL:
4       Q. Mr. Forster, you understand that your oath
5  from this morning still applies?
6       A. Yes, I do.
7       Q. When you were applying for your visa in
8  November and December of -- when you applied in November and
9  were waiting for it in December, was anyone else waiting for
10 their visa too, that you know of?
11      A. Myself and Marcus.
12      Q. Okay, both of you?
13      A. Yes.
14      Q. And did you both get your visas at the same
15 time?
16      A. Yes, that's right.
17      Q. We were talking earlier about the crater
18 that's at the KS Endeavor site. Do you remember that?
19      A. Mm-hm.
20      MR. FRASER: Is that a "yes"?
21      A. Yes, sorry.
22 BY MS. MITCHELL:
23      Q. Did you do any analysis as to whether that
24 crater would backfill?
25      A. No.

Page 145

1       Q. Would it surprise you if the crater was
2  backfilling?
3       A. Not at all, no.
4       Q. Would you expect that?
5       A. I would expect that, yeah.
6       Q. Do you know the rate at which it's
7  backfilling?
8       A. No, I don't, no.
9       Q. Could the backfill of the crater have any
10 impact on the nematode life at the -- at the bottom of the
11 crater?
12      A. It's unlikely. It's -- it's possible,
13 I suppose, but -- it was -- sorry, in what way? What do you
14 mean?
15      Q. So if there's material coming into the crater
16 and landing on the bottom, would that be disruptive for
17 nematodes that were at the bottom?
18      A. It would import nematodes.
19      Q. Okay, so it would bring nematodes in?
20      A. It would bring them in, yes.
21      Q. Okay. Would it do anything to the existing
22 nematodes?
23      A. Not if -- no, no, because it's --
24      Q. So piling -- piling material on top of
25 nematodes doesn't bother then?

SIMON FORSTER  –  5/3/2016

Page 146

1      A.  If it was massive amounts, the ones at the
2  bottom would have to migrate to the top and that is
3  a possibility, but it would be -- it might disturb them
4  slightly, but they would survive.  I mean, it depends on the
5  rate of infilling.
6      Q.  Okay, so you'd want to understand the rate of
7  the backfilling in order to understand whether it had any
8  impact on the nematodes in the crater?
9      A.  The ones at the bottom, yes.
10     Q.  Okay.  Did you ever provide any guidance
11  whatsoever to -- about what communities within the Niger
12  Delta should be considered for inclusion in the class?
13     A.  Communities as in human communities or animal
14  communities?
15     Q.  Human communities?
16     A.  No, I didn't.
17     Q.  Okay.  Did you -- did you ever provide any
18  input on the class definition?
19     A.  No.
20     Q.  Did your report conclude that the
21  environmental impacts you observed are significant?
22     A.  We didn't make a judgment on that.
23     Q.  One way or the other?
24     A.  No, we didn't make a judgment.
25     Q.  Okay.  Did your report reach any conclusion

Page 147

1  about dead or diseased fish?
2      A.  No, it didn't, no.
3      Q.  Did it reach any conclusion about dead or
4  diseased livestock?
5      A.  No.
6      Q.  Did it reach any conclusion about
7  contaminated water?
8      A.  No.
9      Q.  Did it reach any conclusion about
10  contaminated soil?
11     A.  No.
12     Q.  Did it reach any conclusion about
13  contaminated air?
14     A.  No.
15     Q.  Did it reach any conclusion about general
16  health breakdown in the community?
17     A.  No.
18     Q.  Do you claim in your report that defendants
19  extracted pollutants and waste materials from the borehole
20  at the time of the drilling?
21     A.  No, we don't comment on it.
22     Q.  And are you opining on that in any way?
23     A.  Opining?
24     Q.  On what --
25     A.  Providing an opinion?

Page 148

1      Q.  -- came out of the borehole?
2      A.  When you say "opining", do you mean providing
3  an opinion on?
4      Q.  Yes.
5      A.  The borehole?  What borehole?
6      Q.  The borehole for the well.
7      A.  No.
8      Q.  Are you opining in any way about the
9  discharge of pollutants from the well?
10     A.  No.
11     Q.  Are you offering any opinion that the ingress
12  of hydrocarbon gas and pollutants impacted fish in the
13  ocean?
14     A.  No.
15     Q.  Are you offering any opinion that the wells
16  containing drinking water in the communities was impacted by
17  the KS Endeavor?
18     A.  Not off the top of my head, no.
19     Q.  Are you offering any opinion on how many
20  fish, if any, were killed by the KS Endeavor incident?
21     A.  No.
22     Q.  Are you offering any opinion about illness
23  and sickness in the local community --
24     A.  No.
25     Q.  -- caused by the KS Endeavor?

Page 149

1      A.  No.
2      Q.  Are you offering any opinion about the
3  existence of economic damage to the named plaintiff?
4      A.  No.
5      Q.  Are you offering any opinion about what
6  happened to the rig in the course of the fire?
7      A.  No.
8      Q.  Are you offering any opinion about the force
9  of any explosion related to the rig?
10     A.  No.
11     Q.  Did you ever describe the crater as a blast
12  crater?
13     A.  I don't believe so, no.
14     Q.  Did you identify a defined geographic zone of
15  contamination from the KS Endeavor rig?
16     A.  By "contamination" you mean contamination
17  with chemicals?
18     Q.  Yes.
19     A.  Or -- no.
20     Q.  Was the time you were allotted for taking
21  samples while you were on the January 2016 sampling trip,
22  was that sufficient for the number of samples you needed to
23  take?
24     A.  Yes, it was.
25     Q.  What were the conditions like during the

38  (Pages 146 to 149)

