# EXHIBIT M

1  **RUFUS-ISAACS, ACLAND & GRANTHAM LLP**
2  *JACQUELINE PERRY (State Bar No. 218367)*
   *NEIL J. FRASER (State Bar No. 125651)*
3  232 North Canon Drive
   Beverly Hills, California 90210
4  Phone:    (310) 274-3803
   Fax:      (310) 860-2430
5  E-Mail:   *jperry@rufuslaw.com/nfraser@rufuslaw.com*

6

7  Attorneys for Plaintiffs

8
                    **UNITED STATES DISTRICT COURT**
9
                   **NORTHERN DISTRICT OF CALIFORNIA**
10

11 | DR. FOSTER OGOLA; ELDER ENDURE | CASE NO.: 14-cv-00173-SC
12 | HUMPHREY FISEI; MR. FRESH TALENT;
   | MATTHEW KINGDOM MIESEIGHA; | **PLAINTIFF NATTO IYELA GBARABE'S**
13 | CHRIS WILFRED ITONYO; NATTO IYELA | **SUPPLEMENTAL AND AMENDED**
   | GBARABE (On Behalf of Themselves and as | **RESPONSES TO DEFENDANT**
14 | Representatives of the Communities embedded | **CHEVRON CORPORATION'S**
   | within the BRASS, EKEREMOR, | **INTERROGATORIES, SET ONE**
15 | KOLOKUMA/OPOKUMA, SAGBAMA,
   | SOUTHERN IJAW, NEMBE, OGBIA and | Judge:      Hon. Samuel Conti
16 | YENAGOA LOCAL GOVERNMENT | Courtroom:  1, 17th Floor
17 | AREAS OF BAYELSA STATE, collectively
   | known as the FUNIWA COMMUNITY),
18
19 |                     Plaintiffs,
20 | vs.
21 | CHEVRON CORPORATION, a Delaware
22 | Corporation; DOES 1 through 100, inclusive,
23 |                     Defendants.
24

25 | PROPOUNDING PARTY:      DEFENDANT CHEVRON CORPORATION

26 | RESPONDING PARTY:       PLAINTIFF NATTO IYELA GBARABE

27 | SET NO.:                ONE

28

6009.1.4.3

1   Plaintiff Natto Iyela Gbarabe ("Plaintiff") provides these responses ("Responses") to the

2   First Set of Special Interrogatories ("Interrogatory(ies)") propounded by Defendant Chevron

3   Corporation ("Defendant") as follows:

4   Plaintiff provides these Responses without waiving its right to object to the use (including

5   introduction into evidence) of any document or information identified in these Responses, or

6   subsequently produced, for any purpose, proceeding, or action, on any grounds (including

7   questions of authenticity, foundation, relevancy, materiality, privilege and admissibility).

8   Inadvertent identification or production of privileged documents or information by Plaintiff is not

9   a waiver of any applicable privilege.

10   The Responses are made based on information and documents presently available to

11   Plaintiff.   Plaintiff has not completed its investigation of the facts and documents relating to this

12   action, nor has it completed its preparation for trial.  Plaintiff reserves its right to amend, revise,

13   correct, supplement, clarify or enlarge the Responses.  Further, the Responses herein are made

14   without prejudice to Plaintiff's right to use at trial subsequently discovered information and

15   documents as well as information and documents which are omitted from these Responses as a

16   result of oversight, error or mistake.

17   No incidental or implied admissions are intended by the Responses.  The fact that Plaintiff

18   has responded or objected to any Interrogatory shall not be deemed an admission that Plaintiff

19   accepts or admits the existence of any facts set forth in that Interrogatory or assumed by such

20   Interrogatory, or that the Responses constitute admissible evidence.  The fact that Plaintiff has

21   answered part of or all of any Interrogatory is not intended to be, and shall not be construed as, a

22   waiver by Plaintiff of any part of any objection to any Interrogatory.

23   The responses below are based upon current personal knowledge of the Plaintiff and are

24   subject to supplementing further upon acquisition of further relevant factual information

25

26   ## RESPONSES TO INTERROGATORIES

27   ## INTERROGATORY NO. 1:

28   Separately for each item of property damage that you allege you suffered as a result of the

RUFUS-ISAACS ACLAND &
GRANTHAM LLP
232 N. CANON DRIVE
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 274-3803 • Fax (310) 860-2430

1  Incident (including by way of illustration, damage to fishing ponds, farm plots, rivers, etc.),

2  provide the following information with as much detail and specificity as possible:

3      a) Description of the property including its location, size, value and condition as to January

4  1, 2012 and the present;

5      b) Description of the alleged damage, including nature, scope, loss of value, and when it

6  began and ended;

7      c) Description of the ownership of the property including your interest in the property (e.g.,

8  fee simple owner, dweller or any other capacity, as referenced in SAC ¶ 65), the identity of any

9  other owners, and the nature/percentage of the respective interests.

