1
2
3
4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7                                        Case No.  14-cv-00173-SI

8    NATTO IYELA GBARABE,

         Plaintiff,                      **ORDER DENYING PLAINTIFF'S
9                                        MOTION FOR CLASS
                                         CERTIFICATION; GRANTING
10       v.                              DEFENDANT'S MOTIONS IN LIMINE;
                                         AND DENYING PLAINTIFF'S MOTION
11   CHEVRON CORPORATION,                TO SUBSTITUTE AND MOTION TO
                                         ADMIT OCTOBER 26, 2016 PHYSALIA
         Defendant.                      REPORT; SETTING CASE
12                                       MANAGEMENT CONFERENCE FOR
                                         APRIL 14, 2017 AT 3PM**
13

14                                       Re: Dkt. Nos. 123, 181, 182, 206, 207, 216

15

16          On December 9, 2016, the Court held a hearing on plaintiff's motion for class certification,

17   plaintiff's motion for an order admitting into evidence the Verde/Physalia report dated October 26,

18   2016, plaintiff's motion to substitute a new fisheries expert, defendant's motion in limine to strike

19   and exclude the report and testimony of Professor Jasper Abowei, and defendant's motion in

20   limine to exclude the socio-economic report and testimony by the authors of the Onyoma Research

21   Group.

22          For the reasons set forth below, after careful consideration of the voluminous record in this

23   case, the Court concludes that plaintiff has not met his burden to demonstrate that this case should

24   be certified as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3).  Plaintiff

25   has failed to show through any evidence that causation can be proven on a classwide basis, and

26   much of the evidence submitted has been shown to be unreliable.  Furthermore, the Court

27   concludes that plaintiff has not demonstrated typicality, adequacy or superiority, and the proposed

28   class definition suffers from numerous deficiencies.

United States District Court
Northern District of California

**BACKGROUND**

On January 16, 2012, an explosion occurred on the KS Endeavor drilling rig, which was drilling for natural gas in the North Apoi Field, five nautical miles off of the coast of Nigeria. Plaintiff Natto Iyela Gbarabe is a fisherman who resides in the Niger Delta region of southern Nigeria. Plaintiff alleges that prior to and on January 16, 2012, "a series of pump failures on the rig led to a massive build-up of pressure which was reported to defendant Chevron Corporation, either directly or through [Chevron Nigeria Limited ("CNL")]." Fourth Amended Compl. ¶ 4 (Dkt. No. 99). Plaintiff alleges that "[t]he instruction from Chevron Corp. was to continue drilling the borehole which proximately caused a 'blow-out' manifesting itself in an explosion which killed 2 rig workers and created a fire which burned, spreading toxins and hydro-carbons, heating the ocean water and polluting the same. The fire continued to rage for some 46 days until extinguished on or about March 2, 2012." *Id.* Plaintiff alleges that the KS Endeavor was operated by KS Drilling under the management of CNL, which in turn acted at defendant Chevron's direction. CNL is not named as a defendant in this action.

I.      **The complaints**

On January 13, 2014, six plaintiffs (Natto Iyela Gbarabe, Fresh Talent, Elder Endure Humphrey Fisei, Matthew Kingdom Mieseigha, Foster Ogola[1], Chris Wilfred Itonyo) filed this lawsuit claiming to represent 65,000 people throughout eight Local Government Areas of Bayelsa State, Nigeria. Dkt. No. 1 at ¶¶ 9, 24.[2] The original complaint alleged,

> Each of the Plaintiffs brings this action on behalf of themselves and their communities for which each has been designated a 'leader.' Some 65,000 persons have been identified as having been directly affected by, interested in and have claims arising out of the incident of January 16th 2012 and a list of those currently identified with claims are to be found at the offices of the Nigerian representative, A.P. Egbegi of Bayelsa State, Nigeria who holds a power of attorney to act on

---

[1] Mr. Ogola's name was spelled "Ogala" in the original complaint and early orders of this court, and later changed to "Ogola." This order uses the Ogola spelling.

[2] According to Wikipedia. Bayelsa State comprises an area of 21,100 square kilometers (8,150 square miles)). *See* https://en.wikipedia.org/wiki/Bayelsa_State.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    behalf of the communities and which list will be made available. The said power of
2    attorney has been granted in turn to the attorneys herein representing the Plaintiffs.

*Id.* ¶ 9.[3]

3    The complaint alleged that the plaintiffs and the people they represented suffered "losses to

4    their livelihood," "environmental disaster impacting upon food and water supplies," and  "health

5    problems," and the complaint sought "compensation arising out of the Defendants' gross

6    negligence, willful misconduct, negligence per se, acts of nuisance and negligent infliction of

7    emotional distress and breaches of Nigerian law – in particular the Nigerian Oil Pipelines Act

8    1990, the Petroleum (Drilling and Production) Regulations 1969 and the Land Use Acts of 1978."

9    *Id.* ¶ 3.  The complaint alleged that "[e]xpert reports have concluded that there have been

10   significant environmental impacts and all areas have been subjected to various degrees of

11   damage." *Id.* ¶ 25.

12   This case was initially assigned to Judge Samuel Conti.  Judge Conti dismissed the original

13   complaint in part because the six plaintiffs purported to represent other members of the Nigerian

14   communities allegedly affected by the explosion and fire, but they did not bring the case as a class

15   action.  Dkt. No. 30 at 10-11.  Plaintiffs had argued that it is common practice in Nigeria for large

16   groups of plaintiffs to sign onto a lawsuit by executing powers of attorney.  Dkt. No. 25 at 17-18.

17   As the Court explained, however, "the Federal Rules of Civil Procedure require that an action be

18   prosecuted in the name of the real party in interest."  Dkt. No. 30 at 11.

19   Judge Conti also dismissed the complaint because plaintiffs had not adequately alleged

20   injury to the six plaintiffs.  Judge Conti noted that plaintiffs had merely listed general categories of

21   damages they allegedly suffered, but that nowhere did they explain how the explosion or fire on the

22   KS Endeavor harmed plaintiffs.  The Court explained:

23       There is no discussion whatsoever of how a fire on an offshore rig damaged the
24       businesses, livelihoods, property, or health of Dr. Ogola or any of the other
         plaintiffs in this case. Plaintiffs make claims about damage to fish, livestock,

25   _____

26       [3]  Egbegi then gave power of attorney to Nicholas Ekhorutomwen, a solicitor practicing in
     Nigeria and England, who then gave power of attorney to Rufus-Isaacs, Acland & Grantham LLP,
27   which is Ms. Perry's and Mr. Fraser's former law firm. Dkt. No. 154-2 (Ex. 7 at 5-12) (Power of
     Attorney documents).  After Ms. Perry and Mr. Fraser left Rufus-Isaacs, Acland & Grantham
28   LLP, they filed a substitution of attorney, and their former firm is no longer involved in this case.
     Dkt. Nos. 177-78.

contamination of water and soil, and "general health breakdown." But there are no allegations that the damaged livestock belonged to Plaintiffs, that the Plaintiffs' livelihoods depended on fisheries, that the contaminated water or soil harmed them or their property, or that the "general health breakdown" affected them.

*Id*. at 10 (citation omitted).

After being granted leave to amend, plaintiffs filed their first amended complaint as a class action on behalf of 65,000 "clients." Dkt. No. 34 ¶ 12. Plaintiffs again alleged that expert reports showed damages in "all areas" (*id*. ¶ 30), and plaintiffs relied on the allegations regarding expert reports showing "the severe impact upon these communities of the trauma of the explosion" in opposing defendant's motion to dismiss. Dkt. No. 40 at 3:12-13. Judge Conti granted defendant's second motion to dismiss, finding that the amended complaint only alleged injury to unidentified class members and failed to allege that the named plaintiffs had suffered injury in fact. Dkt. No. 44 at 9-12.

On September 3, 2014, plaintiffs filed the second amended complaint. Dkt. No. 45. The second amended complaint added allegations of property damage and adverse health consequences for the six plaintiffs. *Id*. ¶¶ 12(i)-(vi). It alleged, for example, that

> Plaintiff Natto Iyela Gbarabe is a fisherman in Koluama 1, in the Southern Ijaw Local Government area of Bayelsa State. He, like other members of this particular community, which depends upon fishing for its primary method of earning a living, suffered personal loss by way of an almost total loss of yield in the waters customarily fished by plaintiff after the KS Endeavor rig explosion and 46 day fire. The diminution in yield in the area plaintiff customarily fishes continues. Plaintiff further suffered health [sic] from the effects of the polluted air and water caused by the gas rig explosion of the KS Endeavour, which included diarrhea and vomiting. Plaintiff is aware of other community members who suffered the same health issues, as well as additional debilitating conditions caused by the released pollutants, such as skin rashes and boils.

*Id*. ¶ 12(vi). As with the previous complaints, the SAC realleged that expert reports showed significant environmental impacts and damage to "all areas." *Id*. ¶ 33. Plaintiffs also attached to the second amended complaint a document titled "Schedule A," listing the names of 65,000 putative class members across Bayelsa State and the economic damages each allegedly incurred.[4] Dkt. No. 45-1 to 45-4.

---

[4]   This document was referred to in earlier versions of the complaint but not attached. Plaintiffs adopted Schedule A as their damages computation in initial disclosures. Dkt. No. 154-5 (Ex. 13 at 11).

United States District Court
Northern District of California

Chevron moved to dismiss the second amended complaint on several grounds, including that plaintiffs had failed to allege causation and that the allegations of harm up to 60 miles inland were facially implausible.   Dkt. No. 49 at 4-6.   In opposition, plaintiffs argued that their allegations were sufficient and they reiterated that their claims were supported by "expert reports [that] have identified the severe impact upon the communities[.]"  Dkt. No. 51 at 4.   Judge Conti granted in part and denied in part Chevron's motion.   Judge Conti found that plaintiffs' amended allegations were not implausible on their face, and he noted that plaintiffs were not required to prove causation at the pleadings stage.   Dkt. No. 56 at 4-5.   Judge Conti dismissed plaintiffs' public nuisance claim with prejudice and granted Chevron's motion to strike the second amended complaint to the extent that it asserted claims on behalf of communities rather than the communities' individual members.  *Id.* at 9.

On January 23, 2015, the parties agreed to limit the first phase of discovery to issues relevant to class certification.   Dkt. Nos. 63, 69.   The parties agreed to a class certification schedule under which plaintiffs would file their class certification motion by August 6, 2015, with a hearing scheduled for December 4, 2015.  Dkt. No. 69.

On March 18, 2015, the parties stipulated and the Court entered an order modifying the class certification schedule.   Dkt. No. 76.   The stipulation stated that the extension of time was necessary because "plaintiffs' counsel has advised that their retained experts are investigating which named plaintiffs and alleged class members have what plaintiffs' counsel consider objectively sustainable claims and, based on that investigation, anticipate reducing the number of named plaintiffs and class members and/or the scope of the proposed class."  *Id.* at 1:23-26.   The stipulation and order provided:

> June 1, 2015 will be the deadline for plaintiffs' counsel to file the appropriate pleadings for the purpose of limiting the currently identified lead plaintiffs and/or prospective class members to those deemed by plaintiffs' counsel to have sustainable claims.  If plaintiffs intend to narrow the definition of the class from the description in the CMC Statement filed January 23, 2015, they shall do so in an appropriate pleading by June 1, 2015.

*Id.* ¶ 1.

On May 12, 2015, Chevron moved to dismiss with prejudice the claims of Foster Ogola,

United States District Court
Northern District of California

1   Elder Endure Humphrey Fisei, Fresh Talent, Matthew Kingdom Mieseigha, and Chris Wilfred

2   Itonyo for failing to respond to Chevron's first and second requests for production and first set of

3   interrogatories.   Dkt. No. 77.   That discovery sought the basis for plaintiffs' allegations of

4   statewide injury and injury to the named plaintiffs and the 65,000 putative class members.   Dkt.

5   No. 78 ¶¶ 1-3.  In response to Chevron's motion, plaintiffs filed an opposition that did not actually

6   oppose the dismissal of the five plaintiffs, and acknowledged that the five plaintiffs did not have

7   articulable claims of damage.  Dkt. No. 80 at 5.  The opposition also stated:

> What has changed, through the development of scientific evidence, is the defined
> area within which the complaint alleges environmentally damaging pollution from
> an exploratory gas rig explosion and fire impacted individuals and their
> communities within the Nigerian State of Bayelsa, causing damage to the land,
> coastal waters, rivers, inlets and waterways and impacted the health and livelihoods
> of individuals within the area contaminated.
>
> This objective scientific evidence rendered it apparent to plaintiffs' counsel that
> some – though not all – of the communities represented by five of the six lead
> plaintiffs could not articulate a provable claim for environmental damage from the
> signature incident – a good faith determination that, when communicated, was not
> met favorably by the five lead plaintiffs representing, in part, those communities
> deemed to be outside said definable zone of contamination.

15   Dkt. No. 80 at 2:13-23; *see also id*. at 3:17-20 ("It is counsels' careful investigation that has

16   developed evidence that the full effect of the explosion, and thus the impact zone, must be more

17   narrowly and specifically defined to conform to proof.  The practical effect is that some, but by no

18   means all, of the communities already known to the defendant and the Court through the pleadings

19   will be stricken.").  Plaintiffs' counsel referred to this process as a "realignment" of the class.  *Id*.

20   at 3:27.   Plaintiffs' counsel also stated, "The proposed redefinition of this action is almost

21   complete and plaintiffs' counsel will be seeking defendant's agreement to a stipulated amendment

22   of the complaint to articulate the reduced number of communities asserting claims under the

23   original pleading, together with the names of the new, duly authorized lead plaintiffs to adequately

24   represent the interests of each of these communities.  If a stipulated amendment cannot be agreed

25   upon, plaintiffs will seek amendment by motion filed on or before June 1, 2015." *Id*. at 4:19-25.

26       On June 1, 2015, plaintiffs filed their third amended complaint without defendant's

27   consent or leave of court.  Dkt. No. 82 ("TAC").  The TAC removed the five plaintiffs who were

28   the subject of Chevron's sanctions motion and added eleven new named plaintiffs.  The TAC

United States District Court
Northern District of California

reduced the putative class from 65,000 to 15,000 people by dropping five of the eight Local Government Areas covered in the previous complaints, leaving Brass, Ekeremor, and Southern Ijaw Local Government Areas (the specific communities within those LGAs were listed in the caption). *Id*. ¶¶ 8, 32. The TAC contained the same allegation as the previous complaints that expert reports showed damage in all areas. *Id*. ¶ 33.

In an order filed July 28, 2015, the Court granted Chevron's motion to strike the TAC. Dkt. No. 94. The Court held that plaintiffs were required to seek leave of court before filing the TAC because the TAC added eleven new plaintiffs. *Id*. at 4. The Court rejected plaintiffs' argument that the new plaintiffs were not actually new because they were among the 65,000 community members that the original named plaintiffs claimed to represent through power of attorney. *Id*. The Court noted that it had "rejected this argument at least twice, and it admonishes Plaintiffs for raising it yet again. As explained in the Court's order on Defendant's first motion to dismiss, 'the Federal Rules of Civil Procedure require that an action be prosecuted in the name of the real party in interest.'" *Id*.

In a separate order filed July 28, 2015, the Court granted defendant's motion for the sanction of dismissal of five of the named plaintiffs for failure to comply with discovery obligations. Dkt. No. 93. The Court found that the five plaintiffs were served with discovery which required responses by April 3, 2015. The Court further found that those five plaintiffs had not responded by that date or any time thereafter, and that the plaintiffs were not cooperating with their counsel.

On September 29, 2015, named plaintiff Natto Iyela Gbarabe filed the fourth amended complaint pursuant to a stipulation and with leave of court. Dkt. No. 99. The fourth amended complaint ("FAC") is the operative complaint. The FAC realleges that plaintiff suffered "personal loss by way of an almost total loss of yield in the waters customarily fished by plaintiff after the KS Endeavor rig explosion and 46-day fire, as well as damage to fishing equipment," and that "Plaintiff further suffered health issues from the effects of the polluted air and water caused by the gas rig explosion of the KS Endeavour, which included diarrhea and vomiting." *Id*. ¶ 10(i). Similarly, the FAC realleges that "[e]xpert reports have concluded that there have been significant

environmental impacts and all areas have been subjected to various degrees of damage." *Id.* ¶ 30. The FAC seeks compensation and punitive damages arising out of Chevron's alleged gross negligence, willful misconduct, negligence per se, acts of nuisance, and breaches of Nigerian law. *Id.* ¶ 3.

The FAC alleged a class consisting of,

All residents of the coastal, estuarine and adjacent river or creek-situated areas of the Ekeremor, Southern Ijaw, Brass and Nembe Local Government Areas, State of Bayelsa, Federal Republic of Nigeria who, as of January 16, 2012 and thereafter, used the land, rivers, waterways, ponds, inlets, estuaries and adjacent oceanic waters for the purpose of fishing and/or farming to provide food and livelihood and who sustained articulable damage and/or diminution to said activities as a result of the explosion of defendant's exploratory gas rig as detailed herein.

*Id.* ¶ 12.  The FAC added:

[t]he communities wherein known Class Members are located and which are represented by the plaintiff are identified as Koluama 1 and 2; Ezetu 1 and 2; Ekeni; Sangana; Kongo Akassa; Minibie; Buama; Otuo; Itohoni-ama; Igbabeleu; Egwama; Llama; Fishtown aka Beleugbene (Brass); Ikebiri 1; Ikebiri 2; Foropa; Bilabiri; Amatu; Bessengbene; Letugbene; Odioama; Ewoama; Okpoma and Twon.

*Id.*  The FAC further reduced the putative class from 15,000 to 12,600 people by eliminating three of the communities that were covered by the previous complaints (Koluama 11, Ezetu 11, and Ikebiri 11).