SIMON FORSTER  -  5/3/2016

Page 150

1  sampling trip?  Was the -- was the weather good the whole
2  time?
3        A.  Most of the time.  It -- a couple of days we
4  had a swell in the afternoon.
5        Q.  Okay.  And when you say "a swell", you mean
6  the water swelled or --
7        A.  Yes, yes.  Yeah, there was a -- a swell, and
8  up and down movement of water.
9        Q.  Fair enough.  Apart from that, were there any
10  adverse weather --
11       A.  No.
12       Q.  Any problems with the vessel while you
13  were --
14       A.  What, mechanical problems?
15       Q.  Yes.
16       A.  No mechanical problems.
17       Q.  Any other kinds of problems with the vessel?
18       A.  No.
19       Q.  Were there any problems with any of the
20  equipment you were trying to use?
21       A.  No.
22       Q.  Did everything go as you expected it to while
23  you were on the sampling trip?
24       A.  With the exception of collecting the
25  replicate samples, we didn't have enough time to do that, as

Page 151

1  we discussed previously, but apart from that everything went
2  to plan once we were at sea.
3        Q.  And for the initial sampling plan that you
4  were going to use if you'd left port on time, were you going
5  to return mid-trip to drop samples off?
6        A.  No.
7        Q.  Okay, that was never part of the plan?
8        A.  No, that was never part of the plan as far as
9  I recall, no.
10       Q.  Okay.
11       A.  It was discussed previously, but we decided
12  not to because it would just add too much time.
13       Q.  Okay.  And what would have been the advantage
14  of doing that?
15       A.  The advantage of doing that would be that we
16  could send back half of the chemistry samples because
17  they're time-related, they're time-specific.
18       Q.  And did any of the chemistry samples exceed
19  their holding time?
20       A.  No.  I say that; you'll have to confirm that
21  with the chemical analysts, but I was not informed that
22  there were any.
23       Q.  Okay, and does that matter if they exceed the
24  holding times?
25       A.  Again that's a question you'll have to ask

Page 152

1  the chemist.
2        Q.  Okay.  And do you have any information about
3  that?
4        A.  I would -- if it did exceed the stability
5  times, there would be an analyst note put on the analyst
6  just saying that the stability times had been exceeded,
7  therefore the results might be compromised.  It won't be
8  more specific than that.
9        Q.  Okay.
10       A.  I don't have the knowledge to say what the
11  results would be if they did, so that's a question you'll
12  have to direct to the analysts when they're here.
13       Q.  Okay.  Okay, let's talk about the technical
14  summary points that you have.
15             MR. FRASER:  I'm sorry, the non-technical summary?
16  BY MS. MITCHELL:
17       Q.  Non-technical.  Sorry.  That's on page 46.
18  Let's see.  Actually, maybe I'll take you to the report on
19  page 2, if you don't mind.  If you could turn to the report
20  at page 2.  If you could look at that and look at Exhibit 46
21  at the same time.
22       A.  Actual page 2 or the blue page 2?
23       Q.  Actual page 2.
24       A.  So comparing page 1 and page 2?
25       Q.  Yeah, sorry, if you can look at page 2.  Did

Page 153

1  you conclude that the macrofauna communities were
2  characterized by lose species richness and low species
3  density?
4        A.  Yes.
5        Q.  And without having any information outside of
6  the nearfield, you don't know if that's consistent with the
7  baseline or not; is that correct?
8        A.  That is correct, yes.
9        Q.  So you can't opine about whether any of that
10  is attributable to the KS Endeavor?
11       A.  Not without undertaking analysis of farfield
12  samples.
13       Q.  And you haven't done that so far?
14       A.  We haven't done that, no.
15       Q.  Okay.  And that's true for the presence of
16  the macrofauna and meiofaunal copepods as well; correct?
17       A.  That's correct, yes.
18       Q.  Let's turn to page 108 of your report.
19  What's that a picture of?  Is that plate 4, do you see
20  plate 4?
21       A.  Plate -- plate 4, yes.
22       Q.  What's that a picture of?
23       A.  That's a picture of the day grab with the
24  sediment in.  A full day grab.
25       Q.  Okay.  And do you see in the text on the

DTI Court Reporting Solutions - San Francisco
(800) 869-9132                    www.deposition.com

1          **CERTIFICATE OF COURT REPORTER**

2

3     I, Leanne Shipp, an Accredited Real-time Reporter, hereby

4     certify that the testimony of the witness Simon Forster in

5     the foregoing transcript, numbered pages 1 through 172,

6     taken on this 3rd day of May, 2016 was recorded by me in

7     machine shorthand and was thereafter transcribed by me; and

8     that the foregoing transcript is a true and accurate

9     verbatim record of the said testimony.

10

11

12    I further certify that I am not a relative, employee,

13    counsel or financially involved with any of the parties to

14    the within cause, nor am I an employee or relative of any

15    counsel for the parties, nor am I in any way interested in

16    the outcome of the within cause.

17

18

19    Signed:   ..........  *Caccias (Ill*

20    Name:    Leanne Shipp

21    Date:    ...............  12/5/16

22

23

24

25

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

_____

NATTO IYELA GBARABE,              ) Case No.

                   Plaintiff,     ) 14-cv-00173-SI

        v.                        )

                                  )

CHEVRON CORPORATION,              )

                   Defendant.     )

_____)

Video Deposition of EBIERE ODODO

Chevron Nigeria Limited

2 Chevron Drive

Lekki, Lagos, Nigeria

Friday, July 15, 2016, 9:06 a.m.