10 **RESPONSE TO INTERROGATORY NO. 1:**

11     a)  In common with members of my community I suffered damage and destruction to

12         fishing hooks and nets which I owned and used for my fishing livelihood. These were

13         damaged by the excessive sargassum weeds, which were thrown up as a consequence

14         of the explosion and washed into the Koluama territories.

15     b)  Fishing nets have had to be replaced or repaired over time. The damage is continuing

16         as the weed is still present and I, in common with my fellow fishermen, have to cut

17         our nets in order to free them from the weed because the weight of the weed caught

18         in the nets can otherwise cause the boats to capsize. This is an ongoing expense and

19         loss.

20     c)  No individual member of the community actually owns fishponds including myself.

21         I, in common with the members of the community, have the right of occupancy and

22         possession of the riparian and ocean fishing grounds which, being rural, are owned

23         by the community. These rights are granted by custom, common law and statute. The

24         visitor fishermen who used the community fishing grounds paid rent to the

25         community which, in turn, was used for the common interest of the community and I

26         was entitled to the benefit of those rents as expended in common with my fellow

27         community members. It is impossible to say what my exact share of these rents was

28         as they varies and were spent as a collective for the benefit of the community as a

RUFUS-ISAACS ACLAND & GRANTHAM LLP
232 N. CANON DRIVE
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 274-3803 • Fax (310) 860-2430

whole. The extensive loss in relation to the fishing catch began immediately after the explosion and is still ongoing.

### Further Supplemental Responses

d) For the avoidance of doubt, I do not and did not actually own any fish pond/s nor do any member of the community that I represent. All land is owned by the government and I, as a fisherman and in common with members of the community that I represent have occupancy and possessory entitlement to all riparian and oceanic habitat. The foregoing is my understanding based upon custom and use. My legal advisors advise me that the Governor of the State holds all rural land in trust for the rural peoples who still retain a customary right of occupancy. These rights have been enshrined in various statutes that cover the possessory entitlements of the individual and community interests, which particularly include the Land Use Decree of 1978, now the Land Use Act 2004.

e) So far as specific damage to my property was concerned I attempted to resume my fishing from the beginning of March 2012 and soon found that my nets became entangled in weeds (sargassum weeds) that prevented the catch of such fish that might have been still available for catching. The nets were damaged thus and became unusable and required replacement. I lost approximately 9 bundles of nets of various sizes. The smaller bundles that I lost (three bundles) cost 45000.00 Naira for each bundle to replace (**135000.00 Naira**); the next size up, of which I lost 4 bundles, cost 65000.00 per bundle (**260000.00 Naira**) and finally 2 bundles at a cost of 90000.00 each (**180000.00 Naira**). Thus it cost me some 575000.00 Naira or some **US$2875** (dividing by approximately 200 naira to the dollar) which sum included accessories such as floaters, leads and twine at a time when I was able to make no income from my trade as a fisherman. I simply could not afford to continue to repair or replace my fishing equipment and thus I was forced to stop even attempting to fish for profit from March 2013 and have made no profitable income since. Thus my income has

6009.1.4.3

4

1  been negligible since the incident and thus my losses from my trade have been total

2  from the amounts that I earned prior to the incident.

3  **INTERROGATORY NO. 2:**

4  Separately for each item of personal injury that you allege you suffered as a result of the

5  Incident, provide the following information with as much detail and specificity as possible:

6  a) Description of the injury, including all symptoms and when it began and ended;

7  b) Description of any medical or health examination or treatment you received for the

8  injury including the identity of the person who examined or treated you, the dates, your symptoms,

9  and any tests or diagnoses.

10  c) The amount in damages you are claiming for the injury and how you calculate it.

11  **RESPONSE TO INTERROGATORY NO. 2:**

12  a) Within about two weeks from the explosion, I suffered from serious gastro-enteritis as

13  a consequence of eating contaminated fish that had been affected by chemicals. I

14  further suffered such serious skin irritation and complaints that I had to leave my

15  community and move to Yenagoa with my family. I also suffered shock and distress

16  for myself and my family and alarm at the ailments that affected us all.

17  b) I sought no formal medical treatment for myself preferring to use herbal and natural

18  remedies.

19  c) I cannot answer this question as it is a matter for experts to consider how much my

20  injuries are worth.