## II.     Schedule for class certification

By stipulation and order, plaintiff's Rule 23 motion was originally due on August 6, 2015, with a hearing scheduled for December 4, 2015.  Dkt. No. 69.  The parties agreed that plaintiff's class certification motion "will include causation evidence as to the named Plaintiffs comparable to *Lone Pine*."  Dkt. No. 63 at 3:21-25.[5]

On  March  18,  2015,  in  light  of  plaintiff's  counsel's  need  for  additional  time  to

---

[5]  The Ninth Circuit and other circuits have issued case management orders requiring toxic tort plaintiffs to make a *prima facie* showing of exposure and causation to avoid unnecessary delays and expenses in complex litigation.  *Lone Pine* orders "are designed to handle the complex issues and potential burdens on defendants and the court in mass tort litigation."  *Acuna v. Brown and Root Inc.*, 200 F.3d 335, 340 (5th Cir. 2000).  These orders are commonly referred to as "*Lone Pine* orders," after *Lore v. Lone Pine, Inc.*, No. L 33606-85, 1986 WL 637507 (N.J. Super. Ct. Monmouth County, Nov. 18, 1986), the first case in which such an order was used.

United States District Court
Northern District of California

United States District Court
Northern District of California

"investigat[e] which named plaintiffs and alleged class members have what plaintiffs' counsel consider objectively sustainable claims" and the anticipated reduction of the scope of the proposed class, the class certification filing date was extended to November 9, 2015.  Dkt. No. 76.  The March 18, 2015 stipulation and order also provided,

> By June 1, 2015, plaintiffs shall also serve Rule 26-compliant reports and other required materials for any expert that they intend to use to support their class certification motion, subject to timely supplementation.  All such supplemental reports and materials will be provided to counsel for defendant as and when received and before filing of plaintiffs' class certification motion.

*Id.* ¶ 2.

The parties agreed to extend the June 1, 2015 deadline to June 15, and on that date, plaintiff served on defendant a report titled "KS Endeavor Rig Blowout Environmental Desk Study," prepared by Verde Environmental Group, Ltd.  Dkt. No. 97 ¶ 2, Ex. 1.[6]  The executive summary for that report states, *inter alia*, that the report "presents an initial desk study review of available reports pertaining to a Drilling Rig explosion that occurred on 16th January 2012," and that "Verde concludes that further independent studies are required and recommends the completion of air and water monitoring in the immediate area of the incident along with air dispersion modeling.  Furthermore to confirm whether damage has occurred to the marine environment, it is recommended that an appropriate, internationally-accepted marine survey and analysis techniques are implemented."  *Id.* Ex. 1 at 1.

On September 17, 2015, plaintiff requested a ten-month extension of the class certification filing deadline.  Plaintiff's counsel stated that they needed the extension because they had "retained an environmental consulting firm named Verde in May 2015 to conduct a review of gathered evidence regarding the environmental impact of the rig explosion on the surrounding marine and coastal area," and

> [F]ield investigation work supportive of plaintiff's class certification submission is required and this work, to be carried out by the retained firm, Verde Environmental

---

[6]  It is not clear whether plaintiff served any other expert materials by June 15, 2015. However, plaintiff did not disclose his fisheries expert (Professor Jasper Abowei) or his socioeconomic experts (Professors Alagoa, Derefaka and Okorobia) until April 6, 2016.  Dkt. No. 221, Ex. B.

> Consultants Ltd, cannot be undertaken until the end of the current Nigerian rainy season.  As set forth in the supporting declaration of Kevin Cleary of Verde, this field work cannot begin until mid-October at the earliest and, based upon Verde's experience and knowledge of working conditions in Nigeria, cannot reasonably be expected to be completed until around July 2016.

Dkt. No. 95 at 2:3-8; Dkt. No. 95-1 ¶ 2 (Cleary Decl.).

Chevron opposed the request for an extension, arguing that plaintiff did not provide any explanation for why he failed to commission any expert field work in the 16 months between when this case was filed in January 2014 and the beginning of the rainy season in May 2015. Defendant noted that although plaintiff stated that he had retained Verde in May 2015, plaintiff had listed Verde as his expert in his Initial Disclosure Statement on February 20, 2015.  *See* Dkt. No. 97 (Ex. 4 at 4).  Defendant also submitted deposition testimony from Kevin Cleary of Verde, in which Mr. Cleary testified that plaintiff's counsel did not formally retain Verde or ask it to perform any work until one week before the June 1, 2015 deadline for expert reports for class certification.  Dkt. No. 103-1 (Cleary Dep. at 17:20-25, 38:2-12).[7]

Judge Conti rejected the ten-month extension, but gave plaintiff a three-month extension until February 6, 2016.   Dkt. No. 108.   In granting the extension Judge Conti stated that "[n]o further extensions of the above dates will be granted."  *Id.*; *see also* Dkt. No.  107 at 16:21-25 (transcript of Oct. 1, 2015 hearing, during which Judge Conti stated:  "That's the last extension. That's the last. I mean, there's not going to be any other.  And if it's detrimental to the plaintiff, then it's detrimental to the plaintiff.  But everything has to come to an ending. You've had plenty of time.").

This case was re-assigned to this Court on November 3, 2015.  Dkt. No. 111.  In a case management conference statement filed December 7, 2015, plaintiff requested an additional three-

---

[7]   After discovery, Chevron now asserts that plaintiff's September 17, 2015 request for an extension was not actually based on difficulties presented by the rainy season, but rather due to the fact that plaintiff did not obtain funding until November 2015.  *See* Dkt. No. 203, Ex. G at PHYSALIA_00094 (10/6/15 email from Cleary (Verde) to Forster and Trett (both Physalia), recounting meeting with lawyers and funder and stating that budget approval was needed to move forward and they would meet as soon as approved); *id.* at Ex. H (10/27/15 email from Cleary to Forster and Trett reporting that "[t]he legal team have still not pressed the button on the project" and "[t]here is no point in meeting face to face until we get the official go ahead"); *id.* at Ex. I (declaration of plaintiff's third-party funder confirming that the funding agreement was "operative as of 23 November 2015").

United States District Court
Northern District of California

1    month extension of the class certification filing deadline "based upon delays caused by scientific

2    imperatives and the upcoming holiday season."  Dkt. No. 115 at 10:9-10, 15. Plaintiff claimed

3    Verde could not take seabed samples on the December 2015 trip because the laboratories would be

4    "closed for approximately two weeks between Christmas and New Year" and unable to do the

5    testing.  *Id*. at 11.  Plaintiff stated,

6            Since the briefing schedule issued by Court Order on October 5, 2015 (ECF No.
             108), counsel for Plaintiff have been organizing the on-site inspection and sampling
7            work required for class certification support with their designed environmental
             experts, Verde Environmental Consultants.  Verde will be in Nigeria and engaged
8            in the first phase of this work – the mapping of the seabed to identify sample sites
             and the taking of water samples – at the time of this case management conference
9            [December 11, 2015].

10           It had been hoped that Verde would be able to complete the in-field investigation in
             one trip to the accident area but, based upon unforeseen delays in the securing of an
11           appropriate boat to mount the necessary equipment for the collection of seabed
             samples, that phase of the operation has run into a problem caused by the upcoming
12           holiday period as follows:

13           It is essential for evidentiary purposes that all samples taken from in and around the
             site of the rig explosion are collected, stored and preserved in a manner that
14           guarantees their integrity from collection through bringing them to shore,
             packaging and dispatching them from Nigeria to the United Kingdom to the
15           laboratories who are contracted to conduct the testing of the samples for evidence
             of environmental impact directly related to the KS Endeavor blowout. The advent
16           of the Christmas and New Year holidays in the U.K. means that these laboratories
             will be closed for approximately two weeks between Christmas and New Year.
17           Counsel for Plaintiff have been informed that the integrity of samples collected
             prior to that time would be compromised by any delay in testing and that the
18           holiday closures creates such a delay. Being that it is essential that the samples are
             preserved and tested in a scientifically appropriate manner to verify the results and
19           findings, Verde has been advised to wait until after the holiday period before
             collecting and sending the samples.
20
     Dkt. No. 115 at 10:22-11:9.  Plaintiff's counsel further stated,
21
             The only rational decision under the circumstances is for Verde to return to Nigeria
22           in early 2016 to collect the necessary samples for dispatch to the U.K. testing
             facilities for analysis upon arrival. This, unfortunately, means completion of the
23           investigation, testing and results will be pushed back for at least a month and a half
             to two months.
24
     *Id*. at 14:27-15:2.[8]  The Court granted plaintiff a two-month extension of the filing deadline, until
25

26   _____

27           [8]  Due to reasons that are disputed by the parties, Verde/Physalia was unable to conduct the
             December 2015 trip as planned.  However, as plaintiff's representations in the December 7, 2015
             case management conference statement demonstrate, the December 2015 trip was to be limited to
28           mapping the seabed and obtaining water samples; no seabed samples were planned for the
             December 2015 trip.  Instead, as plaintiff informed the Court at the December 11, 2015 case

                                               11

United States District Court
Northern District of California

April 8, 2016.  Dkt. No. 116.

On April 8, 2016, plaintiff filed his motion seeking class certification pursuant to Rule 23(a) and (b)(3).  Plaintiff supported his motion with reports from four sets of experts: (1) a set of reports by the Verde/Physalia group, which include reports by Jones Environmental Laboratory Ltd. (collectively the "Physalia 1" report), Dkt. No. 124-1 to 124-11; (2) a report titled "Summary of Post Impact Studies and Findings of the Effect of January 2012 Chevron Gas Rig Explosion Off the Atlantic Ocean" by Professor Jasper Abowei, a Nigerian fisheries professor, Dkt. No. 125-3; (3) a report by the Onyoma Research team led by Professor Alagoa titled "Socio-Economic Report on the Effects of the KS Endeavor Rig Explosion on the Coastal Communities of Bayelsa," Dkt. No. 125-1, 125-2; and (4) a report titled "Damage Model for Class Action Management in the Matter of Gbarabe v. Chevron," by Christopher Money.  Dkt. No. 126-1.  Plaintiff also submitted other evidence in support of the class certification motion, such as declarations from putative class members, photographs of the site of the explosion and surrounding areas, and declarations from Nigerian lawyers regarding the Nigerian court system.

Plaintiff failed to timely produce to defendant the materials on which plaintiff's experts relied as required by Federal Rule of Civil Procedure 26(a)(2)(B)(ii), thus necessitating further modifications of the schedule.  *See* Dkt. Nos. 129, 169.

On September 16, 2016, defendant filed its opposition to plaintiff's motion for class certification, along with several expert reports in support of the opposition.  Dkt. Nos. 180, 183-89.  Defendant also filed two motions in limine to exclude the report and testimony of Jasper Abowei and to exclude the report by the Onyoma Research team.  Dkt. Nos. 181-82.

On September 30, 2016, the Court held a case management conference.  At that conference, the parties informed the Court that on September 14, 2016, plaintiff proposed a new class definition, and that Chevron had declined to stipulate to it.  *See* Dkt. No. 190 at 1.  Plaintiff requested permission from the Court to amend the class definition, and the Court directed plaintiff

---

management conference (which was held prior to the cancellation of the December trip), plaintiff's plan was that Verde/Physalia would take samples of the seabed in early 2016. Verde/Physalia did return in January-February 2016 and at that time mapped the seabed and took both water and seabed samples.

to provide the proposed amended class definition to defendant by October 7, 2016, and allowed defendant to file a response to the proposal by October 21, 2016. *See* Dkt. Nos. 192, 199-200.

On November 10, 2016, the Court held a further case management conference. At the conference, plaintiff requested a further extension of time to file the reply papers from November 18 to November 25, 2016. The Court granted that extension. At that conference, the parties informed the Court that plaintiff wished to replace his fisheries expert Jasper Abowei with a different fisheries expert, Professor Eyiwunmi Falaye, and that Chevron objected to plaintiff's request. The parties also informed the Court of a dispute regarding plaintiff's request to submit a new report dated October 26, 2016 from the Verde/Physalia experts ("Physalia 2"). The Court directed plaintiff to file motions for leave to substitute a new fisheries expert and for leave to submit the new Physalia 2 report. Dkt. No. 205. Plaintiff filed the two motions for leave on November 16, 2016. Dkt. Nos. 206-11, 217-18.

On November 26, 2016, plaintiff filed his reply brief in support of the class certification motion, along with exhibits totaling over 1,500 pages. Dkt. Nos. 213-16. Buried in the thousands of pages of exhibits are seven new expert reports: (1) a November 25, 2016 report by Physalia titled "Gbarabe v. Chevron; Scenarios for Fisheries Impacts, Dkt. No. 214-4 at 1-17; (2) a November 24, 2016 report by Lwandle Marine Environmental Services titled "KS Endeavour Gas Blowout Incident: Potential Effects on Artisanal Fisheries," Dkt. No. 214-4 at 18-31; (3) a report by Roy van Ballegooyen, WSP Coastal and Port Engineering, titled "Transport and Fate of Fine Sediments and Muds Released into the Marine Environment During the KS Endeavor Blowout Incident"), Dkt. No. 214-4 at 32-47; (4) a November 2016 report by plaintiff's proposed new fisheries expert, Professor Falaye, titled "Report on Effects of Funiwa Deep 1A Gas Blowout in Bayelsa State, Nigeria on Fish Diversity." Dkt. No. 214-4 at 48-95; (5) a November 25, 2016 report by Physalia titled "Review of, and Comments on, the Adams (Neal Adams Services) Document: An Evaluation and Assessment of the 2012 KS Endeavor Natural Gas Blow-out Incident" Dkt. No. 214-3; (6) a November 17, 2016 report by Physalia titled "Review of, and Comments on, the Deardorff, Deines and Palmquist (Exponent) Document" Dkt. No. 214-5; and (7) a declaration and supporting exhibit titled "Conceptual Document" by John Welches of Red

Mallard, Inc., Dkt. No. 215-3 at 4-36, and a C.V. and declaration by Todd Hilsee (in a different case) regarding providing notice, Dkt. No. 215-4 to 215-5.   Defendant has objected to this evidence on numerous grounds.

### III.   "Realignment" of the class

As discussed *supra*, at some point plaintiffs' counsel became aware that the claims of five named plaintiffs, and of most of the original class of 65,000, were untenable.   What plaintiff and his counsel knew, and when they knew it, has been the subject of much discovery and some motion practice.   At an August 24, 2016 hearing, Ms. Perry stated, "[i]t was in about [March/February 2015] that we first learned through Mr. Alagoa Morris that the likelihood of the full complement of the 60-odd-thousand people in all those 300-odd communities was more likely than not to be claims that could not be sustained.   That was in about February 2015."   Dkt. No. 173 at 24:3-7.

In response to defendant's discovery requests, plaintiff's counsel have admitted that they had no contacts with the six plaintiffs or the Nigerian lawyer Mr. Egbegi before filing this lawsuit.   Dkt. No. 154-1 (Ex. 3 at 4-7); Dkt. No. 154-2 (Ex. 8 at 1; Ex. 9); Dkt. No. 173 at 11-14 (transcript of Aug. 24, 2016 hearing; counsel stating that they first had contact with six plaintiffs around May 2014).   Plaintiff's counsel have stated that Mr. Ekhorutomwen, the Nigerian lawyer who practiced with a U.K. firm, purportedly assured them that Mr. Egbegi had done "full due diligence" in Nigeria.   Dkt. No. 154-1 (Ex. 3 at 4, 5).   According to counsel, "[i]t is not customary nor acceptable practice for a barrister to do due diligence on a fellow professional within the English system[.]"   *Id*. at 4.

Unsatisfied with plaintiff's responses to discovery seeking the factual basis for the allegations of causation and injury to the named plaintiffs and the class in the various iterations of the complaint,[9] on July 22, 2016, defendant filed a motion to compel further discovery.   Dkt. No.

---

[9]   For example, plaintiff informed defendant in a letter dated April 18, 2016, that counsel relied on a draft Post-Impact Report from the Bayelsa State Ministry of the Environment for the allegations in the original complaint. Dkt. No. 154-1 (Ex. 3 at 5).   At the August 24, 2016 hearing on defendant's motion to compel further discovery, Mr. Fraser confirmed that counsel relied on

153. In response, Ms. Perry submitted an August 7, 2016 declaration stating:

> 8. . . . When five of six original lead plaintiffs became non-cooperative and concern grew in regard to evidence which, in our opinion, required further authentication, we launched an investigation into the best method of establishing fully credible evidence emanating from the Niger Delta region, a remote area of a foreign nation fraught with well-recorded dangers and conflicts. Our independent investigation led us to Mr. Alagoa Morris, an environmental activist whose credibility and integrity was determined to be acknowledged generally in the Niger Delta region. He was asked to assist on the ground in Bayelsa State to determine whether the original lists of claimants were credible, given the withdrawal of cooperation by all but one of the original lead plaintiffs and the Nigerian referring attorney, Mr. Egbegi. Mr. Morris was of the opinion that we could not rely upon the authenticity of the original list of communities because of their location inland from the ocean, even though the State is made up of a maze of rivers and creeks.[10] An investigation was instigated utilizing the services and local knowledge of Mr. Morris which culminated in the decision to reduce the zone of claimed contamination and reduce the number of claimants to those in communities located on or near the Bayelsan coast. Defendant was immediately informed of this undertaking and kept informed at every stage of these developments, which included our difficulties in obtaining the cooperation of or information from 5 of the 6 Lead Plaintiffs and Nigerian counsel. This lack of cooperation meant that decisions as to the viability of the claims as original[ly] constituted had to be made based upon available information. Whether or not the sudden withdrawal of cooperation by five or six original lead plaintiffs and Nigerian counsel was because of any knowledge on their part that the original claimant list contained false claims could not be established, nor were we able to secure the original sign-up documents. Therefore, a judgment as to the necessity for a realignment of the case had to be based upon the available facts and evidence known to us.
>
> 9. A further development in 2014 was that [Nicholas Ekhorutomwen] removed himself from Harding Mitchell and commenced his own firm of solicitors. It has been made clear to defendant that Mr. Fraser and I had lost confidence in [Nicholas Ekhorutomwen]'s competence and that we began to doubt we could rely upon him or Peter Egbegi for the information we sought. Our concern was that we only continued to represent individuals who, in our legal opinion, appeared to have genuine and viable claims within an establishable zone of contamination. With the

the Bayelsa State Ministry report for the allegations in the original complaint of injury throughout Bayelsa State, approximately 8,150 square miles. *See* Dkt. No. 186-3, Ex. 2 at 19:2-9. However, that report studied communities that were a mean of 10 kilometers from the explosion site, and that report did not study or make findings about locations in Bayelsa State outside that area. Dkt. No. 154-3 (Ex. 12 at 1-2).