Reported by:  Jason T. Meadors, RPR, CRR

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

| | |
|---|---|
| 1   A   Yes, that's in Ikebiri. | 1   Q   Okay.  What else do you remember about what |
| 2   Q   Who owns the church? | 2   happened when the incident occurred? |
| 3        MR. FRASER:  Objection.  Irrelevant.  Lack | 3   A   When the incident occurred, I cannot give |
| 4   of foundation.  Go ahead and answer. | 4   you details that this also happened, that also |
| 5   A   The owner of the church is late. | 5   happened, this is -- that also occurred.  I can't |
| 6   BY MR. DOMINGO: | 6   give you details. |
| 7   Q   What is his or her name? | 7   Q   Did you hear anything when the incident |
| 8   A   Kojo. | 8   occurred? |
| 9   Q   Kojo is his name? | 9   A   I've told you already that when the |
| 10   A   Yes. | 10   incident occurred, that there was a sound and the |
| 11   Q   Who owns the church now? | 11   houses were shaking. |
| 12        MR. FRASER:  Same objection. | 12   Q   How loud was the sound? |
| 13   A   We're just attending the church.  We've not | 13   A   It sounded really loud, and in the sea, |
| 14   nominated a new owner of the church. | 14   there was a fire of flames going up. |
| 15   BY MR. DOMINGO: | 15   Q   Can you recreate the noise that you heard |
| 16   Q   Who is the present pastor of the church? | 16   when the incident occurred? |
| 17   A   There's no -- nominated a church pastor. | 17        MR. FRASER:  Objection.  Objection, |
| 18   Q   When you go to church on Sunday, who is it | 18   improper -- objection, improper demonstration. |
| 19   that's speaking to the people that are there? | 19   Instruct not to attempt.  How can you recreate the |
| 20   A   Any person can preach, but we've not held a | 20   noise of an explosion? |
| 21   leader yet. | 21   BY MR. DOMINGO: |
| 22   Q   Does your husband, Columbus, preach at the | 22   Q   Can you make the noise that you heard? |
| 23   church? | 23        MR. FRASER:  Counsel, without regard to |
| 24        MR. FRASER:  Objection.  Objection, | 24   decibels, are you just asking for -- a description? |
| 25   irrelevant. | 25   Is that what you're asking for. |
| **Page 78** | **Page 80** |

| | |
|---|---|
| 1   A   If people tell him, he can preach. | 1        MR. DOMINGO:  I ask you to comply with the |
| 2   BY MR. DOMINGO: | 2   court order, Counsel. |
| 3   Q   Does he preach at the church, yes or no? | 3        MR. FRASER:  No, I'm -- |
| 4   A   If they tell him in the church to preach, | 4        MR. DOMINGO:  I'm asking her to recreate |
| 5   yes, he will preach. | 5   the noise -- |
| 6   Q   Has he preached in the past at the church? | 6        MR. FRASER:  Then objecting, vague and |
| 7   A   Yes.  He preaches sometimes. | 7   overbroad.  Instruct not to answer as phrased. |
| 8   Q   Does he own the church? | 8        MR. DOMINGO:  Please recreate the noise |
| 9        MR. FRASER:  Objection.  Asked and | 9   that you heard on the day of the incident. |
| 10   answered. | 10        MR. FRASER:  Instruct not to answer as |
| 11   A   I've just told you now, there was not | 11   phrased. |
| 12   nominated a church leader yet. | 12   BY MR. DOMINGO: |
| 13   BY MR. DOMINGO: | 13   Q   How long did the noise last? |
| 14   Q   Does he own the church now? | 14   A   I can't remember the -- I don't know the |
| 15   A   We don't have the church owner yet. | 15   minutes. |
| 16   ==Q   I want to talk with you about the day of== | 16   Q   Did it last more than an hour? |
| 17   ==the incident.  Do you remember when the incident== | 17        MR. FRASER:  Objection.  Asked and |
| 18   ==occurred?== | 18   answered. |
| 19   ==A   I can't remember.== | 19   A   I don't know. |
| 20   ==Q   You don't remember anything about the== | 20   BY MR. DOMINGO: |
| 21   ==incident?== | 21   Q   Was the noise so loud that you had trouble |
| 22   ==A   I can't remember.== | 22   hearing people when you were talking to them? |
| 23   Q   Earlier, you told me that your nets were in | 23        MR. FRASER:  Objection.  Objection. |
| 24   the water and that you were at home. | 24   Incomplete hypothetical.  Assumes facts not in |
| 25   A   Yes, I've told you that already. | 25   evidence.  Lacks foundation.  Go ahead and answer if |
| **Page 79** | **Page 81** |

```
 1    C E R T I F I C A T E
 2    (LEKKI, LAGOS)
 3    (NIGERIA)
 4
 5    I, Jason T. Meadors, Registered Professional Reporter
      and Certified Realtime Reporter, do hereby certify
 6    that the aforementioned witness was first duly sworn
      by me, as noted by stipulation of counsel, to testify
 7    to the truth; that I was authorized to and did report
      said deposition in stenotype; and that the foregoing
 8    pages are a true and correct transcription of my
      shorthand notes of said deposition.
 9
      I further certify that said deposition was taken at
10    the time and place hereinabove set forth and that the
      taking of said deposition was commenced and completed
11    as hereinabove set out.
12    I further certify that I am not attorney or counsel
      of any of the parties, nor am I a relative or
13    employee of any attorney or counsel of any party
      connected with the action, nor am I financially
14    interested in the action.
15    The foregoing certification of this transcript does
      not apply to any reproduction of the same by any
16    means unless under the direct control and/or
      direction of the certifying reporter.
17
      IN WITNESS WHEREOF, I have hereunto set my hand this
18    22nd day of July, 2016.
19
20
21
22    _____
23    JASON T. MEADORS
24    Registered Professional Reporter
25    Certified Realtime Reporter
```

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


_____

NATTO IYELA GBARABE                ) Case No.