21

22  **Further Supplemental Responses**

23  d) I suffered gastric problems that included severe diarrhea for several days. For the

24  gastric symptoms I obtained herbal remedies from my home village and later

25  purchased drugs from a pharmacy in Yenagoa. I suffered skin irritation and rashes that

26  lasted some 3 months. I applied balms and antiseptic powders that helped the

27  symptoms and ultimately cleared these. I suffered shock and distress. I am claiming no

28  special damages for the costs of these treatments and the value of the general damages

RUFUS-ISAACS ACLAND &
GRANTHAM LLP
232 N. CANON DRIVE
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 274-3803 • Fax (310) 860-2430

1  for my physical and mental suffering will be a matter of general damages and thus a

2  matter for a jury to determine.

3

4  **INTERROGATORY NO. 3:**

5  Separately for each item of property damage or personal injury, describe with as much

6  detail and specificity as possible what caused it. If you do not know what caused it, so state and

7  describe with as much detail and specificity as possible any and all potential causes.

8  **RESPONSE TO INTERROGATORY NO. 3:**

9  The injury was caused by pollution from the chemicals discharged into the air, blown from

10  the sea as well as the enormous impact of the firestorm which continued to burn for some 46 days

11  and blew inland. Breathing difficulties were caused to myself, my family and my community. The

12  gas and fire flare from the explosion and the aftermath and the chemicals discharged into the

13  atmosphere were the clear causes of the breathing and skin problems whilst the chemicals that

14  impacted into the eco-system affecting the waters and the fish within them were the cause of the

15  gastric problems for me. The breeding grounds of the fish have been affected which impacts upon

16  the stock and the fish is still contaminated from the chemicals that were discharged into the waters

17  which the fish ingest in the waters within and around the community.

18  The chemicals and pollutants have impacted water from the Atlantic Ocean, rivers, creeks

19  and rivulets which has lost its natural value and is no longer the water that we locals knew. The

20  salt water from the sea which was used to treat diarrhea due to its medicinal value became and

21  remains poisonous. The fishing grounds, the eco-system, soil and wild life of the area, as well as

22  trees and mangroves and the general environment has been destroyed or degraded. The seaweeds,

23  such as sargassum, float near the surface of the sea and wash ashore in the communities.

24  There has been destruction and degrading of seafood such as shrimp, oysters, periwinkles,

25  water snails as well as the mangrove swamps.

26  All of the above has impacted upon the losses to my own livelihood and that of my

27  community.

28

RUFUS-ISAACS ACLAND &
GRANTHAM LLP
232 N. CANON DRIVE
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 274-3803 • Fax (310) 860-2430

1

2    **Further Supplemental Responses**

3        The best response that I can give in respect of the types of chemicals or pollutants that

4    emanated from the KS Endeavor explosion is to say that I am a layperson and am unable to

5    identify what comprised the materials that were discharged when the explosion occurred and the

6    fire burned. All I can state is that the effects described in my responses were temporal effects at

7    the time of the explosion and its aftermath and that prior to the event the effects, damage and

8    symptoms so described were not present. The actual identification of the chemicals and pollutants

9    will be promulgated by expert evidence.

10

11

12    **INTERROGATORY NO. 4:**

13        Separately for each month from January 2010 to the present, describe with as much detail

14    and specificity as possible your income including the source and amount.

15

16    **RESPONSE TO INTERROGATORY NO. 4:**

17        Prior to the KS Endeavor explosion I was able to make a minimum of 5000 Naira per day

18    for six days per week (I attend Church on Sundays and thus I do not work).This I was able to earn

19    from fishing in the creeks and  rivers during the rainy season which runs from April to October.

20    During the dry season, November to March I was able to make a minimum of 15000 daily (six

21    days per week). The calculation is done in the unit of 20 called 'oto' in the local dialect, of

22    different sizes. The size determines the prices. Allowing for some 25 days per month, for the rainy

23    months (7 months) I was able to average some 125000 per month (or with an exchange rate of

24    approximately 200 Naira to the US dollar, $625 per month. In the dry season, I was able to

25    average some 325000 Naira per month (or $1625 per month).

26        This was the position up until January 16th 2012. After the explosion I have made very

27    little by way of income from fishing and I catch no fish for personal consumption. Indeed I have

28    been hardly able to sell any fish and I have to find money to buy fish for myself and my family to

6009.1.4.3                                          7

RUFUS-ISAACS ACLAND &
GRANTHAM LLP
232 N. CANON DRIVE
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 274-3803 • Fax (310) 860-2430

1   eat.

2          The figures provided in the earlier document was provided in error and had not been

3   provided by me. I had provided the accurate figures but there appears to have been an error in

4   transmitting these in the document lists produced which are clearly too high.