[10] Mr. Alagoa Morris is plaintiff's current Nigerian "litigation coordinator." At his July 2016 deposition, Mr. Morris was asked about the original class definition and Schedule A. Mr. Morris testified that the list of purportedly impacted communities was "very bogus" because some communities were "really, really upstream." Dkt. No. 154-5, Ex. 14 (Morris Dep. at 25-26). "Common sense told me it's not possible." *Id.* at 28. Mr. Morris testified that he "laugh[ed]" at the allegations of Ogola's claims when he first saw them. *Id.* at 53-54. Mr. Morris testified that many of the people listed on Schedule A do not exist, and that for several of the communities listed in Schedule A, "almost hundred percent of the list there was fake." Dkt. No. 186-2 (Morris Dep. at 78-79, 80).

assistance of Mr. Morris, who had independently investigated the impact of the subject rig explosion immediately after it happened for his own organization, it was determined to reduce the claims to those emanating from the coastal communities currently part of this action. Defendant was fully informed of this determination and of our commitment that, at no time, would we be party to any claim that was determined to be less than credible. The recent re-signups were conducted to assist us in identifying and eliminating such claims. Careful procedures were put in place. It appears, however, that some re-signups may lack the honesty and/or diligence, which, once fully investigated, will sound in their removal from the case as appropriate. Defendant is aware that we have repeatedly assured them that any clam found to be false will be excised.

10. It is submitted that this continued commitment to ensuring all claims are genuine evidences an ethical standard we adhere to that makes defendant's allegations of fraud all the more repugnant. This is Nigeria, an African nation with well-documented problems of corruption from the upper reaches of government down in which individuals and corporations have both, at times, been implicated. If there are some "bad apples" within the claimants herein, we intend to take the necessary action to dismiss them from further participation. It is not appropriate to characterize the entire case as based upon a fraud as it is clear evidence capable of inflicting damage on the livelihood of thousands of claimants has been developed and the extent of damage, ultimately, presents a factual question.

Dkt. No. 162 ¶¶ 8-9; *see also* Dkt. No. 186-3, Ex. 2 at 22:10-16 (transcript of Aug. 24, 2016 hearing wherein Ms. Perry stated that "[t]he first time we knew that the amounts [on Schedule A] had been doctored was when Mr. Gbarabe and the other 11 then, we hoped, named plaintiffs were asked to deal with the interrogatories. That's when we first found out. That was in June 2015. . . . It was in June we first knew that the figures were wrong."); Dkt. No. 186-1 (Gbarabe Dep. Vol. 1 at 111-16, testifying that all of the lost income figures on Schedule A were "exaggerated" and "doctored").[11] Plaintiff's counsel have also stated that they never reviewed or had access to the documents on which Schedule A was based, and that they "haven't been able to get any information from the people that compiled these lists." Dkt. No. 173 at 30:25-31:18.

In 2016, plaintiff undertook a "re-signup" process to collect new claim forms from all putative class members in an effort to ensure that only genuine claims were included in the class. At the August 24, 2016 hearing, counsel described the "re-signup" process as follows:

[T]he re-sign-up process only involves persons that are on the original list that can be verified to actually have a genuine − we're trying to verify who has a genuine claim; making sure that these people exist, and they live in the community where

---

[11] Although plaintiff's counsel knew by June 2015 that "the amounts [on Schedule A] had been doctored," Dkt. No. 186-3, Ex. 2 at 22:11-12, plaintiff's counsel included Schedule A as attachments to the TAC and FAC, filed on June 1, 2015 and September 29, 2015, respectively.

these lists say they live, and that they have credible claims of damage because of their occupation, and the fact that they lived in Koluama, for example, at the time of the incident.

The re-sign-up process that went forward in the early part of this year will need to be addressed again in certain aspects to continue to hone down the client list, and make sure that we only have what we believe to be genuine claimants involved in this case; but Schedule A, in and of itself, contains the list of all the precertification claimants that will be in this case going towards class certification. We're just − but we've already dropped a great many of them. And there's going to be more done based upon the information we've got back during the re-sign-ups. That was done to try and authenticate the − what portions of the lists were, in fact, accurate.

*Id.* at 23:4-18.

Thus, as late as August 24, 2016 − well after plaintiff's motion for class certification was filed − plaintiff's counsel stated that they were still "trying to verify who has a genuine claim" and acknowledging that the "re-signup" process was flawed and that plaintiff's counsel would need to "continue to hone down the client list." *Id.* Indeed, as discussed in greater detail *infra*, discovery conducted by Chevron during the summer of 2016 shows that the "re-signup" process has been riddled with unreliability, as *inter alia*, new claim forms were submitted in the names of deceased persons; there are multiple inconsistent forms with matching names, but different income figures and signatures; and class members testified that the forms contain false and inaccurate information and that forms were submitted on behalf of individuals without their knowledge or consent using inaccurate information and fraudulent signatures or thumbprints.

## LEGAL STANDARD

Class actions are governed by Rule 23 of the Federal Rules of Civil Procedure. Plaintiff bears the burden of showing that he has met each of the four requirements of Rule 23(a) and at least one subsection of Rule 23(b). *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1067 (9th Cir. 2014), *citing Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).

The Court's "class certification analysis must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim." *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 133 S.Ct. 1184, 1194 (2013) (*quoting Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) (internal quotation marks omitted)). These analytical principles govern both Rule 23(a) and 23(b). However, "Rule 23 grants courts no license to engage in free-ranging merits

17

United States District Court
Northern District of California

1  inquiries at the certification stage." *Amgen*, 133 S.Ct. at 1194-95.  "Merits questions may be

2  considered to the extent – but only to the extent – that they are relevant to determining whether

3  Rule 23 prerequisites for class certification are satisfied." *Id.*

4      Under Rule 23(a), the class may be certified only if: (1) the class is so numerous that

5  joinder of all members is impracticable, (2) questions of law or fact exist that are common to the

6  class, (3) the claims or defenses of the representative parties are typical of the claims or defenses

7  of the class, and (4) the representative parties will fairly and adequately protect the interests of the

8  class.  *See* Fed. R. Civ. P. 23(a).  A plaintiff must also establish that one or more of the grounds

9  for maintaining the suit are met under Rule 23(b): (1) that there is a risk of substantial prejudice

10 from separate actions; (2) that declaratory or injunctive relief benefitting the class as a whole

11 would be appropriate; or (3) that common questions of law or fact predominate and the class

12 action is superior to other available methods of adjudication.  *See* Fed. R. Civ. P. 23(b).  In

13 addition, the class must not be vaguely defined and must be "sufficiently definite to conform to

14 Rule 23."  *Probe v. State Teachers' Ret. Sys.*, 780 F.2d 776, 780 (9th Cir. 1986); *see also Briseno

15 v. ConAgra Foods*, 844 F.3d 1121, 1124 n.4 (9th Cir. 2017) (holding that party seeking class

16 certification does not need to show it is "administratively feasible" to identify class member, and

17 citing *Probe* for the proposition that Rule 23 does require class to be "sufficiently definite").

18     "If expert testimony critical to class certification is challenged, a district court must make a

19 determination as to the admissibility and persuasiveness of that evidence before certifying a class."

20 *Grodzitsky v. Am. Honda Motor Co.*, No. 2:12–cv–01142–SVW–PLAx, 2014 WL 718431, at *6

21 (C.D. Cal. Feb. 18, 2014) (citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982-83 (9th Cir.

22 2011) (holding that the "district court correctly applied the evidentiary standard set forth in

23 *Daubert*" to expert declarations at the class certification stage).  Federal Rule of Evidence 702

24 permits expert testimony where "(a) a scientific, technical, or other specialized knowledge will

25 assist the trier of fact to understand the evidence or determine a fact in issue; (b) the testimony is

26 based on sufficient facts or data; (c) the testimony is the product of reliable principles and

27 methods; and (d) the expert has reliably applied the principles and methods to the facts of the

28 case."  Fed. R. Evid. 702.  *See also United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002)

("[Rule 702] consists of three distinct but related requirements: (1) the subject matter at issue must be beyond the common knowledge of the average layman; (2) the witness must have sufficient expertise; and (3) the state of the pertinent art or scientific knowledge permits the assertion of a reasonable opinion.").

## DISCUSSION

Before turning to the specific issues raised by the pending motions, the Court makes several preliminary and general observations. First, plaintiff's motion and reply briefs repeatedly make factual assertions without citation to any evidence in violation of Civil Local Rule 7-5(a).[12] *See, e.g.*, Dkt. No. 123 at 5-9 (statement of facts section in class certification motion). These assertions include sweeping and serious allegations, such as "[t]he discharged material from the explosion into the ocean has washed ashore and affected the soil which in turn has impacted upon farming and food products relied upon by communities from whom the putative class is drawn, with the consequence they have been unable to rely upon farming for sustenance or income due to the hydrocarbon and other pollutants that have impacted upon their land," and "[t]he air quality, affected by both the explosion and the fire and the toxins released as a consequence, caused common, classwide health hazards, giving rise to breathing difficulties." Dkt. No. 123 at 8-9. Plaintiff's class certification motion is replete with allegations that the rig explosion caused significant environmental impact and harm to the proposed class, and yet for the most part these assertions are not supported by citations to any evidence. It is not the Court's task to "examine the entire file for evidence . . . where the evidence is not set forth in the . . . papers with adequate references so that it could be conveniently found." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001). Further, and as discussed *infra*, when plaintiff includes

---

[12] That rule provides, "Affidavit or Declaration Required. Factual contentions made in support of or in opposition to any motion must be supported by an affidavit or declaration and by appropriate references to the record. Extracts from depositions, interrogatory answers, requests for admission and other evidentiary matters must be appropriately authenticated by an affidavit or declaration." In further violation of Local Rule 7-5(a), most of the exhibits are unaccompanied by a supporting declaration. *See, e.g.*, Dkt. Nos. 124-1 through 124-10, 125-1 through 125-9, 126-1, 127-2, 127-3, 214-16.

citations to the record, an examination of the cited evidence generally reveals that it does not actually support plaintiff's assertion.

Second, plaintiff has repeatedly shown a disregard for scheduling orders in this case. As the procedural history recounted *supra* shows, plaintiff was granted numerous extensions of the deadline to file the class certification motion and supporting evidence. Once briefing was finally underway, however, plaintiff repeatedly failed to provide the materials upon which his experts relied, resulting in further delay; sought to amend the class definition after Chevron filed its opposition, resulting in additional briefing; filed motions on the eve of the hearing seeking to add a new expert and to admit new expert reports, again resulting in further briefing; and filed a raft of new and undisclosed expert reports in connection with the reply brief. This case has been pending since January 2014, and plaintiff has been provided with more than ample time to conduct discovery and prepare the class certification motion. Both Judge Conti and this Court have been generous with regard to granting plaintiff extensions of time and affording plaintiff considerable leeway in presenting the class certification papers.

Third, citing a January 23, 2015 case management conference statement, plaintiff's motion for class certification incorrectly asserts that defendant has stipulated to liability for class certification purposes. Dkt. 123 at 3:12-15. In fact, that statement provides, "Defendants have advised that that they do not intend to dispute that there are questions of law and fact common to the proposed class, to wit the allegations concerning Defendant's role in the events leading up to the Incident and Chevron Corporation's relationship with CNL and other entities as set forth in the second amended complaint." Dkt. No. 63 at 7:12-16. Defendant also stated, "[d]efendants have further advised that they intend to dispute whether Plaintiffs have defined a proper class, whether the named Plaintiffs are typical or adequate representatives, whether causation of alleged damages and injuries and the presence or extent thereof are common to class members and predominate over common issues, whether a class action is superior, and whether Rule 23(b)(2) is satisfied." *Id*. at 7:16-18. Thus, all of the matters identified by defendant are contested in the pending motions.

United States District Court
Northern District of California

I.     **Defendant's Motion to Strike Professor Jasper Abowei and Plaintiff's Motion to Substitute New Fisheries Expert**

In support of the class certification motion, plaintiff filed a report titled "Summary of Post Impact Studies and Findings on the Effect of January 2012 Chevron Gas Rig Explosion of the Atlantic Ocean," by Jasper Abowei, a biology professor at the Niger Delta University.  Dkt. No. 125-3.  In his report, Professor Abowei states that he conducted a field study from April to May 2012 "to establish the effects of the January, 16 2016 [sic], Chevron gas plant blowout at the Atlantic Ocean on the started [sic] environmental parameters.  A total of seven sampling stations were established: Foropa, Ekene, Ejetu, Kulama 1 and 2, fish town and Ikebiri fishing port."  *Id.* at § 2.1.  Professor Abowei's report summarizes four articles that he previously wrote about that 2012 study; Professor Abowei did not conduct any new research for the report in this case.  Dkt. No. 186-1 at 54-55 (Abowei Dep. Vol. 1).  Professor Abowei concludes in his report:

> The January 16 Chevron gas blow out affected Phytolankton [sic] species, composition Benthic macro fauna species composition, Condition factor, mortality, exploitation ratio and catch per unit effort of Lagocephacelus laevigatus (Tarpon) and Fish species composition, histology, shrimp fishery and fishing gear types. The resultant of which is low catch, sicknesses and diseases which could spread to different localities as a result of the interconnection of the creeks in the area. These effects are unquantifiable.

*Id.* at 15.  Professor Abowei's report also asserts, *inter alia*,

> The brass river is an estuary (all rivers, streams and other open river systems flow in this system). Amatu in Ekeremu Local Government Area of Bayelsa State and Brass situate at the rivers and creeks **which are Tributaries and Distributaries of the Atlantic Ocean. The rivers and creeks in the area are interconnected** (Plate 2 and Appendix 1). The **Brass River being an Estuary could receive pollutants from the January 16, 2012 Chevron gases blow out**. Similarly, Amatu people could be impacted. This is because affected fish with sub lethal concentration levels of heavy metals (having fed on millions of contaminated planktons and micro and macro invertebrate flora and fauna by a phenomenon known as **biomagnifications** up the food chain) can **migrate either for spawning or seeking for safer zones**. These contaminated fish would be caught and consumed by the inhabitants in the area. The resultant effects on the inhabitants are cancer, heart diseases, dysentery and cholera, production of deformed children, infertility in both meals [sic] and females and a lot too numerous to mention.

*Id.* at 4 (emphases and punctuation in original).

Plaintiff's motion for class certification cited Professor Abowei's report as evidence of causation:

> The devastation of the fishing lifestyle and industry is borne out by the scientific studies into the effect of the rig explosion performed by Professor J.F.N. Abowei, a

21

fisheries and aquatic pollution expert, who carried out several objective scientific studies of the affected area in April/May 2012. Prof. Abowei's findings, attached hereto, established a profound effect on human and aquatic life through study of:

> "Plankton species composition; Benthic macro fauna species composition; Condition factor, mortality, exploitation ratio and catch per unit effort of Lagocephacelus laevigatus (Tarpon); and Fish species composition, histology, shrimp fishery and fishing gear types."

. . .

> It was found that "(f)ishing is the major occupation of the inhabitants. It is carried out both at commercial and subsistent levels. The fish species landed, their relative abundance and distribution were very low. Most of the fish species were rare and few, few were common but none was abundant and dominant. This is not normal in a marine environment, especially in the Atlantic Ocean. In fact, further investigation need to be done to ascertain if the pollution is not continuing." (Abowei Summary Report, p.11-12)[13]

Dkt. No. 123 at 26-27. Thus, plaintiff relied on Professor Abowei's report to show that the rig explosion harmed the marine environment and "devastat[ed]" the fishing lifestyle and industry of the putative class.

On September 16, 2016, defendant filed a motion in limine to exclude Professor Abowei's report and testimony. Defendant contends that Abowei's report and related testimony are unreliable and inadmissible on numerous grounds, including *inter alia* (1) Professor Abowei altered some data in his report in order to support his conclusions,[14] (2) in one of the four articles which form the basis for his report in this case ("Effects of Water Pollution on Benthic Macro Fauna Species Composition in Koluama Area, Niger Delta Area, Nigeria," Dkt. No. 188-3), Abowei copied data from studies he and others conducted from 2007 to 2009 in the Sombreiro

---

[13] Although plaintiff's motion cites pages 11-12 of the Abowei report for this quotation, it is actually found on pages 14-15 of the report. Dkt. No. 125-3 at 14-15.

[14] Abowei's report posited that polychaetes, a type of benthic macrofauna, are an indicator of pollution, and that "the dominance of Polycheates [sic] in saltwater is attributed to their ability to tolerate [a] polluted environment." Dkt. No. 125-3 at 13. In Table 2 of his report, titled "Relative Abundance of Major Families of Benthic Macro fauna," Abowei stated that polychaetes were the most abundant of the major families of benthic macro fauna studied, at 48%, and that crustaceans were the second most dominant at 35%. *Id.* However, in one of Abowei's source articles, as well as the May 2012 Bayelsa State Assessment of the Chevron Rig Gas Blowout (which lists Abowei as a member of the study team), those numbers are reversed, with crustaceans listed as the most abundant at 48% and polychaetes listed as the second most abundant at 35%. *See* Dkt. 125-9 140, 144 (Abowei's paper), Dkt. 188-13 at 52 (Bayelsa State Assessment).