            Plaintiff,          )  14-cv-00173-SI

   v.                              )

                           )

CHEVRON CORPORATION,               )

            Defendant.          )

_____)



Deposition of ALADINYO OMIEBI

Chevron Nigeria Limited

2 Chevron Drive

Lekki, Lagos, Nigeria

Thursday, July 14, 2016, 4:48 p.m.


Reported by:  Robert V. Short, CSR 10565


_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

1 happened?
2     A   I heard -- I heard that Bonga spoiled
3 something.  I heard something like that.
4     Q   Did you hear where, what community --
5 strike that.
6         Did you hear what community the Bonga oil
7 spill spoiled?
8         MR. CARR:  Objection, calls for hearsay.
9         THE DEPONENT:  When the incident
10 happened, even in our place we heard that Bonga had
11 spoiled so many things.
12 BY MR. MASON:
13     Q   In Okpoama?
14     A   Yes.
15     Q   When you say "the incident," are you
16 talking about the Bonga oil spill?
17     A   Ask me the question again.
18     Q   In your last answer you said, "When the
19 incident happened, even in our place we heard that
20 Bonga had spoiled so many things."
21         What incident are you referring to?
22     A   I -- that one, I don't understand.
23     Q   Do you understand that the Bonga oil
24 spill is different from the KS Endeavor gas
25 incident?

Page 66

1         MR. CARR:  Objection, calls for
2 speculation.
3         THE DEPONENT:  I don't understand.  Ask
4 me the one I know of.  This one you're talking
5 about, I don't understand.
6 BY MR. MASON:
7     Q   Had you ever heard the word "Bonga"
8 before I said it?
9     A   I don't understand this one.  I don't
10 understand.
11         Are you asking me what you were asking me
12 before or is it a different thing you're asking me?
13     Q   Forget everything that I've asked you.
14         Did you know the word "Bonga" before I
15 said it?
16     A   The Bonga oil spill, is it about gas or?
17     Q   I can't answer questions for you.
18         But have you heard of the Bonga oil spill
19 before I said it?
20     A   I don't understand.
21     Q   Before the KS Endeavor gas incident, had
22 you ever seen pollution, chemicals, oil, gas, in
23 your community?
24         MR. CARR:  Objection, compound, calls for
25 an expert opinion, calls for speculation.

Page 68

1     A   I don't understand you.
2     Q   You said -- you said you knew what the
3 Bonga oil spill was.  I'm trying to understand what
4 you think it was.  So the --
5     A   I don't understand it.
6     Q   My question to you is:  Did you ever see
7 oil in your community and somebody said "That's
8 from the Bonga oil spill"?
9         MR. CARR:  Objection, calls for hearsay,
10 compound.
11         THE DEPONENT:  No, I didn't hear.
12 BY MR. MASON:
13     Q   Have you ever made a claim against Shell
14 for the Bonga oil spill?
15     A   No.
16     Q   Do you know anyone in your community
17 who's made a claim against Shell for the Bonga oil
18 spill?
19         MR. CARR:  Objection, calls for hearsay.
20         THE DEPONENT:  No.
21 BY MR. MASON:
22     Q   So earlier you said that the Bonga oil
23 spill had spoiled some communities.
24         Do you know what communities the Bonga
25 oil spill spoiled?

Page 67

1         THE DEPONENT:  Ask me the question again,
2 please.
3         MR. MASON:  Can you just reread it?
4         (Interpreter reinterprets.)
5         THE DEPONENT:  It's when the incident
6 happened that I perceived the smell of gas.
7 BY MR. MASON:
8     Q   Had you ever seen -- strike that.
9         When you smelled -- strike that.
10     Q   When you perceived the smell of gas after
11 the incident, did you see anything different about
12 the water?
13     A   It's been long, so I can't remember.
14     Q   Have you ever heard of illegal bunkering?
15     A   No.
16     Q   Have you ever heard of bush refineries?
17     A   I perceived the gas, the smell of the
18 gas, that's what I'm telling you.
19     Q   Since -- since the incident, did you ever
20 notice seaweed in the ocean or river that you had
21 not seen before?
22     A   It is the fish I saw that I told you
23 earlier on.  That's what I'm telling you.
24     Q   My question was:  Since the incident
25 happened till today, have you ever seen seaweed in

Page 69

Pages 66 to 69

Page 82

```
 1                    C E R T I F I C A T E
 2   (LEKKI, LAGOS)
 3   (NIGERIA)
 4
 5        I, Robert V. Short, Certified Shorthand
     Reporter, do hereby certify that the aforementioned
 6   witness was first duly sworn by me, as noted by
     stipulation of counsel, to testify to the truth;
 7   that I was authorized to and did report said
     deposition in stenotype; and that the foregoing
 8   pages are a true and correct transcription of my
     shorthand notes of said deposition.
 9        I further certify that said deposition
     was taken at the time and place hereinabove set
10   forth and that the taking of said deposition was
     commenced and completed as hereinabove set out.
11        I further certify that I am not attorney
     or counsel of any of the parties, nor am I a
12   relative or employee of any attorney or counsel of
     any party connected with the action, nor am I
13   financially interested in the action.
          The foregoing certification of this
14   transcript does not apply to any reproduction of
     the same by any means unless under the direct
15   control and/or direction of the certifying
     reporter.
16        IN WITNESS WHEREOF, I have hereunto set
     my hand this 18th day of July, 2016.
17
18
19
20
21
22                    _____
23                    ROBERT V. SHORT,
24                    Certified Shorthand Reporter
25
```

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


_____

                                )

NATTO IYELA GBARABE             ) Case No.