5

6          **Further Supplemental Responses**

7          After the incident, in about March 2012, I attempted to resume some fishing but the catch

8   or yield was insufficient to make any sales. I have been barely able to catch sufficient fish for

9   subsistence for myself and my family, let alone make any profit from fishing. Even if I had been

10  able to afford to replace the damaged nets and equipment, the failure of fishing stocks have

11  yielded such poor stocks that to even try to fish commercially has been most discouraging and a

12  virtual waste of effort.

13         The 'oto' means 20 fishes of different sizes. In the custom of local people of Koluama, the

14  bigger the size of the fish in the 'oto'. The higher the price that the fish would fetch at market

15  sales. The prices are always determined by the prevailing market forces of the seasonal demand

16  and supply.

17         When I signed the verification it was because I was simply asked to confirm if the figures

18  on the list supplied to my US attorneys had was accurate and I had no reason to believe that they

19  were not. The figures which I was being asked to confirm, without being given the actual amounts,

20  were those on the original list as supplied by me to persons taking details from me in Nigeria-

21  persons who, I have reason to believe are no longer involved in these proceedings. It was only

22  when the actual figures themselves were put to me and I was asked about these in detail that I

23  realized that the figures in the list that my US attorneys had been supplied with were not in fact

24  correct and I hastened to point this out immediately. The figures now supplied are accurate and I

25  have corrected this at the earliest opportunity when the discrepancy was noted between what I

26  supplied by way of supplementary information to my attorneys and what they had in front of them

27  from a list supplied at an earlier date, which clearly contained inaccurate information.

28

6009.1.4.3

8

**INTERROGATORY NO. 5:**

Describe with as much detail and specificity as possible all testing and inspections of water, land, or air in your community or elsewhere in Bayelsa state at any time in the last five years, including date, title, and the results and identify the person or entity who performed the testing.

**RESPONSE TO INTERROGATORY NO. 5:**

A full post impact report was commissioned on behalf of the Koluama Communities to examine the impact of the KS Endeavor explosion. This report is dated march 2012 and is the Post Impact assessment of Chevron (KS Endeavor (Panama) Rig Wellhead Gas Explosion/Fire on the Environmental Qualities, Socioeconomic and Health of Koluama Communities (Clan) produced by SIA Resources Ltd. This document will be disclosed as part of my disclosures for the document requests (Set 1). It is know that there exists a post impact report concluded by NOSTRA which organization holds this report as well as a report entitled post Impact Assessment of Chevron KS Endeavor Gas Explosion on the Assets of Okunbiri/Sangana cooperative Societies, Akassa, Brass Local Government Area, Bayelsa state produced by Unic Concepts Limited dated March 2012. I do not have possession or custody of this report but will try to bespeak the same. Other various reports were commissioned but I have not seen all of these and cannot specifically identify the authors or originators. If any become available to me, I will serve these as and when.

**INTERROGATORY NO. 6:**

Separately for each community you claim sustained damage as a result of the Incident, describe the damage with as much detail and specificity as possible including the location of the community and the nature, scope and duration of the damage.

**RESPONSE TO INTERROGATORY NO. 6:**

Please see answers provided to Interrogatory request 3 above.

The waterways of the Koluama Communities have been polluted by toxins from the KS Endeavor explosion. The description of the sargassum weed and its impact on the fishing

1  equipment of myself and the other fishermen of the community has been described. This problem

2  continues.

3     The community as a whole has lost the advantage of the rents chargeable to visiting

4  fishermen to what was the rich waters of the area. These losses commenced immediately post

5  incident and have not been recovered.

6     Business activity has been crippled in that fish, seafood stocks, periwinkles as well as the

7  mangrove swamps have been destroyed or degraded. The losses arising from the business activity

8  described has not recovered and is expected to continue.

9     Wild life within the area has been destroyed so as well as the fishing grounds, the damage

10  encompasses soil, wild life, trees, mangroves and the general environment.;

11     Vibrations from the explosion damaged buildings, causing severe cracking in walls of

12  houses in Koluama 1 and 2.

13     The communities of Koluama 1 and 2 were badly affected by the pollutants emanating

14  from the air and the sea. Stomach complaints; eye complaints; skin complaints; breathing

15  problems as well as severe shock and psychological distress and effect. Reports commissioned by

16  the Bayelsa State Ministry of Health are in this organization's custody and control but these will

17  be requested and served when received.

18     The effect of the damage and injury continues to this day and indeed air/gas bubbles can

19  still be seen coming up from the scene of the incident at and near the site of the rig.

20     The fish and seafood caught from the waters around and in Koluama being contaminated

21  forced myself and the community at large to purchase fish from outside. We still do so to a lesser

22  extent.