United States District Court
Northern District of California

River area, which is in a different state outside of the geographic area at issue in this litigation, and reported those findings as the results of the Koluama study,[15] (3) Abowei's methodology and results cannot be tested,[16] and (4) at his June 30-July 1, 2016 deposition, Abowei abandoned the causation opinions in his report.[17]

On October 15, 2016 (the deadline for filing plaintiff's opposition to defendant's motion in limine), plaintiff withdrew Abowei as an expert.  Dkt. No. 194 at 3.  In a November 7, 2016 case management conference statement, plaintiff's counsel stated,

> As the Court is aware, plaintiff withdrew Professor Jasper Abowei as his expert in regard to fishing in the waters off Bayelsa State and the effect thereon caused by the KS Endeavor blowout. This was in response to defendant's motion in limine to exclude his filed report on grounds that only became apparent to plaintiff when Prof. Abowei's deposition was taken in Lagos in July.

---

[15]   In 2011, Abowei published an article titled "Benthic Macro-Fauna Composition and Abundance in Sombreiro River, Niger Delta, Nigeria."  Dkt. No. 188-11.  In that study he reported polychaete dominance at 46.4%, with crustaceans at 7.2%, and concluded that the "dominance of Polychaeta" indicated pollution tolerance.  *Id.* at 261.  In the Koluama article, Abowei copied portions of the Sombreiro River article, including the sentence"[t]he dominance of Polychaetes in the brackish water station (Degema) may be attributed to their level of pollution tolerance."  Dkt. No. O25-9 at 145; Dkt. No. 188-11 at 259.  Degema was one of the four sampling stations for the Sombreiro River study and article, and was not one of the sampling stations listed for the Koluama article.  *Compare id.* at 259, *with* Dkt. No. 125-9 at 144.

[16]   At his deposition, Abowei testified that that his working papers and the water samples that he took for the field work that he did in April and May of 2012 were all destroyed in a 2012 flood.  Dkt. No. 186-1 (Abowei Dep. Vol. 1 at 54-56).  He also testified that he obtained fish from the sampling sites by going to the sampling stations and measuring fish caught by fishermen in those locations, and that he did not know if the fish had been caught in a river, a creek, or the ocean, nor did he know how far away from the KS Endeavor site the sampled fish had been caught.  *Id.* at 138-39, 143.  Abowei testified inconsistently that he kept records of these measurements but also that he did not write down the information.  *Id.* at 144.  Abowei also testified that it was "impossible" to replicate the results of his study.  *Id.* at 205-06 (Vol. 2).

[17]   At his deposition, Abowei testified it was his opinion that "maybe" the KS Endeavor explosion contributed to pollution or "maybe it didn't."  *Id.* at 201; *see also id.* at 136 (admitting that his studies were "not trying to come up with cause and effect.").  Abowei also admitted that he had no scientific data or analysis to support the causation opinions stated in his report.  *See id.* at 48-49 ("I – I don't know, because I did not go into the gas studies"); *id.* at 42 ("I have not carried out a study that pollutant will be released"); *id.* at 93 (did not collect or test for water pollution, natural gas, or petroleum products); *id.* at 353-54 (did no scientific study to determine the truth or falsity of the statement in his report that the KSE incident affected plankton, macrofauna or any fish); *id.* at 254-55, 354-55 (did no study to determine if the gas blowout caused "low catch, sicknesses, and diseases" as stated in the conclusion of his report).

United States District Court
Northern District of California

> At said deposition, it was revealed that Prof. Abowei had copied the writing of others into review papers he compiled without giving credit to the source.[18] Although this is not strictly plagiarism as he did not claim to have performed the scientific work of others or claimed the [work] as his own, the multiple instances of review paper copying without credit casts a serious shadow on Abowei's credibility.  It also was revealed at the professor's deposition that all the collected data from the expeditions which led to Abowei's four reports on marine conditions in the months following the KS Endeavor explosion and fire had been lost in the subsequent floods of 2012, which destroyed his laboratory and all his records.
>
> Counsel for plaintiff, in evaluating these factors, especially after receipt of Chevron's motion in limine, determined that Prof. Abowei lacked the professional credibility to provide the expert opinion for which he was retained.

Dkt. No. 202 at 27:21-29:4.  At the November 10, 2016 case management conference, the Court informed plaintiff that if he wished to retain a new expert in the place of Abowei, plaintiff must file a motion seeking leave of court.  Dkt. No. 205.

On November 16, 2016, plaintiff filed a "motion in support of substitution of designated fisheries expert witness in place of Professor Jasper Abowei."  Dkt. No. 207.  That motion states that in response to defendant's motion in limine to exclude Professor Abowei's report and testimony, "the plaintiff voluntarily agreed, on a without prejudice basis, that Professor Abowei would be withdrawn as a witness," and that "[i]mportantly, the plaintiff did not concede that the report and testimony of Professor Abowei should be excluded."  *Id.* at 4.  Plaintiff asserts,

> The plaintiff engaged Professor Abowei in good faith, believing his credentials to be appropriate to the task he was asked to perform and the expert evidence he was likely to adduce.  As has already been mentioned, due diligence on Professor Abowei did not reveal any issues that would reflect on his suitability as an expert witness in his chosen field of expertise.  It was only through the close scrutiny by the defendant that the plaintiff was brought to the realization that some of the testimony might not be reliable evidence to put before a jury.  The plaintiff has taken the responsible step of withdrawing Professor Abowei and has done so in a timely way for the benefit of the parties and the court.  The plaintiff should not be penalized for doing so.  The timeliness of the replacement needs to be seen in the context of the paucity of relevant Nigerian fisheries experts and marine ecologists available to provide evidence.  It would have been irresponsible of the plaintiff to withdraw Professor Abowei without first searching for an appropriate replacement.

*Id.* at 10.

Plaintiff seeks to substitute Professor Eyiwunmi Falaye in place of Professor Abowei. Plaintiff asserts that a substitution would not be disruptive because "[t]he expert initially

---

[18]   At his deposition, Professor Abowei admitted that he had "copied" the work of others but claimed it was appropriate because his papers were "reviews."  Dkt. No. 186-1 at 321, 412 (Abowei Dep. Vol. 2).

United States District Court
Northern District of California

designated has been withdrawn and will take no further part.  The material already presented by that expert has already been viewed and closely critiqued by the defendant to the extent required to form the basis of the defendant's *in limine* motion and therefore is unlikely to occupy any additional time in countering the material if it is in fact adopted in whole or in part by the substituted expert."  *Id.* at 6-7.  As noted *supra*, on November 26, 2016, plaintiff filed, without leave of court, a November 2016 report by Professor Falaye, titled "Report on Effects of Funiwa Deep 1A Gas Blowout in Bayelsa State, Nigeria on Fish Diversity."  Dkt. No. 214-4 at 48-95.  Professor Falaye's report was filed as "Physalia Exhibit G," an exhibit to Physalia's (unauthorized) November 25, 2016 report.

The Court has carefully reviewed Professor Abowei's report and all of the material filed by defendant in support of its motion in limine, and concludes that the report and any related testimony is inadmissible pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Federal Rule of Evidence 702, and Federal Rule of Civil Procedure 26.  Among the myriad problems with Professor Abowei's report, there is no scientific data or analysis supporting the report's conclusions, and when asked at his deposition whether the rig explosion caused pollution, Professor Abowei could only say "maybe it did, maybe it didn't."  This admission alone renders his causation opinion speculative and inadmissible.  The Court is very troubled by the fact that Abowei apparently altered data to fit his theory and that he copied data from unrelated studies and passed that data off as relevant to the issues in this case.  Because plaintiff has withdrawn Abowei, the Court finds it unnecessary to set forth an exhaustive list of all of the reasons why his report and testimony are inadmissible.  However, defendant's motion in limine details the numerous, serious problems with the reliability of Professor Abowei's report and related testimony, and the Court finds it appropriate to GRANT defendant's motion for the reasons set forth by defendant.  For these reasons, it would also not be appropriate for another expert to rely on Professor Abowei's flawed and speculative report.

The Court also concludes that plaintiff has not demonstrated good cause under Federal Rule of Civil Procedure 16(b)(4) to amend the scheduling order in this case in order to substitute

in Dr. Falaye.[19]  "Rule 16(b)'s 'good cause' standard primarily considers the diligence of the party seeking the amendment." *Johnson v. Mammoth Recreations*, 975 F.2d 604, 609 (9th Cir. 1992). As set forth *supra*, plaintiff has been given numerous extensions of the class certification deadlines in this case.  Plaintiff was supposed to provide Rule 26-compliant reports for class certification by June 2015, and to "supplement" those reports and materials by the class certification filing deadline.  Plaintiff did not identify Professor Abowei until April 6, 2016, and then submitted his report on April 8, 2016 in connection with the class certification motion. Plaintiff's counsel state that they became aware of the need to replace Professor Abowei at his deposition on June 30-July 1, 2016, and yet plaintiff waited until October 15, 2016 − after defendant filed its *Daubert* motion − to withdraw Abowei, and until November 16, 2016 to file a motion to substitute.  Plaintiff has not shown diligence in seeking to substitute a new expert.

Plaintiff also claims that he exercised diligence in retaining Abowei, and that the issues uncovered by defendant came as a surprise to counsel.  Plaintiff's counsel state they first learned of Abowei's lost data at his deposition.  However, as defendant notes, under Rule 26(a)(2)(B)(ii), the "facts or data" considered by Abowei in forming his opinions were required to be produced as part of his report.  At a minimum, plaintiff's counsel should have asked Abowei about his underlying facts and data prior to producing his report on April 8, 2016; the fact that they did not itself demonstrates a lack of due diligence.  Moreover, when the underlying "facts or data" were not produced with Abowei's report on April 8, 2016, defendant asked for those materials on April

---

[19]  Plaintiff asserts that Rule 16 does not apply because "[t]his case is not subject to a scheduling order as was agreed in the first joint case management statement.  (ECF#63, Section 17)."  Dkt. No. 218 at 4.  In that first joint case management statement, the parties agreed that it was appropriate to set a schedule for class certification, and to defer setting a further schedule at that time.  As plaintiff is well aware, and as documented in this order, the Court has repeatedly issued scheduling orders governing class certification in this case, including deadlines for disclosures of experts in support of class certification.  However, even if the Court analyzed plaintiff's motion to substitute under Rule 37, as plaintiff asserts is appropriate, the Court would reach the same conclusion.  *See Fidelity Nat. Financial, Inc. v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 308 F.R.D. 649, 652 (S.D. Cal. 2015) (holding that a request to substitute an expert after the deadline in a scheduling order has passed is evaluated under Rule 16, and that the Rule 16(b) and Rule 37(c) factors are "largely coextensive," because "Whereas Rule 16(b) directs a District Court to evaluate (1) the moving party's diligence, and (2) prejudice, Rule 37(c) directs a District Court to assess (1) whether the moving party has shown 'substantial justification,' and (2) harm.").

United States District Court
Northern District of California

United States District Court
Northern District of California

13, 2016.  Dkt. No. 210, Ex. C.  In a series of e-mails beginning June 14, 2016, plaintiff's counsel confirmed to defense counsel that Abowei's data was lost in the 2012 flood.  Therefore it is inaccurate for counsel to state that they did not know this fact until the June 30-July 1 deposition. *Id.*, Ex. D-E.

Further, even a cursory review of the report Abowei prepared for this case should have raised alarms.  The report contains numerous typographical errors, including repeatedly listing the wrong date for the KS Endeavor explosion.  *See* Dkt. No. 125-3 at 3, 6.  The report contains sentences that do not make sense.  *See, e.g. id.* at 9 ("The diagram was repeated six times along the fitted."), *id.* at 14 ("The fish species landed, their relative abundance and distribution were very low.").  If counsel had reviewed the four articles Abowei summarized to create the report for this case, counsel should have noticed numerous red flags, including the fact that one article, mentioned *supra*, based its conclusions on samples from the "Degema" sampling station, which was not one of the stations in the Koluama area listed in the article (and the Degema sampling station related to an earlier study in a different part of Nigeria), Dkt. No. 125-9 at 145.

Plaintiff argues that there will be no prejudice to defendant if plaintiff is allowed to substitute in a new fisheries expert, while "if the motion is denied, it is plaintiff who may be deprived of the opportunity to present any expert evidence as to fisheries and marine ecology and thereby suffer prejudice, the most drastic of sanctions that result from a game-changing and outcome-determinative inflexibility."  Dkt. No. 218 at 3-4.  Contrary to plaintiff's assertions, the Court finds that allowing plaintiff to retain a new fisheries expert at this time would cause considerable prejudice to defendant and disruption to the schedule in this case.  Allowing plaintiff to substitute in a new expert would also require permitting Chevron to (1) review Professor Falaye's report, (2) take Professor Falaye's deposition (likely in Nigeria), (3) designate a defense expert to prepare a responsive report, (4) file a *Daubert* motion if it wished, and (5) file supplemental briefing on class certification.[20]  In addition, permitting a substitution would further

---

[20]  Chevron has indicated that it would file a *Daubert* motion regarding Professor Falaye. At the December 9, 2016 hearing, Chevron asserted, *inter alia*, that Professor Falaye had copied, without attribution, portions of an article titled "Impact of the Deepwater Horizon well blowout on the economics of US Gulf fisheries" in preparing the report that was submitted in this case on

United States District Court
Northern District of California

1  delay the class certification proceedings.  Plaintiff has had more than ample time to retain experts

2  for class certification, and under all of the circumstances of this case, the Court finds that

3  defendant's successful *Daubert* challenge to Professor Abowei does not constitute good cause for

4  the proposed substitution.  *See Crandall v. Hartford Cas. Ins. Co.*, No. CV 10–00127–REB, 2012

5  WL 6086598, at *3 (D. Idaho Dec. 6, 2012) ("A party's choice upon which expert to hire for

6  assistance in a lawsuit is just that—a choice.  Sometimes the results of those choices go smoothly

7  and successfully.  Sometimes they do not.  However, the timely progression of a lawsuit cannot

8  turn on whether a party is fully satisfied with the particular choice of an expert.  Those are

9  decisions, including the due diligence necessary to guard against difficulties arising from such

10  decisions, that must be made by parties within the scheduling time-frames imposed by the

11  Court.").

12

13  **II.     Defendant's Motion in Limine to Exclude Onyoma Research "Socio-Economic"
              Report**

14

15        In support of the class certification motion, plaintiff filed a report titled "Socio-Economic

16  Report on the Effects of the KS Endeavor Rig Explosion of [sic] the Coastal Communities of

17  Bayelsa."  Dkt. No. 125-1.  The authors of the report are Professor Ebiegberi Alagoa, Professor

18  Abi Derefaka, and Dr. Atei Okorobia, and they work for Onyoma Research in Port Harcourt,

19  Nigeria.  The three authors are historians, and Professor Derefaka is also an archaeologist.

20        The report contains four sections: (1) an introduction (Dkt. No. 125-1 at 24-25), (2) an

21  explanation of the authors' methodology (*id.* at 27-36), (3) a "baseline documentation of the

22  history, traditions and socioeconomic structure of the impacted coastal communities of Bayelsa

23  State before the KS Endeavour rig explosion of January 16th 2012" (*id.* at 37-113), and (4) a

24  discussion of the alleged "impact" of the explosion on the coastal communities.  *Id.* at 114-47.

25  The authors opine that the rig explosion caused "deafening noise pollution," "earth vibrations that

26  shook" buildings like a "military invasion," "sea encroachment," "dust-cum-chemically saturated

27  wind" causing "accelerated rusting," disappearance of sea life, cracks in buildings, an invasion of

28

November 26, 2016.  Professor Falaye did not author the Deepwater Horizon article.

"strange sea-weeds" resulting in a decline in fish catch, "dwindl[ing] of the weaving and carving industries," "desecration of traditional religious beliefs, cultural values and institutions," the breakdown of family structures, difficulties for women to "enjoy sexual intimacy with their spouses," migration of people from coastal communities to surrounding areas, "medical/health challenges" such as anemia, hypertension, malaria and arthritis, "collapse in morals, family values and security," including "young women resort[ing] to prostitution" and "young men [taking] to piracy and militancy." *Id.* at 114, 116, 119, 122-24, 131-33, 136-37, 142-43.[21]

The authors' findings are based on "field work" which consisted of their "unstructured interviews" of putative class members and reviewing the results of a written survey of class members. *Id.* at 31-36 (describing methodology). At their depositions, the authors testified that they did not conduct any scientific studies to determine whether there was a scientific basis for their findings regarding increased pollution, earth vibrations, a decline in fish catch or disappearance of marine life. Dkt. No. 186-2 (Okorobia Dep. at 281 ("we are not in a position to do that," referring to conducting scientific studies on noise pollution), *id.* at 34 (we are "not a natural scientist and a physical scientist" regarding how far the effects and noise of an explosion can be felt); Dkt. No. 186-1 (Derefaka Dep. at 44 (we "don't have scientific evidence to determine" percussive effects). Professor Alagoa testified that the authors did not consider taking samples of water, fish or anything else because "we expected that those scientific things should be left to specialists in those types of activity." Dkt. No. 186-1 (Alagoa Dep. at 125). Similarly, Professor Okorobia testified, when asked whether he measured any fish to support the finding of fish depreciation, "Those are things that those in the fishery science will do. Historians don't go measuring fish size and all that. We don't do that in our profession. We don't weigh things, we don't measure things." Dkt. No. 186-2 (Okorobia Dep. at 172). The authors also acknowledged that they are not experts in studying prostitution, (Dkt. No. 186-1, Alagoa Dep. at 14; Derefaka Dep. at 16), and when asked for the number of people who engaged in prostitution following the

---

[21] At the December 9, 2016 hearing, plaintiff's counsel stated that plaintiff no longer claimed that the rig explosion caused an increase in seaweed, property damage, or "special" medical claims. Separate from the *Daubert* challenge to the Onyoma report, it is unclear whether plaintiff currently claims any of the alleged effects discussed in the Onyoma report.