                                )

            Plaintiff,          ) 14-cv-00173-SI

                                )

        v.                      )

                                )

CHEVRON CORPORATION,            )

                                )

            Defendant.          )

_____)



Deposition of HANNAH PETER, VOLUME I

Chevron Nigeria Limited

2 Chevron Drive

Lekki, Lagos, Nigeria

Thursday, July 14, 2016



_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

7/14/2016                          Gbarabe v. Chevron                          Hannah Peter

Page 66

```
 1      A   No.
 2      Q   You've never had stooling before the incident?
 3      A   No.
 4      Q   And other than the stooling, did it -- did the
 5   fish make you sick in any other way?
 6      A   I can't remember right now.
 7      Q   And when you say "stool," do you mean
 8   diarrhea?
 9      A   I don't know what you call "diarrhea."
10      Q   Is it just frequent -- when you frequently
11   have to use the restroom?
12      A   Yes.
13      Q   How many times did you get sick from eating
14   the fish that smelled like kerosene?
15      A   I can't remember.
16      Q   When is the first time that you got sick after
17   eating the fish that smelled like kerosene?
18      A   The first time we went fishing, we caught the
19   fish, came back, used it to cook, and that's when I
20   experienced it.
21      Q   The first time you went fishing after the
22   incident, you caught fish that smelled like kerosene?
23      A   Yes.
24      Q   When was the first time that you went fishing
25   after the incident?
```

Page 67

```
 1      A   I can't remember.  It's been a long time ago.
 2      Q   Was it a day?  Was it a week?
 3      A   It was about a week after the incident -- we
 4   didn't go to the sea to fish; we went to the river to
 5   fish -- that we caught the fish.
 6      Q   So the fish from the river, that's the fish
 7   that tasted like kerosene?
 8      A   It's both the sea and the river, because it's
 9   the fishes from the sea that also comes into the river.
10      Q   But you caught the fish from the river that
11   you ended up eating that tasted like kerosene?
12      A   Even when I catch the fish from the river, it
13   smells like that.  Even those I catch from the sea
14   smells like that.
15      Q   What river do you fish in?
16      A   Koluama River.
17      Q   What other -- have you had any other health
18   problems since the incident?
19      A   Yes.  I had rashes on my skin; because after
20   the incident, if you use the river water to bathe, you
21   have rashes on your skin.
22      Q   When is the first time you noticed the rash?
23      A   After the incident, when I used the river
24   water to shower.
25      DEPOSITION OFFICER:  "After the incident" --
```

Page 68

```
 1   what?
 2      THE INTERPRETER:  "When I used the river water
 3   to shower."
 4   BY MS. PIKE:
 5      Q   Was it that day?
 6      A   I can't remember it in detail like that
 7   because it's been a long time ago that it occurred.
 8      Q   Well, how soon after the incident do you
 9   remember bathing in the river water and developing the
10   rash?
11      MR. CARR:  Objection.  Compound.
12      THE DEPONENT:  After the incident occurred,
13   the river is where we actually go to shower.  So
14   whenever we go there after the incident, that's when I
15   noticed the rashes.
16   BY MS. PIKE:
17      Q   How soon after bathing did you notice the rash
18   develop?
19      A   The moment you finish bathing, your body
20   itches you.
21      Q   Where on your body did you have the rash?
22      A   All over my body.
23      Q   Was there any particular part of your body
24   that the rash was, like your arms, or was it -- did you
25   have it from head to toe?
```

Page 69

```
 1      A   Because we shower all over our body, so it was
 2   all over our body that I was itching.
 3      Q   What did the rash look like?
 4      A   I can't remember.
 5      Q   Did the rash have a color?
 6      A   I don't know if it had color or not.  I can't
 7   remember.
 8      Q   How long did the rash last on your body?
 9      A   I don't know, but for a while.  I don't know,
10   but for a while.  I can't remember, but for a while.
11      Q   What river do you bathe in?
12      MR. CARR:  Objection.  Asked and answered.
13      MS. PIKE:  I didn't ask this one.
14      THE DEPONENT:  I've -- I've answered.  Koluama
15   River.
16   BY MS. PIKE:
17      Q   And is Koluama River a saltwater river?
18      A   It's saltwater, but we bathe in it.
19      Q   Do you bathe anywhere else other than the
20   river?
21      A   Yes.  We bathe from the well as well.
22      Q   How often do you bathe in the river versus
23   bathing -- bathing in the well?
24      A   I -- I use both of them simultaneously.  But
25   after the incident, even the well water was
```

Pages 66 to 69

Page 88

1                    C E R T I F I C A T E
2     (LEKKI, LAGOS)
3     (NIGERIA)
4
5          I, Stephanie Leslie, Certified Shorthand
      Reporter, do hereby certify that the aforementioned
6     witness was first duly sworn as noted by stipulation of
      counsel to testify to the truth; that I was authorized
7     to and did report said deposition in stenotype; and
      that the foregoing pages are a true and correct
8     transcription of my shorthand notes of said deposition.
           I further certify that said deposition was
9     taken at the time and place hereinabove set forth and
      that the taking of said deposition was commenced and
10    completed as hereinabove set out.
           I further certify that I am not attorney or
11    counsel of any of the parties, nor am I a relative or
      employee of any attorney or counsel of any party
12    connected with the action, nor am I financially
      interested in the action.
13         The foregoing certification of this transcript
      does not apply to any reproduction of the same by any
14    means unless under the direct control and/or direction
      of the certifying reporter.
15         IN WITNESS WHEREOF, I have hereunto set my
      hand this 21st day of July, 2016.
16
17
18
19
20
21    _____
22    STEPHANIE LESLIE,
23    Certified Shorthand Reporter
24
25

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

---

NATTO IYELA GBARABE                ) Case No.