23     I represent the communities of Koluama 1 and 2 but I am well aware that the effects of the

24  expulsion and its aftermath fire impacted similarly to the effects that I have described in

25  communities such as Ezetu, Foropa, Fish town, Ikeberi and Sangana and into such communities as

26  Bilaberi and Bisagbene in Ekeremor Local Government Area.

27

28

RUFUS-ISAACS ACLAND &
GRANTHAM LLP
232 N. CANON DRIVE
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 274-3803 • Fax (310) 860-2430

1    **Further Supplemental Responses**

2    I represent the community of Koluama 1 only. I have sought to identify other communities

3    that I am aware of and the location of these can be identified from the map that I understand has

4    been supplied to the defendant.

5    I am not a scientist and thus I can only rely upon the post impact report for the detail of

6    what damage has been caused within my own community and those also identified in that report

7    (also now supplied to the defendant). The fishing grounds have been depleted as described and

8    until the weeds are cleared and the breeding grounds restocked and the chemical deposits are

9    removed and the waterways cleaned, the fish will continue to be both scarce and contaminated as

10   well as impossible to catch in numbers. Since we are a fishing community and the other

11   communities identified are also fishing communities, the best that I can say is that the effects of

12   the explosion continues today and is likely to remain so until the area has been the subject of

13   extensive remediation.

14   I am presently unable to provide exact details of how long others in the community were

15   impacted by health issues nor can I presently state the economic effect of the loss of rental that

16   visiting fishermen paid but as this information becomes available to me, I shall endeavor to

17   provide the same.

18   As for other affected communities, I can say that new lead plaintiffs are being sought from

19   the lists of claimants in this lawsuit and, to my knowledge, these new lead plaintiffs will be

20   responding to discovery, including this interrogatory, with information specific to the communities

21   on whose behalf they are acting.

22

23   **INTERROGATORY NO. 7:**

24   Describe with as much detail and specificity as possible everything you did to mitigate the

25   damage you allege you suffered as a result of the Incident.

26   **RESPONSE TO INTERROGATORY NO. 7:**

27   We sought to bring the incident and its effects to the attention of all stakeholders and the

28   local and international community through peaceful protests and demonstrations at home and in

6009.1.4.3

11

RUFUS-ISAACS ACLAND &
GRAYTHAM LLP
232 N. CANON DRIVE
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 274-3803 • Fax (310) 860-2430

1   Yenagoa, the Bayelsa State capital and at the offices of Chevron Nigeria limited in Warri, Delta

2   State with a view to getting someone to stop the gas flare fire and to demand a clean up of the

3   damaged environment.

4           We sought to and did attract the attention of the Federal and State Government officials in

5   order that relief food and water could be provided as the water wells were polluted as well as the

6   food supply. In the event we managed to gain the attention of the Federal President (Goodluck

7   Jonathan) who visited the impact zone; the various officers and officials of the Bayelsa State

8   Government and even officials of Chevron Nigeria Limited (including the CEO) so that they could

9   all see the effects for themselves. A medical team was sent by the Bayelsa State Government to

10  visit and report upon the communities. Some relief was provided for the short term- regrettably for

11  the longer term, the communities have been left to fend for themselves.

12          We embarked on a sensitization program of the people of the communities about the

13  hazardous effects of the incident, using town criers. We warned the community of the dangers of

14  eating fish and poisoned seafood from the incident. We were unable to eat any dead fish.

15          I personally travelled around the Koluama communities consulting with local

16  representatives with whom I held meetings to both notify and warn of the dangers in the food and

17  water following the explosion.

18          To this day the contamination of the hydrocarbons can be seen oozing from the bones and

19  heads of fish caught within the impact zone.

20

21          **Further Supplemental Responses**

22          The incident happened on the 16th January 2012. A first meeting took place on the 18th

23  January 2012 in the village. A further meeting was held in Yenagoa on the 20th January 2012. A

24  protest event occurred on the 21st January 2012 when the fire was raging. Since that date, regular

25  meetings have been held as the need arises but I cannot supply accurate dates. Suffice to say these

26  meetings are generally in the town square and attended by chiefs and village elders including

27  Chief Christian Mughenbofa, Chief Godfrey Ekuere to name but two.

28          There were communications between the Koluama community and the Nigerian House of

1 Representatives dated May 30th 2012 and July 12 2012 and a letter was received from the House

2 of Representatives dated May 24 2012.

3      All of these activities were attempts to get something done to ameliorate the suffering and

4 deprivation of the community following the impact of the explosion as the community had serious

5 and acute problems with food and water supplies which required emergency attention and caused

6 tension and distress.

7      Unfortunately no clean up has been done to the area because this exercise is way beyond

8 the resources available to the community.

9

10 **INTERROGATORY NO.8:**

11      If you contend that any alleged Class members have sustained damage or injury as a result

12 of the Incident different from the damage or injury you have described in response to these

13 interrogatories, list each other type of damage or injury sustained by the alleged Class.