United States District Court
Northern District of California

explosion, Alagoa responded, "It could be any number."  *Id.*, Alagoa Dep. at 90-91.  Similarly, the authors admitted that they are not experts in studying militancy and could not cite any study that says the KS Endeavor incident caused an increase in militancy in the relevant communities.  Dkt. No. 186-1 (Derefaka Dep. at 16); Dkt. No. 186-2 (Okorobia Dep. at 157).

Defendant has moved to exclude the Onyoma report as inadmissible under Federal Rule of Civil Procedure 26, Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).  Defendant contends that the report's findings are not based on any scientific study or expertise, and instead that the report is largely a compilation of second- and third-hand hearsay (the interviews of class members and responses to the written survey) offered for the truth of the matter asserted.

Defendant also argues that the written survey and its results are inadmissible.  The survey was created by the Onyoma team and administered by Gbarabe and others acting as community representatives to 145 prospective class members.  Citing the Onyoma authors' deposition testimony regarding their backgrounds and training, defendant argues that the Onyoma authors are not experts in designing surveys, and that the individuals who administered the surveys do not have any training or expertise in survey administration or interview techniques.  Defendant also argues that the survey is filled with leading and suggestive questions, such as questions that assume the rig explosion caused particular kinds of damage (e.g., Question No. 82, "What kind of damage has your shrine or other cultural resource suffered as a result of the Chevron facility explosion in 2012?"), and questions that suggest a change in circumstances in 2012 (e.g., Question Nos. 19 and 20, asking respondents how much income they earned before and after 2012).  Dkt. No. 186-20 (survey).  Defendant also argues that the survey was not free of self-interest bias because, *inter alia*, the respondents knew that the survey was for litigation.  *See* Dkt. No. 186-1 (N. Gbarabe Dep. Vol. 2 at 302-03) (testifying that when he gave putative class members the survey, he told them survey was for the case); (Baghebo Dep. at 88) (same); (Elemokumo Dep. at 38) (same); (J. Bruce Dep. at 76) (same).  Defendant also argues that the survey is flawed because the Onyoma team did not supervise the survey process and no one verified the accuracy of responses.  Chevron states that when it deposed 13 purported survey respondents in Nigeria, many

testified either that they had not participated in the survey or that they had no memory of doing so. *See* Dkt. No. 186-2 (Igoli Dep. at 60-61); (Ipale Dep. at 181-82); (Kojo Dep. at 86-87); (B. Morris Dep. Vol. 1 at 157-59); (Ododo Dep. at 25-26, 94-95); (Toruyai Dep. Vol. 2 at 45-46). Others testified that they provided false information on the surveys. *See* Dkt. No. 186-2 (Tukuru Dep. at 205); Dkt. No. 186-1 (J. Bruce Dep. at 199-200). Defendant also notes that the Onyoma team included an "honesty question" in the survey, and that 117 of the 145 respondents failed the Onyoma team's test.[22]

Defendant also argues that plaintiff failed to comply with Rule 26(a). Defendant notes that the report is not signed, does not include a statement of compensation, and does not identify the cases in which the authors testified in the past four years. The report also does not specify what is intended as an opinion rather than a factual statement, and does not state "the basis and reasons" for any opinions.

In response, plaintiff concedes that the report is not "*Daubert*-compliant on any scientific issue regarding the rig explosion itself or the consequent extent of environment[al] damage." Dkt. No. 194 at 5. Plaintiff states that he "is not relying on any opinion in the report as to the causal link between the rig explosion and its impact on the economic, social and cultural life of the affected communities." *Id*. at 10. Plaintiff also appears to concede that the report does not comply with Rule 26, but asserts that these issues are "not prejudicial, administrative, and easily remedied without impacting upon any substantive issues." *Id*. at 3. Plaintiff does not specifically respond to any of defendant's arguments regarding channeling of hearsay or the infirmities of the written survey, or the authors' lack of scientific, technical or other specialized knowledge regarding the subjects in the report.[23]

---

[22] Survey question No. 37 asked: "Does the K[]S Endeavor Rig at the Chevron Apoi North Facility interfere with your fishing area?" Dkt. No. 186-20 at 6. Dr. Okorobia testified that the question was included in the survey to "test [the respondents'] honesty" because a drilling rig that is no longer there cannot interfere with someone's fishing area. *See* Dkt. No. 186-2 (Okorobia Dep. 322-23). Dr. Okorobia also said that Question No. 37 was included to test a respondent's consistency, and that a "yes" answer could also mean that the respondent did not understand the question. *Id*. Of the 145 survey respondents, 117 answered "yes" to Question No. 37. Dkt. No. 183-1 at 20.

[23] Defendant's motion in limine also noted, *inter alia*, that the authors misreported survey

United States District Court
Northern District of California

1   Notwithstanding these concessions by plaintiff regarding the inadmissibility of the report's

2   findings and the failure to comply with Rule 26, plaintiff asserts that the report is admissible for

3   the purpose of "provid[ing] the historical and societal framework upon which plaintiff's argument

4   that damages are capable of proof on a class wide basis is consequently constructed."  *Id*. at 5.

5   Plaintiff asserts that "the fundamental reason for the Onyoma report's submission is to provide a

6   historical perspective and societal background information not otherwise generally known to the

7   average American layman about the coastal area of Bayelsa State and the communities closest to

8   the site of the ill-fated exploratory Chevron gas rig."  *Id*. at 6.

9   There are a number of problems with plaintiff's assertions.  First, as defendant notes,

10  plaintiff's motion for class certification clearly *did* rely on the Onyoma report to prove class-wide

11  impact.  After describing the "field report findings" as "detailed, first-hand and deeply sourced,"

12  plaintiff's motion for class certification contained the following block quote from the Onyoma

13  report:

> The impact of the K.S Endeavour Rig Explosion at the Chevron Apoi North
> Facility off the Bayelsa Coastal Communities was widespread.  It can be seen in the
> **Bio-Physical Environment** (in the form of noise pollution, earth vibrations
> causing cracks in the wells and buildings, and the acceleration of sea encroachment
> and blocking of waterways); in the **Traditional Economy** (in terms of the
> disappearance of some fish species and other marine resources; the appearance of
> new/strange sea-weeds that impede normal fishery activities; the drastic decline in
> fish output and the emigration of many fisherfolk to other lands and 'greener
> pastures.'  Others are the forced importation of "ice" or frozen fish from abroad
> into the coastal communities; the increasing pauperization of the people; decline in
> the demand for new woven fishing gears and associated accessories, as well as the
> decline in the demand for new labor and apprentices).

---

responses and made assertions without factual support.  For example, some survey respondents
reported that "youth delinquency" was a greater problem after 2012, and "youth delinquency" was
not defined in the survey.  The report states that based upon survey responses as well as interviews
of class members, "[s]ince 2012, there is [a] resurgence of militancy and piracy in the coastal part
of the Niger Delta."  Dkt. No. 125-1 at 144-46.  In addition, the authors included a photograph of a
man surrounded by pirates pointing guns at his head, with the caption "Some of the youths have
taken to piracy and militancy as alternative survival strategy."  *Id*. at 145.  At their depositions,
the authors admitted that they did not have any information on the number of militants living in
the communities before or after 2012, that they did not know whether any of the youths became
militants due to the rig explosion, and that the photograph included in the report was taken in
2006, a fact that is clear in the book from which the authors took the photograph.  *See* Dkt. No.
186-1 (Alagoa Dep. at 96-97; Derefaka Dep. at 67-69); Dkt. No. 186-2 (Okorobia Dep. at 157);
Dkt. No. 186-13, Ex. 39 (photograph from book).

> Its impact is also obvious in the **Socio-Cultural life and activities of the People** (especially in the desecration of the traditional religious beliefs and cultural values as well as institutions; and its impact on health and sanitation).  It also produced some **Socio-Political Impact**.  The incidence of the K.S Endeavor Rig Explosion has exposed more than ever before, the weaknesses of the Nigerian socio-political institutions, especially the judicial system and the functioning of the Ministries of Environment at the State and Federal levels.  It has also led to, among other things, the disruption of family structure and bonds; and the collapse in morals, social values and security in the communities."

Dkt. No. 123 at 25-26 (quoting Dkt. No. 125-1 at 12-13) (emphasis in motion and report).  Thus, it is disingenuous and inaccurate for plaintiff to assert that he "is not relying on any opinion in the report as to the causal link between the rig explosion and its impact on the economic, social and cultural life of the affected communities."  Dkt. No. 194 at 10.

Second, plaintiff asserts − without any explanation − that the report's historical and societal background section (Chapter 3) shows that damages are capable of proof on a class-wide basis.  Plaintiff asserts,

> The Onyoma report essentially lays the evidentiary foundation for plaintiff's predominance submission under Rule 23(b) that damages in this case can practically *only* be proven on a class-wide basis once the societal structure of the coastal communities from which many putative class members are drawn, is understood, with the long historical dominance of the fishing industry to the virtual exclusion of other sources of income, the reliance placed on fish for basic sustenance, the enduring abject poverty of the indigenous people despite the natural wealth of the region and its exploitation by corporate concerns, the timeless ways of fishing that generally employ small boats made from natural materials available locally and the use of nets cast by hand, both of which, by definition, illustrate a uniformity to catch capabilities throughout the region, the traditional methods of distribution and sale of fish catch common throughout the class defined geographic area, the reason why records documenting individual loss are virtually nonexistent, and the uniformity of diet based, essentially on resources available in this swamp, water-dominated environment.

Dkt. No. 194 at 8:11-27 (emphasis in original).  As an initial matter, it is not clear how the various factors identified by plaintiff, such as the "historical dominance of the fishing industry to the virtual exclusion of other sources of income," would demonstrate that damages can be proven on a class-wide basis.

Moreover, the report does not state that the coastal communities rely on the fishing industry "to the virtual exclusion of other sources of income." The report states that "fishing, saltmaking and trading [are] the three dominant occupations of the Bayelsa Coastal Communities. Other subsidiary vocations were subsistent farming, canoe-carving and other local crafts."  Dkt.

33

United States District Court
Northern District of California

No. 125-1 at 77.   Defendant also notes that during the depositions, putative class members testified that they were teachers, accountants, civil servants, and pastors, and some class members testified that they had other sources of income such as disability payments or payments from a government amnesty program for former militants.   *See* Dkt. No. 201-1, Ex. 2 (deposition testimony).   Similarly, contrary to plaintiff's assertion, the report does not show that fishing catch is uniform throughout the region due to the "timeless ways of fishing that generally employ small boats made from natural materials" and the "use of nets cast by hand." Dkt. No. 194 at 8.   Instead, the report states that "as many as 31% [of fishermen] use semi-industrial vessels."   Dkt. No. 125-1 at 10.   Further, defendant has submitted evidence showing that class members used different types of fishing equipment, and that the claim forms that plaintiff produced to defendant in this case show a wide range of claimed fishing income both before and after the rig explosion.   *See* Dkt. No. 201-1, Ex. 2 (deposition testimony); Dkt. No 201-1 ¶ 4.   Simply asserting that over 70 pages of a report is relevant to proving class damages does not, without more, make it so.[24]   Neither plaintiff's motion for class certification nor plaintiff's opposition to defendant's motion in limine demonstrates how Chapter 3 of the Onyoma report is relevant to common proof of damages. Further, plaintiff has conceded that Chapter 4 of the report is inadmissible.

The Court accordingly GRANTS defendant's motion in limine as to the Onyoma Research Report.

### III.   Plaintiff's Motion for an Order Admitting into Evidence the Verde/Physalia Far Field Analysis (Physalia 2)

In support of the class certification motion, plaintiff also filed a set of reports by the Verde/Physalia group, which include a chemical analysis by Jones Environmental Laboratory Ltd.

---

[24]   Further, the Court has reviewed Chapter 3 of the report, and nothing in that chapter would appear to be relevant to a determination of damages.   The chapter discusses, *inter alia*, environmental characteristics; cultural institutions, festivals, and taboos; a history of the fishing industry and different fishing methods; demographic characteristics; health characteristics and disease; local crafts and industries; and agriculture.   In addition, Chapter 3 contains numerous irrelevant pictures and photographs, such as pictures of snakes, ancestral houses, seashells, canoe carving, women processing periwinkles, different methods of preserving fish, clay pots, different types of fishing gear, whale bones, and clothing.   *See generally* Dkt. No. 125-1 at 30-113.

1    (collectively the "Physalia 1" report), Dkt. No. 124-1 to 124-11.  On November 16, 2016, plaintiff

2    filed a motion for leave to file the "Physalia 2" report, which is dated October 26, 2016.

3         Physalia 1 states that plaintiff's experts visited the well site in January 2016 and completed

4    their planned mapping and sampling between January 26 and February 3, 2016.  Dkt. No. 124-1 at

5    § 3.0.  The scientists mapped the seabed around the well site and collected 48 sediment samples

6    from the seabed in an area radiating 2.7 km from the KS Endeavor rig site (the "near-field"

7    samples).  Dkt. No. 124-2 at 1. Plaintiff also obtained samples from 26 other sites outside the near-

8    field, ranging up to 12 km from the KS Endeavor rig (the "far field" samples).  *Id*. at 11.  The

9    Physalia 1 report contains a "benthic" analysis of microscopic sediment-dwelling animals in the

10   48 near-field samples.  The experts did not conduct a benthic analysis of the 26 "far field"

11   samples.  The Physalia 1 report includes a chemical analysis of sediment samples taken from both

12   the near-field and the far field sampling sites.  *Id*. at 1-2 and Dkt. No. 124-9 to 124-11.[25]

13        Physalia 1 concludes that a crater exists in the seabed and that there may be fewer small

14   organisms (known as benthic meiofauna and macrofauna) in the sediment in the immediate area

15   around the well site than in areas farther away.  Dkt. No. 124-2.  Plaintiff's class certification

16   motion cites the Physalia 1 report for the assertion that "the displacement and re-distribution of

17   materials that emanated from the KS Endeavor crater during and following the blow-out incident

18   resulted in long-term, persistent impacts on the surrounding marine habitats."  Dkt. No. 123 at

19   24:2-4 (quoting Dkt. No. 124-2 at 31).  Plaintiff also cites the Physalia 1 report as proof that "gas

20   leakage at the rig site has never ceased since the January 2012 blowout."  Dkt. No. 123 at 24-25.

21   Plaintiff's motion for class certification did not cite or discuss the chemical analysis performed by

22   Jones Environmental Laboratory Ltd.

23        Defendant's opposition to plaintiff's motion for class certification argues that Physalia 1

24   does not provide any scientific evidence of causation.  Defendant has submitted deposition

25   testimony of the Physalia 1 authors (taken on May 3-5, 2016), in which they state that the opinions

26

27        [25]  The report states that the earlier recommendation to conduct air dispersion modeling

28   was not undertaken "as it was concluded that there was insufficient baseline data to allow an
     accurate and reliable model to be developed."  Dkt. No. 124-1 at § 1.2.

United States District Court
Northern District of California

in Physalia 1 focused only on benthic fauna in the small area near the well site, and that they were not opining that any impact on fish or humans occurred.  Dr. Marcus Trett, the Scientific Director of Physalia, was specifically asked about the conclusion in the report that "the crater during and following the blowout incident resulted in long-term, persistent impacts on the surrounding marine habitat":

> Q.    And when you say "the surrounding marine habitat," are you talking about the nematode communities near the well site?
>
> A.    In this case – yes.
>
> Q.    Okay. And you're not talking about the surrounding marine habitat as it would affect the fish or anyone else like that, are you?
>
> A.    No, we can't make conjecture on that at all, no.

Dkt. No. 186-2 (Trett Dep. Vol. 2 at 197-198:9).  Dr. Trett also stated that it is impossible to detect any impact on fish from a loss of benthic fauna:

> Q.    And you're not opining that any kind of decrease in the limited area that you studied on the benthic community would have any impact on fish communities or anything larger than on the benthic community, are you?
>
> A.    On fish communities, no, because you're so far up the food chain and they're so mobile, their dependency on that small area there would be negligible and you wouldn't be able to—wouldn't be able to—to detect the change in their flow of nutrients through the food chain. That's a fact.

*Id.* at 198-99.  Dr. Trett also testified that Physalia 1 "did not offer any opinion on" "dead or diseased fish," "dead or diseased livestock," "contaminated water," "contaminated soil," "contaminated air," "a general health breakdown in the community," whether there was a "methane release at the time of the KS Endeavor release," whether "any wells containing drinking water were impacted by the KS Endeavor incident," whether "any kind of pollutant was carried inland by the tides and the creeks and soil," "illness and sickness in the community," "the impact on farming of food products," or whether "any economic damages exist to plaintiffs."  Dkt. No. 186-2 (Trett Dep. Vol. 1 at 109-10); *see also* Dkt. No. 186-1 (Calvo Dep. at 8 (Physalia 1 did not offer an opinion on impact of KS Endeavor on fish)).

The Physalia experts also testified that while it was their opinion that the low diversity of benthic fauna at the well site was due to the rig explosion, the scientists did not have any data on

United States District Court
Northern District of California

the baseline or background conditions.  Dkt. No. 186-2 (Trett Dep. Vol. 1 at 50-51); Dkt. No. 186-1 (Forster Dep. at 48-50; Calvo Dep. at 10).  Dr. Forster (Senior Ecologist) testified that the "far field" samples "should give you an idea of the background conditions" and that until the far field samples were tested, "we can't state, without undertaking [the testing of the far field samples], whether [the near field samples] can be considered background conditions or whether they're as a result of the proximity of the incident."  Dkt. No. 186-1 (Forster Dep. at 48-50).  Dr. Forster was asked, "But you didn't do the work here because of the timing?"  To which he answered "No, we've got the samples but we didn't analyze them, no."  *Id.* at 49; *see also* Trett Dep. at 50-51 (testifying that "the far field would be of considerable interest to be able to tie that down and put the other sediments into context so we could adjust our hypotheses, because we have to generate these as we look and try and describe things, to see what it is that's driving the – driving the community structures.").