           Plaintiff,        )  14-cv-00173-SI

  v.                               )

                                )

CHEVRON CORPORATION,               )

           Defendant.        )

---

Deposition of HELLEN STANLEY

Chevron Nigeria Limited

2 Chevron Drive

Lekki, Lagos, Nigeria

Friday, July 8, 2016, 4:48 p.m.


Reported by:   Robert V. Short, CSR 10565

---

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

1  remembered to tell you.  But I don't remember, I
2  don't know.
3      Q    So you don't think she asked you what
4  your income was?
5      A    What I don't know, I don't know.  And I
6  don't know.
7      Q    Did she tell you why she was -- strike
8  that.
9          Why did you think you were filling out
10  this form?
11      (Interpreter and deponent converse in Ijaw.)
12      A    I don't know.
13          MR. BERSHADSKI:  Could we go off the
14  record for a second.
15          DEPOSITION OFFICER:  We're going off the
16  record.  The time is 7:45 p.m.
17              (Brief recess taken.)
18          DEPOSITION OFFICER:  We're back on the
19  record.  The time is 7:52 p.m.
20          MR. MASON:  During the break I made a
21  photocopy of the witness' voter registration card
22  which I have now marked as Exhibit 920.
23              (Exhibit 920 was marked for
24  identification.)
25      Q    Earlier you were talking about your

Page 62

1  per month?
2          (Interpreter and deponent converse in Ijaw.)
3      A    Back then, before 2012, the farming
4  season was really, really good.  I made -- I made
5  lots and lots of income, because the crops grew
6  better.
7          Everything was really, really good.
8  Before the -- before 2012 -- before I saw the stuff
9  floating on the river.  Before I saw those, the
10  crops were really, really good.
11          I was making about sometimes 100 K,
12  sometimes 80,000.  And I've told you already, I
13  even called 70,000 to you.  I don't -- I can't
14  remember the exact figure I gave my sister to fill
15  on the form.  But I've told you the range at which
16  my income varies.  But after the incident, things
17  have not been good.
18      Q    When you say 80 or 70,000, was that per
19  week or per month?
20      (Interpreter and deponent converse in Ijaw.)
21      A    Year -- monthly.
22      Q    Do you remember how -- strike that.
23          When your sister asked you the question
24  about how much you made per month before 2012, do
25  you remember how you came up with the number that

Page 64

1  sister, who helped you fill in the form you
2  remembered.
3          Do you think she asked you what your
4  income was?
5      A    Yes.
6      Q    Do you remember what you told her?
7      A    The month or the year -- yearly or
8  monthly.
9      Q    Do you remember what you told her your
10  income monthly was for the period -- the two years
11  prior to January 2012?
12      A    The incident happened a long time ago.
13  So right now I can't remember the exact figure I
14  gave her.
15      Q    So as you sit here today, you have no
16  idea what you were making per month in the two
17  years prior to January 2012?
18      A    The incident happened a long time ago.
19  So right now I don't know if I would now call a
20  different figure.  Because I don't know -- I can't
21  remember the figure I gave her, because the
22  incident happened a long time ago.  So that's why
23  I'm saying that I don't know.  I've forgotten.
24      Q    Do you think that before January 2012,
25  you were making more than a hundred thousand Naira

Page 63

1  you gave her?
2      A    What I told her is what she must have
3  filled in the form.  But as of right now, I can't
4  remember the exact figure I gave her or how I came
5  about that figure.
6      Q    And do you remember when it was that you
7  gave her this form to fill out for you?
8      A    It's been a long time, so I can't
9  remember.
10      Q    Was it this year?
11      A    I don't know if it was this year.
12          MR. MASON:  I'm showing you what has been
13  marked as Exhibit 377.
14              (Exhibit 377 was marked for
15  identification.)
16      Q    This was given to us by your attorneys in
17  backwards order.  So, apologies, but I would like
18  to direct your attention to page 1, which is the
19  second to last page.
20          Does this look at all familiar to you?
21          And I understand you can't read, but does
22  this look familiar?
23      A    When I -- when I -- I didn't really take
24  my time to look at the form.  The minute they gave
25  me the form, I just give it to her, that's what I

Page 65

Page 72

1                    C E R T I F I C A T E
2     (LEKKI, LAGOS)
3     (NIGERIA)
4
5           I, Robert V. Short, Certified Shorthand
      Reporter, do hereby certify that the aforementioned
6     witness was first duly sworn by me, as noted by
      stipulation of counsel, to testify to the truth;
7     that I was authorized to and did report said
      deposition in stenotype; and that the foregoing
8     pages are a true and correct transcription of my
      shorthand notes of said deposition.
9           I further certify that said deposition
      was taken at.
10          The time and place hereinabove set forth
      and that the taking of said deposition was
11    commenced and completed as hereinabove set out.
12          I further certify that I am not attorney
      or counsel of any of the parties, nor am I a
      relative or employee of any attorney or counsel of
13    any party connected with the action, nor am I
      financially interested in the action.
14          The foregoing certification of this
      transcript does not apply to any reproduction of
15    the same by any means unless under the direct
      control and/or direction of the certifying
16    reporter.
            IN WITNESS WHEREOF, I have hereunto set
17    my hand this 11th day of July, 2016.
18
19
20
21
22
23          _____
24          ROBERT V. SHORT,
25          Certified Shorthand Reporter

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

_____

NATTO IYELA GBARABE                  ) Case No.