14 **RESPONSE TO INTERROGATORY NO. 8:**

15      Some members of the communities suffered from such severe shock that high blood

16 pressure problems were found. Miscarriages were reported and some persons left the area for good

17 due to the impossible living conditions for breathing and eating and being able to economically

18 survive after the impact. This last has had the effect of further impacting upon both community

19 life and business as some artisans left the area.

20

21      **Further Supplemental Responses**

22      The health problems delineated are intended to do no more than demonstrate a general

23 pattern of injury. They are not the subject of individual claims and they arise from the polluted air,

24 the eating of contaminated fish and the general shock and effect of the explosion that impacted

25 upon the community as a whole and included the skin, breathing and gastric problems that largely

26 mirrored my own symptoms and that of my family. Some persons manifested slightly different

27 symptoms and the examples were given by way of illustration only but essentially the same or

28 similar effects were felt generally by those in my community.

6009.1.4.3                                                        13

RUFUS-ISAACS ACLAND &
GRANTHAM LLP
232 N. CANON DRIVE
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 274-3803 • Fax (310) 860-2430

RUFUS-ISAACS ACLAND & GRANTHAM LLP
232 N. CANON DRIVE
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 274-3803 • Fax (310) 860-2430

1

2  **INTERROGATORY NO. 9:**

3      Describe with as much detail and specificity as possible all information supporting the

4  allegations in paragraph 28 of the Second Amendment Complaint including identifying the land

5  and water that was allegedly harmed as described therein and whether it includes any of the

6  property for which you or the alleged Class claim damage in this lawsuit. Paragraph 28 states:

7  "Prior to the events out of which this claim arises, Defendant's activities in the Niger Delta had,

8  among other things, eroded and destroyed agricultural land, forests and swamps and contaminated

9  the local water supply thereby killing the fish and wildlife upon which the local economies have

10  been based for centuries. Defendant has pumped or caused oil and gas to be pumped out of the

11  Niger Delta and has caused environmental degradation .... ".

12  **RESPONSE TO INTERROGATORY NO. 9:**

13      Prior to January 2012, an oil well blowout happened at the Funiwa oil field near to the area

14  of the instant explosion. This facility was operated by Texaco Nigeria Limited which company

15  was taken over by Chevron Nigeria Limited. This caused severe pollution, damage and impact

16  upon the communities at that time (it is believed to have occurred in about 1980 but the effects of

17  the 2012 explosion have been far more pervasive and serious.

18      Within the impacted areas Chevron has been flaring gas from the Funiwa and North Apoi

19  oil Fields. Different types of pollution such as oil spillages from broken pipelines have been

20  problematical for Bayelsa for over 50 years.

21

22      **Further Supplemental Responses**

23      As a small boy growing up in Koluama 1 Community I observed gas flaring which has

24  continued over 4 decades from the facility then operated by Texaco at the Funiwa oil field (since

25  taken over by Chevron). This facility, which is closer to Koluama 1 than any facility operated by

26  any other oil company, carries out flaring 24 hours per day and is approximately 5 nautical miles

27  from Koluama 1. In late December 2011, a spill from the Bonga field occurred. This is

28  approximately 20 nautical miles from Koluama 1 and I believe that Shell is the responsible

6009.1.4.3          14

1 company for this spill.

2      Pollution has been caused to an extent from all of the described activities.

3

4 **INTERROGATORY NO. 10:**

5      Describe in as much detail as possible any source of pollution at any time since January 1,

6 2010, in or near the communities and areas where you live and work (e.g., hush refineries,

7 sabotage, bunkering, spills, flaring, etc.).

8 **RESPONSE TO INTERROGATORY NO. 10:**

9      As described in answer to Number 9 above, there has been continued flaring and other

10 spills including oil spill in December 2011. The impact of the KS endeavor explosion was

11 different in kind and intensity from other pollution activities noted in the area prior to the KS

12 Endeavor and from January 2010.

13

14      **Further Supplemental Responses**

15      As described above, it is the Chevron facility, which is the closest to Koluama 1, but the

16 Bonga oil spill appears to be the responsibility of Shell. Thus it is not contended that Chevron has

17 been solely responsible for pollution in the Delta but as stated above the explosion and the

18 aftermath of the KS Endeavor produced an immediate, long-lasting and wholly different type of

19 effect from previous pollution experienced.

20

21 **INTERROGATORY NO. 11:**

22      State whether the alleged Class includes any non-natural persons and, if so, identify them.

23 **RESPONSE TO INTERROGATORY NO. 11:**

24      Non-natural persons are not, to my knowledge, involved as Plaintiffs in this case. As

25 communities, we live and work together in a sharing manner. For example, some communities are

26 fishing co-operatives but they are not legal entities as such- simply a way to pool resources as

27 individuals to benefit the community as a whole.