On November 16, 2016, plaintiff filed a "motion for an order admitting into evidence the Verde/Physalia far field sediment sample analyses for consideration as part of class certification hearing."  Dkt. No. 206.  The report that plaintiff wishes to have admitted into evidence is dated October 26, 2016, and titled "The *KS Endeavor* Blowout Incident Residual Marine Benthic Impact Assessment; Final Report; Near & Far Field Survey Results."  Dkt. No. 210-1, Ex. I.[26]  In the "Non-Technical Summary," the authors state "Owing to time constraints imposed on the investigation by the deadline for the initial submissions of evidence, an interim report presenting the findings of the 46 near-field samples was submitted by Physalia in April 2016. The remaining 26 far-field samples were analyzed subsequently in the combined findings of the full data set are presented and reported in the present document (Physalia, October 2016)."  *Id.* at 1.

Plaintiff's argument about why he should be permitted to rely on the October 26, 2016 Physalia report essentially amounts to the following:  the report is important and plaintiff needs it to prove causation; there "wasn't enough time" to analyze the far field samples prior to filing the

---

[26] Plaintiff did not attach a copy of the report to the motion.  Instead, defendant provided the report to the Court when defendant filed its opposition to plaintiff's motion.  *Id.*

United States District Court
Northern District of California

1    class certification motion; there is no harm to defendant because the far field samples were split

2    and provided to defendant when they were collected in January-February 2016, and thus defendant

3    has had the opportunity to conduct its own analysis of those samples;[27] defendant "opened the

4    door" to the admission of the far field evidence by arguing in the class certification opposition that

5    Physalia 1 was limited to a benthic analysis of the near field samples; and plaintiff was not able to

6    analyze the far field samples earlier due to a lack of time, which is defendant's fault because

7    Verde/Physalia had to abort the December 2015 trip and therefore had to do all of the sampling in

8    January-February 2016.

9         Defendant objects to plaintiff's motion on numerous grounds.  As an initial matter,

10   defendant notes that plaintiff has mischaracterized Physalia 2 as being limited to a "benthic"

11   analysis of the 26 "far field" sediment samples.  In fact, Physalia 2 also reworks the chemical

12   analysis of all of the samples, and the report introduces new evidence about the "prevailing

13   direction of the water current" and normalizing samples using aluminum as a proxy.  *See, e.g.*,

14   Dkt. No. 210-1, Ex. I at 31.

15        Plaintiff does not dispute that the October 26, 2016 report contains new chemical analysis.

16   Instead, plaintiff's reply brief in support of the motion to admit the Physalia 2 report states,

17        Chevron complains that Physalia 2 attempts to introduce evidence surrounding
18        "prevailing direction of the water current" and normalizing samples using
          aluminum as a proxy (ECF 208 at p8, line 9-10).  These matters are explained in
19        the materials just cited (Fisheries Impacts ECF 214-4 and in Physalia 2 itself at
          Section 3.3).

20   Dkt. No. 217 at 6:1-2.  Thus, plaintiff's explanation of why Physalia 2 contains new chemical

21   analysis is to cite the November 2016 fisheries report by plaintiff's proposed new fisheries expert,

22   Dr. Falaye (that was filed in connection with plaintiff's reply papers), and to Physalia 2 itself.

23

24        [27]  Indeed, plaintiff's counsel accuse defendant of failing to act diligently with regard to its
25   own handling and analysis of the far field samples gathered by plaintiff and provided to defendant
     earlier this year.  *See* Dkt. No. 217 at 4:12-19 ("Significantly, despite every opportunity to do so,
26   and substantial prodding by plaintiff, Chevron has not disclosed whether or not it has conducted
     an analysis of the samples delivered into its possession, let alone any details of any analysis (if
27   conducted).  To suggest that this is somehow protected by legal professional privilege or work
     product is fatuous.  It can only be deduced that:  Chevron has not been diligent in doing so;
28   Chevron have analyzed the samples and do not like the results; The integrity of the samples has
     been scientifically compromised in some manner by Chevron's own storage.").

United States District Court
Northern District of California

This is a circular and wholly inadequate explanation for the inclusion of new chemical analysis in Physalia 2.  The Court also finds that by omitting the fact that the new report contains new chemical analysis, plaintiff's "motion for an order admitting into evidence the Verde/Physalia far field sediment sample analyses for consideration as part of class certification hearing" does not accurately represent the scope of the newly supplied report.

Defendant also argues that plaintiff has not demonstrated any good cause to supplement the record well after the deadlines set by the Court for expert evidence relevant to class certification.  In addition, at the December 9, 2016 hearing, defendant informed the Court that despite numerous requests, plaintiff had still not provided to defendant the facts and data upon which the October 26, 2016 Physalia 2 report relied.

The Court concludes that plaintiff has failed to demonstrate any good cause to modify the scheduling order and permit the filing of this late report.  As noted *supra*, since March 18, 2015, the scheduling order (Dkt. No. 76) has required plaintiff to disclose all expert opinions, including supplemental opinions, no later than the deadline for filing the class certification motion.  At a minimum, if plaintiff knew that his experts would not be able to perform the "benthic" analysis on the far field samples by April 8, 2016, plaintiff should have filed a motion for leave to file a supplemental expert report no later than April 8, 2016.  Instead, plaintiff waited until November 16, 2016, to file that motion, well after defendant had taken the depositions of the Physalia experts and after defendant filed its opposition papers.  At the December 9, 2016 hearing, in response to questioning by the Court about why plaintiff's counsel waited so long to have the far field analysis done, plaintiff's counsel stated,

> So we didn't actually get the sampling back until the end of January, and that's the reason why there was an absolute rush to get the even near field samples done so we could be ready for the original date and we didn't want to let the Court down.
>
> There just simply wasn't time to do the far field samples, and by then, I believe, we'd probably taken a little more time than should have been, but we waited to see what was going to be set out in the May depositions with the scientists.  And it was following that we said, "We've clearly got to get this."

Dkt. No. 239 at 9:7-11 (transcript of Dec. 9, 2016 hearing).  Deciding to "wait to see what was going to be set out in the May depositions with the scientists," and then waiting another five

United States District Court
Northern District of California

1    months after that to file a motion seeking leave to file a late expert report flies in the face of any

2    claim that plaintiff has acted diligently or that there is good cause.

3            The Court also finds that the record does not support counsel's claim that they did not have

4    sufficient time to conduct the analysis contained in Physalia 2 prior to the class certification

5    deadline.  As detailed *supra*, on December 4, 2015, plaintiff's counsel requested from this Court

6    an additional three month extension of the class certification filing deadline, because, counsel

7    reported, the UK laboratories would be closed for two weeks between Christmas and New Year's.

8    Dkt. No. 114.  Plaintiff's counsel stated at that time that they intended the December 2015 trip to

9    be limited to mapping the seabed, and that the experts would return in January 2016 to collect the

10   water and sediment samples.  Defendant has submitted deposition testimony of Mr. Cleary

11   (Verde), in which he testified that Messrs. Forster and Trett of Physalia, who were the individuals

12   who conducted the sampling, did not get their visas to travel to Nigeria until January 2016.  Dkt.

13   No. 227 (Cleary Dep. at 133:2-18).  The record before the Court, consisting of emails between the

14   Verde/Physalia scientists, as well as the deposition testimony of Cleary, Forster and Trett, shows

15   that by early December 2015, plaintiff and his experts had decided that the December 2015 trip

16   would be limited to mapping the seabed, not only due to the "scientific imperatives" and the

17   holiday closures of the UK laboratories, Dkt. No. 115 at 10:9-10, but also due to the fact that the

18   scientists would who be conducting the sediment sampling did not have their visas to travel to

19   Nigeria until January 2016.  *See generally* Dkt. 142.[28]

20           Plaintiff's other arguments about the Physalia 2 report are equally lacking in merit.  The

21   fact that defendant was provided with the far field samples when they were taken is entirely

22   irrelevant to the issue of whether plaintiff should be permitted to file a brand new report

23   containing new expert analysis months after the class certification filing deadline and after

24   defendant has filed its opposition.  Similarly, the fact that defendant pointed out the various

25

26           [28] At his May 3, 2016 deposition, Mr. Forster testified that "the plan" in November 2015
27   was that he and Mr. Trett would go to Nigeria in December 2015 to conduct the sampling, but that
     by early December they had to cancel that plan because they did not have their visas.  Dkt. No.
28   142, Ex. 5 (Forster Dep. at 58:1-61:25).

United States District Court
Northern District of California

1   limitations of Physalia 1 in the opposition to the class certification motion does not "open the

2   door" to allow plaintiff to submit new, late expert evidence.  Finally, for all of the same reasons

3   that the Court denied plaintiff's request to substitute a new fisheries expert, the Court finds that

4   allowing plaintiff to file a late report containing new analysis is prejudicial to defendant.  *See Tele*

5   *Atlas N.V. v. NAVTEQ Corp.*, No. C-05-01673 RMW, 2008 WL 4809441, at *1-4 (N.D. Cal. Oct.

6   28, 2008) (denying Tele Atlas' request for leave to file an additional expert report where Tele

7   Atlas "realized it had failed to produce evidence on a variety of topics"; holding Tele Atlas failed

8   to act diligently and "NAVTEQ will also be substantially prejudiced if Tele Atlas is permitted to

9   supplement the record after expert discovery has closed in response to NAVTEQ's motions for

10  summary judgment.").[29]

11

12  **IV.     Objections to Evidence**

13         In support of the class certification motion, plaintiff filed declarations from nine class

14  members (named plaintiff Natto Iyela Gbarabe; class members Beatrice Ezekiel, Benjamin

15  Ayibatonye, Cornelius Olumofa, Daniel Awe, Ebiwei Baghebo, Festus Ileberi, Iyadima Duoduo,

16  Peter Agu).  Chevron objects on the grounds of hearsay, lack of authentication, and lack of

17  personal knowledge to the class member declarations, particularly to the portions of the

18  declarations offering scientific and medical opinions and referring to matters they did not

19  personally observe.  For example, Chevron objects to Mr. Gbarabe's statements "A medical

20  monitoring team was sent by the Bayelsa State Government to visit and report upon the

21  communities.  However, none of the communities had or were given access to medical treatment

22  and traditional remedies were used throughout the area, using local plants and known natural

23

24         [29] In any event, the Court notes that Physalia 2 does not extrapolate its findings about
    benthic fauna to any impact on fish or humans.  In addition, although the Court will not consider
25  the new chemical analysis in that report, the Court notes that defendant contends that the chemical
    analysis is flawed for numerous reasons (*see* Dkt. No. 208 at 5-6, 11).  In addition, as defendant
26  notes, Physalia 2 inaccurately reports concentrations of chemicals as milligrams per kilogram,
    while the underlying data shows the concentrations are actually nanograms per kilogram, which
27  causes the reported concentration of the chemicals to be 1 million times greater than actual.
    *Compare* Dkt. 210-1, Ex. I at 98-121, *with* Dkt. No. 124-11.

28

curatives," and "It will be noted that prospective class members sustained exact or similar reactions to the onslaught of chemicals that assailed the air both from the explosion and fire storm that raged for 46 days. Thus I and thousands of community members were affected by this discharge of chemicals which cause breathing difficulties, skin problems as referred to above as well as the gastrointestinal problems that beset so many by eating affected fish and drinking polluted water." Dkt. No. 126-2, ¶¶ 7, 22.

The Court finds that the class member declarations submitted by plaintiffs contain numerous statements based on hearsay and which lack authentication and personal knowledge. *See, e.g.*, Dkt. No. 126-4 ¶ 19 ("The communities of Sangana, Konho Akassa, Minibie, Otuo, Itohoni-Ama, Liama, Igweama, Igbabeleu, Buo-Ama were badly affected by the pollutants emanating from the explosion and burn through the air and in the sea and waters of the coast. Stomach complaints; eye complaints; skin complaints; breathing problems, as well as severe shock and psychological distress, were common throughout my communities."). The Court sustains Chevron's objections, and finds that Gbarabe and the class members may only testify about matters for which they have personal knowledge.

On November 26, 2016, plaintiff filed his reply brief in support of the class certification motion, along with exhibits totaling over 1,500 pages. Dkt. Nos. 213-16. The voluminous exhibits contain seven new expert reports: (1) a November 25, 2016 report by Physalia titled "Gbarabe v. Chevron; Scenarios for Fisheries Impacts, Dkt. No. 214-4 at 1-17; (2) a November 24, 2016 report by Lwandle Marine Environmental Services titled "KS Endeavour Gas Blowout Incident: Potential Effects on Artisanal Fisheries," Dkt. No. 214-4 at 18-31; (3) a report by Roy van Ballegooyen, WSP Coastal and Port Engineering, titled "Transport and Fate of Fine Sediments and Muds Released into the Marine Environment During the KS Endeavor Blowout Incident"), Dkt. No. 214-4 at 32-47; (4) a November 25, 2016 report by Physalia titled "Review of, and Comments on, the Adams (Neal Adams Services) Document: An Evaluation and Assessment of the 2012 KS Endeavor Natural Gas Blow-out Incident" Dkt. No. 214-3; (5) a November 17, 2016 report by Physalia titled "Review of, and Comments on, the Deardorff, Deines and Palmquist (Exponent) Document" Dkt. No. 214-5; (6) a declaration and supporting

exhibit titled "Conceptual Document" by John Welches of Red Mallard, Inc., Dkt. No. 215-3 at 4-36, and a C.V. and declaration by Todd Hilsee (in a different case) regarding providing notice, Dkt. No. 215-4 to 215-5 ; and (7) the November 2016 report by plaintiff's proposed new fisheries expert, Professor Falaye, Dkt. No. 214-4 at 48-95, which the Court has excluded *supra*.  In addition to these reports, plaintiff has filed, *inter alia*, press articles (Dkt. No. 213-2) and documents recently produced by Chevron (Dkt. No. 214, Ex. K).[30]

Defendant has objected to this evidence on numerous grounds.  As defendant notes, "[p]laintiff simply loaded these reports into the record, without citing them by page or line in its reply brief.  The brief refers to six as 'Physalia rebuttal reports' (and purports to incorporate all six by reference in a mass citation to Ex. L (ECF 212, 5:16-18)), without disclosing that three separate, unauthorized reports by different purported experts are buried as 'exhibits' and an appendix to Physalia reports [the Lwandle, van Ballegooyen, and Falaye reports]."  Dkt. No. 220 at 1:3-8.  In addition, many of the exhibits are unaccompanied by a declaration in violation of Civil Local Rule 7-5(a).

Defendant objects that none of the reports, even those that purport to be rebuttal, are true rebuttal reports.  Defendant argues that plaintiff has not identified any new unforeseen facts offered by defendant's experts or otherwise demonstrated that the reply materials could not have been submitted with the class certification motion.  Defendant also argues that the new reports violate the scheduling order, that the submission of new materials with the reply will prejudice defendant, and that the reports are replete with speculation regarding potential impacts, assumptions, and what "can happen."

The Court SUSTAINS defendant's objections to all of the new reports (and exhibits thereto) filed by plaintiff in connection with the reply brief.  The Court agrees with defendant that the new reports are not true rebuttal reports, and that plaintiff is simply attempting yet again to submit new expert evidence long after the deadlines that the Court set for the filing of such expert

---

[30]  It is unclear whether this document was filed several times by plaintiff.  Further, because many of the voluminous exhibits were filed without an accompanying declaration, the Court is not able to determine precisely how many documents were filed, or what the documents are.  *See generally* Dkt. Nos. 213-16.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

evidence.  Plaintiff claims that the new reports are prompted in part by a recent document production by Chevron (filed by plaintiff as Dkt. No. 214, Ex. K), which plaintiff claims provides new baseline information.  However, as defendant notes in its objection, plaintiff's reply does not explain how this document provides new baseline information and plaintiff does not cite any specific pages in this document (nor does plaintiff cite any specific pages of any of the new expert reports which purportedly analyze Exhibit K).  Further, Exhibit K was produced by defendant in response to a September 22, 2016 document request by plaintiff.  *See* Dkt. No. 212 at 5:9-16 (stating that Exhibit K was produced in response to a document request at Dkt. 204-1); Dkt. No. 204-1 (plaintiff's request for production of documents dated September 22, 2016).  Thus, plaintiff did not even request this document until well after the deadline for filing the class certification motion and accompanying expert evidence.  The Court also SUSTAINS defendant's objections to the press articles as hearsay, and Exhibit K as improper rebuttal evidence.  The Court will permit the filing of the deposition testimony attached to Mr. Carr's declaration.

To the extent that plaintiff has objected to the expert declarations filed by defendant,[31] the Court finds it unnecessary to rule on those objections because this order does not rely on any of the defense experts' reports.  Plaintiff also filed an objection to the "admissibility and consideration of evidence" contained in a booklet of transcript excerpts and demonstratives provided by Chevron at the December 9, 2016 hearing.  Plaintiff's objection that defense counsel was required to provide the demonstrative aid prior to the hearing is OVERRULED, as there is no such requirement that opposing counsel be provided with an advance copy.  Further, while plaintiff's arguments about the accuracy of the income charts and health symptoms page are noted by the Court, the evidentiary objections are OVERRULED because the booklet is a demonstrative aid, and not evidence.

---

[31]  Plaintiff did not file any motions in limine.  However, plaintiff's reply brief asserts that defendant's experts do not meet *Daubert*.

44

# V.      Class Definition

Plaintiff's motion for class certification, filed on April 8, 2016, proposed to certify the class as it was framed in the FAC.  During the course of briefing the class certification motion, however, plaintiff sought to further revise the proposed class definition.  In an August 8, 2016 case management conference statement, plaintiff's counsel stated,

> Based upon testimony elicited in the recent depositions in Nigeria, plaintiff's counsel has informed Chevron that they intend to adjust the geographic parameters of the area of Bayelsa State within the class description.  Plaintiff anticipates this will include eliminating from the complaint (1) Odiama community (Brass LGA) because that community submitted claims against Shell for an oil spill occurring shortly before the incident involved in this action,[32] and (2) Bilibiri community (Ekeremor LGA) for a failure to provide authenticated re-signup claims for said community.  Bilibiri's representative, Cornelius Olumofa, failed to appear at deposition in Lagos and, as a result, plaintiff agreed to withdraw his declaration in support of class certification.