              Plaintiff,   )  14-cv-00173-SI

    v.                               )

                         )

CHEVRON CORPORATION,                 )

              Defendant.   )

_____)

Deposition of DAVID TUKURU

Chevron Nigeria Limited

2 Chevron Drive

Lekki, Lagos, Nigeria

Thursday, July 14, 2016, 8:45 a.m.

Reported by:   Jason T. Meadors, RPR, CRR

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

7/14/2016                     Gbarabe v. Chevron                     David Tukuru

---

1     A   Yeah.
2     Q   And when they went to each compound, would
3   they speak with members of that compound to explain
4   the forms?
5         MR. FRASER:  Objection.  Calls for
6   speculation.  You can answer.
7     A   Yes.
8   BY MR. DOMINGO:
9     Q   Were you involved in going around the town
10  with Gbarabe and Festus Ilibiri?
11    A   No.  No.
12    Q   How did you determine what income
13  information to write on your form?
14    A   Say it again.
15    Q   You told me earlier that the form asked how
16  much money you made before and after the incident,
17  correct?
18    A   Yes.
19    Q   How did you know what number to write down?
20        MR. FRASER:  Objection.  Argumentative.  Go
21  ahead and answer.
22    A   It's -- it's what I did.  It's not what I
23  know.  What I did is, nobody told me -- I didn't have
24  any other information concerning it.  I did what I
25  know.  As a right thing.

Page 50

---

1   BY MR. DOMINGO:
2     Q   How did you compute the number that you
3   wrote down on the form?
4     A   It's not as computed in any way.  It's not
5   a computed number.
6     Q   How did you determine what number you
7   should write down?
8     A   It's not determined.  It's not determined.
9     Q   What number did you write down for the
10  amount of money that you earned before the incident?
11    A   It's a long time.  I think we talked
12  about -- I finished up around 280,000 a month.
13    Q   280,000 naira per month?
14    A   Yeah.
15    Q   You said you talked about it.  Who did you
16  talk about that with?
17    A   Talked about.
18    Q   Yes, sir.
19    A   I didn't talk to anybody.
20    Q   How did you know to write 280,000 naira in
21  response to that question?
22    A   Outright.  I'm living it -- I can do that
23  myself.
24    Q   How did you know that 280,000 naira was
25  your monthly income before the incident occurred?

Page 51

---

1     A   How do I know.
2     Q   Yes, sir.
3     A   What I know about it.
4     Q   Yes.
5     A   It's funny to ask me.
6         DEPOSITION OFFICER:  I'm sorry?
7     A   It's funny to ask me how do I know this
8   before that time.  If I'm involved, I know -- I know
9   what I'm involved in.
10  BY MR. DOMINGO:
11    Q   Well, do you keep records of how much you
12  earn each month?
13    A   You mean?
14    Q   Do you keep a record, writing down the
15  amount of money you earn each month?
16    A   In everything that's -- has been done,
17  sometime, when something happens, you -- it is
18  profit, anyway, monthly.  It cannot be exactly the
19  same.  You have a higher month.  You have a lower
20  month.  In every month, it can't be the same.  So we
21  take that higher amount, that's all.
22    Q   Why do you take the higher amount?
23    A   That is the high form.
24    Q   Excuse me?
25    A   It's the high form.  It's about the

Page 52

---

1   records.  Not the minimum.
2     Q   So when you wrote down the number on the
3   form, you wrote down the maximum.
4     A   Yes.
5     Q   Do you keep track of the amount of money
6   you make each month?  Do you write it down somewhere?
7     A   No.
8     Q   So when you wrote down the number and you
9   just remembered what the maximum amount you made in a
10  month was?
11    A   Yes.
12    Q   Did you fill out the information for how
13  much money you made each month after the incident
14  occurred?
15    A   Yes.
16    Q   And what number did you write for that?
17    A   I can't remember it again.  I forgot.
18    Q   When you wrote down that number, how did
19  you come up with it at the time?
20    A   To be frank, after the incident, there were
21  not much fishing in the river again.  Like I told
22  you, if I get the fish on the fields, not even --
23  like carrying my nets to cast, so they have to live
24  in the environment.  Not just the open.  Fish is --
25  fish have to live in the environment, so if I go to

Page 53

---

Pages 50 to 53

Page 229

1   C E R T I F I C A T E
2   (LEKKI, LAGOS)
3   (NIGERIA)
4
5   I, Jason T. Meadors, Registered Professional
    Reporter, Certified Realtime Reporter, do hereby
6   certify that the aforementioned witness was first
    duly sworn by me, as noted by stipulation of counsel,
7   to testify to the truth; that I was authorized to and
    did report said deposition in stenotype; and that the
8   foregoing pages are a true and correct transcription
    of my shorthand notes of said deposition.
9
    I further certify that said deposition was taken at
10  the time and place hereinabove set forth and that the
    taking of said deposition was commenced and completed
11  as hereinabove set out.
12  I further certify that I am not attorney or counsel
    of any of the parties, nor am I a relative or
13  employee of any attorney or counsel of any party
    connected with the action, nor am I financially
14  interested in the action.
15  The foregoing certification of this transcript does
    not apply to any reproduction of the same by any
16  means unless under the direct control and/or
    direction of the certifying reporter.
17
    IN WITNESS WHEREOF, I have hereunto set my hand this
18  20th day of July, 2016.
19
20
21
22
23  JASON T. MEADORS
24  Registered Professional Reporter
25  Certified Realtime Reporter

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

_____

NATTO IYELA GBARABE                ) Case No.