28

RUFUS-ISAACS ACLAND &
GRANTHAM LLP
232 N. CANON DRIVE
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 274-3803 • Fax (310) 860-2430

**INTERROGATORY NO. 12:**

Describe with as much detail and specificity as possible all information supporting the allegations in paragraph 38 of the Second Amendment Complaint, including the basis for your claims about the Nigeria judiciary and the details of how Chevron allegedly sought to interfere with legal process, specifying who was involved, what was done and when it happened.

**RESPONSE TO INTERROGATORY NO. 12:**

It has been my experience and the experience of those in my community, as well as Bayelsa State generally, that both the courts and the authorities have generally favored the multi national corporations who disobey court orders and undertakings with impunity and know that they will rarely if ever suffer sanctions for so doing. An example can be cited in the case of Jonah Gbemre v Shell Petroleum development Company Nigeria Limited & others AHRLR 151 wherein, even though the court granted the plaintiffs' relief to prevent SPDC from further flaring gas in the Iwherekan community in Delta State, SPDC refused to obey the court order.

Another example of the oil companies acting with impunity knowing that no sanction would befall it involved Chevron Corporation which, in 2001, undertook to build a medical facility to ease the health effects of years of pollution from activities in the Delta after bad publicity from the 1980 event which involved another Chevron rig explosion. Chevron undertook to build these health facilities in Ezetu, in partnership with the then State Governor. The building was completed but was neither staffed nor equipped nor supplied with medicines or equipment. It never opened its doors. It was, in effect a shell of a building, the project abandoned when the spotlight was turned away. No action whatsoever was taken to enforce completion and opening by any person in authority and the same is true of a facility in my own community of Koluama which was built by Chevron but inadequately provided with proper working facilities and provides an occasional skeletal and wholly inadequate health service. No person in authority will enforce any action against Chevron or any of the other multi- nationals leaving the communities to fend for themselves as best they can even though a good many of the health problems suffered can be laid at the door of the corporate activities.

The pattern is seen all over the Delta- oil companies making promises that are not kept and

1  even after the present incident, no assistance was offered immediately and no visit by any Chevron

2  Corporation official took place until weeks after the incident.

3  　　　The Courts and government bodies generally are in thrall to the corporate institutions and

4  the issue of real justice being obtained in the Nigerian Courts is unreliable to say the least. Quite

5  simply the corporation wield power and influence within the governmental departments and the

6  courts that make them unlikely to be brought to account or if they are, to obey any order that may

7  be made against them.

8  　　　We firmly believe that an order sanctioned by or a judgment obtained in a US Court will

9  have to be obeyed and has a far greater chance of both being fulfilled and implemented on behalf

10  of our community than any order obtained in a Nigerian court.

11

12  **Further Supplemental Responses**

13  　　　For the avoidance of doubt, it is no longer contended that Chevron made improper

14  payments to officials in connection with this litigation. The responses provided to date are the best

15  that are presently within my knowledge but I reserve the right to add any further responses by way

16  of further supplementary information as the same becomes available to me in the course of further

17  enquiries and acquired facts as I understand I am fully so entitled to do.

18  　　　Although I do not personally have any case documents from representative cases in my

19  personal custody, I believe my attorneys can point to numerous examples of Nigerian courts

20  favoring oil companies over claims asserted by the people of the Delta. I can cite to the Land Use

21  Act of 1979, which, although it contains a provision meant to provide compensation to farmers

22  when their land is polluted, the reality is that prices paid in lieu of farming are well below market

23  price, if, indeed, any compensation is paid at all.

24  　　　When it comes to fishing, the Nigerian courts have frequently simply ignored or dismissed

25  claims since it is hard to establish some claims without visible preserved evidence. The

26  government and oil companies generally refuse to recognize the values locals place on communal

27  fishing areas and lands and the courts reject cases for compensation. The Land Use Act has been

28  enforced by the courts in an uneven and discriminatory way to dispossess people of the use of

6009.1.4.3

17

RUFUS-ISAACS ACLAND &
GRANTHAM LLP
232 N. CANON DRIVE
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 274-3803 • Fax (310) 860-2430

areas where the government and oil companies wish to start up oil and gas ventures and is a prime example of the courts working with the government and not as an independent judiciary, with the consequence that it is very hard, if not impossible, to get justice in Nigerian courts in suits against oil companies.