Dkt. No. 163 at 10:19-28.

Plaintiff's new class definition, served on Chevron on October 7, 2016, several weeks after Chevron filed its opposition, proposes the following class:

> All residents of the communities known as Koluama 1 and 2; Ezetu 1 and 2; Ekeni; Sangana; Kongo Akassa; Minibie; Buama; Otuo; Itohoni-ama; Igbabeleu; Egwama; Llama; Fishtown aka Beleugbene (Brass); Foropa and Amatu (Old Amatu and New Amatu) and the neighboring fishing camps related to said communities whose health was adversely affected and/or who used the coastal, estuarine and adjacent river or creek-situated areas of the Ekeremor, Southern Ijaw and Brass Local Government Areas, State of Bayelsa, Federal Republic of Nigeria, who, as of January 16, 2012 and thereafter, used the rivers, waterways, inlets, estuaries and adjacent oceanic waters for the purpose of fishing for sustenance and/or for economic gain and who sustained articulable damage and/or diminution to said activities as a result of the explosion of defendant's exploratory gas rig as detailed herein, and all other persons who are able to present a verifiable claim that the ocean and estuarine waters within the herein-defined geographic zone constituted their customary fishing grounds as of January 16, 2012.

---

[32]  The KS Endeavor explosion occurred on January 16, 2012.  Less than one month earlier on approximately December 21, 2011, a crude oil spill occurred at the Shell Bonga oilfield in the Niger Delta.  Plaintiff's "litigation coordinator," Alagoa Morris, testified at his deposition that the Bonga spill spread from the coastal communities of Odioama to Amatu, which is the same stretch of coastline at issue here.  *See* Dkt. No. 186-2 (A. Morris Dep. at 245); Dkt. No. 186-25 (Ex. 277-78, deposition exhibits from A. Morris deposition).  Named plaintiff Gbarabe testified that the Bonga spill was "a massive spill" that caused crude oil to wash up "[e]verywhere on the coastline"—including the Koluama beaches, river, and estuary—and "affect[ed] everybody on the coast."  Dkt. No. 186-1 (N. Gbarabe Dep., Vol. 2 at 173-76).  Another putative class member testified that the Bonga oil spill was the worst oil spill in Koluama's history.  Dkt. No. 186-2 (Ibobra Dep. at 136).

United States District Court
Northern District of California

> The geographic zone in which the putative class members fish is defined as stretching from the mouth of the Dodo River to the Northwest, inclusive of the communities of Old Amatu and New Amatu to the western bank of the Brass River to the Southeast and includes the ocean area between said boundaries to the twelve-mile territorial limit claimed by the Federal Republic of Nigeria and all estuarine and brackish waters of the rivers, inlets and creeks within said area.

Dkt. No. 200-1.  Plaintiff does not state how many people are included in the proposed amended class (although defendant states that approximately 5,630 people have filed claims as part of the "re-signup" process, which was undertaken prior to the proposed amendment of the class definition).  Dkt. No. 189 at 13; Dkt. No. 200-2 ¶ 2.

According to defendant, the principal differences between the proposed class definition and the previous class definition are: (1) the previous class was limited to residents of the listed coastal areas, whereas the new definition expands the class to include non-residents whose "customary fishing grounds" as of the date of the KS Endeavor incident were within the proposed "geographic zone"; (2) the previous definition covered 90 miles of the Bayelsa State coastline, while the new definition covers about 75 miles of that coastline, dropping on the western side a portion of the coastline in the Ekeremor LGA and, on the eastern side, a portion of the Brass LGA and all of the Nembe LGA; (3) the previous definition listed 26 communities in which "known Class Members" were located, while the new definition includes only 17 of those communities (and related "fishing camps") and limits the proposed resident class to those communities; and (4) the new definition expressly refers for the first time to adverse "health" effects, and drops the express reference in the previous definition to "farming."  The nine excluded communities are two inland communities (Ikebiri 1 and 2), three communities near the western edge of the proposed "geographic zone" (Bessengbene, Letugbene, Bilabiri), and four communities outside the eastern edge (Twon, Ewoama, Okpoma, and Odioama).

There are numerous problems with plaintiff's proposed amended class.  First and foremost, plaintiff has not submitted any evidence showing that the proposed geographic area covered by the amended class definition corresponds to an area of actual harm. As discussed in the previous sections, plaintiff has not submitted any scientific evidence showing that the rig explosion impacted fish or humans, or that there is a geographic "zone of contamination."  Without any such evidence of causation, plaintiff's amended class definition is arbitrary and untethered to any

evidence of harm.  *See Kemblesville HHMO Ctr., LLC v. Landhope Realty Co*., Civ. A. No. 08-2405, 2011 WL 3240779, at *6 (E.D. Pa. July 28, 2011) (finding class definition improper because it was "arbitrary and not reasonably related to evidence of record concerning MTBE contamination"); *Brockman v. Barton Brands, Ltd*., No. 3:06CV-332-H, 2007 WL 4162920, at *4 (W.D. Ky. Nov. 21, 2007) (denying class certification and finding the plaintiffs "offer no evidence whatsoever that the airborne contaminants spread in a uniform fashion in all directions . . . for a distance of up to two miles, or that the contaminants complained of by proposed class members bear a relationship to Defendant"); *Duffin v. Exelon Corp*., No. CIV A 06 C 1382, 2007 WL 845336, at *4 (N.D. Ill. Mar. 19, 2007) (denying class certification because "[t]here is simply no correlation between plaintiffs' evidence concerning the location of contaminated air and groundwater, and the 'arbitrarily drawn lines on a map' constituting plaintiffs' proposed class"); Second, the issues identified by plaintiff as giving rise to the need to amend the class definition are not cured by the amended class definition.  Plaintiff's counsel stated in the August 8, 2016 case management conference statement that that they wished to amend the class definition to exclude individuals who filed claims for the Shell Bonga oil spill.  In an e-mail dated October 21, 2016, plaintiff's counsel informed defense counsel that one of the reasons for dropping the Odioama community was "the documented onshore damage from the AGIP oil spill and the Bonga spill." Dkt. No. 200-3.[33]  However, defendant has submitted evidence showing that the amended class definition still includes individuals who claim they were damaged by the Bonga spill, including named plaintiff Gbarabe.  Gbarabe testified that he signed up as a claimant for the Shell Bonga oil spill.  Dkt. No. 186-1 (N. Gbarabe Dep., Vol. 2 at 170, 173).  Gbarabe is a resident of the Koluama community.  Other putative class members whose communities remain in the proposed amended class definition have filed claims seeking compensation for the Shell Bonga oil spill.  *See* Dkt. No. 186-1 (Awe Dep. at 291; Ekeni resident); (Clinton Dep. at 93-95; Koluama resident); Degbe Dep.

---

[33]  Perhaps another reason for dropping the Odioama community is the fact that at his July 12, 2016 deposition, one putative class member testified that when he coordinated the "re-sign up" process in the Odioama area, he instructed respondents to copy their information from Schedule A, the same list that Gbarabe admitted had been "doctored" to inflate the claims. Dkt. No. 186-2 (Sampson Dep. at 182-85:8).

United States District Court
Northern District of California

at 224, 226; Ekeni resident); Dkt. No. 186-2 (Ibobra Dep. at 69; Koluama 2 resident); F. Ileberi Dep. at 97-101; Koluama 1 resident); (Tukuru Dep. 32-33; Koluama 1 resident). Indeed, putative class member George Ibobra, a resident of Koluama 2, testified that he collected approximately 4,000 claim forms for residents of Koluama 2 regarding the Shell Bonga oil spill. Dkt. No. 186-2 (Ibobra Dep. at 70-71). Mr. Ibobra testified that he is a community representative with regard to the Bonga spill, and that in that capacity he was aware that people from other coastal communities in Bayelsa State had submitted claims for compensation for the Bonga spill. *Id.* at 72:11-75:2.

Although the amended proposed class includes individuals who have submitted claims for the Shell Bonga oil spill, plaintiff has made no effort to exclude the Bonga oil spill (or other sources of pollution, such as illegal oil bunkering and refining operations) as a possible cause of the injuries claimed by plaintiff and the putative class. None of the expert reports mention the Bonga oil spill, let alone exclude it as a possible cause of the claimed damage. The Bonga oil spill occurred less than a month before the KS Endeavor rig explosion, and purportedly affected the same geographic areas at issue in this case − as evidenced by the fact that the named plaintiff and thousands of class members have submitted claims for the Bonga oil spill, and yet plaintiff has not attempted to either exclude the Bonga oil spill claimants from the proposed class or show through any scientific evidence that the Bonga oil spill is not the cause of the claimed injuries in this case. *Cf. Clausen v. M/V New Carissa*, 339 F.3d 1049 (9th Cir. 2003) (addressing expert testimony regarding causation and reliability of expert's opinions excluding other possible causes in case involving destruction of oyster beds which allegedly occurred as a result of an oil spill).

In the August 8, 2016 case management conference statement, plaintiff also stated that the community of Bilabiri would be excluded because no claim forms were submitted by members of that community. Dkt. No. 163 at 10. However, defendant states that no residents of Igbabaleu submitted claim forms, and yet Igbabaleu is still included in the amended class definition. Dkt. No. 200-2 ¶¶ 2-3.

Further, plaintiff stated that the need to amend the class definition was prompted by the "testimony elicited in the recent depositions in Nigeria." Although plaintiff does not specify what he means by that statement, defendant has submitted deposition testimony from 36 proposed class

48

members whose depositions were taken in June and July, 2016.  This deposition testimony reveals the following: (1) claim forms were submitted on behalf of individuals without their knowledge or consent using inaccurate information and forged signatures or fraudulent thumbprints[34]; (2) a claim form was submitted in the name of at least one deceased person[35]; (3) claim forms contained admittedly false information[36]; and (4) plaintiff produced multiple inconsistent forms with matching names but different income figures and signatures.  Defense counsel has filed a declaration which states,

> Based on Jones Day's review of the claim forms plaintiff produced to Chevron in this litigation, it appears that there are multiple claims forms submitted for at least 105 individuals.  As an example, there are many instances where there are two or more forms bearing the same name and birthday but different signatures, income figures or other information. There are also instances where two forms bear the same name, birthday, and signature but otherwise contain different information. And there are instances where two forms appear to bear the same name and signature but contain different birthdays and other information.

Dkt. No. 186 ¶ 33.   Plaintiff has not disputed this statement.   Although the amended class

---

[34]  For example, Racheal Erefawei (Amatu 2 resident), testified that her father filled out her claim form, that she did not know what information he put down on the form, that they did not discuss the responses, and that the fingerprint on the claim form was not hers because she has never put her fingerprints on a document before. When asked about various answers on the claim form, Ms. Erefawei stated she did not know whether the responses were correct or not, and at least one response (which stated that her health problems lasted for several months after the explosion) was a "lie." Dkt. No. 186-1 (Erefawei Dep. at 9, 18-19, 52, 77-80); *see also id.* (Ibobra Dep. at 9, 108-09; Koluama 2 resident, testified that his brother filled out form for him and that he did not give him any information to do so); *see also* Dkt. No. 186-2 (Princewill Dep. at 8, 43; Koluama 1 resident, testified that signature on claim form was not his/hers); (Tukuru Dep. at 7, 158-63; Koluama 1 resident, stating that the handwriting and signature on the claim form was not his, that although some of the information on the form – such as his phone number – was correct, other information about his monthly income and damages was not correct and that "this is not my document").

[35]  A claim form dated August 3, 2016 was submitted for Mr. Susu Freeman of Fishtown. Dkt. No. 186-5, Ex. 30.  Putative class member Chico Freeman testified that Susu was his younger brother, and that he died in 2015.  Dkt. No. 186-1 (Freeman Dep. at 80-81).

[36]  For example, Uyadougha Ziprebo testified that he wrote exaggerated damages figures because he "never thought about someone coming to scrutinize what I've written before."  Dkt. No. 186-2 (Ziprebo Dep. at 119-20); *see also id.* (Ipale Dep. at 8, 285-87; Ezetu 1 resident, testified that claims about damage to his health were inaccurate and a "mistake").  This is not a comprehensive list of the examples provided by defendant.  *See generally* Dkt. No. 189 at 10-11 (specific examples of class members admitting that they provided false information on the claim forms, or that inaccurate information was the result of "mistakes").

United States District Court
Northern District of California

definition drops some communities where the claims of damage were highly questionable,[37] the amended class definition still includes numerous communities for which the class member evidence of harm has been demonstrated to be unreliable.

Finally, the class definition uses vague terms like "articulable damage," "diminution to said activities," "neighboring fishing camps related to said communities," "customary fishing grounds," and "verifiable claim" without defining them. This ambiguous language prevents an objective determination of class membership. For example, what are the "neighboring fishing camps"? How would it be determined if a non-resident's "customary fishing grounds" were within the defined geographic zone?

## VI.   Rule 23(a) Requirements

A named plaintiff bears the burden of demonstrating that the class meets the following four requirements of Rule 23(a): (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a); *see Zinser v. Accufix Research Inst., Inc*., 253 F.3d 1180, 1186 (9th Cir.), *opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001). Defendant contends that plaintiff has not demonstrated typicality or adequacy.

### A.   Typicality

Defendant argues that named plaintiff Gbarabe is not typical because he alleges that he suffered only a few of the many injuries that are claimed by the class. Defendant also argues plaintiff is atypical because he is subject to an individual standing defense due to a power of

---

[37] Defendant submitted evidence showing that at least 52 claim forms from one community (Ikebiri) contain the identical or closely similar statement that "people are dying untimely due to the explosion" (Dkt. No. 186-5, Ex. 31), which one respondent from Ikebiri (who had provided that response) testified at his deposition was untrue. Dkt. No. 186-1 (Baghebo Dep. at 269-72).

United States District Court
Northern District of California

attorney that he gave for his fishing cooperative.

Plaintiff responds that a named plaintiff's claims need only be "reasonably co-extensive with those of the absent class members; they need not be identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). At the hearing, plaintiff's counsel also stated that the putative class is no longer seeking relief for property damage or "special" medical injuries, only "a general health impairment that took place in the first couple of weeks after the incident." Dkt. No. 239 at 15-16 (transcript of Decl. 9, 2016 hearing). While it is still unclear precisely what medical injuries are currently being alleged by the putative class, the Court agrees that named plaintiff Gbarabe need not allege all of the same injuries as the absent class members in order to be typical.[38]

However, "a named plaintiff's motion for class certification should not be granted if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal quotation marks and citation omitted). Defendant argues that Gbarabe is atypical because he needs to overcome a threshold standing issue that is not applicable to anyone other than the members of his fishing cooperative. Defendant has submitted evidence showing that in April 2012, Gbarabe, through his fishing cooperative, granted an irrevocable power of attorney to Chief Hudson Ebiowei to, *inter alia*, "[e]valuate and assess the damages done to our Deep Sea, Rivers, Creeks and other economic activities as a result of Gas Fire and Pollution at Koluama, Southern Ijaw Bayelsa State of Nigeria; on the 16th of January, 2012" and "[t]o immediately demand and/or take all necessary steps including legal action to ensure prompt and adequate payment of the total

---

[38] The Court notes, however, that the scope of the injuries claimed by the named plaintiff and the putative class have changed throughout the course of this case, including with this latest revision at the hearing. At the hearing, counsel did not clarify what they considered to be "general health impairments" as opposed to special medical injuries, and thus it is still not clear to the Court what health claims are advanced by the putative class. At the hearing, counsel also stated that plaintiff (and the class) no longer claimed that the explosion caused an increase in seaweed which damaged fishing nets, and that counsel now believed that the seaweed was related to climate change. *Id.* at 17-18. Similarly, counsel stated that the class was not claiming property damage, and based upon the revised class definition, it appears that the class is not claiming a harm to the farming industry, notwithstanding the allegations made in the motion for class certification.

United States District Court
Northern District of California

damages covered by the dangerous Gas Fire of Chevron Nig. Pic. at Koluama, Bayelsa State."
Dkt. No. 186-29 (Power of Attorney).  The Power of Attorney is signed by Gbarabe (and other
members of the fishing cooperative), and he is listed as the Chairman of the cooperative.  *Id*.
Defendant has also submitted a copy of a claim submitted by Chief Hudson Ebiowei to Chevron
on behalf of Gbarabe's fishing cooperative (as well as on behalf of numerous other fishing
cooperatives), as well as a copy of the cooperative's bylaws which state that the cooperative is
intended to promote the economic interests of its members and to, *inter alia*, market fish on behalf
of its members. Dkt. No. 186-34 (claim); Dkt. No. 186-13 (bylaws).

Plaintiff does not specifically respond to defendant's argument regarding standing.
Plaintiff's reply brief states, "In terms of standing, it matters not how plaintiff's fishing losses
arose; the evidence is clear they, just like all other prospective class members, stem from fishing
losses that the existing evidence also suggests strongly are a direct result of the environmental
damage inflicted on the marine environment by Chevron's rig blowout." Dkt. No. 212 at 10:16-
19.  However, this assertion does not respond to the specific challenge raised by defendant,
namely whether Gbarabe has standing to seek relief for damage to his fishing livelihood in light of
the fact that he signed the power of attorney on behalf of his fishing cooperative.  Based on
plaintiff's failure to respond to this issue, the Court cannot make an evaluation of whether this
standing question is unique to Gbarabe or shared by some or many of the putative class, nor can
the Court determine whether a challenge to Gbarabe's standing would be successful.  The Court
does note, however, that defendant has raised a non-trivial challenge to Gbarabe's typicality to
which plaintiff has provided no response.  However, because the Court finds that Gbarabe is not
adequate, the Court need not determine whether he is typical.