                    Plaintiff,     )  14-cv-00173-SI

        v.                         )

                                   )

CHEVRON CORPORATION,               )

                    Defendant.     )

_____)

Video Deposition of UYADOUGHA ZIPREBO

Chevron Nigeria Limited

2 Chevron Drive

Lekki, Lagos, Nigeria

Thursday, July 7, 2016, 9:26 a.m.

Reported by:   Jason T. Meadors, RPR, CRR

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

7/7/2016                   Gbarabe v. Chevron                   Uyadougha Ziprebo

---

**Page 110**

1            DEPOSITION OFFICER:  I'm sorry.  But I do
2    know --
3         A    But I do know of one of my town boys who
4    was on the rig at the tiem, on the day of the
5    incident.
6    BY MR. DOMINGO:
7         Q    Do you belong to a fishing cooperative?
8         A    Fishing people?
9         Q    Do you know what a fishing cooperative is?
10        A    No, I don't know.
11        Q    Do you know what a fishing group is?
12        A    I don't know of any fishing group, but what
13   I know is sometimes when, you know, if someone
14   fishing in one of our -- one of my communities people
15   that fish get lost in the river.  You know, we all
16   come together.  The fishermen all come together and
17   sometimes contribute money to pull out our speedboats
18   to go into the sea to look for the person.  That's
19   what I know of there.  A group.
20        Q    This morning, you said that you filled out
21   a form to become a claimant in this case.  Do you
22   remember that?
23        A    Yes, I said so.
24        Q    Did that form ask how much money you made
25   from fishing before January 2012?

---

**Page 111**

1         A    I think there was a question like that.
2         Q    What did you write in response to that
3    question?
4         A    The -- the incident has been known to
5    happen a long time ago.  I can't give you an exact
6    figure of what I was writing out.
7         Q    What's your best recollection?
8         A    If I think, what would I say?
9         Q    What is your best recollection of the
10   answer you wrote to that question?
11        A    It's been long.  I can't remember.  I
12   didn't let it register in my brain either.
13        Q    I'm showing you Exhibit 629.  Have you seen
14   this document before?
15        A    No.  I've not.
16        Q    Do you see the page number in the bottom
17   right-hand corner?
18        A    Yes.
19        Q    Please turn to page number 10.  Do you see
20   your name fifth from the top?
21        A    Yes.  I'm seeing it.
22        Q    It's next to number 12184?
23        A    Yes.
24        Q    Have you seen your name on this list
25   before?

---

**Page 112**

1         A    This kind of piece?
2         Q    Yes.
3         A    The form was filled looked something like
4    this, but this one compound, this is the first time
5    I'm seeing it.
6         Q    This form says that you -- strike that.
7              This document says that you live in
8    Atukpulu compound.
9         A    I see.
10        Q    Is that true?
11        A    I'm also in -- at the Ikiru compound, but
12   that is not where I'm actually living, but it's not
13   far from the truth.
14        Q    This document says that you were born on
15   May 23rd, 1963.  Is that true?
16        A    It's possible that I filled this wrong, but
17   as it is here, I'm seeing it.
18        Q    If you follow that row to the right, it
19   contains numbers of how much money you made each
20   month in dollars, before and after the incident.  Did
21   you ever tell anyone how much money you made in
22   dollars before and after the incident?
23        A    No, I've not told anybody that.
24             DEPOSITION OFFICER:  No, I've not what?
25        A    No, I've not told anybody that.

---

**Page 113**

1              DEPOSITION OFFICER:  Thank you.
2    BY MR. DOMINGO:
3         Q    I'm showing you Exhibit Number 406.  Can
4    you take a moment, please, and look through the pages
5    of this document?
6         A    (Examines an exhibit.)
7         Q    Do you recognize this document?
8         A    This is -- this is -- this looks like the
9    document I was given to fill.
10        Q    Earlier, you told me that if you saw the
11   form, you'd know if you filled it out or if someone
12   else did.  Did you fill out this form?
13        A    Yes, I filled the form.
14        Q    Look at the first page.  Is this your
15   handwriting at the top?
16        A    Yes, this is my handwriting.
17        Q    Do you see the signature down at the
18   bottom?
19        A    Yes, I see.
20        Q    Is that your signature?
21        A    Yes, that's how I wrote it.
22        Q    Earlier, I had you write your signature on
23   a piece of paper.  Do you remember that?
24        A    Earlier, I showed you this one, and I
25   didn't specifically tell you that this is how I

---

Pages 110 to 113

Page 156

```
 1   C E R T I F I C A T E
 2   (LEKKI, LAGOS)
 3   (NIGERIA)
 4
 5   I, Jason T. Meadors, Registered Professional Reporter
     and Certified Realtime Reporter, do hereby certify
 6   that the aforementioned witness was first duly sworn
     by me, as noted by stipulation of counsel, to testify
 7   to the truth; that I was authorized to and did report
     said deposition in stenotype; and that the foregoing
 8   pages are a true and correct transcription of my
     shorthand notes of said deposition.
 9
10   I further certify that said deposition was taken at
     the time and place hereinabove set forth and that the
11   taking of said deposition was commenced and completed
     as hereinabove set out.
12
13   I further certify that I am not attorney or counsel
     of any of the parties, nor am I a relative or
14   employee of any attorney or counsel of any party
     connected with the action, nor am I financially
15   interested in the action.
16
17   The foregoing certification of this transcript does
     not apply to any reproduction of the same by any
18   means unless under the direct control and/or
     direction of the certifying reporter.
19
20   IN WITNESS WHEREOF, I have hereunto set my hand this
     14th day of July, 2016.
21
22
23   _____
24   JASON T. MEADORS
25   Registered Professional Reporter
```