One report considered on this issue is entitled "Examining Constitutional, Legislative, and Administrative Provisions Concerning Indigenous Peoples in Nigeria" , a report prepared by Babatunde Fagbayibo, a true and correct copy of which was provided with my response to Chevron's Request for Production (Set One, request 44). The writer surveys cases brought by various groups, including the Ijaw and Ogoni tribal groups, against the federal government and oil companies and determines that the resources at the disposal of the government and oil companies heavily weigh the scales against the claims of the people. Furthermore a congested court system and an unsatisfactory record of enforcement of court orders also illustrate the deficiencies of the Nigerian court system. The study also found prevailing customary realities are paid scant respect and this undermines indigenous customary systems still prevalent in the country.

**INTERROGATORY NO. 13:**

Separately for each piece of information provided in response to the above interrogatories, identify the source of that information.

**RESPONSE TO INTERROGATORY NO. 13:**

In formation in this part of the world is freely disseminated and exchanged.

The sources wherefrom I derive my responses arise from personal knowledge and knowledge gleaned from meetings with other community leaders. I personally saw the 1098 blow-out and the consequent damage to the environment at that time. I personally saw the fire burn following the present incident and experienced the effects of the air and water pollutants discharged.

I have further obtained information from relatives and friends and neighbors. I have personally experienced the damage to the fishing and water industries as well as obtaining information from my visits within the communities that I represent in this law suit.

6009.1.4.3                                18

1     Where some matters regarding the judiciary have not been personally known to me I have

2  obtained some information from the Environmental Rights action group.

3     I understand that the issue of a problematically functioning judiciary is more likely the

4  province in detail of expert opinion to address the matter in detail rather than the anecdotal

5  evidence and experience that I have personally come across or been informed about.

6

7  **<u>Further Supplemental Responses</u>**

8     Information is gathered and disseminated at gatherings and meetings that are held from

9  time to time in public spaces (town squares for example). At these meetings information is shared

10  publically and privately from person to person. These meetings are how we learn of births,

11  marriages and deaths. The community comes together to share information, gather financial

12  contributions to help for burial, purchase wedding gifts. So too is the gathering of information and

13  facts when a catastrophe strikes as in the KS Endeavor explosion and the whole community

14  gathers to see what help can be rendered, what suffering has occurred; how the community should

15  and can respond to any emergency. Sometimes these meetings are held in the actual town halls.

16  Save as otherwise indicated in the body of the above responses, I have sought to provide

17  information that was either known personally to me or was observed by me.

18

19

20  DATED: May 1 , 2015        RUFUS-ISAACS ACLAND & GRANTHAM LLP

21  **REDATED May 15 2015**

22                By:             /s/

23                    Jacqueline Perry
                      Attorneys for Plaintiffs

24

25  DATED: May 15 , 2015      RUFUS-ISAACS ACLAND & GRANTHAM LLP

26

27                By:             /s/

28                    Neil Fraser
                      Attorneys for Plaintiffs

RUFUS-ISAACS ACLAND &
GRANTHAM LLP
232 N. CANON DRIVE
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 274-3803 • Fax (310) 860-2430

## VERIFICATION

**I, NATTO IYELA GBARABE**, do hereby declare:

I am a party to the above-entitled action and have read the foregoing document entitled *Response of plaintiff Natto Iyela Gbarabe to first set of Interrogatories propounded by defendant Chevron* and I know the content thereof. The responses contained therein are true of my own personal knowledge, except as to those matters that are stated upon my information and belief, and those matters I believe to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _27th_ day of _April_ 2015 at _Yenagoa_, Bayelsa State, Federal Republic of Nigeria.

_____
NATTO IYELA GBARABE

**-1-**

**VERIFICATION**

## PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California, over the age of eighteen years and not a party to this action. My business address is 232 N. Canon Drive, California 90210.

On May 15, 2015, I served the following documents:

**Supplemental and Amended Responses of plaintiff Natto Iyela Gbarabe to interrogatories propounded by defendant Chevron Corporation**

On the interested parties by serving:

**JONES DAY
555 California Street, 26th Floor
San Francisco, California 94104
Attn: ROBERT A. MITTELSTAEDT, ESQ. (ramittelstaedt@JonesDay.com)
     CAROLINE N. MITCHELL, ESQ (cnmitchell@JonesDay.com**

( ) By Personal Delivery: I personally hand-delivered such document to a Jones Day agent who presented themselves at 945 Mayo Street, Los Angeles, CA 90042 to pick up this document and the production items on DVD.

(_) By Mail: I caused such envelope to be deposited in the U.S. Mail at Los Angeles, California, postage fully paid, in the usual and customary course of business.

(_X_) By E-Mail: I caused such document to be transmitted by e-mail to the persons at the e-mail addresses specified above, with said transmission reported as completed.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 15th day of May 2015 at Los Angeles, California.

_____/S/_____
NEIL J. FRASER

**PROOF OF SERVICE**