## B.      Adequacy

Defendant contends that plaintiff Gbarabe is not adequate for the same reasons he is not
typical, and also because his sworn testimony and verified discovery responses have been evasive
and contradictory, raising serious questions about his credibility.  Defendant has submitted the
following evidence regarding Gbarabe's testimony and discovery responses:

United States District Court
Northern District of California

Fishing cooperative:  Gbarabe filed an affidavit in this case dated July 18, 2014.  Dkt. No. 186-33 (Ex. 706).  In the affidavit, Gbarabe stated that he was a member and Chairman of the Iyela-Ogbo Deep Sea Fishing Co-operative.  *Id*. ¶ 6.  Gbarabe also stated in a discovery response that he was a member of that fishing cooperative.  Dkt. No. 186-23 (Ex. 282).  However, on a Loss/Damage Questionnaire dated March 25, 2016, Gbarabe answered "no" in response to a question asking if he belonged to a fishing cooperative, a farming cooperative, or any other form of work-related organization.  Dkt. No. 186-35 at No. 19 (Ex. 725).  At his deposition, Gbarabe initially denied being a member of a fishing cooperative, and after further questioning, admitted to being both a member and founder of the fishing cooperative.  Dkt. No. 186-1 (N. Gbarabe Dep. Vol. 2 at 34-37).  Gbarabe also provided arguably evasive testimony about whether he had authorized Chief Ebiowei to sue for his fishing cooperative.  *Id*. at 45, 68-69.

Power of attorney:  The 2012 power of attorney from the six original plaintiffs to Egbegi, which was the basis for authorizing counsel to represent them in this case, was only signed by Foster Ogola and Fresh Talent.  Dkt. No. 186-37 (Ex. 918).  In his July 18, 2014 affidavit, Gbarabe stated that he and the other original named plaintiffs were present at the March 25, 2012 meeting with Mr. Egbegi when the power of attorney was signed, and "it was agreed that Dr. Foster Ogola and Mr. Fresh Talent only would sign the Power of Attorney . . . and as long as all parties were present and agreed, we considered that method would suffice."  Dkt. No. 186-33 ¶ 17 (Ex. 706).  At his first deposition on December 9, 2015, Gbarabe testified that he was present at the meeting when the document granting power of attorney to Egbegi was signed.  Dkt. No. 186-1 (N. Gbarabe Dep. Vol. 1 at 81, 87).  At his second deposition on July 5, 2016, however, Gbarabe testified that he was not present at that meeting, that the July 18, 2014 affidavit contained many false statements which he knew to be false when he signed it, and that he signed the affidavit because his attorney (Egbegi) told him to.  *Id*. at Vol. 2, 150-53, 159, 198-99, 202.

Where he and his family lived:  Gbarabe provided inconsistent testimony regarding where he and his family were living at the time of the incident, and when and why he moved from Koluama (on the coast) to Yenagoa (inland).  Gbarabe stated in his interrogatory answers that "[w]ithin about two weeks from the explosion, I suffered from serious gastro-enteritis as a

53

consequence of eating contaminated fish that had been affected by chemicals. I further suffered such serious skin irritation and complaints that I had to leave my community and move to Yenagoa with my family.  I also suffered shock and distress for myself and my family and alarm at the ailments that affected us all." Dkt. No. 186-4 at 5.  At his deposition, Gbarabe testified that neither his wife nor his son were in Koluama on the day of the explosion, and that at that time his wife was living in Ogoniland and his son was living in Port Harcourt.  Dkt. No. 186-1 (N. Gbarabe Dep. Vol. 1 at 159-61).

Allegations in complaint:  At his deposition, Gbarabe was also questioned about the allegation in the second amended complaint that polluted air and water caused him to vomit.  *See* Dkt. No. 45 ¶ 12(vi).[39]  Gbarabe testified that he did not vomit as a result of the explosion, and that this allegation was "doctored."  Dkt. No. 186-1 (N. Gbarabe Dep. Vol. 1 at 294-95). Similarly, Gbarabe testified that the SAC's allegation that he "is aware of other community members who suffered the same health issues, as well as additional conditions caused by the released pollutants such as skin rashes and boils," (Dkt. No. 45 ¶ 12(vi)) was untrue, that "all the plaintiffs, they are just imagining things," and he stated that he did not see the SAC prior to its filing.  Dkt. No. 186-1 (N. Gbarabe Dep. Vol. 1 at 294-95). However, Gbarabe then testified that he reviewed the third and fourth amended complaints before they were filed to make sure they were accurate.  *Id*. at 296-97, 305-07.  When defense counsel noted that the third and fourth amended complaints contained the identical allegations regarding vomiting and other community members suffering the same health issues as well as skin rashes and boils, Gbarabe testified that he made a "mistake" and that "maybe it slipped my mind that telling them [the lawyers]" that those allegations were untrue.  *Id*. at 298, 305-07.

Pre-incident fishing income:[40]  Gbarabe has also provided conflicting statements about his pre-incident fishing income.  Schedule A lists him twice, once as Iyela Gbarabe with monthly

---

[39]  The SAC alleged, "Plaintiff further suffered health from the effects of the polluted air and water caused by the gas rig explosion of the KS Endeavor, which included diarrhea and vomiting."

[40]  The figures were converted to U.S. dollars by the parties.

United States District Court
Northern District of California

income of $5,208 and once as Natto Gbarabe with monthly income of $2,604. Dkt. No. 45-1, at 1276, 1316.  In his April 2015 interrogatory response, Gbarabe stated his pre-incident income was $5,208 per month, and his post-incident income was $521 per month.  Dkt. No. 186-4 at 2:18-19 (Ex. 11).  In the supplemental responses dated May 2015, Gbarabe stated that the earlier amount was incorrect, and that his pre-incident income for January 2010-2012 was $625 per month for the rainy season and $1625 for the dry season.  Dkt. No. 186-4 (Ex. 18 at 7:22-25).  On the March 25, 2016 Loss/Damage Questionnaire, Gbarabe stated his average monthly income for the two years prior to the incident was the equivalent of $1,400 per month.  Dkt. No. 186-35 at No. 7 (Ex. 725).  Finally, at his July 2016 deposition, he said in 2011 he made the equivalent of $500 per month for the rainy season and $1000 per month for the dry season.  Dkt. No. 186-1 at 242-42 (N. Gbarabe Dep. V. 2).

Plaintiff's reply accuses defendant of indulging in a "sideshow" regarding Gbarabe's credibility.  Dkt. No. 212 at 11:8.  Plaintiff asserts,

> However, while accusing Gbarabe of all manner of rank dishonesty, Chevron, rather disingenuously, choose to omit the fact it was Gbarabe himself who first brought to the attention of all parties that the damage figures he had collected for Koluama and provided to former co-lead plaintiff Ogola had been altered from those he had recorded, initially in interrogatory responses back in May 2015 (Exhibit M) and that it was Gbarabe himself who was honest in admitting that he had signed papers put in front of him by Nigerian lawyers because the Nigerian said to sign it (Deposition of Natto Gbarabe, July 5, 2016, 151:6-15; Exhibit N).

*Id*. at 11:9-16.  Plaintiff does not address any of the other inconsistencies in his testimony or discovery responses, including the conflicting statements that plaintiff provided in March and July of 2016 regarding his pre-incident fishing income.

The Court finds that defendant has raised significant, unanswered questions about Gbarabe's credibility that render him an inadequate named plaintiff.  "The honesty and credibility of a class representative is a relevant consideration when performing the adequacy inquiry because an untrustworthy plaintiff could reduce the likelihood of prevailing on the class claims."  *Harris v. Vector Mktg. Corp*., 753 F. Supp. 2d 996, 1015 (N.D. Cal. 2010).  "[I]ssues relating to credibility do not automatically result in inadequacy of a class representative; rather, lack of credibility renders a class representative inadequate only where the representative's credibility is questioned

United States District Court
Northern District of California

on issues directly relevant to the litigation or there are confirmed examples of dishonesty, such as a criminal conviction for fraud." *Senne v. Kansas City Royals Baseball Corp*., 315 F.R.D. 523, 570 (N.D. Cal. 2016) (internal quotation marks and citation omitted).  Here, Gbarabe's credibility has been seriously questioned on numerous issues directly relevant to this case, including his pre-incident fishing income, the allegations in the complaint about his injuries, and whether he was a member of a fishing cooperative.  While a named plaintiff's credibility issues would be of concern in any class action, they are particularly important in a case such as this where there is no documentation of income, residence, or medical records, and thus the testimony of the named plaintiff is essential.  Plaintiff's response that the Court should take note of Gbarabe's honesty because he admitted that he signed an affidavit containing numerous false statements does not provide the Court with any degree of confidence that Gbarabe can adequately represent the class.  For all of these reasons, the Court concludes that plaintiff Gbarabe is not an adequate class representative.

The Court also concludes that plaintiff's counsel have not demonstrated that they can adequately represent the proposed class in this complex case.  Throughout the history of this matter, and specifically the litigation of the class certification motion, plaintiff's counsel have demonstrated a complete disregard for scheduling orders, evidenced a lack of familiarity with or understanding of the Federal Rules of Civil Procedure and the Civil Local Rules, and failed to diligently prosecute this case.  Despite being on notice since March 2015 that plaintiff would be required to submit evidence of causation for class certification, and after being given numerous extensions of time to prepare the class certification motion, plaintiff's class certification motion fell woefully short of meeting his evidentiary burden.  The expert reports by Professor Abowei and the Onyoma group were deficient on myriad levels, which plaintiff ultimately and belatedly conceded. The expert reports of the Verde/Physalia group − both timely and untimely − did not evaluate the impact of the explosion on fish or humans.  Plaintiff repeatedly failed to produce to defendant the underlying data that his experts used, and remarkably even as of the date of the class certification hearing, plaintiff had not provided defendant with the data underlying the Physalia 2 report.  The class member evidence is riddled with falsity and unreliability, including the evidence

56

1    gathered after the "re-sign up" process that was intended to weed out the "bad apples" and ensure

2    that only genuine claims were included in this case.

3            In short, the entire manner in which plaintiff's counsel have litigated this action leads the

4    Court to conclude that they should not be appointed as class counsel.  *See Gomez v. St. Vincent*

5    *Health, Inc.*, 649 F.3d 583, 592-93 (7th Cir. 2011) (affirming district court's denial of class

6    certification where court found, *inter alia*, that counsel was not diligent, failed to develop a full

7    record for summary judgment consideration, and demonstrated lack of respect for judicial

8    resources);  *Wrighten v. Metropolitan Hosp., Inc.*, 726 F.2d 1346, 1351-52 (9th Cir. 1984)

9    (affirming denial of class certification on adequacy grounds where counsel filed late class

10   certification motion, counsel had difficulty furnishing evidence of discrimination experienced by

11   class, failed to comply with federal and local rules, and engaged in improper and disruptive

12   behavior in discovery); *Sweet v. Pfizer*, 232 F.R.D. 360, 370-71 (C.D. Cal. 2005) (finding counsel

13   inadequate for numerous reasons, including failure to comply with federal rules, failure to submit

14   trial plan, and quality of pleadings).

15

16   **VII.    Rule 23(b) − Superiority**[41]

17           "Rule 23(b) also requires that class resolution must be 'superior to other available methods

18   for the fair and efficient adjudication of the controversy."  *Hanlon*, 150 F.3d at 1023 (quoting Fed.

19   R. Civ. P. 23(b)(3)).   The Court must determine "whether the objectives of the particular class

20   action procedure will be achieved in the particular case."  *Id*. (citation omitted).  The four factors

21   for the Court's examination are: (1) the interest of each class member in individually controlling

22   the prosecution or defense of separate actions; (2) the extent and nature of any litigation

23   concerning the controversy already commenced by or against the class; (3) the desirability of

24   concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to

25   be encountered in the management of a class action.  *Zinser*, 253 F.3d at 1190-92.

26           The record before the Court shows that a proposed class action in this Court is not superior

27

28   ───────────────────

     [41]   The Court finds it unnecessary to address the other Rule 23(b) requirements.

United States District Court
Northern District of California

United States District Court
Northern District of California

to other methods of adjudicating this controversy.  The first factor is the interest of each member in "individually controlling the prosecution or defense of separate actions." Fed. R. Civ. P. 23(b)(3)(A). "Where damages suffered by each putative class member are not large, this factor weighs in favor of certifying a class action."  *Zinser*, 253 F.3d at 1190.  In December 2015, plaintiff's counsel represented that the damages claimed were "in excess of $1.5 billion."  Dkt. No. 115 at 20:12-13.  At that time, the proposed class was alleged to include 12,600 people, and thus the average damages claim was $119,000 per person.  Even if the claimed damages were reduced by half, the Court finds the claimed damages are significant, and thus that this factor is weighs against certifying a class.

On the second factor, defendant has submitted evidence showing that as of September 16, 2016, Chevron was aware of 72 lawsuits that were filed in various Federal High Courts in Nigeria seeking compensation for alleged injuries resulting from the KS Endeavor rig explosion and fire, including many suits on behalf of communities, fishing cooperatives, and other large groups. Dkt. No. 186 (Mitchell Decl. ¶ 41); Dkt. 186-13 (Ex. 28, list of lawsuits).  Defendant asserts that at least one lawsuit was filed on behalf of all allegedly affected residents in Bayelsa State, encompassing all of the putative class.  *See Ekiozidi Jonathan Diekedie, et al. v. Chevron Nigeria Limited, et al.*, No. FHC/YNG/CS/99/2015 (Nigeria Fed. High Court) (bringing claims on behalf of "all of Bayelsa state"). Thus, there is considerable litigation regarding this controversy that is pending in Nigeria, and this factor weighs against certifying this case as a class action.

In addition, "[a]lthough the issue has not been addressed by the Ninth Circuit, other federal district courts have held that '[c]ourts may properly consider res judicata concerns when evaluating the Superiority Requirement with respect to a proposed class that includes foreign class members.'"  *Willcox v. Lloyds TSB Bank, PLC*, CIVIL NO. 13–00508 ACK–RLP, 2015 WL 10090605, at *10 (D. Haw. Nov. 12, 2015 (quoting *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 281 (S.D.N.Y. 2008)).  Plaintiff has submitted the declaration of Oba Nsugbe, who states that he/she is a Queen's Counsel and a Barrister qualified to practice law in the United Kingdom and in Nigeria. Dkt. No. 127-6.  Nsugbe states that "the provisions of [a Nigerian statute] show that the mechanism exists in Nigeria through which a Nigerian court may recognize such a foreign

1   judgment as the basis to resist and dismiss local proceedings brought in Nigeria that have already

2   been subject to completed proceedings in a court of the United States between the same parties

3   relating to the same subject matter." *Id*. ¶ 3.  However, evidence that a "mechanism exists" by

4   which a Nigerian court may enforce a foreign judgment does not demonstrate that Nigerian courts

5   likely would bar Nigerians from pursuing their cases in Nigeria simply because they are absent

6   class members in a United States class action.

7         The third factor − the desirability of concentrating the litigation in this forum − also weighs

8   against class certification. The proposed class consists of thousands of Nigerian citizens, and the

9   gas explosion occurred in Nigeria. All of the witnesses and evidence are located in Nigeria. The

10  only connection to this forum is the presence of defendant Chevron Corporation, which allegedly

11  directed the activities of non-party Chevron Nigeria Limited.  *See Zinser*, 253 F.3d at 1191-92

12  ("[W]here the potential plaintiffs are located across the country and where the witnesses and the

13  particular evidence will also be found across the country, plaintiffs have failed to establish any

14  particular reason why it would be especially efficient for this Court to hear such a massive class

15  action lawsuit.") (internal quotation marks and citation omitted); *see also Baricuatro v. Indus.*

16  *Pers. & Mgmt. Servs. Inc.*, Civ. A. No. 11-2777, 2013 WL 6072702, at *11 (E.D. La. Nov. 18,

17  2013) (proposed class action where majority of class members lived in the Philippines was not a

18  superior method of adjudication).

19        Finally, the record before the Court also demonstrates that there would undoubtedly be

20  significant difficulties in managing a class of thousands of Nigerian residents. Plaintiff's counsel

21  have repeatedly stated that they have had difficulty in obtaining verifiable information regarding

22  the claims of the people who they represent. *See, e.g.*, Dkt. No. 186-5, Ex. 21 (April 18, 2016

23  letter from plaintiff's counsel to defendant stating "as you know well, Nigeria can be a difficult

24  place from which to extract information and in particular the Delta area. Comprehensive

25  investigations take time anyway − in Nigeria, the inherent logistical and geographic difficulties

26  multiply general difficulties many times over.").  Further, because Chevron lacks power to

27  subpoena witnesses from Nigeria, the only class member testimony at trial will be from witnesses

28  plaintiff wants or is able to proffer.  Defendant states that "of the 55 claimants whom Chevron

1   sought to depose in Nigeria, plaintiff produced 36 of them.  Even though the no-shows had

2   submitted claim forms, and counsel had confirmed their availability only a week before the

3   depositions, they reportedly became unavailable because they 'migrated,' were too old, or couldn't

4   be located."  Dkt. No. 189 at 13 n.21.

5

6                                              **CONCLUSION**

7          For the reasons set forth above, the Court concludes that plaintiff has failed to meet his

8   burden to show that this case should be certified as a class action.  Accordingly, the Court

9   DENIES plaintiff's motion for class certification, DENIES plaintiff's motion to admit the

10  Verde/Physalia "far-field" sediment sample analyses, DENIES plaintiff's motion to substitute a

11  new fisheries expert, and GRANTS defendant's motions in limine.  A case management

12  conference is scheduled for April 14, 2017 at 3:00 p.m.

13

14         **IT IS SO ORDERED**.

15

16  Dated: March 13, 2017

17                                                    _____

18                                                    SUSAN ILLSTON
                                                      United States District Judge

19

20

21

22

23

24

25

26

27

28